**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
DAVID R. STICKNEY (Bar No. 188574)
(davids@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

           -and-

HANNAH ROSS
(hannah@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:   (212) 554-1400
Fax:   (212) 554-1444

*Attorneys for Plaintiff Iron Workers Local
580 Joint Funds*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRON WORKERS LOCAL 580 JOINT FUNDS, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NVIDIA CORPORATION, JENSEN HUANG, and COLETTE KRESS,<br><br>Defendants. | Case No.: 18-cv-7669<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Iron Workers Local 580 Joint Funds ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by NVIDIA Corporation ("NVIDIA" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning NVIDIA; and (d) other public information regarding the Company.

## I. INTRODUCTION

1. This securities class action is brought on behalf of purchasers of NVIDIA stock between August 10, 2017 and November 15, 2018, inclusive (the "Class Period"). The claims asserted herein are alleged against NVIDIA and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. NVIDIA designs, develops, and markets graphics processing units ("GPUs") and related software. Although traditionally used in connection with computer gaming, demand for the Company's GPUs surged as NVIDIA's GPUs became widely used in connection with cryptocurrencies. Given the volatility in the cryptocurrency market, the Company's ability to adapt to the ever-changing cryptocurrency landscape was critical to investors.

3. Throughout the Class Period, Defendants assured investors that the Company followed the market closely and could adjust to rapid changes in the cryptocurrency markets. Even as analysts increasingly began to question the Company's ability to manage inventory in the face of an uncertain cryptocurrency market, Defendants touted that NVIDIA and its executives are "masters at managing our channel, and we understand the channel very well." NVIDIA also repeatedly assured investors that sales to cryptocurrency-related customers made up a small portion of the Company's revenues, and that strong demand for GPUs by NVIDIA's core customer base of computer gamers would compensate for any decline in demand from cryptocurrency users.

4.     These representations had their intended effect, as analysts upgraded the Company's stock and NVIDIA shares traded at record highs.  At the same time, NVIDIA senior executives began selling significant amounts of their personally held shares.  For example, CEO Huang sold 110,000 of his personally-held NVIDIA shares during the Class Period, reaping over $18 million in proceeds.

5.     Notwithstanding the Company's assurances, on November 15, 2018, NVIDIA significantly cut its revenue guidance for the fiscal fourth quarter, revealing that revenue would decline by over 7% in the quarter—a significant departure from the 17% growth investors had been led to expect.  NVIDIA attributed its poor financial results to surging inventory of midrange GPUs that built up in the channel before the rapid fade of cryptocurrency mining.  These disclosures caused NVIDIA shares to decline by 29% over the ensuing two trading sessions.

## II.     JURISDICTION AND VENUE

6.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  NVIDIA maintains its corporate headquarters in Santa Clara, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

8.     Plaintiff Iron Workers Local 580 Joint Funds provides, among other things, pension and health benefits to both active and retired participants in the iron working industry, as well as their dependents and beneficiaries.  Plaintiff purchased shares of NVIDIA stock on the public

market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

9. Defendant NVIDIA is a multinational technology company. Incorporated in Delaware, the Company maintains its corporate headquarters at 2788 San Tomas Expressway, Santa Clara, California. NVIDIA stock trades on the NASDAQ, which is an efficient market, under ticker symbol "NVDA." As of November 9, 2018, there were 610 million shares of NVIDIA stock outstanding, owned by at least hundreds or thousands of investors.

10. Defendant Jensen Huang ("Huang") is, and was at all relevant times, President and Chief Executive Officer of NVIDIA, as well as a member of the Company's Board of Directors.

11. Defendant Collette Kress ("Kress") is, and was at all relevant times, Executive Vice President and Chief Financial Officer of NVIDIA.

12. Defendants Huang and Kress are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with NVIDIA, possessed the power and authority to control the contents of NVIDIA's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. BACKGROUND

13. Based in Santa Clara, California, NVIDIA designs, develops, and markets GPUs and related software. A GPU is essentially a computer chip that performs rapid mathematical calculations, primarily for the purpose of rendering computer images. Although traditionally used in connection with computer gaming, demand for the Company's GPUs has skyrocketed as NVIDIA's GPUs became popular among cryptocurrency "miners."

14. Cryptocurrency functions by enabling the public to generate additional currency by working through complex calculations, a process referred to as "mining" cryptocurrency. In order to compete with other miners, a cryptocurrency miner needs a high-powered computer with specialized hardware. Although cryptocurrency mining was originally performed using traditional central processing units—or "CPUs"—their limited processing speeds and significant power consumption led to limited output, rendering the CPU-based mining process inefficient. As a result, miners began using GPUs, which offered faster processing speeds and significantly greater efficiency.

15. Recognizing the opportunity presented by this new customer base, NVIDIA began manufacturing a GPU unit specifically designed and marketed for cryptocurrency mining. At the same time, the Company repeatedly assured investors that sales of NVIDIA's core gaming GPUs were driven, almost entirely, by demand from gaming customers and not by surging demand from cryptocurrency miners. The Company also stated that cryptocurrency mining was only a small part of its GPU business, and that its focus remained on manufacturing GPUs for computer gamers.

## V. NVIDIA DEFRAUDS INVESTORS

16. The Class Period begins on August 10, 2017, the day NVIDIA issued a press release announcing its financial results for the fiscal second quarter ended July 30, 2017.[1] In the press release, which was also filed with the SEC on Form 8-K, the Company reported "record revenue . . . of $2.23 billion, up 56 percent from $1.43 billion a year earlier, and up 15 percent from $1.94 billion in the previous quarter." The press release also quoted CEO Huang attributing the revenue growth to a variety of factors, including: "[d]atacenter revenue increased more than two and a half times"; "[a] growing number of car and robot-taxi companies are choosing our DRIVE PX self-driving computing platform"; and "in Gaming, increasingly the world's most popular form of entertainment, we power the fastest growing platforms - GeForce and Nintendo Switch."

17. That same day, NVIDIA held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, analysts questioned

---

[1] The Company operates on a fiscal year ending on the last Sunday in January.

how the Company was managing the volatility in the cryptocurrency markets. In response, Defendant Huang stated that "our strategy is to stay very, very close to the market. We understand its dynamics really well." Defendant Huang also credited the scale of NVIDIA's business as a reason why the Company would not be impacted by the ebb and flow of the cryptocurrency markets, stating that "the larger of a GPU company you are, the greater ability you could absorb the volatility" and touting the Company's "ability to rock and roll with this market as it goes."

18.     On September 6, 2017, NVIDIA presented at the Citi Global Technology Conference. During the conference, Defendant Kress was asked about the steps NVIDIA has taken "to avoid cannibalization of core gaming market" as a result of increased demand from cryptocurrency miners. In response, Defendant Kress stated that "we covered most of cryptocurrency with our cryptocards that we had developed." Kress also stated that NVIDIA has "the ability, given the breadth of GPUs that we already build, to develop GPUs exclusively for cryptocurrency" and that the Company is "able to serve that market quite effectively, and we will serve that market effectively."

19.     On November 9, 2017, NVIDIA issued a press release announcing its financial results for the third quarter ended October 29, 2017. In the press release, which was also filed with the SEC on Form 8-K, the Company reported "record revenue . . . of $2.64 billion, up 32 percent from $2.00 billion a year earlier, and up 18 percent from $2.23 billion in the previous quarter." The press release also quoted Defendant Huang attributing the Company's revenue growth to a variety of factors, including: NVIDIA's "Volta GPU has been embraced by every major internet and cloud service provider and computer maker"; the Company's "TensorRT inference acceleration platform opens us to growth in hyperscale datacenters"; "GeForce and Nintendo Switch are tapped into the strongest growth dynamics of gaming"; and NVIDIA's "new DRIVE PX Pegasus for robotaxis has been adopted by companies around the world."

20.     That same day, NVIDIA held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Kress stated that although "GPU sales [] benefited from continued cryptocurrency mining" the Company "remain[ed] nimble in our approach to the cryptocurrency market" and assured investors that its

cryptocurrency-related business "will not distract us from focusing on our core gaming market." During the call, analysts questioned "why should we think that crypto won't impact the gaming demand in the future?" In response, Defendant Huang assured investors that "longer term, the way to think about that is . . . crypto is small for us but not 0." Defendant Huang further downplayed the importance of cryptocurrency mining on NVIDIA's growth, touting that "when you think about crypto in the context of our company overall, the thing to remember is that we're the largest GPU computing company in the world. And our overall GPU business is really sizable and we have multiple segments." In addition, Huang also stated that "crypto usage of GPUs will be small but not 0 for some time."

21.     On November 29, 2017, NVIDIA presented at the Credit Suisse Technology, Media and Telecom Conference. During the conference, an analyst noted that "it was the first time that [NVIDIA] had mentioned cryptocurrency as being partly . . . driving the gaming side of the business"—meaning that the Company acknowledged that at least some portion of sales of gaming GPUs were being purchased for cryptocurrency mining. In response, Defendant Kress continued to downplay the impact of cryptocurrency demand on NVIDIA's gaming business, stating that although "there probably is some residual amount or some small amount in terms of that . . . [w]e do believe the majority does reside in terms of our overall crypto card."

22.     Although cryptocurrency prices began to decline in early 2018, sales of NVIDIA GPUs continued to increase, which the Company attributed to "pent-up demand" among gamers who had been priced out after demand from cryptocurrency miners drove up GPU prices and caused inventory constraints. The Company also continued to assure investors that cryptocurrency mining was only a small part of its business and that NVIDIA would not be negatively affected by the cryptocurrency market decline.

23.     For example, on February 8, 2018, NVIDIA issued a press release announcing its financial results for the fourth quarter ended January 28, 2018. In the press release, which was also filed with the SEC on Form 8-K, the Company reported "record revenue . . . of $2.91 billion, up 34 percent from $2.17 billion a year earlier, and up 10 percent from $2.64 billion in the previous quarter." The press release also quoted Defendant Huang attributing the Company's revenue

growth to a variety of factors, including adoption of NVIDIA's GPUs as "software developers working in AI, self-driving cars, and a broad range of other fields continued to discover the acceleration and money-saving benefits of our GPU computing platform."

24.     That same day, NVIDIA held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendant Kress stated that NVIDIA "met some of this [cryptocurrency] demand with a dedicated board in our OEM business, and some was met with our gaming GPUs."  As a result, Kress stated "this contributed to lower than historical channel inventory levels of our gaming GPUs throughout the quarter."  Although Kress acknowledged that the "overall contribution of cryptocurrency to our business . . . was a higher percentage of revenue than the prior quarter" she assured investors that "our main focus remains on our core gaming market."  Also during the conference call, Defendant Huang assured investors that "there's a fairly sizable pent-up demand going into this quarter" among gamers looking to purchase NVIDIA GPUs.  Defendant Huang also stated that although the GPU supply "channel is relatively lean" NVIDIA was "working really hard to get GPUs down to the marketplace for the gamers."

25.     On February 26, 2018, NVIDIA presented at the Morgan Stanley Technology, Media & Telecom Conference.  During the conference, an analyst asked about the cause of NVIDIA's GPU supply constraints and how NVIDIA was prioritizing its sales in a supply-constrained environment.  In response, Defendant Kress stated that the "channels had been influenced by not only the strength of the overall gaming that we had seen for the overall holiday season, but also the large uptick that we've seen in the overall valuation of cryptocurrency."  Kress also stated that the Company was focused on "mak[ing] sure [] gamers worldwide receive the cards that we want to do."  Kress also continued to assure investors that cryptocurrency miners would not impact sales of GPUs to gaming customers, stating that "we do believe we can serve [cryptocurrency miners] primarily with those specialized cards and that's going to be our goal going forward" and that "we're going to really try our hardest to really focus our overall GPUs for gaming for overall gamers going forward."

26. On May 10, 2018, NVIDIA issued a press release announcing its financial results for the first quarter ended April 29, 2018. In the press release, which was also filed with the SEC on Form 8-K, the Company reported "record revenue . . . of $3.21 billion, up 66 percent from $1.94 billion a year earlier, and up 10 percent from $2.91 billion in the previous quarter." The press release also quoted Defendant Huang attributing the Company's revenue growth to a variety of factors, including that NVIDIA's "datacenter business achieved another record and gaming remained strong."

27. That same day, NVIDIA held a conference call with analysts and investors to discuss the Company's earnings and operations. During the call, Defendant Huang continued to reassure investors that NVIDIA was not driving sales of gaming GPUs by selling them to cryptocurrency miners, stating that "we try to as transparently reveal our numbers as we can. And . . . our strategy is to create a SKU that allows the crypto miners to fulfill their needs . . . as much as possible, fulfill their demand that way."

28. On May 16, 2018, NVIDIA held its annual shareholder meeting, during which Defendant Huang responded to questions submitted by shareholders before the meeting. During the meeting, Defendant Huang continued to downplay the importance of cryptocurrency mining on the Company's growth, stating that "Ethereum and crypto mining is a recent GPU application. It is a bonus in our business, but volatile. It's not really a factor in our core business. We have great growth drivers without crypto." Defendant Huang also stated that "Our core gaming business – our core businesses in gaming and high-performance computing and artificial intelligence and in self-driving cars are doing so well that with or without crypto mining, we have a growth – we have a wonderful growth business behind us."

29. The statements and omissions set forth in ¶¶16-21; 23-28 were materially false and misleading. In truth, revenue growth attributed to NVIDIA's gaming GPUs was driven, in significant part, by surging demand among cryptocurrency miners. In addition, contrary to its assertions, NVIDIA did not have visibility into its inventory channel and was unable to adapt to changes in the cryptocurrency markets. Moreover, as cryptocurrency prices began to plummet, NVIDIA masked slowing growth by continuing to push mid-range GPUs into the channel, which

caused inventory levels to skyrocket and ultimately left NVIDIA with over three months of excess inventory in its channel.

## VI.  DISCLOSURES OF COMPANY'S MISCONDUCT CAUSE SIGNIFICANT INVESTOR LOSSES

30.  On August 16, 2018, NVIDIA lowered its revenue guidance by about 2.2% for the third quarter of 2018 and reported that it no longer expects a meaningful contribution from cryptocurrency miners for the remainder of the year.  NVIDIA also reported that its GPU inventory had ballooned by over 30% from the prior quarter, which investors feared could be a sign of slowing demand for NVIDIA's GPUs.  As a result of these disclosures, NVIDIA shares declined by $12.62 per share, or 4.9%.

31.  Despite these disclosures, NVIDIA continued to assuage investor concerns about slowing demand for its GPUs.  For example, during an August 16, 2018 conference call with analysts and investors, Defendant Huang attributed rising inventories to ramping up the launch of a new GPU product—featuring the Company's "Turing Architecture"—and assured investors that the inventory would "work itself out" and that the Company was "not concerned about the channel inventory."  Defendant Huang further touted that "[w]e are masters at managing our channel, and we understand the channel very well."

32.  The statements and omissions set forth in ¶31 were materially false and misleading.  In truth, demand for NVIDIA gaming CPUs among cryptocurrency miners was a much more significant driver of NVIDIA's growth than the Company had disclosed.  In addition, contrary to its assertions, NVIDIA did not have visibility into its inventory channel and was unable to adapt to changes in the cryptocurrency markets.  Moreover, as cryptocurrency prices began to plummet, NVIDIA masked slowing growth by continuing to push mid-range GPUs into the channel, which caused inventory levels to skyrocket and ultimately left NVIDIA with over three months of excess inventory in its channel.

33.  On November 15, 2018, however, NVIDIA significantly cut its revenue guidance for the fiscal fourth quarter, revealing that revenue would actually <u>decline</u> by over 7% in the quarter—a significant departure from the 17% <u>growth</u> investors had been led to expect.  NVIDIA

attributed its poor financial results to surging inventory of midrange GPUs that built up before the rapid fade of cryptocurrency mining. As a result, the Company said it will not ship any of its mid-range GPUs into the channel for at least an entire quarter.

34. Following these disclosures, analysts immediately questioned management's credibility and were quick to note that these disclosures stood in stark contrast to the Company's prior assurances regarding the impact of cryptocurrency on its business and NVIDIA's ability to react to rapid changes in the cryptocurrency market. For example, analysts with BMO Capital Markets stated that "[t]he large shortfall in guidance due to a bloated channel due to crypto-currency is in sharp contrast to the comments around channel inventory from the company." Several other analysts questioned whether the Company could work through its bloated inventory in just one quarter, indicating that the inventory issue is so large that it could take up to three quarters to resolve.

35. These disclosures caused NVIDIA shares to decline by $57.69, or 28.5%, over the next two trading sessions, wiping out over $35 billion in shareholder value.

## VII. LOSS CAUSATION

36. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of NVIDIA stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on August 16, 2018 and November 15, 2018 the price of NVIDIA stock fell. As a result of their purchases of NVIDIA stock during the Class Period, Plaintiff and other members of the Class suffered harm.

## VIII. CLASS ACTION ALLEGATIONS

37. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased NVIDIA stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of NVIDIA and their families and affiliates.

38. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. NVIDIA has approximately 610 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

39. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether Defendants' misconduct impacted the price of NVIDIA stock;

(f) Whether Defendants' conduct caused the members of the Class to sustain harm; and

(g) The extent of harm sustained by Class members and the appropriate measure of harm.

40. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained harm from Defendants' wrongful conduct.

41. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

42. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

IX. **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

43. NVIDIA's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

44. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of NVIDIA who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.     PRESUMPTION OF RELIANCE

45. At all relevant times, the market for NVIDIA stock was an efficient market for the following reasons, among others:

(a)  NVIDIA stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, NVIDIA filed periodic public reports with the SEC and NASDAQ;

(c)  NVIDIA regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  NVIDIA was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

46. As a result of the foregoing, the market for NVIDIA stock promptly digested current information regarding NVIDIA from all publicly available sources and reflected such information in the price of NVIDIA stock. Under these circumstances, all purchasers of NVIDIA

stock during the Class Period suffered similar injury through their purchase of NVIDIA stock at artificially inflated prices and the presumption of reliance applies.

47. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the impact that demand from cryptocurrency miners had on NVIDIA's GPU business—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the NVIDIA's GPU business, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

48. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

49. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause economic harm to Plaintiff and other members of the Class.

50. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

51. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

52. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal NVIDIA's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

54. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased NVIDIA stock and were harmed when the truth about NVIDIA negatively impacted the price of those securities. Plaintiff and the Class would not have purchased NVIDIA stock at the prices they paid, or at all, had they been aware of the truth about NVIDIA.

55. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

56. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

57. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

58. The Individual Defendants acted as controlling persons of NVIDIA within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about NVIDIA, the Individual Defendants had the power and ability to control the actions of NVIDIA and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

XI. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

XII. **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  December 21, 2018

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP

 */s/ David R. Stickney*
DAVID R. STICKNEY

David R. Stickney (Bar No. 188574)
(davids@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

-and-

HANNAH ROSS
(hannah@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Attorneys for Plaintiff Iron Workers Local 580 Joint Funds*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Patrick Doherty, on behalf of Iron Workers Local 580 Joint Funds ("Iron Workers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Fund Director of Iron Workers. I have reviewed the complaint and authorize its filing.

2. Iron Workers did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Iron Workers is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Iron Workers' transactions in the NVIDIA Corp. securities that are the subject of this action are set forth in the chart attached hereto.

5. Iron Workers has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Howard v. Arconic, Inc.*, No. 17-cv-1057 (W.D. Pa.)

6. Iron Workers is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

    *Holwill v. AbbVie Inc.*, No. 18-cv-6790 (N.D. Ill.)

7. Iron Workers has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

    *Shenk v. Mallinckrodt plc*, No. 17-cv-145 (D.D.C.)
    *City of Dearborn Heights Act 345 Police & Fire Retirement System v.*
    *Chicago Bridge & Iron Company N.V.*, No. 17-cv-1580 (S.D.N.Y.)
    *McKenna v. Dick's Sporting Goods, Inc.*, No. 17-cv-3680 (S.D.N.Y.)
    *Parchman v. MetLife, Inc.*, No. 18-cv-780 (E.D.N.Y.)
    *Chandler v. Ulta Beauty, Inc.*, No. 18-cv-1577 (N.D. Ill.)

8. Iron Workers will not accept any payment for serving as a representative party on behalf of the Class beyond Iron Workers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31 day of December, 2018

*Patrick Doherty*
*Fund Director*
*Iron Workers Local 580 Joint Funds*

**Iron Workers Local 580 Joint Funds**
**Transactions in NVIDIA Corp.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 2/6/2018 | 800 | 220.5383 |
| Purchase | 5/4/2018 | 261 | 238.3650 |
| Purchase | 5/4/2018 | 117 | 238.4820 |
| Purchase | 5/4/2018 | 46 | 238.0283 |
| Purchase | 5/4/2018 | 475 | 238.3650 |
| Purchase | 5/4/2018 | 212 | 238.4820 |
| Purchase | 5/4/2018 | 83 | 238.0282 |
| Purchase | 5/7/2018 | 282 | 248.5163 |
| Purchase | 5/7/2018 | 14 | 248.4700 |
| Purchase | 5/7/2018 | 513 | 248.5163 |
| Purchase | 5/7/2018 | 26 | 248.4700 |
| Purchase | 5/8/2018 | 79 | 249.1153 |
| Purchase | 5/8/2018 | 143 | 249.1153 |
| Purchase | 5/9/2018 | 58 | 254.1148 |
| Purchase | 5/9/2018 | 105 | 254.1149 |
| Purchase | 5/10/2018 | 58 | 258.6103 |
| Purchase | 5/10/2018 | 7 | 258.7500 |
| Purchase | 5/10/2018 | 106 | 258.6104 |
| Purchase | 5/10/2018 | 12 | 258.7500 |
| Purchase | 6/13/2018 | 68 | 262.8978 |
| Purchase | 6/13/2018 | 124 | 262.8978 |
| Purchase | 6/28/2018 | 84 | 240.5631 |
| Purchase | 6/28/2018 | 153 | 240.5631 |
| Purchase | 7/12/2018 | 142 | 252.3377 |
| Purchase | 7/12/2018 | 97 | 251.0885 |
| Purchase | 7/12/2018 | 259 | 252.3377 |
| Purchase | 7/12/2018 | 176 | 251.0885 |
| Purchase | 9/27/2018 | 174 | 267.0557 |
| Purchase | 9/27/2018 | 315 | 267.0557 |
| Purchase | 10/12/2018 | 350 | 244.2782 |
| Purchase | 10/26/2018 | 148 | 198.9448 |
| Purchase | 10/26/2018 | 271 | 198.9448 |
| Sale | 11/15/2017 | (600) | 209.6897 |
| Sale | 3/28/2018 | (800) | 221.1272 |
| Sale | 10/10/2018 | (400) | 252.7093 |