**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
Andrew L. Zivitz (*pro hac vice*)
(azivitz@ktmc.com)
Matthew L. Mustokoff (*pro hac vice*)
(mmustokoff@ktmc.com)
Eric K. Gerard (*pro hac vice*)
(egerard@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Counsel for Lead Plaintiff E. Öhman J:or Fonder AB and
Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
John C. Browne (*pro hac vice*)
(johnb@blbglaw.com)
Michael D. Blatchley (*pro hac vice*)
(michaelb@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3472

*Counsel for Lead Plaintiff Stichting Pensioenfonds PGB and
Co-Lead Counsel for the Class*

[Additional counsel listed on signature page.]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re NVIDIA CORPORATION SECURITIES LITIGATION | Case No. 4:18-cv-07669-HSG |
| | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| This Document Relates to: All Actions. | DEMAND FOR JURY TRIAL |
| | Judge: Hon. Haywood S. Gilliam, Jr. Courtroom: 2 |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE ............................................................................8

III.    PARTIES ................................................................................................................9

IV.     FORMER EMPLOYEES REFERRED TO IN THE COMPLAINT ........................................10

V.      FACTUAL ALLEGATIONS ...............................................................................11

        A.      NVIDIA's Reliance on Its Gaming Segment and China Market.......................................11

        B.      Background on Cryptocurrency Mining ......................................................13

        C.      Defendants Repeatedly Deny the Importance of Sales to Cryptocurrency Miners in Driving NVIDIA's Revenues .........................................................18

        D.      Unknown to Investors at the Time, Defendants Knew that NVIDIA's Gaming Revenues Were Largely Attributable to Cryptocurrency Mining Throughout the Class Period ..............................................................22

                1.      Internal Sales Data Throughout 2017 Reveals Surging Demand for GeForce GPUs by Crypto-Miners in NVIDIA's Largest Market.........................23

                2.      Weekly Sales Reports to Key NVIDIA Executives, Including Defendant Fisher, Describe Booming Crypto-Related Demand for GeForce GPUs ..............25

                3.      March 2017 Presentation to Defendant Fisher and Other Top Gaming Executives Warns of Growing Dependence on Crypto-Mining Demand ............26

                4.      Bulk Purchases in China, the United States, and Russia Highlight the Popularity of GeForce GPUs Among Crypto-Miners .........................................27

                5.      Internal GeForce Experience Data Shows GeForce Gaming GPUs Being Used for Crypto-Mining ............................................................28

                6.      September 2017 Presentation Quantifies GeForce Sales to Miners in China........29

                7.      January 2018 Licensing Agreement Revision Expressly Accommodates Crypto-Miners ...........................................................31

        E.      Securities Analysts Corroborate NVIDIA's Dependence on Crypto-Related GeForce Sales During the Class Period................................................33

        F.      Independent Expert Analysis Confirms That NVIDIA Vastly Understated Crypto-Related Sales throughout the Class Period .......................................34

        G.      The Truth Emerges ...........................................................................35

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1.   August 16, 2018:  With Demand from Crypto-Miners Gone and Inventory Ballooning, Defendants Falsely Assure Investors That They Are "Masters" of Managing NVIDIA's Channel...........................................................................35

2.   November 15, 2018: Investors Learn New Information Regarding NVIDIA's Reliance on Crypto-Miners, Exposing a Glut of Unsold GeForce Inventory .....................................................................................38

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ...................42

A.   May 10, 2017 NVIDIA Annual Investor Day ................................................43

B.   August 10, 2017 Earnings Call ......................................................................43

C.   August 12, 2017 *VentureBeat* Interview........................................................44

D.   August 23, 2017 Form 10-Q ..........................................................................45

E.   September 6, 2017 Citi Global Technology Conference .................................45

F.   November 9, 2017 Earnings Call ...................................................................46

G.   November 10, 2017 *VentureBeat* Interview ...................................................47

H.   November 21, 2017 Form 10-Q ......................................................................47

I.   November 29, 2017 Credit Suisse Technology, Media and Telecom Conference............48

J.   February 9, 2018 *Barron's* Article.................................................................49

K.   March 26, 2018 *TechCrunch* Article .............................................................49

L.   March 29, 2018 *Mad Money* Appearance .......................................................50

M.   August 16, 2018 Earnings Call ......................................................................50

VII.   ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................51

VIII.   PRESUMPTION OF RELIANCE ...........................................................................56

IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .....................................57

X.   CLASS ACTION ALLEGATIONS .........................................................................58

XI.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT...........................................59

XII.   PRAYER FOR RELIEF .......................................................................................61

XIII.   JURY DEMAND ................................................................................................61

Lead Plaintiffs E. Öhman J:or Fonder AB ("Öhman Fonder") and Stichting Pensioenfonds PGB ("PGB," and together with Öhman Fonder, "Lead Plaintiffs") bring this action individually and on behalf of all others who purchased or otherwise acquired the common stock of NVIDIA Corporation ("NVIDIA" or the "Company") between May 10, 2017, and November 14, 2018 (the "Class Period"), and were injured thereby.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on the ongoing independent investigation of their undersigned counsel. This investigation includes review and analysis of, among other things: (i) NVIDIA's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) videos and transcripts of NVIDIA's conference calls with analysts and investors; (iv) Company presentations, press releases, and reports; (v) news and media reports concerning NVIDIA and other facts related to this action; (vi) price and volume data for NVIDIA securities; (vii) information from consultations with relevant experts; and (viii) information provided by former NVIDIA employees, some of whom expressed concern about providing Lead Counsel with information for fear of retaliation by NVIDIA. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.      Defendant NVIDIA is a multinational technology company that purports to have invented in 1999 the graphics processing unit ("GPU"), a type of processor that electronics manufacturers incorporate into their devices, including graphics cards for video games. NVIDIA's most popular product line is its "GeForce" brand of GPUs, a favorite among video-game enthusiasts ("gamers").

2.      In early 2017, NVIDIA faced an unusual problem: its flagship product was flying off the shelves. Under normal circumstances, such a trend would be cheered. But Defendants knew that the spike in GeForce GPU sales was not sustainable. The enormous sales growth owed not to an increase in demand from gamers, NVIDIA's traditional consumer, but rather from bands of online upstarts who were

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

buying up the processors by the thousands and deploying them in massive datacenters to solve complex mathematical problems in pursuit of digital tokens called "cryptocurrencies."

3.      These so-called "crypto-miners" were chasing a modern-day gold rush unfolding in cyberspace and based on an esoteric new technology called "blockchain." Instead of picks and shovels, the crypto-miners relied on computing power and processors. They had discovered that GeForce GPUs were particularly adept at quickly processing the computations required by cryptocurrency mining—and at a fraction of the cost of more powerful chips designed for scientific and industrial settings.

4.      As the financial rewards of cryptocurrency mining escalated rapidly, so, too, did demand for GeForce GPUs, the crown jewel of NVIDIA's all-important Gaming segment. The Gaming segment produced more revenues than the Company's four other segments combined, with GeForce sales making up the lion's share. Moreover, nowhere was cryptocurrency mining more popular than in China, where NVIDIA earned more than half of its revenues and made up to 50% of its worldwide GeForce sales. This confluence of skyrocketing demand for NVIDIA's most important product in its largest market had the effect of supercharging the Company's revenues.

5.      By early 2017, NVIDIA's executive team in Santa Clara, California was awash in data showing that cryptocurrency miners were behind the burgeoning GeForce sales in China and elsewhere. Near the start of the year, the Company's China sales team had begun tracking crypto-related GeForce sales based on transaction data provided by NVIDIA's manufacturing partners. The data expressly identified GeForce sales to crypto-miners, who had begun to make bulk purchases of tens of thousands of GPUs at a time from these partners. Well before the start of the Class Period, the Company was consolidating this data in its internal sales database, of which NVIDIA's executive team in the United States made ready use. Indeed, a former Senior Account Manager in China who was contacted by Lead Counsel stated that the U.S.-based executive team was "obsessed" with it. Furthermore, key U.S. executives received weekly sales reports aggregating GeForce sales to crypto-miners from the week before, supplemented by quarterly spreadsheets. This data reflected that, throughout 2017, ***60% to 70% of NVIDIA's GeForce revenue in China came from sales to crypto-miners***.

6.      Among those who received this data were the head of NVIDIA's Gaming segment and the GeForce business unit, Defendant Jeff Fisher, who reported directly to the Company's CEO, Defendant

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Jensen Huang; Vice President Worldwide GeForce Sales John Milner, Fisher's direct report; and Senior Director for China, David Zhang, who oversaw the Company's colossal China market from its California headquarters.

7.     In March 2017, armed with this data, Fisher, Milner, and Zhang traveled to China and received a presentation from the sales team in which the explosion in cryptocurrency-related sales was addressed head-on.  These executives were told that sales to crypto-miners had recently caused GeForce sales to nearly double in China.  Fisher, however, told his team internally that the growing reliance on sales to miners was "***dangerous***."

8.     Fisher's remark was both historically accurate and prescient.  NVIDIA's chief rival, chipmaker Advance Micro Devices ("AMD"), had been burned in a cryptocurrency boom several years earlier, when it was AMD's processors that miners preferred.  AMD watched its sales numbers—and its share price—skyrocket as crypto-miners hoarded its GPUs, only to see both plunge when cryptocurrency prices crashed and demand from miners evaporated.  The lesson from AMD's experience was that cryptocurrency-related revenues were unreliable and unsustainable, as miners' demand was directly linked to the wildly volatile prices of the cryptocurrencies for which they labored.

9.     In early 2017, watching the cryptocurrency markets again catch fire, NVIDIA internally feared a similar cycle as it became clear to Defendants that miners had turned to GeForce GPUs as their processor of choice.  Yet its executives were not about to leave easy money on the table.  They needed to find a way to capitalize on the white-hot demand from voracious miners, while assuring investors that the Company's core Gaming business was well-immunized against the volatilities of cryptocurrency prices.

10.     In May 2017, NVIDIA launched a special GPU designed specifically for cryptocurrency mining (the "Crypto SKU").  Critically, NVIDIA did ***not*** report Crypto SKU sales in Gaming segment revenues, which made up more than 50% of NVIDIA's sales year after year.  Rather, the Company reported the Crypto SKU sales in the "Original Equipment Manufacturer & Intellectual Property" ("OEM") segment, an ancillary catch-all segment that had historically contributed around 5% to 10% of Company revenues.

11.     In short, Gaming was a segment analysts and investors paid close attention to; OEM was not.  Launching the Crypto SKU and reporting its sales in the OEM segment allowed NVIDIA to claim

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

that any mining-related revenues were cordoned off in OEM, thus assuring investors that its cash-cow Gaming business was insulated from crypto-related volatilities.  The strategy had its intended effect, with news outlets reporting that NVIDIA was "making the cards designed for this use [i.e., cryptocurrency mining] so that the surging digital currency demand doesn't affect its ability to serve the lucrative PC gaming market."

12.     Unbeknownst to the market, however, crypto-miners overwhelmingly favored the GeForce GPU to the newly launched Crypto SKU.  In fact, the Crypto SKU lacked a crucial feature that rendered it far less appealing to miners than the GeForce:  it had no port for video display.  The lack of a display port rendered the Crypto SKU useless for anything but mining; unlike GeForce GPUs, they could not be used for Gaming.  Thus, when mining became unprofitable as cryptocurrency prices declined, miners would have no secondary market of gamers on which to dump their idle hardware, precluding them from recouping any of the large upfront costs involved in setting up their operations.  This feature ensured that most miners would prefer the GeForce to the Crypto SKU.

13.     While the market remained unaware of miners' preference for GeForce GPUs, NVIDIA's top executives had complete knowledge of the trend and took full advantage of the cover that the Crypto SKU provided.  As the Company's Gaming and overall revenues jumped dramatically each quarter during the Class Period, Defendants Fisher, Huang, and CFO Colette Kress repeatedly attributed the gains to strong demand from gamers—ignoring or falsely trivializing the sizable impact from crypto-miners.  Similar claims appeared in the Company's SEC filings.

14.     At the same time, Defendants regularly assured the market—often in direct response to analyst questions—that sales to miners consisted almost entirely of the Crypto SKU, claiming that NVIDIA satisfied the "***vast . . . majority of the cryptocurrency demand out of that specialized product***." Indeed, the ***only*** revenues that Defendants publicly disclosed as cryptocurrency-related were sales of the Crypto SKU.  Defendants' message throughout the Class Period was that cryptocurrency was not a material driver of the Company's revenue.

15.     In fact, Defendants repeatedly went out of their way to make misleading and false statements regarding the impact of cryptocurrency sales on NVIDIA's financial performance—again, often in direct response to analyst questions.  For example, when Defendant Huang was interviewed by

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

*VentureBeat* in November 2017, he was explicitly asked whether "cryptocurrency is driving all of your success." Huang rebuffed the idea, responding, "***crypto is small for us but not 0*. . . . *It's large for somebody else. But it is small for us*.**" Later that month, while attending a technology conference, Defendant Kress was asked by a Credit Suisse analyst about the impact of cryptocurrency-related demand on NVIDIA's gaming revenues. She responded that it was "***some small amount***" but that the "***majority***" of the Company's cryptocurrency-related revenues stemmed from the Crypto SKU. Time and time again during the Class Period, Defendants were questioned about the subject, and time and time again they stated that cryptocurrency revenues had only a "small" role in driving the Company's impressive growth.

16. These and other statements set forth below were false. As Defendant Kress later acknowledged, NVIDIA's Gaming revenues had been irretrievably "tainted with cryptocurrency" and depended heavily on sales to miners. Defendants knew this when the Class Period began, and their attention never wavered. Indeed, the phenomenon was scrupulously tracked, quantified, and discussed in the internal sales database, weekly sales reports, and spreadsheets that top executives such as Defendant Fisher had been receiving since early 2017.

17. In August 2017, Fisher, Milner, and Zhang commissioned a PowerPoint presentation from the China sales team that would provide an update on cryptocurrency mining in the Company's largest market. The presentation, sent to Zhang and other senior executives in September, revealed the granularity with which NVIDIA was tracking these sales. Among other data, the slide deck noted that during the first eight months of 2017, ***1.5 million GeForce GPU units had been sold to crypto-miners*** in China. The slide deck also detailed NVIDIA's plan to directly target the largest miners in China, going so far as to list the top ten by name next to their cell phone numbers and projected monthly demand in thousands of units.

18. Beyond these internal sales figures, Defendants used a software program that was bundled with the graphics cards to track how consumers were using their GeForce GPUs throughout the Class Period. The program, called "GeForce Experience," transmitted usage data from users back to NVIDIA, enabling the Company to determine whether consumers were using each GPU for gaming or for mining. The software was widely adopted, with Defendant Fisher boasting that 100 million GeForce owners used

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

GeForce Experience.  It revealed widespread use of GeForce Gaming GPUs by crypto-miners.  As the Senior Account Manager in China put it, "*We actually know this data*."

19.     Defendants not only knew about, but *encouraged* large-scale crypto-mining with GeForce GPUs.  In early 2018, NVIDIA announced that it had revised its End User License Agreement ("EULA"), prohibiting commercial datacenters from using GeForce GPUs *unless they were used for crypto-mining*.  The move, viewed internally as a bald effort to push these entities into far more expensive non-gaming GPUs that the Company designed, reflected Defendants' view that cost-sensitive mining operations could not be persuaded to make a similar shift—a belief confirmed by NVIDIA's own salespeople, who had unsuccessfully tried to upsell miners into more expensive professional products in the past.  As one former Senior Product Director put it, "*they knew GeForce was being used for crypto*, and there was no way they could convince [miners] to use a pro GPU, so they carved it out."  The accommodation was a "classic move," which the Senior Director said "was almost guaranteed to have been done by Jensen [Huang] himself."

20.     The façade of the Gaming segment's invulnerable growth began to crumble in the spring of 2018, as the cryptocurrency markets started to weaken.  With the prices of the currencies in freefall by the summer, crypto-mining became unprofitable, and the demand from miners dried up.  So, too, did GeForce sales.

21.     On August 10, 2018, Defendants were forced to acknowledge that "probably . . . *a great deal*" of cryptocurrency miners had bought GeForce Gaming GPUs in recent months, revealing to investors that NVIDIA's crypto-related revenues had *not* been contained in its OEM segment, but rather had a substantial—and negative—impact on its core Gaming business.  Defendants also disclosed that GeForce inventories had ballooned more than 36% to $1.09 billion.  NVIDIA's share price fell on the news, with analysts blaming the drop on the collapse of cryptocurrency mining.  Yet Defendants falsely reassured the market that the swelling inventory would not be a problem, as demand from gamers would pick up the slack created by the disappearance of crypto-related sales.  Analysts again credited these assurances.

22.     On November 15, 2018, the full truth behind Defendants' deception was revealed.  Defendants announced that NVIDIA had missed analyst expectations for the third quarter and was

revising its guidance for the fourth quarter to reflect a ***7% decline*** year-over-year. Attributing the reversal to a "***sharp falloff in crypto demand***" for NVIDIA's Gaming GPUs, NVIDIA revealed that it would make no shipments into the distribution channel of—and thus recognize no revenue for—the mid-range GeForce GPUs that miners had favored. The promised demand from gamers simply did not exist, and it became fully apparent to the market that, contrary to Defendants' earlier representations, NVIDIA's revenues were unduly dependent on cryptocurrency mining. On the news, NVIDIA's stock plunged 28.5% over two trading sessions, falling from $202.39 to $144.70 per share on heavy trading volume.

23.     Market observers were shocked by the revelations. One analyst noted that the disclosures stood "in sharp contrast to the comments . . . at the last earnings call." Another, from Deutsche Bank, stated that the results "call into question what the true growth rate of Gaming was/is," while a reporter told Defendant Huang incredulously, "I . . . thought [cryptocurrency] was never really more than a tenth of your revenue." Another observer was more blunt: "***NVIDIA lied about its cryptocurrency earnings to avoid [a] stock crash***," positing that "***the steep falls [in NVIDIA's stock price] [we]re a strong incentive for Nvidia to mask large fluctuations in revenue***." The remarks echoed those of the former Senior Account Manager in China, who told Lead Counsel, "***NVIDIA sure lied to everyone***."

24.     After the dust cleared, securities analysts sought to probe the extent to which NVIDIA's Gaming revenues had relied on GeForce sales to crypto-miners during the Class Period. In January 2019, for example, RBC Capital Markets ("RBC") produced a report that compared the $602 million in reported Crypto SKU sales in the OEM segment—the ***only*** revenues that Defendants had publicly attributed to crypto-mining—to what it believed the Company really had earned from the crypto-boom. The analysis concluded that NVIDIA had earned $1.95 billion from crypto-mining between April 2017 and October 2018. In other words, RBC found that ***Defendants understated crypto-related revenue by $1.35 billion***.

25.     To follow up on these reports, which were generally supported by interviews of former employees conducted in recent months, Lead Plaintiffs retained an economic consulting firm, Prysm Group, specializing in cryptocurrency markets to conduct an independent analysis of NVIDIA's crypto-related revenues. Like the RBC report, this analysis confirmed that NVIDIA had ***grossly understated*** its

crypto-related revenues.  The economists determined that the Company had earned at least $1.728 billion from sales to miners between May 2017 and August 2018—meaning that ***Defendants understated NVIDIA's crypto-related GPU sales by approximately $1.26 billion, all of which was contained in the Company's*** <u>***Gaming***</u> ***segment***.

26.     These results, which are set forth below, demonstrate that Defendants falsely claimed, quarter after quarter, that the Gaming segment's sales growth owed to strong organic demand from gamers while misleading the market into believing that NVIDIA's dependence on cryptocurrency-related revenues was "small" and that any exposure to that inherently volatile demand was contained in its ancillary OEM segment.  In truth, the gains had been ephemeral, due largely to an intense but transient source of demand that Defendants tracked fastidiously and knew about for months before the Class Period began, yet chose to hide from investors.

| FY 2018 | | | FY 2019 | | |
|---|---|---|---|---|---|
| 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | **Total** |
| **NVIDIA's Reported Revenues for Crypto SKU** | | | | | |
| $150m | $70m | $75m | $289m | $18m | **$602m** |
| **Prysm Group Analysis – All Cryptocurrency-Related Revenues** | | | | | |
| $349m | $299m | $541m | $364m | $175m | **$1,728m** |
| **Difference Between Reported Revenues for Crypto SKU and All Cryptocurrency-Related Revenues Calculated by Prysm Group** | | | | | |
| $199m | $229m | $466m | $75m | $157m | **$1,126m** |

27.     Through this action, Lead Plaintiffs seek to hold Defendants accountable to NVIDIA's shareholders for their deceit.

## II.     JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

29.     Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  NVIDIA is headquartered and conducts business in this District, and many of the

acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

30.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### Lead Plaintiffs

31.     Co-Lead Plaintiff Öhman Fonder is a large, independent institutional investor responsible for overseeing approximately $9.2 billion in assets.  Founded in 1906, Öhman Fonder is headquartered in Stockholm, Sweden.  As set forth in the certification attached hereto as Exhibit A, Öhman Fonder purchased NVIDIA stock and suffered damages as a result of the securities law violations alleged herein. By order dated May 2, 2019, the Court appointed Öhman Fonder a Lead Plaintiff in this action.

32.     Co-Lead Plaintiff PGB is a multisector pension fund headquartered in Amsterdam, Netherlands.  Founded in 1953 by employers and employees from the graphics arts industries, it now provides pensions and benefits for more than 311,000 people and manages approximately $30 billion in assets.  As set forth in the certification attached hereto as Exhibit B, PGB purchased NVIDIA stock and suffered damages as a result of the securities law violations alleged herein.  By order dated May 2, 2019, the Court appointed PGB a Lead Plaintiff in this action.

### Corporate Defendant

33.     Defendant NVIDIA is a multinational technology company that purports to have invented in 1999 the GPU, a type of processor designed "to solve some of the most complex problems in computer science."[1]  NVIDIA remains one of the largest participants in the GPU market, with over 80% market share.  While NVIDIA sells its GPUs around the world, a majority of its revenues come from China and Taiwan.  NVIDIA is incorporated in Delaware and maintains its corporate headquarters at 2788 San Tomas Expressway, Santa Clara, California.  Its stock trades on the NASDAQ, under ticker symbol "NVDA."  As of November 9, 2018, there were 610 million shares of NVIDIA stock outstanding, owned by at least thousands of investors.

---

[1] NVIDIA Form 10-K filed February 21, 2019 ("FY 2018 10-K"), at 4.

**Individual Defendants**

34.     Defendant Jensen Huang ("Huang") co-founded NVIDIA in 1993; he has since served as the Company's President and Chief Executive Officer and as a member of its Board of Directors.  Huang holds undergraduate and master's degrees in electrical engineering and worked in technical capacities at LSI Logic and Advanced Micro Devices prior to co-founding NVIDIA.  Throughout the Class Period, Huang signed NVIDIA's filings with the SEC and regularly spoke directly to investors about the details of the Company's performance and the extent to which cryptocurrencies drove it, reassuring the market that "our strategy is to stay very, very close to the market" and "[w]e understand its dynamics really well."

35.     Defendant Colette Kress ("Kress") is, and was at all relevant times, Executive Vice President and Chief Financial Officer of NVIDIA.  Prior to joining NVIDIA, Kress held finance positions at Cisco, Microsoft, and Texas Instruments.  Throughout the Class Period, Kress signed NVIDIA's SEC filings and repeatedly spoke to investors in detail about NVIDIA's GPU business, including concerning NVIDIA's strategies and results related to cryptocurrency mining.

36.     Defendant Jeff Fisher ("Fisher," and together with Huang and Kress, the "Individual Defendants") is currently an Executive Vice President of NVIDIA and has served as NVIDIA's SVP of the GeForce Business Unit since 2008.  Fisher runs NVIDIA's Gaming business.  He is among the five figures who represent the Company at its annual Investor Days, along with Huang, Kress, and the heads of the Automotive and Datacenter segments, a role he has fulfilled since 2012, continuing through the Class Period.  He has been described as a "company stalwart" by NVIDIA insiders.  Huang explained at the May 10, 2017 Investor Day that Fisher was "one of NVIDIA's oldest employees," remarking, "Fish and I grew up together."  Besides Huang and Kress, Fisher is NVIDIA's most prominent executive.

## IV.     FORMER EMPLOYEES REFERRED TO IN THE COMPLAINT

37.     FE 1 was employed by NVIDIA for over 10 years as a Senior Account Manager in China, leaving the Company in December 2017.  As one of approximately four account managers in the China market (NVIDIA's largest), FE 1 managed several large accounts for the Company's "partners" (i.e., the device manufacturers to whom NVIDIA sold most of its products), primarily selling NVIDIA's GeForce Gaming GPUs.  FE 1 described his primary responsibilities as negotiating sales contracts, interacting

with partner companies, and monitoring GeForce sales, pricing, inventory, and usage in China.  FE 1 compiled sales data in NVIDIA's internal sales database, sent weekly sales reports to Gaming executives in the United States (including EVP/SVP and head of Gaming Fisher and Vice President ("VP") Worldwide GeForce Sales John Milner) and presented GeForce sales trends and data to members of the Gaming segment's executive team.

38.     FE 2 was a Senior Products Director who worked at NVIDIA in Santa Clara, California. FE 2 worked at NVIDIA from several years before the Class Period began to May 2017.  FE 2 was primarily involved in software product management and commercialization, focused particularly on software designed to make hardware run more efficiently and effectively.  FE 2 reported first to VP and General Manager Jeff Brown, then to VP and General Manager Bob Pette, both of whom reported directly to CEO Huang.

39.     FE 3 occupied different marketing positions at NVIDIA, working at the company between January 2011 and November 2018, with a nine-month hiatus beginning in July 2013.  FE 3 served as a Senior Director of Marketing for the Americas at NVIDIA, then as Senior Director for Consumer Marketing in Latin America.  FE 3's responsibilities included marketing and public relations strategy, with a particular focus on promoting GeForce Gaming GPUs.  Throughout the Class Period, FE 3 was based in Santa Clara, California.

40.     FE 4 worked as a Community Manager in Moscow, Russia, from 2015 through August 2018.  FE 4's job was to promote NVIDIA's Gaming products to the Russian market through social media and by hosting promotional events.  FE 4 was also responsible for obtaining information about demand for NVIDIA products through conversations with retailers.

V.     **FACTUAL ALLEGATIONS**

A.     **NVIDIA's Reliance on Its Gaming Segment and China Market**

41.     NVIDIA's primary business is the design of GPUs, a type of processor designed "to solve some of the most complex problems in computer science."  GPUs are distinct from the central processing unit ("CPU") of a computer, which handles basic instructions and assigns more complicated tasks to other, more specialized chips.  The GPU is able to perform multiple calculations at the same time, acting as a co-processor that accelerates the CPU by performing computationally intensive tasks more

efficiently, rendering complex images, animations, and video for display far more quickly than a CPU could alone.  Although developed for graphics-rendering and used most frequently in video gaming, GPUs have since expanded to encompass a variety of other applications, including non-graphics tasks requiring repetitive computations.

42.     With limited exceptions, NVIDIA does not sell its GPUs directly to consumers.  Instead, it sells them to other device manufacturers, which NVIDIA calls "partners."  These partners build NVIDIA's GPUs into their own products, such as graphics cards and computers.  The partners then sell these products into their respective distribution channels, which could include wholesalers, retailers, or internet platforms.

43.     NVIDIA's GPUs are divided among five "specialized markets," which industry analysts frequently refer to as "segments."[2]   The five segments are:  (1) Gaming (consumer-market chips designed to improve video-game applications, mainly comprised of NVIDIA's flagship "**GeForce**" GPU line); (2) Original Equipment Manufacturer & IP ("**OEM**") (including low-end GPUs sold into devices such as tablets and phones, as well as intellectual-property assets); (3)  Datacenter (including "Tesla" GPUs, intended for high-end professional and scientific applications); (4) Professional Visualization (including "Quadro" GPUs, serving design and digital-content customers); and (5) Automotive (serving self-driving vehicle developers).

44.     Of these segments, Gaming is NVIDIA's most important—by a large margin.  In every quarter of the Class Period, ***Gaming revenues exceeded those of the four other segments combined***. The vast majority of these Gaming revenues comes from sales of NVIDIA's GeForce GPUs, the product line on which the Company built its reputation.

45.     Defendant Jeff Fisher—NVIDIA's EVP and SVP of the GeForce business unit—heads the vital Gaming segment and has served in that capacity since 2008.  By NVIDIA's own description, he is "responsible for the positioning and go-to-market strategy of GeForce GPUs, the No. 1 consumer

---

[2]  In addition to distributing financial results among these five "specialized markets," NVIDIA also reports revenue between two "business segments" (GPU and Tegra Processor), a distinction of little significance to this dispute.  Because industry analysts focus on revenue distribution among the five specialized markets and frequently refer to these different business units as "segments," that convention is maintained here.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

graphics brand."  At all times material to this dispute, ***Fisher reported directly to Huang***.  One of Fisher's key lieutenants was John Milner, whose title is VP Worldwide GeForce Sales; Milner reported directly to Fisher before and during the Class Period.

46.     In addition to its overwhelming dependence on Gaming revenues, the Company was extremely concentrated geographically as well.  A 2015 study by Goldman Sachs concluded that NVIDIA derived 54% of its revenue from China (including Taiwan).  NVIDIA regularly reports revenues in China comprising more than half of the Company's total.  By contrast, just 13.1% and 7.9% of NVIDIA's revenues for fiscal 2018 came from the United States and Europe, respectively.

47.     David Zhang, who served as NVIDIA's Senior Director for China and was based in the United States, oversaw this critical market during the Class Period.  Zhang oversaw NVIDIA's sales offices in Beijing, Shanghai, Hong Kong, and Shenzhen, as well as two in Taiwan.  He reported to Milner and Fisher.

48.     Beginning in late 2016, NVIDIA's dependencies on its Gaming segment and the China market would conspire to offer Defendants an opportunity to supercharge the Company's growth amid skyrocketing demand for its GeForce GPUs—albeit for a purpose, cryptocurrency mining, wholly unrelated to their intended use.  With that ascent, however, came an inevitable crash, the risk of which Defendants fraudulently concealed from NVIDIA's investors for over a year.

### B.     Background on Cryptocurrency Mining

49.     Blockchain, and the digital currencies that this technology spawned, emerged from the embers of the financial crisis of 2007-2008, when faith in the banking system and its effective regulation was badly shaken.  Positing an alternative to the financial institutions that had governed commerce for centuries, Blockchain's founders envisioned a decentralized, global network whose participants would join in peer-to-peer exchanges using novel digital currencies, their transactions facilitated by the internet, and secured by modern cryptology.

50.     The fundamental concept at the core of blockchain is its function as a decentralized, immutable ledger.  Unlike traditional economies in which central banks or private financial institutions keep track of transactions, in a blockchain, pending transactions are announced publicly (albeit anonymously) to the entire network, verified by certain network participants, and then recorded on a

public ledger.

51.     The verifiers fulfill this task by first consolidating and encrypting the data of a group of transactions using the cryptographic technique of "hashing"—applying an algorithm to convert a string of text into an inscrutable, random sequence of numbers and letters, always of the same length.  Then, the users compete to solve a difficult mathematical puzzle through laborious trial-and-error work performed by their computers to obtain a qualifying "hash output," which allows the "block" of new transactions to be added to the "chain" of prior transactions (hence the name, "blockchain").  The successful verifier is rewarded with a new issue of some of the network's tokens—the network's version of currency—which provide the critical incentive to ensure that transactions in the network continue to be verified.

52.     Because of their underlying reliance on cryptography, the digital tokens circulating on these networks are called "cryptocurrencies."  (The two most popular of these tokens are Bitcoin and Ether, which are used on the Bitcoin and Ethereum networks, respectively.)  The laborious work to verify pending transactions—and thereby unearth new currency—is called "crypto-mining" (or simply "mining"), while the verifiers are called "miners."

53.     Although mining continually increases the supply of tokens in blockchain networks like Bitcoin and Ethereum, these increases are restricted to set intervals.  For instance, a specific number of Bitcoins (currently, 12.5) is released about every 10 minutes.  On the Ethereum network, three Ethers are released about every 15 seconds.

54.     To keep these intervals constant as new miners join the network, the networks increase the difficulty of the puzzles verifiers have to solve in order to add transactions to the public ledger.  When the difficulty level increases, miners must conduct more trial-and-error work to obtain a qualifying hash output.  Miners with more computing power, who can perform those calculations more quickly and on a larger scale, typically beat out the rest.  This feature of crypto-mining has resulted in a technological arms race and encouraged the consolidation of mining activity among those who can stockpile more and better hardware with which to mine.

55.     Indeed, when Bitcoin, Ethereum, and other significant blockchain networks first began, individual miners could mine the new cryptocurrencies using home computers in their basements.  Quickly, however, competition increased, and with it more powerful equipment was deployed.  As a

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

recent University of Cambridge study noted, "[t]he mining sector has evolved in a short time from a hobby activity performed on personal computers into a professional and capital-intensive industry with its own value chain."

56.     This evolution is demonstrated by the exponential growth in the major blockchain networks' "hash rates," which reflect the number of hashing computations performed by an entire network each second.  A network's hash rate stands as the best measure of computing power dedicated to mining that network's cryptocurrency, and it provides knowledgeable observers the information needed to estimate how many computers are working on the network.  By way of example, the Bitcoin network hash rate grew from approximately 7 million H/s (hashes per second) on January 1, 2010, to about 62 *quintillion* hashes per second—nearly a ***trillion*** times as much—by August 2018.  Following the release of Ether in July 2015, the Ethereum network hash rate grew from 11.5 billion H/s to 2.5 trillion H/s in just nine months, only to increase further orders of magnitude in the years that followed.

57.     Proliferating hash rates were driven as much by rapid advances in mining hardware as anything else.  While early crypto-mining was conducted using the CPUs of home computers, miners soon turned to GPUs, which could execute the computationally intensive work of crypto-mining hundreds of times faster.  As miners began to buy multiple GPUs and assemble them into "mining rigs" dedicated for that purpose, demand for GPUs skyrocketed.  *See* Fig. A *infra*.  Mining "farms"— datacenters housing rows of mining rigs—sprouted up soon after.  As each rig contains thousands of dollars in equipment, the start-up costs of mining today are substantial.  Mining has therefore become the domain primarily of for-profit business associations able to pool capital.



Figure A.  A small-scale mining rig comprised of five GPUs
Source:  Financial Times (crediting RBC Capital Markets)

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

58.    Besides the hardware costs, the single greatest expense in mining cryptocurrency is electricity.  The power required to mine cryptocurrencies—and to cool the machines doing that work—is staggering.  As *The Economist* reported last year, recent studies have estimated the power consumption related to Bitcoin mining ***alone*** at 22 terawatt-hours per year—nearly the same as all of Ireland. Consequently, mining farms have consolidated in particular regions of the world where energy costs are lower and the climate cooler—China, Russia, and the Nordic countries chief among them.  *See* Figures B and C *infra*.



Figure B.  A Bitcoin mining farm in China
Source:  BBC



Figure C.  An Ether mining farm in Iceland
Source:  Genesis Mining

59.    Of course, when cryptocurrency prices fall below a certain point, mining ceases to be profitable, no matter the location.  Ignoring the sunk costs of the hardware, miners will compare their rate of return (measured as the number of tokens mined over a certain period multiplied by the prevailing market price for those tokens) with their costs over the same period (most significantly, the price of electricity and equipment storage).  When returns exceed costs, miners continue mining; when costs exceed returns, miners stop.  Miners of Ether (and other cryptocurrencies that are mined using GPUs) have the added benefit of being able to recoup some of their sunk costs by selling used GPUs on the secondary market to gamers when mining becomes unprofitable.

60.    Because cryptocurrency prices have swung wildly over their short history, the profitability of mining has followed suit.  As a result, the demand for mining hardware—including GPUs—has proven extremely volatile.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

61.     In the early years of Bitcoin mining, GPUs were the hardware of choice.[3]  This period coincided with a pronounced bubble in the Bitcoin market in 2013-2014.  In early May 2013, Bitcoin was trading at about $91 per token, with a total market capitalization of $1.01 billion.  Six months later, it hit its then-all-time high of around $1,200 per token and a market capitalization of over $14 billion.

62.     At the time, GPUs made by AMD, NVIDIA's chief rival, were viewed as the gold standard in Bitcoin mining, and it was widely understood that miners preferred AMD's GPUs to NVIDIA's.  Demand for AMD GPUs skyrocketed alongside Bitcoin prices during the second half of 2013, with processors that usually sold for $200-300 per unit selling for $600-800 at the height of the bubble.

63.     While it experienced a temporary boon, AMD soon saw the downside of crypto-mania.  As the price of Bitcoin dropped more than 70% in the five months after its peak, so too did demand for its GPUs—a problem compounded by miners dumping their AMD GPUs on the secondary market at steep discounts.  As one analyst covering AMD noted, "I talked to miners who said[,] 'The moment the price collapsed and the economics went against mining, I just immediately sold all of my stuff on eBay at whatever price I could get.'"  AMD's revenues suffered as its crypto-related sales evaporated.

64.     In 2016, signs of a new bubble appeared.  The price of Bitcoin had rallied from about $230 per coin in September 2015 to nearly $1,000 by the end of 2016.  Meanwhile, an array of new coins came online by way of "initial coin offerings" (capital raises by which an entrepreneurial technologist pitches an idea for a blockchain-based venture, solicits funding, and in return grants investors some quantity of the venture's digital token).

65.     The most significant of these was the Ethereum network and its cryptocurrency, Ether, which rose from $0 to over $10 per token in the several months following its July 2015 launch.  Then, in the spring of 2017, it began a meteoric climb that temporarily peaked at over $400 per token in June,

---

[3] Bitcoin miners ultimately moved on from GPUs to application specific integrated circuits ("ASICs") designed specifically for executing that network's specific hashing algorithm.  GPUs, however, retained their dominance in mining Ether and certain other cryptocurrencies to which ASICs could not be readily applied.  Because this dispute involves sales of NVIDIA GPUs, the focus is on the mining of Ether, the largest of the "altcoins" for which GPU mining is still profitable, although others, such as Z-Cash and Monero, affected demand for NVIDIA's products as well.

with a 24-hour trading volume exceeding $3.1 billion.  Several months later, Ether topped $1,400 per token, an increase of more than 13,000% in a single year.  These skyrocketing valuations made mining enormously attractive—and once again caused a massive surge in demand for GPUs.  As AMD processors again became increasingly hard to find, miners began turning to NVIDIA—specifically, its enormously popular line of GeForce Gaming GPUs.  Cryptocurrency miners—especially those mining Ether—began to purchase GeForce GPUs in droves.  Favorites were the GTX 1060, 1070, 1070Ti, and 1080Ti models based on NVIDIA's "Pascal" chip microarchitecture.

66.     As cryptocurrency prices rose in the months leading up to and during the Class Period, Defendants made a concerted effort to publicly dismiss any suggestions that NVIDIA GeForce GPUs were being purchased *en masse* by crypto-miners.  As detailed below, they did so in three primary ways, which the market accepted.  First, Defendants represented to investors that revenues from sales of its products to cryptocurrency miners were insignificant overall.  Second, Defendants promised investors that only a very small portion of NVIDIA's Gaming revenues resulted from sales to cryptocurrency miners.  Third, Defendants represented that NVIDIA's cryptocurrency-related revenues were contained primarily in the Company's OEM reporting segment, when in fact, almost **two-thirds** of such revenue came from GeForce sales recorded in its Gaming segment.  These representations were materially false and misleading and concealed from investors the enormous risk that the Company's outsized exposure to crypto-mining posed to its financial results.

### C.     Defendants Repeatedly Deny the Importance of Sales to Cryptocurrency Miners in Driving NVIDIA's Revenues

67.     Throughout the Class Period, NVIDIA reported skyrocketing revenues in its core Gaming segment.  For example, on May 9, 2017, NVIDIA reported first quarter sales for its core Gaming segment of $1.02 billion—representing a 49% year-over-year increase and 52.8% of total revenues.  The Company reported similarly spectacular numbers each quarter, including on May 10, 2018, when it announced that Gaming segment revenues were $1.723 billion—a 68% year-over-year increase.

68.     Although impressed with the growth in Gaming revenues, investors and analysts alike questioned whether those revenues truly derived from sales to gamers or were rather from sales to cryptocurrency miners, whose demand for NVIDIA GPUs was sure to disappear when the economics of

mining turned negative.

69.    To better understand the riskiness of NVIDIA's reported revenues, and whether the explosive growth in those numbers was sustainable, analysts pressed Defendants for assurances that the surge in sales was *not* being driven by cryptocurrency-mining demand.  For example, during the Company's September 6, 2017 presentation at the Citi 2017 Global Technology Conference, Citigroup analyst Atif Malik asked Kress to describe "what steps NVIDIA [has] taken to avoid cannibalization of the core gaming market" as a result of increased demand from cryptocurrency miners.  During NVIDIA's November 9, 2017 earnings call, the same analyst asked Huang and Kress to explain "why should we think that crypto won't impact the gaming demand in the future?"

70.    Defendants assuaged these concerns by repeatedly telling investors throughout the Class Period that cryptocurrency-related sales contributed a "small" portion to the Company's overall revenues. For example, when told that "[i]t seemed like people had the impression that cryptocurrency is driving all of your success," Defendant Huang called the impression "*wrong*" and stated that cryptocurrency's effect on NVIDIA's sales was "*small but not zero. . . It's going to remain small for us*."

71.    Huang reiterated those assurances in an interview published in *Barron's* the day after NVIDIA's February 8, 2018 earnings call.  In the interview, Huang discussed cryptocurrencies at length with the reporter and again downplayed the significance of cryptocurrencies for NVIDIA's financial performance.  Specifically, the author of the article explained that "[w]hen I asked Huang if he wanted to point out anything in particular about the report and outlook, Huang began, 'Clearly there's been a lot of talk about crypto'"—and proceeded to assert that the portion of NVIDIA's business related to cryptocurrency had been "small, overall" the prior quarter.

72.    Defendant Huang doubled-down on those assertions during his March 29, 2018 appearance on the CNBC show *Mad Money*.  When host Jim Cramer asked Huang about analysts' concerns that NVIDIA's "cryptocurrency risks are growing," Huang responded by minimizing the effect of cryptocurrency-related activities on NVIDIA's performance, claiming that the "core growth drivers" for the Company's revenue results were other areas of the business—Gaming, Professional Visualization, Datacenter, and Automotive—and that "cryptocurrency just gave it that extra bit of juice."  When Cramer asked Huang to confirm that "if people think [cryptocurrency] is that important, they're gonna miss the

bigger picture," Huang responded, "Absolutely."  He again minimized NVIDIA's cryptocurrency-related revenue, contrasting it to the Company's "core" businesses.

73.     These representations had the desired effect on investors and analysts, with several analysts crediting Defendants' claims that robust revenue growth was being driven by gamers, not crypto-miners, and that NVIDIA's cryptocurrency exposure was small overall.  For example, in a report issued August 11, 2017, JPMorgan reported that crypto-mining-related sales were "not a significant portion of NVIDIA's business" and that NVIDIA "remain[ed] focused on continued growth drivers in AI, autonomous driving and gaming."  Similarly, in a report published on November 10, 2017, BMO Capital Markets reported that "the [C]ompany . . . continues to believe there is only a small amount of GeForce cards that is used for cryptocurrency mining."

74.     Further, when identifying the "primary drivers" of its Gaming segment growth, Defendants consistently identified sales to gamers—***not*** sales to crypto-miners.  For example, at NVIDIA's May 10, 2017 Investor Day conference, the Individual Defendants took turns touting the Gaming segment's strong fundamentals, with Defendant Fisher identifying "PC gaming, eSports, competitive gaming, AAA gaming, [and] notebook gaming" as the key drivers of its growing revenues, saying nothing about demand from crypto-miners.  Defendants made similar statements throughout the Class Period, reiterating the supposedly strong demand for GeForce Gaming GPUs from gamers while failing to disclose that much of the demand for these GPUs came from crypto-miners.

75.     Analysts once again bought Defendants' story.  For example, in reports issued on November 10, 2017, JPMorgan lauded NVIDIA's "strong gaming fundamentals," Susquehanna expressed its "surprise[] [at] the strength in Gaming," and BMO Capital Markets reported that "the company noted broadbased strength in the gaming community[.]"  Similarly, in a report issued February 9, 2018, SunTrust Robinson Humphrey raved about NVIDIA's gaming results, following Defendants' lead in making no mention of cryptocurrency whatsoever:

> NVDA's CQ4 results & CQ1 guidance beat (destroyed) consensus.  Gaming continues to exceed expectations . . . .  Gaming rev was ~13% above consensus . . . with secular growth from eSports, new AAA gaming titles boosting demand for Pascal processors, and continued success of the Nintendo [] Switch platform.

76.     Defendants also misled analysts and investors into believing that nearly all the cryptocurrency-related GPU revenues that NVIDIA earned were reported *not* in the Company's all-important Gaming segment, but rather in its far less significant OEM segment.   NVIDIA had begun selling the Crypto SKU, a GPU designed specifically for cryptocurrency mining, in the summer of 2017.   Sold to add-in board (video card) manufacturers, *Crypto SKU sales appeared only in the OEM segment, not the core Gaming segment*.   This conspicuous segregation of the Crypto SKUs from Gaming was by design:  it allowed Defendants to publicly claim that its mining-related sales were cordoned off in OEM, ostensibly isolating NVIDIA's cash-cow Gaming business from cryptocurrency-related volatility while capitalizing on white-hot demand for the hardware needed for mining.   Defendants repeatedly and falsely assured investors and analysts that NVIDIA met virtually all of crypto-miners' demand for its GPUs through sales of the Crypto SKU, ignoring or obscuring the fact that most of the Company's crypto-related sales—*almost two-thirds*—came from its flagship GeForce Gaming GPU line.

77.     For example, when NVIDIA reported on August 10, 2017, "record revenue" for the second quarter of fiscal 2018 of $2.23 billion driven largely by $1.19 billion in revenues from the Company's Gaming segment, Defendant Huang reassured investors that cryptocurrency mining was not driving the quarter's Gaming revenues.   He claimed that "*we serve the vast . . . majority of the cryptocurrency demand out of that specialized product [the Crypto SKU]*" in the OEM segment, which recorded just $150 million in cryptocurrency-related sales.   Two days later, in a published interview, Huang stated that *all* of NVIDIA's sales to crypto-miners "represented only a couple hundred million dollars, maybe $150 million or so."   This comment that the "$150 million or so" that NVIDIA earned in Crypto SKU sales comprised all the Company's crypto-related sales misleadingly indicated to investors that NVIDIA sold *virtually zero* GeForce GPUs to crypto-miners.   Huang gave a similarly misleading impression the next quarter when, in a November 9, 2017 interview with *VentureBeat*, he stated that NVIDIA's crypto-related sales were "[m]aybe $70 million"—precisely the same figure that NVIDIA had disclosed that day as its third-quarter Crypto SKU sales, again misleadingly assuring investors that the Company's sales to crypto-miners were contained almost exclusively in its ancillary OEM segment.

78.     Similarly, at a Credit Suisse Technology, Media and Telecom Conference on November 29, 2017, Kress acknowledged that while "there probably is some residual amount or some

*small amount* in terms of" cryptocurrency-related sales in the Gaming GPU segment, she stressed that "*the majority [of cryptocurrency-related sales] does reside in terms of our overall crypto card*[.]"

79.     Analysts again credited these statements, taking at face value Defendants' claims that crypto-related sales were captured in the OEM segment, separated from Gaming.  For example, an August 10, 2017 report from Oppenheimer noted that "[c]rypto mining was ~$150M in 2Q"—a figure that matched NVIDIA's reported Crypto SKU sales in the OEM segment that quarter—and mentioned no additional crypto-related revenues in Gaming.  Likewise, in a report issued May 11, 2018, SunTrust Robinson Humphrey explained that "crypto revenue showing up in the crypto SKU significantly mitigates what we see as the biggest near-term risk in NVDA, which is that older gaming GPUs sold to crypto-miners could flood the secondary market and sink gaming revenue."

### D.  Unknown to Investors at the Time, Defendants Knew that NVIDIA's Gaming Revenues Were Largely Attributable to Cryptocurrency Mining Throughout the Class Period

80.     Contrary to Defendants' repeated assurances to investors and analysts, revenues from cryptocurrency were *not* a "small" part of NVIDIA's revenues and were *not* limited to the specialized Crypto SKU, nor were revenues for the Company's Gaming segment driven primarily by "gamers" and "PC gaming, eSports, competitive gaming, AAA gaming, [and] notebook gaming."  Rather, Gaming segment revenues were driven largely by sales to crypto-currency miners.  That crypto-miners fueled NVIDIA's reported surge in Gaming revenues has been confirmed by numerous sources, including NVIDIA's former executives, securities analysts, and Lead Plaintiffs' experts.

81.     Multiple former employees have confirmed that NVIDIA's booming GeForce GPU sales numbers were being driven by demand from crypto-miners even before the Class Period began—and that Defendants and members of their inner circle were well aware of these sales.  Indeed, FE 3, a Senior Director for Consumer Marketing from 2014 through the Class Period, stated that *everyone at NVIDIA* was engaged, to some degree, in talks about cryptocurrency mining's impact on the Company's sales.

82.     According to accounts of these and other former employees, Defendants discussed, studied, tracked, and actively sought to bolster sales of NVIDIA's flagship GeForce line to crypto-miners—all while assuring investors that its Gaming business was protected from the volatility inherent in cryptocurrency-related demand.

1.  **Internal Sales Data Throughout 2017 Reveals Surging Demand for GeForce GPUs by Crypto-Miners in NVIDIA's Largest Market**

83.     FE 1, a Senior Account Manager for NVIDIA in China for over a decade, provided key insight into GeForce sales to miners in that region and U.S.-based executives' knowledge of this widespread phenomenon.  China was the Company's largest market, according to NVIDIA's SEC filings and Jeff Fisher, head of the Gaming segment.[4]   FE 1 confirmed that 40% to 50% of NVIDIA's worldwide GeForce sales were in China.

84.     FE 1 stated that demand for GeForce GPUs by crypto-miners began to surge in 2016.  Large-scale miners made bulk purchases of GeForce GPUs by contacting NVIDIA's "partners"—the manufacturers that purchased NVIDIA GPUs and built them into the graphics cards that were then sold into the relevant distribution channels.   As one of approximately only four account managers in NVIDIA's critical China market at the time, FE 1 had close relationships with several of the Company's largest partners, including Colorful (China's largest graphics-card brand), ZOTAC (a major Macau-based hardware manufacturer), and Inno3d (a popular Hong Kong-based card maker).  Beginning in late 2016, FE 1 began receiving regular reports from these companies that demand for GeForce from miners was "exploding."

85.     FE 1 explained that NVIDIA kept meticulous track of who was buying its GPUs—not simply directly from the Company, but also from its partners and others down the distribution chain as well.  Specifically, FE 1 described how FE 1's customers—the device manufacturers that NVIDIA called "partners"—were required to submit order sheets to NVIDIA identifying who was buying the partners' completed products.  These order sheets specifically described the purchaser, product, and quantity of the device containing NVIDIA's GPU being sold by the partner submitting the order sheet.  As of late 2016, these order sheets **_expressly identified purchases by crypto-miners_**, who had begun buying graphics cards containing GeForce GPUs by the thousands at a time.

---

[4] FE 1 reported to Senior Sales Manager Howard Jiang, who reported to Senior Director for China David Zhang in the United States, who reported to VP Worldwide GeForce Sales John Milner, who reported to EVP/SVP and head of Gaming Jeff Fisher, who reported to CEO Jensen Huang.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

86.     FE 1 reported that near the end of 2016 or early 2017, FE 1's supervisor, Senior Sales Manager Howard Jiang, told FE 1 that "*it would be good to support GeForce*" sales by specifically targeting and selling the GeForce GPUs to miners.  Consequently, Jiang directed FE 1 and the other account managers in China to specifically track GeForce sales to miners, which the account managers began doing.  FE 1 explained that the account managers took the order sheets from partners and inputted the transaction data, including information about the partners' purchasers, into NVIDIA's internal sales database, which was called the "channel support system."   Aggregating the order-sheet data, this database allowed users to track sales trends across an entire region or down to a particular customer and product.  This internal database, like the order sheets from which it was drawn, *expressly identified crypto-miners as purchasers of large blocks of GeForce GPU products*.  The aggregate numbers were staggering.  FE 1 reported that, throughout 2017, *60% to 70% of NVIDIA's GeForce revenue in China came from sales to crypto-miners*.

87.     The GeForce executive team in the United States, including Defendant Fisher, Milner, and Zhang, had ready access to this data.  Indeed, FE 1 described the U.S. executive team as *"obsessed"* with the data, citing VP John Milner as an example of one executive whom FE 1 knew relied on it.

88.     NVIDIA also used this data to include cryptocurrency-related sales of GeForce GPUs in its sales projections for important markets.  During the second half of 2017, FE 1 and his team worked on formulating 2018 GeForce sales projections for the China market.  FE 1 stated that the 2018 forecasts predicted sales would rise 60% over 2017 levels, primarily due to the expected continuing increase in crypto-mining demand for GeForce GPUs.  FE 1 and his sales team *specifically discussed the increased demand from crypto-mining as driving the increased 2018 GeForce sales projections* in forecasting calls, emails, and weekly reports involving Defendant Fisher, Milner, and Zhang.  Furthermore, FE 1 reported that, in conjunction with these forecasts, *NVIDIA planned to increase inventory to support the anticipated increase in GeForce sales driven by mining*.

89.     FE 1 further explained that while the Crypto SKU was sold in China at the same time with some success, the new product lacked a feature that made it considerably less appealing to miners than traditional GeForce Gaming GPUs:  the Crypto SKUs had no ports for video display.  Taking away the display made these boards good for crypto-mining—and nothing else.  Because the Crypto SKU could

not be used for gaming, when the economics of mining turned negative, miners would have no secondary market of gamers willing to buy their hardware. This feature ensured that many miners would continue to prefer GeForce Gaming GPUs to the newly launched SKU, undermining Defendants' public efforts to quarantine mining-related sales in the OEM segment. Indeed, as the Company's own sales numbers reflected, crypto-miners' appetite for GeForce GPUs remained fierce well into 2018.

### 2. Weekly Sales Reports to Key NVIDIA Executives, Including Defendant Fisher, Describe Booming Crypto-Related Demand for GeForce GPUs

90. Additionally, the China sales force regularly reported miners' swelling demand for GeForce products to NVIDIA's U.S. headquarters. According to FE 1, the approximately four China account managers were required to send weekly GeForce sales reports by email to NVIDIA executives in the United States, a practice that began before the crypto-bubble started to expand in late 2016 and continued throughout FE 1's time with NVIDIA. These weekly sales reports from NVIDIA's China team went to, among others, Defendant Fisher, VP Worldwide GeForce Sales Milner, Taiwan-based Asia-Pacific Market Director Andy Hsu, China-based Product Marketing Manager Li Pu, and Senior Director for China David Zhang. The reports provided weekly updates on the preceding week's GeForce sales numbers, sales drivers, customers, inventory issuers, competitors, and other issues relevant to the China market. FE 1 drafted these emails personally.

91. After FE 1 discussed the growing demand for GeForce GPUs from crypto-miners in one of these emails in late 2016, FE 1's boss, Senior Sales Manager Howard Jiang, instructed FE 1 to write a report on crypto-mining in China. At the end of 2016, FE 1 was asked to put together a presentation on the crypto-mining market for GPUs in China. The presentation contained an introduction to crypto-mining, how it worked, the hardware needed to do it, and an overview of the market. FE 1 sent this presentation to Jiang and U.S.-based Senior Director for China David Zhang.

92. After FE 1 submitted the report and presentation, the weekly sales emails were modified to contain a separate section presenting crypto-related GeForce GPU sales based on data gathered from NVIDIA's customers in China. Fisher (Huang's direct report) and key members of his Gaming segment executive team thus received weekly updates on the number of GeForce GPUs being sold to crypto-miners in China throughout 2017. FE 1 also commented regularly on the trend in these weekly updates,

highlighting the significance of cryptocurrency mining to GeForce demand alongside the quantitative sales data on the subject. ***These weekly reports quantifying the impact of crypto-mining demand on GeForce sales in China went to Fisher, Milner, Zhang, and others throughout 2017***.

93.   In addition, FE 1 explained that the China sales team sent quarterly spreadsheets to the U.S.-based GeForce executive team, including Defendant Fisher, Milner, and Zhang. These spreadsheets presented data about the preceding quarter's transaction data, market share, and GeForce GPU sales to crypto-miners in China.

### 3.   March 2017 Presentation to Defendant Fisher and Other Top Gaming Executives Warns of Growing Dependence on Crypto-Mining Demand

94.   FE 1 warned key members of NVIDIA's executive team of the rapid rise in demand for GeForce GPUs by crypto-miners in person two months before the Class Period began. In March 2017, Defendant Fisher, Milner, and Zhang visited China to meet with the Company's sales team there. (FE 1 stated that this was the fifth or sixth time that FE 1 had met Fisher, the first being approximately ten years before.) During the visit, FE 1 gave a presentation to Fisher, Milner, Zhang, and Howard Jiang in which FE 1 emphasized the explosion of crypto-related sales of GeForce GPUs in China. FE 1 specifically reported that ***sales to miners had caused GeForce sales to almost double in a short period***. FE 1 told Fisher and the others that FE 1's customers (NVIDIA's partners) were reporting that sales to crypto-miners were driving GeForce revenues in the country and stated that the mining market was very important. FE 1 also cautioned the group that NVIDIA had to "take care," given the growing reliance on crypto-miners, which ***Fisher called "dangerous"*** during the meeting.

95.   Three months later, in June 2017, FE 1 met with Milner and other NVIDIA executives at a computing expo and again discussed the issue of cryptocurrency-related GeForce sales. FE 1 reiterated the impact of crypto-mining on GeForce revenues and recounted conversations that FE 1 had recently had with a customer in Taiwan about the rise in mining. Of course, this discussion only underscored for Milner and the others what the weekly reports and quarterly spreadsheets documenting massive sales of GeForce GPUs to crypto-miners had been telling them for months.

96.   After FE 1's presentation to Fisher, Milner, Zhang, and Jiang in March 2017 (¶ 94) and FE 1's commentary about crypto-mining's impact on GeForce revenues in the weekly sales reports sent

to Fisher, Milner, and Zhang (¶¶ 90-92), Milner contacted FE 1 directly to discuss the China market. During the second half of 2017, FE 1 emailed one to two times a month directly with Milner.

97.     FE 1 stated that the emails with Milner often focused on the impact of cryptocurrency mining on GeForce sales.  FE 1 stated that Milner, who was well-versed in the subject due to the weekly email reports and FE 1's March 2017 presentation, often asked technical questions about how graphics cards employing GE Force GPUs were used to mine cryptocurrency.  FE 1 also recalled the pair discussing the shortage of GeForce GPUs in China that resulted from the crypto-related demand, which FE 1 raised repeatedly throughout 2017.

### 4.     Bulk Purchases in China, the United States, and Russia Highlight the Popularity of GeForce GPUs Among Crypto-Miners

98.     In addition to the mountains of internal data documenting torrid cryptocurrency-related GeForce sales building up at NVIDIA's headquarters, reports of bulk purchases by miners across the globe confirmed the phenomenon.  FE 1 recounted that, beginning in 2016 and continuing through 2017, mining enterprises placed huge orders for GeForce graphics cards from NVIDIA's partners, often in quantities of 50,000 or 100,000 per order.  FE 1 explained that these bulk orders were deployed to build mining rigs, which each contained eight GeForce cards.  These orders came both from indigenous miners and from representatives of cryptocurrency "farms" who travelled from Russia and elsewhere in Europe and Asia to make bulk purchases from the Chinese manufacturers (NVIDIA's partners).  FE 1 reported that this was "common knowledge" at the Company's China offices and that there was "***no question [that] NVIDIA was concerned***" that if cryptocurrency-mining demand were eliminated, it would have a material impact on revenues.

99.     The same pattern was occurring in the United States.  To take one account, FE 2, the Senior Director one direct-report removed from Huang, stated that GeForce Gaming GPUs were the clear favorite among crypto-miners.  Moreover, FE 2 stated that "[i]t was ***common knowledge*** in the [C]ompany" that GeForce was being selected by the miners over NVIDIA's higher-end and more expensive Quadro and Tesla processors.  Indeed, since GeForce was cheaper, miners purchased it "9 out of 10" times.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

100.    FE 2 based this estimate on the fact that about two times per month, miner groups would come to NVIDIA looking to purchase cheap Gaming graphics cards in bulk amounts, such as 2,000 cards, for crypto-mining.  Each time that occurred, a GPU Product Manager such as Summit Gupta would be called in to upsell the miners a professional product like the Quadro or Tesla.  When the miners learned of the cost of the higher-end processors, they would flatly refuse.  FE 2 stated that the miners were then usually referred to a third-party distributor.  FE 2 reported that he had conversations with Gupta and other Product Managers about these incidents, which provided the Company with ample evidence that its GeForce Gaming GPUs were being bought up by miners *en masse*.

101.    FE 4 observed the same trend unfolding in Russia.  FE 4 was responsible for social media promotion of NVIDIA gaming GPUs in Russia before and during the Class Period.  FE 4, who frequently discussed GPU demand and sales with retailers in his professional capacity, learned that miners were purchasing NVIDIA Gaming GPUs in bulk.  FE 4 observed a huge percentage of GPUs being sold to cryptocurrency miners, and not gamers, in late 2017.  For example, one Moscow retailer sold 2,000 NVIDIA GPU units to a single customer during this period, all for cryptocurrency mining.  FE 4 estimated that, by the first half of 2018, *50% of all NVIDIA GPUs being sold in Russia were to miners*. As a result, shortages grew so great that retailers in Moscow began limiting the number of GPUs that customers could buy.

### 5.    Internal GeForce Experience Data Shows GeForce Gaming GPUs Being Used for Crypto-Mining

102.    In addition to the reports being provided by NVIDIA's sales force nearly in real time, Defendants knew, or were reckless in not knowing, that crypto-miners were buying the Company's GeForce GPUs for mining in substantial quantities because of technical usage data collected through the Company's GeForce Experience software.

103.    GeForce Experience is a type of telemetry software bundled with the graphics drivers for GeForce GTX Gaming graphics cards.  Designed to automatically check for and install updated driver software, GeForce Experience purports to optimize graphics settings to improve graphics performance while gaming.  It also allows users to stream and share what they do on their computers with others.  Defendant Fisher has called GeForce Experience "the heart of our gaming platform."

104.    This software was widely used.  NVIDIA has publicly claimed that "mid-to-high 90%" of its users use GeForce Experience.  In November 2016, NVIDIA reported 80 million users of GeForce Experience.  In July 2017, the Company announced that GeForce Experience was available in its all-important China market.  Fisher reported at the Company's annual Investor Days that user figures had grown to 90 million by May 2017 and 100 million by March 2018.

105.    By NVIDIA's own account and those of former employees, the data gathered from users of GeForce Experience tracked how GeForce GPUs were being used.  The "GeForce Experience FAQ" on NVIDIA's website from the summer of 2017 stated:

> **The application collects data** needed to recommend the correct driver update and optimal settings, including hardware configuration, operating system, language, installed games, game settings, **game usage**, game performance, and current driver version.  If a user is signed into an NVIDIA account, the data is identifiable.  All data collected is protected by NVIDIA's privacy policy.

106.    This remained the Company's publicly stated policy until May 2018, when it was changed to refer readers to NVIDIA's privacy policy, which does not explicitly address what data is collected through the GeForce Experience software.

107.    FE 1 confirmed that NVIDIA was aware of exploding cryptocurrency-related demand for GeForce GPUs through the GeForce Experience data.  FE 1 explained that the software allowed the Company to monitor usage and informed it whether a GPU was being used for gaming or mining.

108.    FE 1 emphasized that GeForce Experience data was used by management and that they understood the market change—specifically, the increased demand—brought on by cryptocurrency mining.  "**We actually know this data**," FE 1 said.  Indeed, FE 1 recalled David Zhang, the U.S.-based Senior Director for China, explicitly discussing how GeForce Experience data allowed NVIDIA to track mining usage.  Of Defendants' later claims that they could not determine whether GeForce GPUs were being used for mining, FE 1 scoffed, "**NVIDIA sure lied to everyone**."

**6.    September 2017 Presentation Quantifies GeForce Sales to Miners in China**

109.    According to FE 1, in August 2017, U.S.-based Senior Director for China David Zhang commissioned a presentation on crypto-mining's effect on GeForce sales in China, which had been requested by executives in the United States, **including Fisher** and Milner.  Over the next few weeks,

senior members of the China sales team completed five drafts of a PowerPoint presentation, entitled "Cryptocurrency/Mining Update, China."   These drafts were circulated to Zhang and Senior Sales Manager Howard Jiang, who provided feedback and edits through the revision process.  In September, FE 1 sent the presentation to Zhang, Jiang, Asia-Pacific Market Director Andy Hsu, Product Marketing Manager Li Pu, and other senior managers.

110.   The presentation contained a trove of internal data and other information reflecting NVIDIA's tracking of crypto-related GeForce sales in China and the Company's intention to target crypto-miners as a substantial source of additional GeForce (and therefore Gaming Segment) revenue. For example, the second slide of the presentation, entitled "China Mining Market Share High in Global," highlighted China's prominent role in fueling the increasing interest in crypto-mining worldwide.  The slide explicitly addressed the "[m]ining impact to GeForce business," reporting "1.5M GTX sitting in mining."  FE 1 explained that this meant that, ***between January and September 2017, NVIDIA had sold 1.5 million GeForce GTX units to miners in China***.  The presentation reported that sales were not limited to Chinese miners, noting, "China Mining Systems are also shipped to overseas."  The deck warned, however, of "***[d]emand fluctuation***" associated with these sales and noted adverse developments in the China crypto-mining market that posed a risk to GPU sales in the country.

111.   Another slide, titled "China April-July Mining Sellout Data," detailed monthly internal sales data concerning GeForce sales to crypto-miners.  The slide stated that NVIDIA had sold approximately 840,000 GeForce GPUs to miners from April to July 2017, providing sales data on a monthly basis.  Based on the conservative price point of $150 per unit (GTX GPUs sell for as high as $800 per unit, depending on the model), this internal data translated into ***$126 million in undisclosed sales of GeForce GPUs to miners over a four-month period in the China market alone***.  The slide also revealed NVIDIA's internal assumption that it was capturing 70% of the crypto-related GPU market in China.  A different slide noted, "China currently Mining GPU run-rate of @200Ku/month"—that is, NVIDIA forecast 2.4 million units sold annually in China alone, translating into $360 million in additional crypto-related GPU sales.

112.   Another slide was titled "New Market, New Business Model" and detailed how NVIDIA should approach the crypto-mining market.  It expressly noted that "Cryptocurrency/Mining (Block-

Chain Technology) biz [would] continue increasing" but again warned that "[t]he cryptocurrency market [came] with **high risk and severe fluctuation**."  According to the same slide, the plan was to "Build up Mining Eco System" by effectively connecting with "AIC [add-in-card manufacturers]/LBHs [local brand holders][,] System builders[,] **Top Miners**[,] [and] Software developers."  Another slide described the new market as "Dynamic, Risky, Concentrated," but stated encouragingly that selling to crypto-miners "becomes long-term business with connection to top miners."

113.    Yet another slide emphasized the importance of China to worldwide Ethereum mining, noting that China Ethereum mining pools (large-scale operations in which capital is pooled to finance crypto-mining) accounted for 40% of the world's share.  Another slide outlined what NVIDIA intended to adopt as a "solid plan" for addressing this rich new market, which FE 1 explained involved the Company preparing for large mining customer orders in excess of 100,000 GPUs per order.  The next slide described how NVIDIA would "**Direct Engage Top 10-20 miners**."  Apparently to that end, a slide near the end of the presentation listed the ten largest commercial miners in China by name, next to which was the mine owner's name, cell phone number or email address, existing mining GPU stockpile, and "Monthly demand & forecast (Units)."

### 7.    January 2018 Licensing Agreement Revision Expressly Accommodates Crypto-Miners

114.    On January 1, 2018, NVIDIA announced a significant change to the End User Licensing Agreement ("EULA") for the GeForce GPU product line:  users would no longer be permitted to use GeForce GPUs in datacenters (large groups of networked computer servers used by organizations for remote storage and data processing).  The new EULA, however, contained an important carve-out.  The provision read:  "No Datacenter Deployment.  The software is not licensed for datacenter deployment, **except that blockchain processing in a datacenter is permitted**."  In other words, NVIDIA would no longer allow industrial-scale GeForce GPU use in datacenters—**unless it was for crypto-mining**.

115.    While NVIDIA told CNBC that GeForce GPUs "were never designed for data center deployments with the complex hardware, software, and thermal requirements for 24x7 operation, where there are often multi-stack racks," users saw the move as an effort to push commercial datacenters from GeForce GPUs (which can be purchased for several hundred dollars each) into buying the Company's

more powerful—and far more expensive—Tesla and Quadro GPUs (which cost several thousand dollars each).  Of course, the justification for prohibiting GeForce GPUs in conventional commercial datacenters applied *equally* to crypto-mining, which also involves around-the-clock operations in multi-stack racks requiring enormous energy just for cooling.  One observer noted in a typical response to an article discussing NVIDIA's move:  "I love in the same breath that they lament that these cards are not designed for a 24x7 environment *but then say that they are ok for mining*.  As if mining isn't being run all day everyday [sic] to recoup the card expenses."

116.    The fact was, Defendants knew that miners could not be pushed into the more expensive products, as the economics of mining would not support it.  Indeed, FE 2 knew that NVIDIA salespersons regularly failed to upsell miners on the higher-end professional Tesla and Quadro GPUs.  "9 of out 10 times," FE 2 said, miners would purchase the cheaper GeForce Gaming GPU.  ¶ 99.  But because Defendants knew that the prolific growth in GeForce revenue in recent quarters owed to crypto-miners buying these GPUs, they inserted the carve-out provision into the EULA to ensure that *these* sales could continue unabated.  As FE 2 explained, "*they knew GeForce was being used for crypto*, and there was no way they could convince [miners] to use a pro GPU, so they carved it out."  The accommodation was a "classic move," which FE 2 said "was almost guaranteed to have been done by Jensen [Huang] himself."

117.    In August, FE 2 attended the annual ACM SIGGRAPH conference, a prominent gathering of tens of thousands of tech industry professionals.  Huang was the keynote speaker.  Although no longer working at NVIDIA, FE 2 met up with former colleagues from the Company, including NVIDIA's Quadro Senior Director of Product Management Scott Fitzpatrick, the Head of Sales, and other sales colleagues.  FE 2 recalled that his former colleagues were incensed by the EULA revision, saying that it was motivated by a marketing justification to prevent the use of lower-priced GeForces in datacenters and fuel sales of the more expensive Tesla and Quadro products instead.  Meanwhile, the cryptocurrency carve-out reflected that the Company understood that mining was a significant source of GeForce sales and constituted an obvious accommodation to the miners on whom rising GeForce revenues depended for support.

E.    **Securities Analysts Corroborate NVIDIA's Dependence on Crypto-Related GeForce Sales During the Class Period**

118.    Consistent with the accounts of NVIDIA's former employees, research analysts published reports after the Class Period showing that, contrary to Defendants' representations during the Class Period, the bulk of NVIDIA's revenues in its Gaming Segment were not from sales to gamers, but rather from sales to crypto-miners.

119.    In January 2019, for example, RBC produced a report seeking to analyze what the true effect of cryptocurrency-related sales had been on NVIDIA's revenue from April 2017 to October 2018. The report concluded that NVIDIA had "generated $1.95B in total revenue related to crypto/blockchain." The report pointedly noted that "[t]his compares to [the] company's statement that it generated ~$602M over the same time period" in the OEM segment.  In other words, RBC's analysis indicated that ***NVIDIA had understated its cryptocurrency-related revenue by $1.35 billion*** over an 18-month period that largely overlapped with the Class Period.  Put differently, Defendants had disclosed only ***30.8%*** of its cryptocurrency-related sales, ***all*** of which it had reported in its OEM segment, while Defendants did not specifically report ***any*** cryptocurrency-related sales in its Gaming segment.

120.    Industry press seized on the RBC analysis immediately, producing headlines such as "Analyst says ***Nvidia lied about its cryptocurrency earnings to avoid stock crash:  They may have concealed revenue to mask shrinking demand***" (TechPost); "Analyst Finds Nvidia Earned $1.35 Billion More in Total Crypto Revenue Than Stated" (Yahoo! Finance); "RBC Capital Markets Analyst Investigates NVIDIA Earnings, Discovers ***Over $1 Billion More Than Stated***" (Bitcoin Exchange Guide); and "Chipmaker NVIDIA Could Have ***Masked Revenue Figures***, Says Royal Bank of Canada Analyst" (Blokt).

121.    As Defendants themselves tacitly conceded after the Class Period, their prior statements that Gaming demand had been strong, that only a "small amount" of GeForce sales had gone to miners, and that the "vast majority" of crypto-related demand had been satisfied by the Crypto SKU were false:

> We are still working through the excess channel inventory that we have ***in gaming***.  We indicated back in November that we felt that would take about 1 to 2 quarters to work through. . . .  We look at [Gaming revenue over the next year] to be flat to slightly down. . . .  We took this opportunity after overall cryptocurrency to find a quarter that was ***not tainted with cryptocurrency*** to come up with, what we believe is, a normalized run rate for overall gaming. . . .  [W]e're still working through that excess inventory [in Gaming].

**F.      Independent Expert Analysis Confirms That NVIDIA Vastly Understated Crypto-Related Sales throughout the Class Period**

122.    To confirm the accounts of the former employees detailed above and the post-mortem estimates of observers such as RBC, Lead Plaintiffs retained an economic consulting firm with specific expertise in the cryptocurrency markets to conduct an independent analysis of NVIDIA's true reliance on crypto-related revenues during the Class Period.  This analysis confirmed that Defendants grossly understated NVIDIA's crypto-related sales, misleading investors into believing that growth in NVIDIA's all-important Gaming segment was due to traditional demand from gamers instead of crypto-miners.

123.    Prysm Group is an economic consulting firm based in New York and Los Angeles that specializes in distributed ledger and blockchain technology.  Prysm Group is led by Drs. Cathy Barrera and Stephanie Hurder, aided by a team of analysts.

124.    Dr. Barrera is the lead collaborator at the MIT Cryptoeconomics Lab, a former tenure-track Professor of Economics at Cornell University and former Chief Economist at ZipRecruiter.  Her research on the economics of blockchain has been presented at the Defense Advanced Research Projects Agency (DARPA), the Federal Reserve, Harvard University, and Stanford University.  Dr. Barrera holds a PhD in Business Economics from Harvard University.

125.    Dr. Hurder is a Visiting Scholar at the Center for Cyber-Physical Systems and the IoT at the University of Southern California and a former management consultant with the Boston Consulting Group.  She has led seminars on the economics of blockchain for groups including IBM Blockchain Accelerator, Polychain Capital, and Tech Coast Angels.  Dr. Hurder holds a PhD in Business Economics from Harvard University.

126.    Prysm Group designed and performed a rigorous demand-side analysis to determine the amount of NVIDIA's revenues attributable to crypto-related sales from May 2017 through August 2018.  Specifically, Drs. Barrera and Hurder examined the top three GPU-mined cryptocurrencies during the Class Period (Ether, Z-Cash, and Monero) for changes in the hashrate, which measures how much computation power is being used by the network for mining.  For each of these cryptocurrencies, they took the quarter-over-quarter change in the hashrate and, utilizing cryptocurrency-specific hash function information, estimated the total units of various popular GPUs required to provide the increase in

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

computational power.  Using NVIDIA market-share data provided by a leading semiconductor industry research data provider, Mercury Research, and applying conservative price and hashrate estimates, Prysm Group concluded that NVIDIA earned cryptocurrency-mining-driven revenue of *$1.728 billion* over this period.  Like RBC's analysis, Prysm Group's data-rich computation contrasts materially with the $602 million in crypto-related sales disclosed by NVIDIA, all of which resided in the Company's Crypto SKU in the OEM segment.  The difference in figures means that ***Defendants understated NVIDIA's crypto-related GPU sales by approximately $1.126 billion from May 2017 to August 2018***.

127.    Prysm Group's comparison of reported-versus-actual crypto-related GPU sales is set forth below and demonstrates that Defendants understated their true crypto-related revenue each quarter—usually by hundreds of millions of dollars.

| FY 2018 | | | FY 2019 | | |
|---|---|---|---|---|---|
| 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | Total |
| **NVIDIA's Reported Revenues for Crypto SKU** | | | | | |
| $150m | $70m | $75m | $289m | $18m | **$602m** |
| **Prysm Group Analysis – All Cryptocurrency-Related Revenues** | | | | | |
| $349m | $299m | $541m | $364m | $175m | **$1,728m** |
| **Difference Between Reported Revenues for Crypto SKU and all Cryptocurrency-Related Revenues Calculated by Prysm Group** | | | | | |
| $199m | $229m | $466m | $75m | $157m | **$1,126m** |

**G.    The Truth Emerges**

**1.    August 16, 2018:  With Demand from Crypto-Miners Gone and Inventory Ballooning, Defendants Falsely Assure Investors That They Are "Masters" of Managing NVIDIA's Channel**

128.    Investors first began to learn about the extent of NVIDIA's dependence on sales to cryptocurrency miners on August 16, 2018, when the Company lowered its revenue guidance by approximately 2.2% for 3Q18 and revealed that it no longer expected a meaningful contribution from cryptocurrency miners for the remainder of the year.  Kress stated that while the Company "had previously anticipated cryptocurrency to be meaningful for the year, we are now projecting no

contributions going forward."   The Company's revised earnings forecast—which "includ[ed] no contribution from crypto"—was significantly lower than the market had expected.   When asked by analysts for more detail about NVIDIA's revised forecast, Kress admitted that "over the last several quarters, we have seen the impacts of crypto and what that can do to elevate our overall gross margins." Kress further explained, "We believe we have reached a normal period as we're looking forward to essentially no cryptocurrency as we go forward."   For his part, Huang conceded that "probably . . . *a great deal*" of cryptocurrency miners had bought NVIDIA's GeForce gaming cards, partially exposing the truth that NVIDIA's cryptocurrency-related exposure was not contained almost exclusively in the reported revenues for the OEM segment.   Separately, the Company revealed that ***inventories had ballooned more than 36% from $797 million in 2Q19, to $1.09 billion in 3Q19***.

129.   On the news of NVIDIA's lowered guidance and swelling inventory, the price of NVIDIA's stock fell by 4.9%, from a close of $257.44 per share on August 16, 2018, to a close of $244.82 per share on August 17, 2018.

130.   Investors and the financial press immediately connected the share price decline to NVIDIA's guidance revision and soft results from its cryptocurrency sales.   In an early-morning August 17, 2018 article entitled "Nvidia stock drops as crypto-mining decline overshadows earnings beat," *Reuters* reported that NVIDIA's shares "fell as much as 5 percent in after-hours trading on Thursday after the chip maker said cryptocurrency-fueled demand had dried up and it forecast sales below Wall Street targets, overshadowing quarterly results that otherwise beat expectations."   Similarly, in an article entitled "NVIDIA Earnings Soar 91%, but Cryptocurrency Bust Spooks the Market," financial press outlet *The Motley Fool* posited that "[t]he culprit [for NVIDIA's stock price decline] was third-quarter revenue guidance coming in lower than Wall Street was expecting, due to the company anticipating that sales to the cryptocurrency market will continue to decline significantly."

131.   NVIDIA's August 16, 2018 disclosure partially corrected Defendants' prior materially misleading misstatements and omissions, which had falsely minimized the impact of cryptocurrency-related sales on NVIDIA's financial performance, by demonstrating that cryptocurrency-related sales were in fact a substantial and significant driver of the Company's revenues and, specifically, its Gaming segment revenues.   Notwithstanding that partially corrective information, Defendants did *not* disclose

that: (1) beginning in 2017, NVIDIA had built up its inventory of GeForce GPUs in order to satisfy anticipated continued demand from crypto-miners (*see* ¶ 88); (2) there was insufficient organic gaming demand for GeForce GPUs to mitigate the loss of cryptocurrency-related demand; and (3) the Company's glut of unsold GeForce GPUs would in fact persist and negatively impact the Company's financial performance because gamers could not replace the demand from crypto-miners.  In fact, Huang downplayed concerns about the rapid growth of NVIDIA's inventory:

> We're expecting the channel inventory to work itself out.  ***We are masters at managing our channel, and we understand the channel very well***.  As you know, the way that we go to market is through the channels around the world.  ***We're not concerned about the channel inventory***.  As we ramp Turing, any—whenever we ramp a new architecture, we ramp it from the top down.  And so we have plenty of opportunities as the—as we go back to the back-to-school and the gaming cycle to manage the inventory, so we feel pretty good about that.

These remarks echoed Huang's earlier claims that any decline in crypto-related demand would be absorbed by demand from gamers, NVIDIA's "core business."

132.    Analysts credited Defendants' reassuring statements.  For example, on August 16, 2018, Evercore expressed the view that Defendants' "commentary on inventory suggests a relatively well-managed channel," noting that "the company suggested that the channel inventory was at the low end of the range[.]"  The next day, CFRA Equity Research reported that "[w]e think NVDA has de-risked its portfolio from crypto"; MKM Partners reached the same conclusion in a report entitled "Crypto De-risked, Inventory Normalization is Next Step"; and UBS reported that "***crypto has now fully reset*** to make things simpler going forward[.]"  Also on August 17, 2018, Morgan Stanley discussed the increase in inventory, reporting Defendants' statements on the earnings call and that "[i]n our callback, the company expressed confidence that this would be ***a smooth channel transition, and that inventories are not out of line***."  MKM Partners' report echoed Huang's claim about inventory, stating that "we believe that ***lower end GPU product will likely work itself through by the end of the October quarter***."  The same day, JPMorgan summarized, "the demand environment remains strong in the current quarter on continued blockbuster gaming titles/e-sports strength."

### 2.     November 15, 2018: Investors Learn New Information Regarding NVIDIA's Reliance on Crypto-Miners, Exposing a Glut of Unsold GeForce Inventory

133.     Defendants' false assurances aside, the news soon got significantly worse.  On November 15, 2018, investors received a more complete picture of NVIDIA's dependence on crypto-mining demand when the Company issued financial results for 3Q19, announcing a nearly 2% revenue miss. Moreover, NVIDIA announced that it was expecting revenues of only $2.7 billion in 4Q19, a ***7% decline*** year-over-year.

134.     In her prepared remarks, Kress acknowledged the full extent to which the Company's Gaming revenues had been dependent on cryptocurrency-related demand: "***Gaming was short of expectations as post crypto channel inventory took longer than expected to sell through***.  Gaming card prices, which were elevated following the sharp crypto falloff, took longer than expected to normalize." This, of course, could not have been the case had Kress's prior assurances that the "vast majority" of crypto-related demand was met by the Crypto SKU been true.  Nevertheless, Kress stated:

> Let's continue with our gaming business. . . .  Although the cryptocurrency wave has ended, the channel has taken longer than expected to normalize. . . .  [O]n midrange Pascal [GeForce] gaming cards, both channel prices and inventory levels remained higher than expected.

Kress also noted gross margin results "below our outlook . . . following the sharp falloff in crypto demand."

135.     Of equal significance, Defendants disclosed that this problem—excess Gaming GPU inventory following the disappearance of crypto-miners—would persist for at least 12 weeks, which Huang admitted would amount to about $600 million in lost revenue.  The Company's 8-K confirmed that the disappointing "gaming revenue outlook for the fourth quarter of fiscal 2019 [was] impacted by the expected work-down of Pascal [GeForce] mid-range gaming card inventory in the channel . . . [and] assumes no meaningful shipments of mid-range Pascal GPUs during the quarter."  Defendants' purported "mastery of the channel" had been a fiction; to the contrary, they had flooded the channel with GeForce inventory to meet crypto-miners' demand just as that demand began its inevitable decline.  Without the throngs of gamers waiting to buy up these products as Defendants had promised, NVIDIA was forced to wait until the inventory could be burned off, recognizing no new revenue for new shipments for at least a

1  full quarter.

2      136.    During the question-and-answer session that followed, virtually every question focused on

3  NVIDIA's inventory problem, with analysts expressing their surprise at the disclosures in light of

4  Defendants' prior statements.  For example, an analyst at BofA Merrill Lynch queried, "[W]hat needs to

5  happen to work down this midrange Pascal inventory? . . .  Because the thinking was that this could be

6  cleared within the October quarter, but it hasn't."  Huang responded, "[W]e came into Q3 with excess

7  channel inventory post the crypto hangover."

8      137.    A Sanford C. Bernstein & Co. analyst observed that the Company's revelations did not

9  square with Defendants' assurances earlier in the Class Period:

> [T]he last several quarters, you've been saying, like on this call, that you guys felt like
> you had a really good handle on the channel, and yet it seems like maybe that wasn't
> exactly the case. . . .  Like what happened?  Because this tone is a little different from
> what we've heard over the last few earnings calls from you.

13      138.    Huang again had to concede that the supposed pent-up demand for the Company's

14  Gaming GPUs was not real, stating that "*[t]he crypto hangover lasted longer than we expected*."

15      139.    The day after the call, analysts from BMO questioned Defendants' credibility:  "[t]he

16  large shortfall in guidance due to a bloated channel due to crypto-currency is in *sharp contrast to the*

17  *comments around channel inventory from the company at the last earnings call*," noting also that

18  "there is a high likelihood that NVIDIA will not grow next year."  BMO concluded that "*NVIDIA's*

19  *growth in gaming over the last year and half was aided in a large part due to a 1x event*

20  *[cryptocurrency] which is not coming back*, at least not any time soon."

21      140.    Analysts at Deutsche Bank reported the same day, "*Gaming does not appear to be as*

22  *compelling an example of growth as many previously believed*," observing that "NVDA finally

23  stumbled as the fall-off in crypto demand and the resulting ballooning of inventory impacted its quarter

24  and more severely impacted the guidance."  Deutsche Bank concluded, "we expect the inventory

25  adjustment to reset Gaming segment expectations to a meaningfully lower level and *call into question*

26  *what the true growth rate of Gaming was/is*."  Similarly, Macquarie noted that the "[m]agnitude of the

27  weakness suggests that *the crypto benefit was much higher than previously thought, and could raise*

28  *questions about Gaming growth*."

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

141.    Also on November 16, 2018, Morgan Stanley also questioned the veracity of Defendants' prior assurances.  Its analysts first predicted, "[t]he stock will likely not bounce back right away, given the severity of the miss post management voicing confidence throughout the quarter that the litany of cautious data points did not signal a potential problem in gaming."  Morgan Stanley continued:

> The implication of [Defendants'] commentary is that a larger portion of demand in late 2017/early 2018 was for crypto than they had initially indicated, and that an end to the crypto bubble caused a channel refill which overshot.  As a result, in the January quarter, the company will literally ship almost no Pascal product into the channel, to allow inventory to clear.  Pascal product is about one-third of the total gaming business.

Morgan Stanley indicated that the Company's 3Q19 revelations gave reason to doubt Defendants' prior statements regarding the supposedly strong demand from gamers:

> ***There is also the question of where end demand actually has been, ex-crypto***; the gaming business peaked at $1.7 bn per quarter, but given that we now have to burn off more than $500 mm worth of channel inventory, end demand was probably closer to $1.5 bn.

The report concluded, "the stock isn't likely to snap back right away, as investors that we talked to are certainly asking some tougher questions."

142.    Under the heading, "Our Conclusion—Frustrating," a November 15, 2018 Wells Fargo report focused on Defendants' contradictory statements about the Company's inventory:

> While we can appreciate that NVIDIA's weak F4Q19 outlook is impacted by a 1-2 quarter work-down of Pascal mid-range gaming card inventory in the channel (~$600M; assuming no sell-in in F4Q19 as crypto-related dynamics flush through the channel), coupled with a seasonal decline in game console builds, ***we think investors will be frustrated by NVIDIA's comments exiting F2Q19 that:  ". . . we [NVIDIA] see inventory at the lower-ends of our stack . . . inventory is well positions for back-to-school and building season that's coming up on F3Q19 . . ."*** (quotations and modifications in original).

The two sets of statements could not be squared.

143.    The news media was equally surprised by the revelation that NVIDIA's revenues had been driven by unsustainable cryptocurrency mining.  On November 17, 2018, *VentureBeat* published an interview it had conducted with Huang shortly after NVIDIA's disastrous November 15 announcements.  The interviewer explained:  "***I . . . thought [cryptocurrency] was never really more than a tenth of your revenue***.  It does surprise me that it can come back and have this bigger effect."  Underscoring the

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

surprise, he asked:

> How do we get to larger numbers that actually affect the quarterly results, though? **Again, it seemed, in the past, that it was described as a small part of revenue**, and now it's something that can affect one or two quarters worth of inventory.  It's hard for me to understand why it makes a big difference.

When Huang tried to explain away NVIDIA's results as being driven by AMD's excess inventory, the interviewer expressed disbelief, stating, "I'm just trying to understand how this comes back to cause a $20 billion swing in a stock price."

144.   On the news, NVIDIA's stock price plummeted 28.5% over two trading sessions, from a close of $202.39 per share on November 15, 2018, to close at $144.70 per share on November 19, 2018.

145.   Defendants made materially false and misleading statements during the Class Period about (1) the supposedly strong continued demand for GeForce GPUs from gamers, rather than crypto-miners; (2) NVIDIA's supposed satisfaction of "most" or the "vast majority" of its crypto-related demand through the Crypto SKU reported in the OEM segment's revenue, as opposed to the Gaming segment's revenue; (3) NVIDIA's capacity to easily absorb volatility in crypto-related demand; and (4) Defendants' ability to manage fluctuations in inventory resulting from crypto-related demand volatility. These materially false and misleading statements caused NVIDIA's common stock to trade at artificially inflated prices.  Before Defendants revealed the truth through the disclosures on August 16, 2018, and November 15, 2018, the market believed NVIDIA's statements to investors.   The disclosure of previously misrepresented and concealed facts about these and other matters caused the price of NVIDIA's common stock to decline markedly, wiping out billions of dollars in shareholder value.

146.   It was entirely foreseeable that concealing from the public, among other things, that:  (1) a substantial portion of NVIDIA's recent growth in its Gaming segment—the Company's largest—was due to sales to crypto-miners, not gamers; (2) NVIDIA's exposure to crypto-related volatility was not mostly contained in its OEM segment; (3) demand from gamers was insufficient to compensate for the decline in crypto-related sales when cryptocurrency prices declined; and (4) Defendants could not properly manage the glut of GeForce GPU inventory left over when crypto-related demand declined, would artificially inflate the price of NVIDIA's securities.  It was also foreseeable that the disclosure of this information and the materialization of concealed risks associated with Defendants' misconduct

would cause the price of NVIDIA securities to decline as the inflation caused by Defendants' earlier misrepresentations and omissions was removed from the price of NVIDIA's securities.  The timing and magnitude of the price declines, and associated market commentary, negate any inference that the losses suffered by Lead Plaintiffs and the Class were caused by facts unrelated to Defendants' misrepresentations and omissions.   Accordingly, the conduct of Defendants, as alleged herein, proximately caused foreseeable losses for Lead Plaintiffs and the Class, who purchased NVIDIA securities during the Class Period.

## VI.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

147.    Defendants made materially false and misleading statements to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Among other things:

(i)      Defendants represented that cryptocurrency mining was, at most, a small, immaterial driver of NVIDIA's overall revenues, when in fact cryptocurrency mining drove a significant amount of NVIDIA's revenues throughout the Class Period;

(ii)     Defendants represented that revenues "for gaming" were driving revenue growth, when in fact a material portion of revenues through NVIDIA's purported "Gaming" segment were actually revenues from sales to cryptocurrency miners, not gamers; and

(iii)    Defendants represented that a majority of NVIDIA's cryptocurrency-related revenues originated from sales of its Crypto SKU and were reported in its "OEM" segment, when in fact a majority—over 65%—of its Class Period cryptocurrency-related revenues were obtained through its purported "Gaming" segment.  By reporting revenues for the Crypto SKU but ***not*** reporting the cryptocurrency-related revenues for the GeForce GPUs in the Gaming segment, Defendants understated NVIDIA's exposure to and dependence on cryptocurrency-related demand by roughly ***$1.13 billion*** over the course of the Class Period.

148.    Defendants also omitted material facts when speaking to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things, Defendants misled investors by omitting that cryptocurrency-related revenues were a material driver of NVIDIA's overall and Gaming-segment results, and by omitting that NVIDIA's cryptocurrency exposure extended to revenues categorized within its purported "Gaming" segment. Once Defendants chose to tout NVIDIA's Gaming-segment and overall revenues and explain key drivers

of those results and guidance, and to soothe investor concerns about cryptocurrency-related risks by identifying NVIDIA's limited exposure via its Crypto SKU, they were required—but failed—to do so in a manner that would not mislead investors, including by disclosing that cryptocurrency mining was a material driver of NVIDIA's overall and Gaming-segment revenues and that NVIDIA faced revenue risk from cryptocurrency-related revenues manifesting not just in its Crypto SKU, but also in its Gaming segment.

A. **May 10, 2017 NVIDIA Annual Investor Day**

149. On May 10, 2017, Defendants Huang, Kress, and Fisher participated in NVIDIA's Annual Investor Day. During the presentation, Defendant Fisher identified the purported "fundamental" drivers for Gaming revenues as "eSports, competitive gaming, AAA gaming, [and] notebook gaming." Defendant Fisher's statement was materially misleading because it identified the purported "fundamental" drivers of NVIDIA's Gaming segment revenues without mentioning that "Gaming" segment revenues actually were being driven significantly by cryptocurrency mining. Indeed, during second-quarter fiscal 2018, when Defendant Fisher made this statement, $199 million (or 17%) of NVIDIA's Gaming-segment revenues were actually derived from cryptocurrency mining (not gaming). ¶ 127. The misleading nature of Fisher's statement was corroborated by FE 1, who stated that (i) by 2016, NVIDIA's partners in China—which accounted for 40% to 50% of NVIDIA's worldwide GeForce revenues—reported that cryptocurrency miner demand for GeForce gaming GPUs was "exploding" (¶¶ 83-84); (ii) throughout 2017, 60% to 70% of NVIDIA's GeForce revenue in China—and therefore approximately 25% to 35% of NVIDIA's *worldwide* GeForce "Gaming" revenues, *before* considering any other geographies whatsoever—came from sales to crypto-miners (and not gamers) (¶ 86); and (iii) sales to crypto-miners in China had caused GeForce revenues to almost double in a short period, as FE 1 had specifically reported to Fisher in March 2017. ¶ 94.

B. **August 10, 2017 Earnings Call**

150. On August 10, 2017, Defendants Huang and Kress hosted NVIDIA's second-quarter fiscal year 2018 earnings call. When Goldman Sachs analyst Toshiya Hari specifically questioned whether cryptocurrency drove NVIDIA's $250 million second-quarter earnings beat and increased third-quarter guidance, Defendant Huang responded that the Company's Crypto SKU accounted for just $150 million

of second-quarter revenues, and that "we serve the vast . . . majority of the cryptocurrency demand out of that specialized product."

151.    Defendant Huang's statements identified in paragraph 150 were materially false and misleading because the majority of the cryptocurrency-related revenues during second-quarter fiscal 2018—$199 million, or 57%—was obtained through NVIDIA's Gaming segment, *not* the Crypto SKU. ¶ 127.  The falsity of this representation is also corroborated by the account of FE 1, who explained that, in NVIDIA's key China market, cryptocurrency mining had caused a dramatic increase in gaming GPU sales (¶¶ 83-84, 86, 88, 94-95, 97, 98, 107-08, 110-13), including sales of hundreds of thousands of GeForce GPUs to miners during this time (¶ 111).  It was also materially misleading for Huang to respond to an analyst's question about whether cryptocurrency drove the earnings beat and increased third-quarter guidance by stating that the Company's Crypto SKU accounted for only $150 million of second-quarter revenues because cryptocurrency-related sales through both the Crypto SKU and "Gaming" segment actually accounted for $349 million in revenues that quarter—i.e., *almost one-and-a-half times* the $250 million earnings beat.  ¶ 127.

**C.    August 12, 2017 *VentureBeat* Interview**

152.    On August 12, 2017, the website *VentureBeat* published an article containing a transcript of an interview of Defendant Huang conducted shortly after the Company's August 10, 2017 earnings call.  During the interview, the interviewer asked Huang:  "Did you say a hallelujah for cryptocurrency?" In response, Huang stated that cryptocurrency mining "represented . . . maybe $150 million or so" and that "our core business is elsewhere."

153.    Defendant Huang's statements identified in paragraph 152 were materially false and misleading because cryptocurrency actually contributed $349 million to NVIDIA's revenues for second quarter fiscal 2018—$150 million through NVIDIA's Crypto SKU, and another $199 million through NVIDIA's Gaming segment—*not* the "maybe $150 million or so" Huang claimed.  *See* ¶ 127.  Huang's statement also created the false and misleading impression that all of NVIDIA's cryptocurrency-related revenues for the quarter were captured in the Crypto SKU, when, in fact, the majority of such revenues— $199 million, or 57%—were received through the Gaming segment (not the Crypto SKU).  *Id*.  This fact is corroborated by FE 1, who explained that crypto-miners bought so much of the Company's GeForce

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

Gaming GPUs in China that approximately 60% to 70% of GeForce sales in the country—25% to 35% of NVIDIA's worldwide GeForce revenues over this period—were attributable to crypto-mining (not gaming) demand from that market alone.  ¶ 86.  It was further materially misleading to represent that NVIDIA's "core business is elsewhere"—*i.e.*, not related to cryptocurrencies—when in fact NVIDIA was reaping extraordinary revenues from that very source, to the tune of $349 million in 2Q18.  ¶ 127.  Additionally, that sum ($349 million) was 16% of NVIDIA's entire 2Q18 revenue and exceeded the revenue generated by each of three of NVIDIA's five reporting segments (*see* ¶ 43)—that is, more than its supposed "core businesses."

### D.    August 23, 2017 Form 10-Q

154.    On August 23, 2017, NVIDIA filed with the SEC its Form 10-Q for second-quarter fiscal 2018, which was signed by Defendants Huang and Kress.  In the Management's Discussion and Analysis section, which announced a 59% increase of $701 million in GPU business revenue year-over-year, Defendants represented that the increase "was due primarily to increased revenue from sales of GeForce GPU products *for gaming*."

155.    Defendant NVIDIA's, Defendant Huang's, and Defendant Kress's statement identified in paragraph 154 was materially false and misleading because—$349 million of NVIDIA's GPU revenues in second quarter fiscal 2018 actually came from sales for cryptocurrency mining, not gaming— representing almost *half* of the $701 million year-over-year increase in GPU revenues.  ¶ 127.  The extraordinary share of NVIDIA's GPU revenues attributable to cryptocurrency mining is corroborated by FE 1, who reported that Chinese crypto-miners (not gamers) alone accounted for approximately 25% to 35% of NVIDIA's worldwide GeForce revenue at this time.  *See* ¶ 86 (60% to 70% of GeForce sales in China went to crypto-miners).

### E.    September 6, 2017 Citi Global Technology Conference

156.    On September 6, 2017, Defendant Kress spoke on behalf of NVIDIA at the Citi Global Technology Conference.  During the conference, Citigroup analyst Atif Malik asked Kress:  "[W]hat steps has NVIDIA taken to avoid cannibalization of core gaming market from these cards?"  In response, Kress stated, "we covered most of cryptocurrency with our cryptocards [Crypto SKU] that we had developed[.]"

157.    Defendant Kress's statement that "we covered most of cryptocurrency with our cryptocards that we had developed" identified in paragraph 156 was materially false and misleading because the majority of cryptocurrency-related demand was not being satisfied through NVIDIA's cryptocurrency-specific cards, but rather through the Company's GeForce gaming GPUs.  Indeed, in second quarter fiscal 2018, 57% of NVIDIA's cryptocurrency revenues (or $199 million) were realized through the Gaming segment, not through the Crypto SKU, while in third-quarter fiscal 2018, 77% of NVIDIA's cryptocurrency revenues (or $229 million) were realized through the Gaming segment, not through the Crypto SKU.  ¶ 127.  That the majority of cryptocurrency-related demand was not covered through the Crypto SKU is corroborated by FE 1, who reported that crypto-miners in NVIDIA's critical China market bought so many GeForce gaming cards that they accounted for approximately 25% to 35% of NVIDIA's worldwide GeForce revenues by themselves.  ¶ 86.

### F.    November 9, 2017 Earnings Call

158.    On November 9, 2017, Defendants Huang and Kress hosted NVIDIA's third-quarter fiscal 2018 conference call.  During the call, Citigroup analyst Atif Malik asked Huang and Kress to "quantify how much crypto was in the October quarter [third-quarter fiscal 2018] and expectations in the January quarter directionally" and explain "why should we think that crypto won't impact the gaming demand in the future."  In response, Kress stated that NVIDIA's "specific crypto [cards] equated to about $70 million of revenue, which is the comparable to the $150 million that we saw last quarter."

159.    Defendant Kress's statement identified in paragraph 158 was materially misleading and omitted material facts.  Specifically, it was materially misleading for Defendant Kress to respond to a question about "how much crypto was in the October quarter" by identifying only the $70 million in Crypto SKU revenues in that quarter, while omitting that 77% of NVIDIA's total cryptocurrency-related revenues, or $229 million, were from sales to cryptocurrency miners through the Gaming segment, not the OEM segment's Crypto SKU.  ¶ 127.  Defendant Kress's omission created the misleading impression that the entirety of NVIDIA's cryptocurrency-related revenues were obtained through the Crypto SKU, when in fact over three times as much came from the "Gaming" segment as the Crypto SKU.  *Id*.  These facts are corroborated by former NVIDIA employees, who reported: (i) cryptocurrency miners in NVIDIA's critical China market did not buy NVIDIA's Crypto SKU product, but bought so many

GeForce Gaming GPUs that they accounted for approximately 25% to 35% of NVIDIA's worldwide GeForce revenues at the time (¶ 86); and (ii) by late 2017, a large percentage of NVIDIA GPUs sold in Russia were going to cryptocurrency miners (not gamers) as well. ¶ 101.

### G.    November 10, 2017 *VentureBeat* Interview

160.    On November 10, 2017, *VentureBeat* published a transcript of an interview conducted with Huang shortly after NVIDIA's November 9, 2017 earnings call.  During the interview, *VentureBeat* questioned whether "cryptocurrency is driving all of your success."  Defendant Huang responded by stating that, for NVIDIA, cryptocurrency was "small but not zero . . . .  It's large for somebody else.  But it is small for us."

161.    Defendant Huang's statement identified in paragraph 160 was materially false and misleading because it falsely characterized cryptocurrency's contribution to NVIDIA's revenues as "small" and "small for us" when, in fact, cryptocurrency-related revenues were a major, material driver of NVIDIA's revenues.  Indeed, for 3Q18, although NVIDIA only reported $70 million in sales through the Crypto SKU, total cryptocurrency-related sales were more than four times as large—$299 million— amounting to 11% of NVIDIA's reported quarterly revenues and again more than three of NVIDIA's four non-Gaming segments.  ¶ 127.  This magnitude is corroborated by former NVIDIA employees, who reported:   (i) Chinese crypto-miners bought so many Gaming GPUs that they accounted for approximately 25% to 35% of NVIDIA's worldwide GeForce revenues at the time (*see* ¶ 86); and (ii) by late 2017, a large percentage of NVIDIA GPUs sold in Russia were also purchased by cryptocurrency miners (and not gamers).  ¶ 101.

### H.    November 21, 2017 Form 10-Q

162.    On November 21, 2017, NVIDIA filed with the SEC its Form 10-Q for third-quarter fiscal 2018, which was signed by Defendants Huang and Kress.  In the Management's Discussion and Analysis section, NVIDIA stated that the 31% increase of $520 million in GPU business revenue year-over-year "was due primarily to increased revenue from sales of GeForce GPU products *for gaming*."

163.    Defendant NVIDIA's, Defendant Huang's, and Defendant Kress's statement identified in paragraph 162 was materially false and misleading.  $648 million of NVIDIA's GPU revenues in the second quarter and third quarter of fiscal 2018 was actually due to sales of GPUs for cryptocurrency

mining, *not* gaming—representing well over 100% of the Company's entire $520 million year-over-year increase in GPU revenues.   ¶ 127.   The extraordinary share of NVIDIA's GPU revenue growth attributable to cryptocurrency mining is corroborated by former NVIDIA employees, who reported: (i) Chinese crypto-miners (not gamers) alone accounted for approximately 25% to 35% of NVIDIA's worldwide GeForce revenue at this time (¶ 86); and (ii) by late 2017, a large percentage of NVIDIA GPUs sold in Russia were going to cryptocurrency miners (not gamers) as well. ¶ 101.

### I.   November 29, 2017 Credit Suisse Technology, Media and Telecom Conference

164.   On November 29, 2017, Defendant Kress represented NVIDIA at the Credit Suisse Technology, Media and Telecom Conference.  When Credit Suisse analyst John William Pitzer asked about the impact of cryptocurrency-related demand on NVIDIA's gaming revenues, Kress stated that "there probably is some residual amount or some small amount" but that "the majority does reside in terms of our overall crypto card [Crypto SKU], which is the size of about $150 million in Q2."

165.   It was materially false and misleading for Defendant Kress to state that there was only "some residual amount or some small amount" of cryptocurrency-related demand impact to Gaming revenues when, during third-quarter fiscal 2018, Gaming segment revenues from sales to crypto-miners (and not gamers) were $229 million.  ¶ 127.  It was also materially false and misleading to state that "the majority" of cryptocurrency-related demand was being satisfied by NVIDIA's "crypto card," when in fact, during second-quarter 2018, nearly 57% of NVIDIA's cryptocurrency-related sales ($199 million) was made through the Company's Gaming segment, and only 43% ($150 million) through its Crypto SKU; and during third quarter 2018, nearly 77% of NVIDIA's cryptocurrency-related sales ($229 million) was made through the Gaming segment, and only 23% ($70 million) through its Crypto SKU.   ¶ 127.   The material falsity of these representations is corroborated by former NVIDIA employees, who reported:  (i) Chinese crypto-miners (not gamers) alone accounted for approximately 25% to 35% of NVIDIA's worldwide GeForce revenues in 2017 (¶ 86); (ii) cryptocurrency miners were making enormous bulk orders of GPUs in China and the United States at this time (¶¶ 98-100); and (iii) a large percentage of NVIDIA GPUs sold in Russia were purchased by cryptocurrency miners at this time as well. ¶ 101.

1

J.       **February 9, 2018 *Barron's* Article**

2

166.    On February 9, 2018, financial news magazine *Barron's* published an article detailing an

3

interview Defendant Huang gave to a reporter following the February 8, 2018 NVIDIA earnings call.  In

4

the article, the author explained that "[w]hen I asked Huang if he wanted to point out anything in

5

particular about the report and outlook, Huang began, 'Clearly there's been a lot of talk about crypto.'"

6

Huang then stated that cryptocurrency represented a "small, overall" "part of our business this past

7

quarter."

8

167.    Defendant Huang's representation that cryptocurrency was only a "small" driver of

9

NVIDIA's business during the past quarter was materially false and misleading because cryptocurrency-

10

related revenues in fourth quarter fiscal 2018 comprised $541 million—nearly 20% of NVIDIA's entire

11

fourth quarter fiscal 2018 revenues.  ¶ 127.  The material falsity of this statement is corroborated by

12

former NVIDIA employees, who reported: (i) Chinese crypto-miners (not gamers) alone accounted for

13

approximately 25% to 35% of NVIDIA's 2017 worldwide GeForce sales (*see* ¶ 86); (ii) cryptocurrency

14

miners were making enormous bulk orders of GPUs in China and the United States at the time (¶¶ 98-

15

100); and (iii) a large part of NVIDIA's Russia GPU sales in late 2017 were to cryptocurrency miners.

16

¶ 101.

17

K.       **March 26, 2018 *TechCrunch* Article**

18

168.    On March 26, 2018, the industry publication *TechCrunch* published an interview with

19

Defendant Huang.  In the interview, in response to questions about NVIDIA's documented supply

20

problems, Defendant Huang stated that "he still attribute[d] crypto's demands as a small percentage of

21

Nvidia's overall business."

22

169.    Defendant Huang's statement identified in paragraph 168 was materially false and

23

misleading.  It was materially false and misleading to state that "crypto's demands [were] a small

24

percentage of [NVIDIA]'s overall business" when, in fact, cryptocurrency-related revenues in fourth-

25

quarter fiscal 2018 totaled $541 million—i.e., nearly 20% of NVIDIA's entire fourth-quarter fiscal 2018

26

revenues.  ¶ 127.  The material falsity of this statement is corroborated by former NVIDIA employees,

27

who reported: (i) Chinese crypto-miners (not gamers) alone accounted for approximately 25% to 35% of

28

NVIDIA's 2017 worldwide GeForce sales (¶ 86); (ii) cryptocurrency miners were making enormous

bulk orders of GPUs in China and the United States at the time (¶¶ 98-100); and (iii) a large part of NVIDIA's Russia GPU sales in late 2017 were to cryptocurrency miners.  ¶ 101.

### L.    March 29, 2018 *Mad Money* Appearance

170.    On March 29, 2018, Defendant Huang appeared on the CNBC show *Mad Money*.  During Huang's appearance, Jim Cramer, the host of *Mad Money*, asked Huang about a Wells Fargo analyst report stating that NVIDIA's "cryptocurrency risks are growing" and a JPMorgan report suggesting that "it's not possible to maintain the cryptocurrency $250 million run rate and so therefore we must be concerned about the stock of NVIDIA."  In response, Huang stated that the "core growth drivers" for the Company's revenue results were other areas of the business—Gaming, Professional Visualization, Datacenter, and Automotive—and that "cryptocurrency just gave it that extra bit of juice."  When Cramer asked Defendant Huang to confirm that "if people think [cryptocurrency] is that important, they're gonna miss the bigger picture," Huang responded, "Absolutely," and again contrasted NVIDIA's cryptocurrency-related business to the Company's "core" businesses including Gaming.

171.    Defendant Huang's statements identified in paragraph 170 were materially false and misleading.  It was materially false and misleading to minimize cryptocurrency's contribution to NVIDIA's business by stating that other areas of the business were the Company's "core growth drivers" and cryptocurrency was not, when in fact cryptocurrency-related revenues in fourth quarter fiscal 2018 comprised $541 million—i.e., nearly 20% of NVIDIA's entire fourth-quarter fiscal 2018 revenues. ¶ 127.   The material falsity of this statement is corroborated by former NVIDIA employees, who reported:  (i) Chinese crypto-miners (not gamers) alone accounted for approximately 25% to 35% of NVIDIA's 2017 worldwide GeForce sales (¶ 86); (ii) cryptocurrency miners were making enormous bulk orders of GPUs in China and the United States at the time (¶¶ 98-100); and (iii) a large part of NVIDIA's Russia GPU sales in late 2017 and approximately 50% in the first half of 2018 were to cryptocurrency miners (not gamers). ¶ 101.

### M.    August 16, 2018 Earnings Call

172.    On August 16, 2018, Defendants Huang and Kress hosted NVIDIA's second-quarter fiscal 2019 earnings call, during which Defendants disclosed that cryptocurrency-related demand had dried up. NVIDIA's Form 8-K filed the same day disclosed that the Company had seen its inventory balloon by

37% the previous quarter, and several analysts asked questions about the glut during the call.  Matthew Ramsay of Cowen and Company asked Huang and Kress if they "could talk a little bit about the gaming channel in terms of inventory, how things are looking in the channel as you guys see it."  Attempting to assuage concerns about the glut of inventory that had resulted from the disappearance of crypto-mining demand, Huang stated:  "We are masters at managing our channel, and we understand the channel very well. . . .  [W]e have plenty of opportunities as the—as we go back to school and the gaming cycle to manage the inventory."

173.    Defendant Huang's statements identified in paragraph 172 were materially false and misleading.  It was materially false and misleading to state that Defendants were "masters at managing [their] channel," "underst[oo]d the channel very well," and had "plenty of opportunities . . . [including] the gaming cycle to manage the inventory," when (i) throughout the Class Period, the overwhelming majority of NVIDIA's cryptocurrency-related revenues—$1.13 billion, or more than 65%—was made through the Gaming segment, not through the OEM segment's Crypto SKU as Defendants repeatedly represented, and (ii) the diminishment of NVIDIA's cryptocurrency-related revenues in second-quarter fiscal 2019 would continue to materially and adversely impact the Company in the form of a massive glut of unsold GeForce GPUs that NVIDIA had amassed to satisfy the anticipated demand from crypto-miners, as explained by FE 1 above (¶ 88), because these GPUs were no longer being purchased by miners and because there was not sufficient demand from gamers to mitigate the loss of cryptocurrency-related demand.  The material falsity of this statement is corroborated by former NVIDIA employees, who reported:  (i) Chinese crypto-miners (not gamers) alone accounted for approximately 25% to 35% of NVIDIA's 2017 worldwide GeForce sales (¶ 86); (ii) cryptocurrency miners were making enormous bulk orders of GPUs in China and the United States at the time (¶¶ 98-100); and (iii) a large part of NVIDIA's Russia GPU sales in late 2017 and approximately 50% in the first half of 2018 were to cryptocurrency miners (not gamers).  ¶ 101.

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

174.    A host of facts, in addition to those discussed above, support a strong inference that NVIDIA and the Individual Defendants knew or were deliberately reckless in not knowing the true facts concerning the impact of cryptocurrency-related demand on NVIDIA's financial performance when

making the misleading statements and omitting the facts discussed above.

175.    *First*, Defendants were directly informed about and had access to data showing the dramatic surge in cryptocurrency-related sales occurring during 2017 and into 2018.  FE 1 reported that, beginning in late 2016 or early 2017, NVIDIA's China sales team began meticulously tracking GeForce sales to crypto-miners, which they inputted into the Company's internal sales database.  ¶¶ 85-86.  FE 1 said that the U.S. executive team had access to this system and was in fact "obsessed" with the sales data, giving VP Worldwide GeForce Sales John Milner as an example of someone who FE 1 knew relied on it. ¶ 87.  FE 1 reported that this data showed that 60% to 70% of GeForce sales in China—NVIDIA's largest market—were going to crypto-miners throughout 2017.  ¶ 86.  In addition, the China team sent weekly GeForce sales reports to NVIDIA executives in the United States throughout 2017, including Fisher (who reported directly to Huang), Milner, and Senior Director for China David Zhang.  ¶ 90.  The reports provided weekly updates on GeForce sales numbers, sales drivers, customers, inventory issuers, competitors, and included a separate section expressly quantifying GeForce sales to crypto-miners from the week before.   ¶ 92.  The U.S. executives also received spreadsheets detailing these sales on a quarterly basis.   ¶ 93.  These reports prompted Milner (Fisher's direct report) to begin corresponding directly with FE 1 by email about crypto-related GeForce sales in China.  ¶¶ 96-97.

176.    Moreover, FE 1 recounted giving a presentation in March 2017 to high-level NVIDIA executives—including Fisher, Milner, and Zhang—that emphasized the explosion of crypto-related sales of GeForce GPUs in China and reported that sales to crypto-miners had caused GeForce sales to almost double in a short period.  ¶ 94.  At this meeting, Fisher called crypto-related demand "**dangerous**."  *Id*. Similarly, FE 1 reported meeting with NVIDIA executives in June 2017 and both discussing the issue of cryptocurrency-related GeForce sales and underscoring the impact of crypto-mining on GeForce revenues.  ¶ 95.  FE 1 created a presentation in September 2017 reporting 1.5 million GeForce GTX GPU units sold to miners during the first nine months of the year.   ¶¶ 109-10.  This presentation had been requested by the U.S. GeForce management team, including Fisher, Milner, and Zhang.   ¶ 109. Meanwhile, the China team's 2018 forecasts, assembled during the second half of 2017, anticipated a 60% rise in GeForce sales based largely on expected demand from crypto-miners.  ¶ 88.  These forecasts were sent to Fisher, Milner, and Zhang, who discussed them with FE 1 and others in calls and by email.

*Id.*  NVIDIA increased its GeForce inventory to meet the anticipated growth in cryptocurrency-related demand in 2018.  *Id.*

177.   FE 1 also explained that, beginning in 2016 and in 2017, the Company had trouble meeting GeForce demand in China because of the burgeoning mining sales, that miners from Europe and elsewhere placed huge orders for GeForce GPUs, often in quantities of 50,000 or 100,000 per order, and that all of FE 1's superiors in China knew of these bulk GeForce orders by miners.  ¶ 98.  FE 2 similarly reported regular contacts with miner groups looking to make bulk purchases of GeForce GPUs in the United States.  ¶¶ 99-100.  When NVIDIA product managers tried to upsell the miners a professional product, the miners would flatly refuse.  ¶ 100.  FE 2 reported that FE 2 had conversations with Professional Product Managers about these incidents, which provided the Company with ample evidence that its Gaming GPUs were being bought up by miners *en masse*—and not gamers.  *Id.*

178.   Further, Defendants were also informed of the true amount of cryptocurrency mining usage through data generated by NVIDIA's GeForce Experience software.  As discussed previously, GeForce Experience is telemetry software that is bundled with the drivers for GeForce GTX graphics cards.  NVIDIA has publicly claimed that more than 90% of its users use GeForce Experience, and its own website explained that the software collects a rich set of information including concerning a user's hardware configuration, operating system, installed games, game settings, game usage, and game performance.  ¶¶ 104-05.  Former NVIDIA employees have likewise explained that the data collected through GeForce Experience allowed NVIDIA to track cryptocurrency-mining usage.  For example, FE 1 stated, "We actually know this data," saying that "NVIDIA sure lied to everyone" in representing that they could not determine whether GeForce GPUs were being used for mining.  ¶ 108.

179.   NVIDIA's modification of the GeForce EULA on January 1, 2018, further supports a strong inference of scienter as to Defendants Fisher, Kress, and Huang.  *See* ¶¶ 114-17.  By prohibiting datacenters from using GeForce GPUs *unless they were used for crypto-mining*, Defendants demonstrated their knowledge that demand from crypto-miners was propping up NVIDIA's Gaming sales.  The importance of NVIDIA's flagship GeForce product line to the Company cannot be overstated: the Gaming segment earned more revenues than the Company's four others combined, with the vast majority of those revenues owing to sales of GeForce GPUs.  ¶ 44.  There can be no doubt that

Defendants Fisher (head of Gaming and the GeForce business unit), Kress (responsible for reporting NVIDIA's revenues across its different segments), and Huang (who built NVIDIA on the strength of the GeForce brand) knew of and approved, if not directed, the change to the EULA.  As the modification expressly permitted large-scale mining operations to use GeForce GPUs, it is clear that Defendants viewed crypto-mining as an important source of revenue for the Gaming segment.  *See* ¶¶ 114-17.

180.   *Second*, Defendants told investors that they personally paid close attention to NVIDIA's revenue drivers.  In public statements, Defendants repeatedly reassured the market that they were personally knowledgeable about NVIDIA's revenue drivers and about the present and expected future impact of cryptocurrency-related sales.  For example, Huang told investors during NVIDIA's August 10, 2017 earnings call that "our strategy is to stay very, very close to the market.  We understand its dynamics really well . . . .  We stay very close to the market.  We know its every single move and we know its dynamics."  During NVIDIA's August 16, 2018 earnings call, he claimed that "[w]e are masters at managing our channel, and we understand the channel very well."  ¶ 131.  Defendants' personal attention to NVIDIA's sales and repeated assurances that they were knowledgeable about the subject demonstrate their knowledge or, at minimum, severe recklessness.

181.   *Third*, many of the misstatements were made in response to pointed analyst questions about the effects of cryptocurrency-related sales.  For example, during NVIDIA's second-quarter fiscal 2018 earnings call on August 10, 2017, when an analyst asked whether cryptocurrency drove NVIDIA's second-quarter earnings beat, Defendant Huang stated that sales of the Company's cryptocurrency SKU accounted for only $150 million of second-quarter sales, and that NVIDIA served "the vast . . . majority of the cryptocurrency demand" using the cryptocurrency SKU.  ¶¶ 77, 150.  Similarly, during the Citi Global Technology Conference on September 6, 2017, Citigroup analyst Atif Malik asked Kress, "[W]hat steps has NVIDIA taken to avoid cannibalization of core gaming market from these cards?"  Kress stated in response, "we covered most of cryptocurrency with our cryptocards [Crypto SKU] that we had developed[.]"  ¶ 156.

182.   *Fourth*, Defendants knew that investors were acutely focused on how much of the Company's revenues were based on cryptocurrency-mining.  Analysts asked questions about the subject during each of NVIDIA's earnings calls during the Class Period, and Defendants were called upon to

speak about it at numerous conferences and in several interviews.  *See, e.g.*, ¶¶ 150, 152, 156, 158, 160, 164, 168, 170.  In addition, shareholders specifically asked Defendant Huang several questions about cryptocurrency-related effects on NVIDIA finances, including at the Company's May 2018 Annual Meeting of Stockholders.  Meanwhile, in an interview published February 11, 2018 in *VentureBeat*, when the interviewer asked Huang "how [he felt] about all the cryptocurrency questions" he had been fielding from analysts and investors, Huang replied:  "You can't not care about cryptocurrency.  It's a global and social and economic phenomenon."

183.  *Fifth*, that Defendants' misstatements and omissions concerned NVIDIA's primary business of selling GPUs further strengthens the scienter inference.  Indeed, statements made by Defendants during the Class Period demonstrate that GPU sales constituted the core of NVIDIA's business.  As Defendant Kress explained at the Credit Suisse Technology, Media and Telecom Conference on November 29, 2017:  "We began our business focused on still what we're focused on today.  We focus on the GPU."  Similarly, at the Morgan Stanley Technology, Media & Telecom Conference on February 26, 2018, Kress stated:  "The company is really based on one single product in terms of a GPU."  Meanwhile, NVIDIA's GPU sales represented approximately 85% of the Company's revenues, and during the Company's 2018 Annual Meeting of Stockholders, Huang explained that "[o]ur GPUs have been the segment with the highest revenue."

184.  *Sixth*, the enormity of NVIDIA's undisclosed cryptocurrency-related revenues further supports the inference that Defendants knew, or were deliberately reckless in not knowing, of its true impact.  Securities analysts have now recognized that NVIDIA's cryptocurrency-driven revenues from August 2017 through July 2018 totaled $1.554 billion, and Lead Plaintiffs' expert has likewise determined that NVIDIA earned at least $1.7 billion in cryptocurrency mining revenues during the Class Period.  These amounts are massive in relation to NVIDIA's reported results: they represent approximately 19% to 37% of NVIDIA's *entire* fiscal 2018 GPU revenue, and 76% to 147% of NVIDIA's GPU-segment growth from fiscal 2018 to fiscal 2019.

185.  *Seventh*, as analysts and the financial press recognized at the time, NVIDIA continued to conceal and misrepresent the true impact of cryptocurrency mining on its financial results even *after* it was forced to reveal on August 16, 2018, that cryptocurrency mining was a major driver of the

Company's revenues.   For example, the financial press noted that "***NVIDIA lied about its cryptocurrency earnings to avoid [a] stock crash***," explaining that "***the steep falls [in NVIDIA's stock price, including at the end of the Class Period] [we]re a strong incentive for Nvidia to mask large fluctuations in revenue***."   ¶ 120.

186.   *Eighth*, Defendant Huang's suspicious stock sale during the Class Period further supports the scienter inference.   On September 6, 2017, Defendant Huang sold 110,000 shares of his personal NVIDIA stock on the open market, unrelated to any options exercise or 10b5-1 plan, reaping $18,269,163.   As analysts later recognized, this sale was highly unusual.   Indeed, over the period of time equal in length to the Class Period but immediately preceding it, *all* of Huang's sales were made pursuant to a 10b5-1 plan and related to the exercise of options.   Moreover, the last time that Defendant Huang had sold over $10 million in NVIDIA stock in a single day was nearly a decade before, on November 21, 2007.   Defendant Huang made this massive sale of personal stock precisely because he knew at the time that, contrary to Defendants' public misrepresentations, NVIDIA was heavily dependent on crypto-currency revenues, which he knew to be unsustainable.   As a November 16, 2018 *SeekingAlpha* article sardonically noted, Defendant Huang was "prescient" in making his September 6, 2017 sale, in light of the Company's eventual disclosure that its GPU sales were, in reality, heavily driven by cryptocurrency mining.

187.   The foregoing facts, particularly when considered collectively, as they must be, support a strong inference of Defendants' scienter.

## VIII.   PRESUMPTION OF RELIANCE

188.   At all relevant times, the market for NVIDIA's common stock was efficient for the following reasons, among others:

1.   NVIDIA's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

2.   As a regulated issuer, NVIDIA filed periodic reports with the SEC and the NASDAQ Stock Market;

3.   NVIDIA regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

4.      NVIDIA was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

189.    As a result of the foregoing, the market for NVIDIA's common stock reasonably promptly digested current information regarding NVIDIA from all publicly available sources and reflected such information in the price of NVIDIA's common stock.  All purchasers of NVIDIA common stock during the Class Period suffered similar injury through their purchase of NVIDIA common stock at artificially inflated prices, and a presumption of reliance applies.

190.    A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

191.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about NVIDIA's GPU sales, associated revenues, and inventory levels, among other topics.

192.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding NVIDIA's GPU sales, associated revenues, and inventory levels, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by NVIDIA were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

193.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of NVIDIA who knew that the statement was false when made.

## X.     CLASS ACTION ALLEGATIONS

194.     Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of NVIDIA between May 10, 2017, and November 14, 2018, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of NVIDIA at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

195.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NVIDIA shares were actively traded on the NASDAQ Stock Market.  As of November 9, 2018, there were 610 million shares of NVIDIA stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class.  Class members who purchased NVIDIA common stock may be identified from records maintained by NVIDIA or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

196.     Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

197.     Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

198.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common

to the Class are:

    a.     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    b.     whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

    c.     whether Defendants acted with scienter; and

    d.     the proper way to measure damages.

199.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

200.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

201.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause economic harm to Lead Plaintiffs and other members of the Class.

202.    Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

203.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous

course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

204.   During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

205.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal NVIDIA's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

206.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased NVIDIA stock and were harmed when the truth about NVIDIA negatively impacted the price of those securities.  Lead Plaintiffs and the Class would not have purchased NVIDIA stock at the prices they paid, or at all, had they been aware of the truth about NVIDIA.

207.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

208.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

209.   Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

210.   The Individual Defendants acted as controlling persons of NVIDIA within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control

public statements about NVIDIA, the Individual Defendants had the power and ability to control the actions of NVIDIA and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## XIII. JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated: June 21, 2019

Respectfully submitted,

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

*/s/ Andrew L. Zivitz*
Andrew L. Zivitz (*pro hac vice*)
(azivitz@ktmc.com)
Matthew L. Mustokoff (*pro hac vice*)
(mmustokoff@ktmc.com)
Eric K. Gerard (*pro hac vice*)
(egerard@ktmc.com)
Nathan A. Hasiuk (*pro hac vice*)
(nhasiuk@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:   (610) 667-7706
Fax:   (610) 667-7056

-and-

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Jennifer L. Joost (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:     (415) 400-3000
Fax:     (415) 400-3001

*Counsel for Lead Plaintiff E. Öhman J:or Fonder AB and
Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:     (310) 819-3472

-and-

John Browne (*pro hac vice*)
(johnb@blbglaw.com)
Michael D. Blatchley (*pro hac vice*)
(michaelb@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:     (212) 554-1444

*Counsel for Lead Plaintiff Stichting Pensioenfonds PGB
and Co-Lead Counsel for the Class*

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

EXHIBIT A

## CERTIFICATION

Öhman J:or Fonder AB ("Öhman" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws that:

1.      Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Plaintiff's Class Period purchase and sale transactions in NVIDIA Corporation securities that are the subject of this action are attached in Schedule A.

4.      Öhman has full power and authority to bring suit to recover for investment losses suffered by all its Funds listed in Schedule A.

5.      Plaintiff has fully reviewed the Consolidated Class Action Complaint and authorizes its filing.

6.      I, Pablo Bernengo, Chief Executive Officer of Öhman, am authorized to make legal decisions on behalf of Öhman.

7.      Plaintiff intends to actively monitor and vigorously pursue this action for the benefit of the class.

8.      Plaintiff will endeavor to provide fair and adequate representation and work directly with the efforts of class counsel to ensure that the largest recovery for the class consistent with good faith and meritorious judgment is obtained.

9.      Aside from the instant action, Öhman is not currently serving nor has it sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this certification.

10.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this __20__ day of June 2019.

Öhman J:or Fonder AB

By: _____

Pablo Bernengo
Chief Executive Officer

**SCHEDULE A**

**ÖHMAN ETISK INDEX USA**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | BUY | 8/9/2017 | 500 | $172.14 |
| Com Stk | RECEIVE * | 8/17/2017 | 300 | $0.00 |
| Com Stk | BUY | 8/31/2017 | 1,500 | $169.47 |
| Com Stk | BUY | 11/30/2017 | 600 | $200.75 |
| Com Stk | BUY | 5/15/2018 | 5,400 | $245.61 |
| Com Stk | BUY | 6/21/2018 | 400 | $257.16 |
| Com Stk | BUY | 9/13/2018 | 800 | $271.39 |
| Com Stk | SELL | 6/13/2017 | 900 | $151.37 |
| Com Stk | SELL | 10/11/2017 | 1,700 | $190.92 |
| Com Stk | SELL | 1/30/2018 | 700 | $242.67 |
| Com Stk | SELL | 3/28/2018 | 600 | $221.30 |
| Com Stk | SELL | 5/23/2018 | 400 | $247.49 |
| Com Stk | SELL | 5/31/2018 | 500 | $252.14 |
| Com Stk | SELL | 7/27/2018 | 400 | $251.97 |
| Com Stk | SELL | 10/15/2018 | 1,000 | $235.38 |

**ÖHMAN GLOBAL GROWTH**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | BUY | 5/10/2017 | 15,000 | $116.02 |
| Com Stk | BUY | 3/7/2018 | 7,925 | $241.33 |
| Com Stk | BUY | 3/12/2018 | 5,931 | $251.30 |
| Com Stk | BUY | 5/14/2018 | 2,019 | $257.99 |
| Com Stk | BUY | 5/16/2018 | 2,400 | $246.12 |
| Com Stk | BUY | 5/18/2018 | 749 | $248.44 |
| Com Stk | BUY | 5/29/2018 | 2,412 | $250.49 |
| Com Stk | BUY | 6/1/2018 | 1,988 | $256.24 |
| Com Stk | BUY | 6/21/2018 | 1,173 | $257.11 |
| Com Stk | BUY | 10/26/2018 | 3,071 | $198.44 |
| Com Stk | SELL | 9/7/2018 | 1,297 | $275.79 |

**ÖHMAN GLOBAL HÅLLBAR**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | BUY | 3/19/2018 | 15,799 | $246.21 |
| Com Stk | BUY | 3/29/2018 | 1,486 | $230.23 |
| Com Stk | BUY | 4/10/2018 | 1,101 | $227.96 |
| Com Stk | BUY | 4/24/2018 | 609 | $221.24 |
| Com Stk | BUY | 5/3/2018 | 774 | $230.54 |
| Com Stk | BUY | 5/17/2018 | 1,422 | $248.69 |
| Com Stk | BUY | 10/2/2018 | 437 | $286.48 |

**ÖHMAN FONDER GLOBAL MARKNAD HÅLLBAR**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | BUY | 10/11/2017 | 3,000 | $190.94 |
| Com Stk | BUY | 12/21/2017 | 200 | $195.89 |
| Com Stk | BUY | 12/28/2017 | 300 | $197.40 |
| Com Stk | BUY | 3/6/2018 | 300 | $242.16 |
| Com Stk | BUY | 4/25/2018 | 200 | $216.66 |
| Com Stk | BUY | 5/4/2018 | 700 | $239.06 |
| Com Stk | BUY | 5/23/2018 | 600 | $247.54 |
| Com Stk | BUY | 6/21/2018 | 200 | $257.11 |
| Com Stk | BUY | 6/28/2018 | 900 | $240.86 |
| Com Stk | BUY | 7/5/2018 | 1,400 | $242.73 |
| Com Stk | BUY | 8/13/2018 | 400 | $256.12 |
| Com Stk | BUY | 9/5/2018 | 800 | $278.42 |
| Com Stk | BUY | 10/2/2018 | 1,200 | $286.48 |
| Com Stk | SELL | 9/4/2018 | 200 | $283.70 |
| Com Stk | SELL | 10/11/2018 | 1,100 | $235.08 |
| Com Stk | SELL | 10/30/2018 | 900 | $203.00 |

**ÖHMAN FONDER HJART-LUNGFOND**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | BUY | 11/12/2018 | 11,000 | $190.74 |

**ÖHMAN INDEX NORDAMERIKA**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | SELL | 8/7/2017 | 200 | $172.31 |
| Com Stk | DELIVER * | 8/17/2017 | 300 | $0.00 |

**ÖHMAN LÅRARFOND 21-44 ÅR**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | BUY | 3/19/2018 | 8,089 | $246.21 |
| Com Stk | BUY | 6/29/2018 | 1,430 | $239.63 |

**ÖHMAN LÅRARFOND 45-58 ÅR**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | BUY | 3/19/2018 | 4,998 | $246.21 |
| Com Stk | BUY | 6/29/2018 | 704 | $239.63 |
| Com Stk | SELL | 4/24/2018 | 698 | $221.15 |

**ÖHMAN LÅRARFOND 59 +**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | BUY | 3/19/2018 | 268 | $246.21 |
| Com Stk | BUY | 6/29/2018 | 32 | $239.63 |
| Com Stk | SELL | 4/24/2018 | 46 | $221.15 |

* Shares transferred from Ohman Index Nordamerika to Ohman Etisk Index USA.

# EXHIBIT B

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

We, Kevin Bergenhenegouwen and Dédé Gast-Meeuwisse, on behalf of Stichting Pensioenfonds PGB ("PGB"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. We are authorized to execute this Certification on behalf of PGB. We have reviewed the Consolidated Class Action Complaint and authorized it to be filed in this matter.

2. PGB did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. PGB is willing to serve as a co-lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. PGB fully understands the duties and responsibilities of a lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. PGB's Class Period transactions in the NVIDIA Corporation securities that are the subject of this action are set forth in the chart attached hereto.

5. Aside from the instant action, PGB is not currently serving and has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification

6. PGB will not accept any payment for serving as a representative party on behalf of the Class beyond PGB's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

We declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed this 20ᵗʰ day of June, 2019.

| Kevin Bergenhenegouwen | Dédé Gast-Meeuwisse |
|---|---|
| Head of Legal & Regulatory Affairs | Senior Legal Counsel |
| *Stichting Pensioenfonds PGB* | *Stichting Pensioenfonds PGB* |

**Stichting Pensioenfonds PGB**
**Transactions in NVIDIA Corp.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/6/2017 | 1,403 | 169.4425 |
| Purchase | 9/6/2017 | 4,209 | 169.4425 |
| Purchase | 12/4/2017 | 1,867 | 200.7125 |
| Purchase | 3/16/2018 | 14,401 | 248.3621 |
| Purchase | 3/19/2018 | 3,778 | 250.1380 |
| Purchase | 3/20/2018 | 1,015 | 249.6537 |
| Purchase | 6/15/2018 | 1,000 | 265.2625 |
| Purchase | 8/16/2018 | 4,837 | 258.3257 |
| Purchase | 8/16/2018 | 4,837 | 258.5137 |
| Purchase | 9/5/2018 | 515 | 277.5340 |
| Purchase | 9/28/2018 | 785 | 281.0225 |
| Sale | 5/31/2018 | (2,650) | 252.1842 |