1   **KESSLER TOPAZ**
2      **MELTZER & CHECK, LLP**
    ANDREW L. ZIVITZ (*pro hac vice*)
3   (azivitz@ktmc.com)
    MATTHEW L. MUSTOKOFF (*pro hac vice*)
4   (mmustokoff@ktmc.com)
    ERIC K. GERARD (*pro hac vice*)
    (egerard@ktmc.com)
5   280 King of Prussia Road
    Radnor, PA 19087
6   Tel: (610) 667-7706
    Fax: (610) 667-7056
7
    *Counsel for Lead Plaintiff E. Öhman J: or Fonder AB and*
8   *Co-Lead Counsel for the Class*

9   **BERNSTEIN LITOWITZ BERGER**
       **& GROSSMANN LLP**
10  JONATHAN D. USLANER (Bar No. 256898)
    (jonathanu@blbglaw.com)
11  JOHN C. BROWNE (*pro hac vice*)
    (johnb@blbglaw.com)
12  JEROEN VAN KWAWEGEN (*pro hac vice*)
    (jeroen@blbglaw.com)
13  2121 Avenue of the Stars, Suite 2575
    Los Angeles, CA 90067
14  Tel: (310) 819-3472

15  *Counsel for Lead Plaintiff Stichting Pensioenfonds PGB and*
16  *Co-Lead Counsel for the Class*

17  [*Additional counsel listed on signature page*]

18              **UNITED STATES DISTRICT COURT**

19         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

20                   **OAKLAND DIVISION**

| | |
|---|---|
| 21 In Re NVIDIA CORPORATION SECURITIES | Case No. 4:18-cv-07669-HSG |
| 22 LITIGATION | |
| 23 | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT** |
| 24 This Document Relates to: All Actions | |
| 25 | Date:        October 31, 2019 |
| 26 | Time:        2:00 p.m. |
| 27 | Judge:       Hon. Haywood S. Gilliam, Jr. |
| | Courtroom:   2 |
| 28 | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

STATEMENT OF RELIEF SOUGHT ................................................................. 1

STATEMENT OF ISSUE TO BE DECIDED .................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................... 1

I. INTRODUCTION ................................................................................... 1

II. STATEMENT OF FACTS ....................................................................... 3

    A. NVIDIA's Reliance on Its Gaming Segment and the China Market .......................... 3

    B. A New Cryptocurrency "Bubble" Develops .............................................................. 4

    C. Defendants Repeatedly Deny the Importance of Sales to Cryptocurrency Miners in Driving NVIDIA's Revenues ..................................................................................... 4

    D. Defendants Knew That Miners Were Behind NVIDIA's Stellar Gaming Growth ..... 6

    E. The Truth Emerges ..................................................................................................... 8

III. ARGUMENT ........................................................................................... 9

    A. Plaintiffs Adequately Plead Loss Causation ............................................................. 9

    B. Plaintiffs Adequately Plead Material Misrepresentations and Omissions ............... 15

        1. Defendants Falsely Denied That Cryptocurrency Mining Was a Material Driver of NVIDIA's Revenues ......................................................................... 15

        2. Defendants' Assurances That NVIDIA's Growth Was "From Sales of GeForce GPU Products *For Gaming*" Were False and Misleading .............. 21

        3. Defendants' Statements Identifying the Purported Drivers of Gaming Revenues Were False and Misleading ........................................................... 23

        4. Defendants' Statements That the "Vast Majority" of Miner Demand Was Served through the Crypto SKU and Omissions of NVIDIA's GeForce Revenues from Miners Were False and Misleading ..................................... 25

    C. Plaintiffs Adequately Plead Scienter ....................................................................... 28

        1. Defendants Had Access to Data Showing NVIDIA's Gaming Segment's Reliance on Cryptocurrency Miners ............................................................... 28

        2. Defendants' Public Statements Confirm That They Either Had Access to the Internal Data or Were Deliberately Reckless in Making Them ................... 32

        3. The Core Operations Doctrine Further Supports Scienter ............................. 33

        4. Defendants Offer No Credible Alternative for Their Statements ................. 34

i                Case No. 4:18-cv-07669-HSG

1         D.      Plaintiffs Adequately Plead Control Person Liability ................................................. 35

2   IV.     CONCLUSION ........................................................................................................ 35

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*In re Aqua Metals, Inc. Sec. Litig.*,
  2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ........................................................................35

5

*Berson v. Applied Signal Tech., Inc.*,
6
  527 F.3d 982 (9th Cir. 2008) ................................................................................... *passim*

7

*In re Cadence Design Sys., Inc. Sec. Litig.*,
  692 F. Supp. 2d 1181 (N.D. Cal. 2010) ..............................................................................34
8

9

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) ..............................................................................13

10

*In re ChinaCast Educ. Corp. Sec. Litig.*,
11
  809 F.3d 471 (9th Cir. 2015) ..............................................................................................34

12

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ................................................................................14, 18, 31
13

14

*Dura Pharm. v. Broudo*,
  544 U.S. 336 (2005) .............................................................................................................9

15

*ESG Capital Partners, LP v. Stratos*,
16
  828 F.3d 1023 (9th Cir. 2016) ............................................................................................35

17

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 1549485 (N.D. Cal. May 1, 2017) ..........................................................13, 30, 33

18

*In re Finisar Sec. Litig.*,
19
  646 Fed. App'x 506 (9th Cir. 2016) ....................................................................................16

20

*Fleming v. Impax Laboratories Inc.*,
  2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) ................................................................14, 15

21

*In re Fusion-io, Inc. Sec. Litig.*,
22
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ......................................................................25

23

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ..................................................................................9, 11, 12
24

25

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) ..........................................................................20, 21

26

*In re Immune Response Sec. Litig.*,
27
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................................26, 27

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

*Institutional Inv'rs Grp. v. Avaya*,
    564 F.3d 242 (3d Cir. 2009)....................................................................................33

*In re Intuitive Surgical Sec. Litig.*,
    2017 WL 4355072 (N.D. Cal. Sept. 29, 2017)........................................................20

*In re Iso Ray, Inc., Sec. Litig.*,
    189 F. Supp. 3d 1057 (E.D. Wash. 2016)................................................................12

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)..............................................................15, 22, 23, 24

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016)..........................................................10, 14, 16, 31

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008)...................................................................................33

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018)................................................................................20

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008)...................................................................................15

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) ............9, 10, 11, 13

*Mulligan v. Impax Labs, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014).......................................................................21

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003)...................................................................................34

*In re Novatel Wireless Sec. Litig.*,
    830 F. Supp. 2d 996 (S.D. Cal. 2011) ...............................................................12–13

*Nursing Home Pension Fund Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004).................................................................... *passim*

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013)..................................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ...............................................................19–20, 24, 28

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996).........................................................................11, 26, 27

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)..................................................................... *passim*

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ...............................................................22

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ................................................................................. *passim*

*In re Resonant Inc. Sec. Litig.*,
   2016 WL 6603953 (C.D. Cal. Sept. 6, 2016) ...............................................16, 17, 18

*Robb v. Fitbit Inc.*,
   216 F. Supp. 3d 1017 (N.D. Cal. 2016)...................................................................30–31

*Rok v. Identiv, Inc.*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017)....................................................................15

*S. Ferry LP, # 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...................................................................29, 33, 34

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009) ...........................................................32, 33

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016)...............................................................................15, 34

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011)...............................................................................21, 23

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017)..........................................................23, 23–24

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
   2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ................................................................18

*In re Snap Inc. Sec. Litig.*,
   2018 WL 2972528 (C.D. Cal. June 7, 2018)..........................................................24, 27

*In re Solarcity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017).........................................................................25

*In re STEC Inc. Sec. Litig.*,
   2011 WL 2669217 (C.D. Cal. June 17, 2011).............................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...................................................................................28, 30, 32

*In re Toyota Motor Corp. Sec. Litig.*,
   2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ............................................................31

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694. (9th Cir. 2012)......................................................................................28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

1

*Zaghian v. Farrell*,
   675 F. App'x 718 (9th Cir. 2017) ..................................................................................20

**Statutes**

15 U.S.C. § 77z-1(b)(1) ...................................................................................................18

15 U.S.C. § 78u-5 (c)(1)(A)(i) .......................................................................................20

**Other Authorities**

Fed. R. Civ. P. 15 ...........................................................................................................35

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

1

**STATEMENT OF RELIEF SOUGHT**

2

Plaintiffs seek an order denying Defendants' Motion to Dismiss the Complaint.

3

**STATEMENT OF ISSUE TO BE DECIDED**

4

Whether the Complaint states a claim under Exchange Act Sections 10(b) and 20(a).

5

**MEMORANDUM OF POINTS AND AUTHORITIES**

6

**I.      INTRODUCTION**

7

This securities fraud action stems from Defendants' false and misleading statements attributing

8

NVIDIA's record Class Period revenues to soaring demand by video gamers for the Company's

9

GeForce processors. In truth, those revenues were driven primarily by sales to cryptocurrency miners

10

seeking to cash in on a stratospheric rise in cryptocurrency prices. That distinction is critical: demand

11

from miners had proven enormously volatile during the last cryptocurrency boom, burning NVIDIA's

12

chief rival when it evaporated. Sensitive to this issue, investors and analysts repeatedly sought

13

assurances from Defendants that demand from cryptocurrency miners was not fueling NVIDIA's

14

revenue growth. In response, Defendants repeatedly assured investors that this was not happening,

15

expressly stating that miners' contribution was "*small* for us" and that the Company's revenue growth

16

was principally driven by sales of NVIDIA's "GPU products *for gaming*"—not mining. To further

17

reassure the market, Defendants claimed that NVIDIA's cryptocurrency-related revenues were

18

largely, if not entirely, confined to sales of its specialized "Crypto SKU" that were recorded as revenue

19

in its auxiliary OEM segment—and therefore were not driving the meteoric growth in NVIDIA's all-

20

important Gaming segment.

21

Defendants' assurances were false. NVIDIA's sales to cryptocurrency miners during the Class

22

Period were far from "small": they amounted to more than *$1.7 billion*. This figure was nearly three

23

times what Defendants disclosed. It was these unsustainable sales to cryptocurrency miners—not

24

revenues from "GPU products for gaming"—that drove the Company's blockbuster results during the

25

Class Period. And the vast majority of these revenues were recorded as sales of GeForce chips in its

26

*Gaming* segment—not the marginal OEM segment as Defendants had claimed.

27

When the truth was ultimately revealed, NVIDIA's stock price tumbled by over 30%. Soon

28

after, the investment bank RBC analyzed newly released data and concluded that NVIDIA had

1

understated its cryptocurrency-derived revenues by more than *$1.3 billion*. Analysts and the media were stunned and directly accused the Company of misleading investors: one pointedly proclaimed that "*NVIDIA [had] lied about its cryptocurrency earnings to avoid [a] stock crash*," while another noted that NVIDIA's reported results stood in "sharp contrast" to its prior claims.

Plaintiffs' Complaint pleads each element of a securities fraud claim. It alleges in detail who made each false or misleading statement, the circumstances under which the statement was made, and the specific reasons why it was false or misleading. The Complaint also pleads a cogent and compelling inference of scienter, citing copious facts showing that Defendants knew their statements were false, or at a minimum, recklessly disregarded a constant stream of reports, documents, and sales data contradicting their public statements.

Unable to seriously challenge Plaintiffs' detailed allegations, Defendants first resort to trying to raise a "loss causation" defense, which the Ninth Circuit has instructed is greatly disfavored at the pleading stage. In doing so, they brush aside the relevant legal standard and impermissibly attempt to craft a counter-narrative by injecting disputed "facts" drawn from documents mentioned nowhere in the Complaint. They also ignore that NVIDIA's stock price fell through the floor when Defendants belatedly admitted that demand from cryptocurrency miners had been the major driver of NVIDIA's results, and that analysts explicitly connected the stock drops to NVIDIA's prior misrepresentations.

Defendants next try to recast their statements as "forward-looking," mere "opinions," or "puffery." But there is nothing forward-looking about NVIDIA's statements to investors that cryptocurrency mining "*is* small for us," and Defendants in no way suggested that their unequivocal representations about the sources of NVIDIA's revenues were mere "opinions" or "corporate platitudes" that should not be credited. In truth, the cryptocurrency boom's effect on NVIDIA was a subject of intense scrutiny during the Class Period and was highly material to the market. Defendants also try to concoct a fact-intensive "truth-on-the-market" defense, claiming (incorrectly) that they told investors all of the omitted facts during the Class Period. But that defense—which is rarely (if ever) appropriate at the pleading stage—cannot be squared with, among other things, the text of Defendants' actual disclosures or the market's stunned reaction when the truth was revealed.

Finally, Defendants challenge scienter, falsely claiming that they were "in the dark" about the

billion-plus dollars in sales to cryptocurrency miners that fueled their exceptional results during the Class Period. According to their motion, they had no way to know the magnitude of their crypto-related revenues and whether miners—rather than gamers—were buying their processors. That assertion is demonstrably untrue, as the Complaint's detailed allegations make clear: throughout the Class Period, Defendants and other top NVIDIA executives received reports, presentations, and sales data showing that NVIDIA's revenue growth was powered largely by demand from miners—a development Defendants privately recognized as "dangerous" given the well-known volatility of that demand. Indeed, an internal company presentation commissioned by Defendant Fisher and other senior executives in 2017 revealed that NVIDIA contemporaneously tracked GeForce sales to miners and developed strategies to market directly to this constituency, despite the recognition in the very same document that mining demand involved "*high risk and severe fluctuation*." And even if Defendants' claimed ignorance were accepted, they were deliberately reckless in assuring worried investors that revenue from cryptocurrency miners was "small," that the "vast . . . majority" of NVIDIA's crypto-mining revenues resided in the OEM segment, and that the Company's remarkable growth owed to sales of Gaming chips to its traditional video-gamer audience.

Plaintiffs satisfy all pleading requirements, and Defendants' motion should be denied.

## II.   STATEMENT OF FACTS

### A.   NVIDIA's Reliance on Its Gaming Segment and the China Market

NVIDIA's principal business is designing and selling GPUs, which are specialized processors that manage and boost the performance of video graphics by performing computationally intensive tasks. ¶ 41.[1] NVIDIA reports revenues across five distinct businesses (called "segments"), two of which are particularly relevant here: (i) the highly material Gaming segment, which accounts for more than 50% of NVIDIA's total revenues, and (ii) the Original Equipment Manufacturer & IP ("OEM") segment, a catch-all business unit of historically marginal importance that includes certain low-end GPUs and intellectual-property assets. ¶¶ 43–44. Geographically, NVIDIA's revenues are highly

---

[1]      "¶ __" refers to paragraphs of the Consolidated Class Action Complaint (Dkt. 113). "Mot." refers to Defendants' Motion to Dismiss (Dkt. 123). All "Ex." references are to the Exhibits to the Declaration of Samantha A. Kirby in Support of Defendants' Motion to Dismiss (Dkt. 124). Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

concentrated: more than 50% of its total revenues and 40–50% of its GeForce sales come from its all-important China market. ¶¶ 46, 83.

## B.    A New Cryptocurrency "Bubble" Develops

Over the past dozen years, online networks that allow users to conduct transactions with digital "cryptocurrencies" untethered from the traditional monetary system have emerged, organized around the once-esoteric technology called "blockchain." ¶¶ 49–50. Instead of banks or other intermediaries recording these transactions, network users do so by solving cryptographic puzzles through laborious trial-and-error computations, a process called "mining." ¶ 52. The "miner" that solves a puzzle to confirm a transaction is rewarded with tokens of the relevant cryptocurrency. ¶ 51.

As the value of these tokens increased, new miners piled into the networks, creating a technological arms race requiring more and more computing power to mine profitably. ¶ 57. Mining gradually consolidated among commercial enterprises operating huge datacenters, while individual hobbyists were pushed out. ¶¶ 55–58. When mining is profitable, these enterprises tend to buy up GPUs—which are well-suited to mining's repetitive computations—in huge quantities, spiking demand for GPUs and leading to shortages among gamers. ¶¶ 57, 97–101. But because cryptocurrency prices are prone to wild swings, cryptocurrency miners' demand for GPUs has proven extremely volatile. ¶ 60. Indeed, NVIDIA's chief rival, AMD, experienced this volatility during the first Bitcoin bubble in 2013-2014: after enjoying supercharged revenues through the boom, AMD's sales crashed when the price of Bitcoin plummeted. ¶¶ 61–63.

In 2016, a new cryptocurrency bubble emerged, as a new cryptocurrency—Ether—arose. Within just a year, the price of Ether soared from $10 a token to more than $1,400. ¶¶ 64–65.

## C.    Defendants Repeatedly Deny the Importance of Sales to Cryptocurrency Miners in Driving NVIDIA's Revenues

As the price of Ether began to rise in 2016, NVIDIA started to experience unprecedented year-over-year increases in quarterly sales in its core Gaming segment. These included a 49% year-over-year revenue increase at the start of the Class Period and similarly spectacular "record" numbers in the quarters that followed. ¶¶ 67, 77.

As investors and analysts were concerned about cryptocurrency miners' volatile demand, they

4

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

1    repeatedly asked Defendants whether NVIDIA's dramatic Gaming-segment revenue growth was
2    actually being driven by sales to miners. ¶¶ 68–69. In response, Defendant Huang represented that
3    cryptocurrency's contribution to NVIDIA's revenues was "***small***," explaining that "[i]t's large for
4    somebody else. But it is small for us." ¶ 160. Meanwhile, Defendants falsely claimed that the "primary
5    drivers" of NVIDIA's Gaming segment growth were sales to gamers, not miners. ¶ 74. For example,
6    at NVIDIA's May 10, 2017 Investor Day conference, Defendant Fisher, the head of the Company's
7    Gaming business, touted the Gaming segment's strong fundamentals, highlighting "PC gaming,
8    eSports, competitive gaming, AAA gaming, [and] notebook gaming" as the key drivers of NVIDIA's
9    growing revenues—but said nothing about sales to cryptocurrency miners. *Id.*

10       These representations had the desired effect and assured analysts that NVIDIA's robust
11   revenue growth was being driven by gamers, not miners, and that its exposure to cryptocurrency risk
12   was minimal. ¶ 73. For example, in an August 11, 2017 report, JPMorgan stated that cryptocurrency-
13   related sales were "not a significant portion of NVIDIA's business" and that NVIDIA "remain[ed]
14   focused on continued growth drivers in AI, autonomous driving and gaming." *Id*.

15       To add credibility to their claims that NVIDIA's all-important Gaming segment was insulated
16   from cryptocurrency-related volatility, Defendants led the market to believe that nearly all of the
17   cryptocurrency-related demand NVIDIA faced was being met through the "Crypto SKU"—a
18   specialized cryptocurrency mining product that the Company developed, marketed, and reported
19   through its ancillary OEM segment (which historically contributed just 5% to 10% of Company
20   revenues)—and *not* through the GeForce chips that drove the revenues reported in the Company's
21   Gaming segment. ¶¶ 10–15, 76–79.

22       Defendants repeatedly told investors that NVIDIA's cryptocurrency-related revenues were
23   almost entirely confined to the Crypto SKU. ¶¶ 150–53, 156–59, 164–65. For example, on August 10,
24   2017, when NVIDIA reported "record revenue" for the second quarter of fiscal 2018 that was driven
25   largely by $1.19 billion in revenues from the Company's Gaming segment, Huang falsely reassured
26   investors that cryptocurrency mining was not the reason behind NVIDIA's exceptional results in its
27   Gaming segment, claiming that NVIDIA satisfied the "*vast . . . **majority*** of the cryptocurrency demand
28   out of [the Crypto SKU]." ¶ 77. Two days later, in a published interview, Huang stated that NVIDIA's

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

1    sales to miners represented "maybe $150 million or so"—the exact amount NVIDIA had just reported

2    selling through the Crypto SKU in its OEM segment—leading investors to believe that little, if any,

3    of NVIDIA's revenues came from sales of GeForce chips to miners. *Id*. The implication was clear: if

4    demand from miners plummeted, only the marginal OEM segment would be affected, with NVIDIA's

5    Gaming juggernaut left intact to continue its ascent. Analysts again credited these claims. ¶ 79.

6        **D.    Defendants Knew That Miners Were Behind NVIDIA's Stellar Gaming Growth**

7            Contrary to Defendants' repeated assurances to the market, revenues from cryptocurrency were

8    ***not*** a "small" part of NVIDIA's revenues and were ***not*** chiefly from Crypto SKU sales in its OEM

9    segment, and the Company's Gaming segment revenues were ***not*** driven primarily by "gamers." ¶ 80.

10   To the contrary NVIDIA's reported Gaming segment revenues were driven predominantly by sales to

11   miners. *Id*. As multiple former employees have confirmed, Defendants were well aware that

12   cryptocurrency mining was playing a central role in fueling the Company's torrid growth. ¶ 81. Indeed,

13   according to these former employees, Defendants not only discussed this fact, but actually studied,

14   tracked, and actively sought to bolster sales of NVIDIA's GeForce line to miners throughout the Class

15   Period. ¶¶ 82–113.

16           For example, FE 1, who served as one of only four account managers in NVIDIA's key China

17   market, explained that the sales team began tracking GeForce sales to miners by early 2017, as

18   cryptocurrency-related demand for GPUs was "exploding." ¶¶ 84, 86. NVIDIA's "partners"—the

19   device manufacturers that were its biggest customers—specifically identified sales to mining

20   operations on order sheets that NVIDIA's sales team then inputted into the Company's central sales

21   database. ¶¶ 84–86. The database showed that throughout 2017, ***60% to 70%*** of NVIDIA's GeForce

22   revenues in China came from sales to miners. ¶ 86. Since the China market accounted for over half of

23   NVIDIA's overall revenues, this meant that at least ***30% to 35%*** of the Company's ***total*** revenues were

24   from miners—even ***before*** accounting for the millions of dollars in revenues from purchases by miners

25   in other parts of the world. ¶ 83.

26           NVIDIA's U.S.-based executive team—including Fisher, VP Worldwide GeForce Sales John

27   Milner (Fisher's direct report), and Senior Director for China David Zhang—had ready access to this

28   data and received both weekly and quarterly sales reports specifically identifying cryptocurrency-

related GeForce sales. ¶¶ 87, 90, 92. The executive team was reportedly "obsessed" with this sales data, which confirmed other data they could access—including usage data that was available from GeForce Experience tracking software, which allowed NVIDIA to determine whether its GPUs were being used for mining or for gaming. ¶¶ 87, 104–08. In addition, Fisher, Milner, and Zhang were specifically told during a March 2017 meeting with the Company's sales team in China that sales to miners had caused GeForce sales to nearly double in a short period, creating a dependency on erratic cryptocurrency mining that Fisher himself called "*dangerous*." ¶ 94.

Rather than mitigate that danger—or at least respond truthfully in public to questions about its emergence—Defendants leaned into it. In the summer of 2017, Fisher and Milner instructed Zhang to have his team in China prepare a presentation that studied cryptocurrency mining's effect on GeForce sales and explored how the Company could exploit the phenomenon to juice sales further. ¶¶ 109–13. The September 2017 study contained a trove of internal sales data and other information reflecting NVIDIA's dependence on miners, which was generating *hundreds of millions of dollars in GeForce sales*. ¶¶ 110–11. It also laid bare the Company's ability to track sales to miners, which were quantified on a monthly basis and used to generate forecasts of expected monthly demand going forward. ¶ 111. Further, while noting that "[t]he cryptocurrency market [came] with *high risk and severe fluctuation*," the presentation outlined NVIDIA's "New Business Model" to target this "New Market," describing how the sales team would directly engage the top 10 to 20 miners in China (whose expected demand was included in the presentation). ¶¶ 112–13.

Defendants' interest in targeting miners to boost Gaming sales was confirmed when NVIDIA issued a new End User Licensing Agreement ("EULA") that prohibited datacenters from using GeForce GPUs—*except for cryptocurrency mining*. ¶ 114. The move was an obvious accommodation to miners, who would not switch to higher-cost GPUs. ¶¶ 116–17. At the same time, the Company ramped up GeForce inventory to support the anticipated increase in sales to miners, which the China sales team projected would grow 60% over 2017 levels in 2018. ¶ 88.

Consistent with these former employee accounts, after the Class Period, research analysts published reports based on later-available data, which showed that sales to cryptocurrency miners—not gamers—had largely driven the Company's success over the preceding 18 months. ¶ 118. In

January 2019, for example, RBC issued a damning report demonstrating that NVIDIA had understated its cryptocurrency-related revenue by ***$1.35 billion*** over an 18-month period that largely overlapped with the Class Period. ¶ 119. To confirm these findings, Plaintiffs retained Prysm Group ("Prysm"), an economic consulting firm specializing in the cryptocurrency markets, to independently analyze the extent of NVIDIA's reliance on cryptocurrency-related revenues during the Class Period. ¶ 122. Through a rigorous quantitative analysis, the source data and general methodology of which is explained in the Complaint, Prysm confirmed that Defendants had understated cryptocurrency-related sales by over $1.12 billion during the Class Period—an amount only modestly less than the RBC estimate that spanned a slightly longer timeframe. ¶¶ 119, 122-27. These enormous sums contrasted with the $602 million in cryptocurrency-related sales that Defendants disclosed over the same period, all of which resided in the OEM segment. ¶¶ 126–27.

### E.      The Truth Emerges

As cryptocurrency prices fell and demand from cryptocurrency miners evaporated in the summer of 2018, NVIDIA could no longer conceal that miners, not gamers, had been the true source of the Company's soaring Class Period revenues in its Gaming segment. The truth began to emerge on August 16, 2018, when NVIDIA lowered its revenue guidance for third quarter fiscal 2018 because it no longer expected a meaningful contribution from cryptocurrency for the remainder of the year. ¶ 128. Defendants admitted that "a great deal" of miners had bought NVIDIA's GeForce gaming cards, partially revealing that NVIDIA's cryptocurrency-related exposure had ***not*** been largely confined to the OEM segment, as they had stated just months before. *Id*. The news drove NVIDIA's stock price down by 4.9%. ¶ 129. Yet Huang assured the market that gamers would absorb the excess inventory, withholding how much of the massive build-up owed to anticipated demand from miners that had now disappeared, and analysts took comfort. ¶¶ 131–32.

Soon, however, the news got significantly worse. ¶ 133. On November 15, 2018, NVIDIA announced a revenue miss for the third quarter and issued negative guidance to reflect a 7% year-over-year decline for the fourth quarter. *Id*. Defendants attributed this decline to an excess of inventory in the Company's Gaming segment—not its OEM segment—caused by a "***sharp falloff in crypto demand***." ¶ 134. The admission shocked investors and directly contradicted Defendants' repeated

1    assurances that the bulk of cryptocurrency-related sales were in the OEM segment, not Gaming, and

2    comprised only a "small" part of the Company's revenues overall. ¶¶ 136–43. NVIDIA had flooded

3    its Gaming-segment channel during the Class Period with GeForce inventory to meet miners' demand,

4    and when the demand evaporated, NVIDIA was stuck with an inventory glut. ¶ 135. NVIDIA further

5    disclosed that the excess Gaming GPU inventory following the disappearance of miners would persist

6    for at least 12 weeks and cause about $600 million in lost revenue. *Id*. On the news, NVIDIA's stock

7    price plummeted 28.5% over two trading sessions. ¶ 144.

8         Analysts and the media were quick to jump on the discrepancy between Defendants' latest

9    announcement and their prior assurances, with one analyst noting that "[t]he large shortfall in guidance

10   due to a bloated channel due to cryptocurrency is in sharp contrast to the comments around channel

11   inventory from the company at the last earnings call." ¶ 139. In an interview published in *VentureBeat*,

12   the interviewer was even more direct: "***Again, it seemed, in the past, that [crypto] was described as***

13   ***a small part of revenue, and now it's something that can affect one or two quarters worth of***

14   ***inventory. It's hard for me to understand*** . . . ." ¶ 143. And when RBC issued its January 2019 report,

15   in which it calculated that NVIDIA had understated its cryptocurrency-related revenues by $1.35

16   billion, one headline proclaimed: "***Analyst says Nvidia lied about its cryptocurrency earnings to***

17   ***avoid stock crash: They may have concealed revenue to mask shrinking demand***." ¶ 120.

18   **III.    ARGUMENT**

19         **A.    Plaintiffs Adequately Plead Loss Causation**

20        Confronted with the Complaint's detailed allegations, Defendants' primary argument is a

21   much-disfavored "loss causation" challenge. To plead loss causation sufficiently, Plaintiffs need only

22   provide "a short and plain statement" that "provide[s] a defendant with some indication of the loss and

23   the causal connection that the plaintiff has in mind." *Dura Pharm. v. Broudo*, 544 U.S. 336, 346-47

24   (2005). "[S]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation,

25   a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th

26   Cir. 2008). "[I]t is normally inappropriate to rule on loss causation at the pleading stage," as it is

27   generally "a matter of proof at trial." *Id*.

28        The Ninth Circuit recently confirmed that loss causation involves "no more than the familiar

9

1    test for proximate cause" and can be demonstrated in "an infinite variety of ways." *Mineworkers'*

2    *Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741

3    (mem.) (2019). "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown

4    even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id*. And,

5    importantly, "[t]o be corrective, the disclosure need not precisely mirror the earlier misrepresentation";

6    it must simply "relate back" to the misrepresentation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210

7    (9th Cir. 2016). Here, Plaintiffs readily satisfy the relevant standard for both stock price declines.

8    **August 16, 2018 stock drop:** The Complaint details how, on August 16, 2018, NVIDIA

9    revealed for the first time that "over the last several quarters, [it had] seen the impacts of crypto and

10   what that can do to elevate our overall gross margins." ¶ 128. NVIDIA further disclosed that the

11   evaporation of cryptocurrency-related revenues for the remainder of the year required an earnings

12   downgrade. *Id*. These disclosures stood in stark contrast to Defendants' statements throughout the

13   Class Period that: cryptocurrency "is small for us" (¶ 160) and a "small, overall" "part of our business"

14   (¶ 166; *see also* ¶ 168); the "vast . . . majority" of cryptocurrency-related demand was met with the

15   Crypto SKU, with only "some residual amount or some small amount" impacting the Gaming segment

16   (¶¶ 150, 164); and the primary driver of the Company's GPU business was sales "of GeForce GPU

17   products **for gaming**," not for mining. ¶¶ 154, 162; *see also* ¶¶ 149, 170.

18   In response to these revelations, NVIDIA's stock price dropped by 4.9% on a single day's

19   trading. ¶ 129. Within hours, analysts published reports explaining that "the culprit" for NVIDIA's

20   stock drop was the disappearance of cryptocurrency-related sales (¶ 130), which required a downgrade

21   to earnings guidance and partially revealed that NVIDIA's Gaming revenues depended heavily on

22   miners. These facts are more than sufficient to plead loss causation. *See First Solar*, 881 F.3d at 754

23   ("It is the underlying facts concealed by fraud that affect the stock price.").

24   In their motion, Defendants attempt to rewrite the Complaint, contending that "Plaintiffs claim

25   Defendants misled investors about a very different subject [from the August 16 disclosure]: which end

26   users had bought GeForce GPUs in the past." Mot. 16. But Plaintiffs' claim is that Defendants falsely

27   minimized NVIDIA's Gaming segment's reliance on cryptocurrency-related sales by misrepresenting

28   that (1) a "vast . . . majority" of NVIDIA's cryptocurrency-related revenues came from Crypto SKU

1   sales in the OEM segment, not GeForce sales in the Gaming segment (¶¶ 150, 156, 164), and (2) sales

2   to miners were responsible for just "some residual amount or some small amount" of Gaming

3   revenues. ¶ 164. Indeed, the first glimpse of the impact of cryptocurrency mining on NVIDIA's

4   business was revealed through the Company's August 16 earnings downgrade. ¶¶ 128–32. This

5   satisfies the causal link: it was "foreseeabl[e]" that misrepresenting the significance of revenues

6   derived from miners and falsely downplaying the Gaming segment's dependence on cryptocurrency

7   revenues would cause a deflation of the Company's stock price following a revelation that

8   cryptocurrency's impact was, in fact, so large that it drove an earnings downgrade. *First Solar*, 881

9   F.3d at 753–54 ("A plaintiff may [] prove loss causation by showing that the stock price fell upon the

10  revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed

11  the miss.").[2]

12      Defendants next contend that "[t]he Company had been noting . . . for a year" that "'some'

13  miners had bought GeForce [Gaming] chips" and, therefore, the August 16 revelations did not disclose

14  any new material information. Mot. 16-17. This argument presents factual issues regarding what the

15  market understood that cannot be resolved as a matter of law. *See Gilead*, 536 F.3d at 1057-58; *cf.*

16  *Provenz v. Miller*, 102 F.3d 1478, 1492–93 (9th Cir. 1996) ("[B]efore the 'truth-on-the-market'

17  [defense] can be applied, the defendants must ***prove*** that the information that was withheld or

18  misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to

19  effectively counterbalance any misleading impression created by insider's one-sided

20  representations.").

21      Moreover, Defendants' argument is wrong on its own terms. Their earlier comments did not

22  meaningfully inform investors that the performance of NVIDIA's Gaming segment was dependent on

23  cryptocurrency demand. On the contrary, Defendants steadfastly maintained throughout the Class

24  Period that the "***vast . . . majority***" of this demand was served through Crypto SKU sales (¶¶ 150, 156,

25  164) and that sales "of GeForce GPU products for gaming"—not mining—were driving the Gaming

---

26  [2]    Indeed, if these false statements had been true—that is, if cryptocurrency truly had a "small"

27  and "residual" impact—then, logically, the August 16 earnings downgrade and ensuing stock drop
    would not have resulted from the disappearance of crypto-fueled demand (which, according to

28  analysts, was the ***only*** thing that prevented NVIDIA from "otherwise beat[ing] expectations"). ¶ 130.

1   segment revenues. ¶¶ 154, 162. These statements propped up the false impression that cryptocurrency

2   had little impact on the Company's Gaming sales. It was not until August 16, 2018 that Defendants

3   admitted that "a great deal" of miners had bought NVIDIA's GeForce gaming cards to the point where,

4   when that demand dried up, NVIDIA's Gaming segment suffered and the Company downgraded

5   earnings (¶ 128)—a markedly different portrayal from Defendants' prior statements that just "some

6   *residual* amount or some *small* amount" of cryptocurrency revenues contributed to Gaming. ¶ 164.

7          Particularly given Defendants' false statements downplaying the magnitude and impact of

8   cryptocurrency-related sales on NVIDIA and its Gaming segment, Defendants' argument that the

9   August 16 disclosure "added no new information" (Mot. 16) cannot succeed as a matter of law. *See*

10  *Gilead*, 536 F.3d at 1058 (plaintiffs plausibly alleged that disclosure was corrective when previously

11  disclosed information "would not necessarily trigger a market reaction because it did not contain

12  enough information to significantly undermine [defendants' alleged false statements]"); *In re Iso Ray,*

13  *Inc., Sec. Litig*., 189 F. Supp. 3d 1057, 1079 (E.D. Wash. 2016) (rejecting argument that disclosure

14  provided no new information because "[a] reasonable inference is that [the prior disclosure] had not

15  been communicated with the same intensity and credibility as IsoRay's May 20 Press Release and

16  therefore, investors failed to appreciate the significance of the information . . .") (citing *In re Apollo*

17  *Grp., Inc. Sec. Litig*., 2010 WL 5927988, at *1 (9th Cir. June 23, 2010)).

18         **November 15, 2018 stock drop:** The Complaint further details how, on November 15, 2018,

19  NVIDIA announced an earnings miss and negative guidance caused by the loss of sales to

20  cryptocurrency miners, which would amount to $600 million in lost revenue. ¶¶ 133–46. In response,

21  NVIDIA's stock price declined by 28.5% over two days, with astonished analysts questioning the

22  credibility of Defendants' prior statements. ¶¶ 136–44.

23         The November 15 earnings miss revealed the true magnitude of NVIDIA's dependence on

24  cryptocurrency-related revenues, exposing the full extent of Defendants' falsehoods that

25  cryptocurrency was "small for us" (¶ 160), accounted only for "some residual amount or some small

26  amount" of Gaming revenues (¶ 164), and that "our core business is elsewhere." ¶ 152. *See In re*

27  *Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1021 (S.D. Cal. 2011) ("Even if some information

28  had come into the market prior to July 20, 2007 partial disclosures at an earlier date do not negate loss

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

causation upon fuller disclosure of the relevant truth."). Plaintiffs' allegations plausibly "trac[e] the loss back to the very facts about which the defendant lied"—NVIDIA's dependence on miners for GPU sales and the impact of cryptocurrency on its financial performance. *First Solar*, 881 F.3d at 753; *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013) (loss causation is established "where a plaintiff shows that misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of a security"); *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1146 (N.D. Cal. 2013) (loss causation satisfied where plaintiff alleged that "the security readjusted to a lower, more accurate level following the materialization of the [concealed] risk, causing Plaintiff to lose money").[3]

Defendants try to characterize the November 15 earnings call as a mere "update, or maybe even a 'correction,'" of NVIDIA's "earlier predictions" of product demand. Mot. 17. But such characterization is belied by, among other things, analysts' contemporaneous reaction to the Company's November 15 disclosure. Immediately following the call, the analyst and financial media community perceived the news as a manifestation of NVIDIA's true exposure to and reliance on cryptocurrency volatility, voicing astonishment in light of Defendants' prior statements falsely downplaying that exposure. ¶¶ 136–43. For example, in a post-earnings call interview with Huang conducted by *VentureBeat*, the interviewer exclaimed:

> *I . . . thought [cryptocurrency] was never really more than a tenth of your revenue.* It does surprise me that it can come back and have this bigger effect . . . . How do we get to larger numbers that actually affect the quarterly results, though? *Again, it seemed, in the past, that it was described as a small part of revenue, and*

---

[3] The earnings miss also exposed the full scope of NVIDIA's inventory problems, which Defendants had falsely downplayed during the prior quarter's earnings call. ¶¶ 131–43, 172–73. *See In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *8 (N.D. Cal. May 1, 2017) ("Defendants' disclosure of below anticipated revenue that is, in part, the result of an inventory build-up" satisfied loss causation where plaintiff alleged that defendants "misled investors by intentionally downplaying or dismissing concerns about the possibility of inventory build-ups, and thus painting an inaccurate picture of Finisar's grow[th] potential"). The supply glut resulted from NVIDIA's undisclosed build-up of GeForce chips to satisfy demand from miners beginning in 2017. ¶ 88. That NVIDIA specifically increased inventory to support the mounting demand from miners demonstrates the importance that Defendants attached to revenue from miners, even as they sought to minimize the impact of mining in their public statements.

*now it's something that can affect one or two quarters worth of inventory. It's hard for me to understand* . . . .

¶ 143. Morgan Stanley also questioned the accuracy of Defendants' previous statements: "*The implication of [Defendants'] commentary is that a larger portion of demand in late 2017/early 2018 was for crypto than they had initially indicated*[.]" ¶ 141. BMO similarly noted the "sharp contrast" between "[t]he large shortfall in guidance due to a bloated channel due to cryptocurrency" and Defendants' "comments around channel inventory . . . at the last earnings call," reporting that "NVIDIA's growth in gaming over the last year and a half" was largely attributable to revenues from miners (¶ 139)—contrary to Defendants' prior statements minimizing the impact of such revenues. Given the revelation that the Gaming segment was highly dependent on miner demand, Deutsche Bank "*question[ed] what the true growth rate of Gaming was/is*" (¶ 140), and Macquarie remarked that the "*[m]agnitude of the weakness suggests that the crypto benefit was much higher than previously thought, and could raise questions about Gaming growth*." *Id*. And after RBC published its analysis of the extent to which NVIDIA's Gaming revenues had relied on sales to miners, *TechPost* declared: "*NVIDIA lied about its cryptocurrency earnings to avoid [a] stock crash: They may have concealed revenue to mask shrinking demand*." ¶ 120.

This analyst commentary demonstrates the connection between Defendants' misrepresentations and the November 15, 2018 disclosure, bolstering the allegations of loss causation. *See Lloyd*, 811 F.3d at 1210–11 (loss causation adequately pleaded where "various analysts perceived the subpoena to be related to CVB's alleged misstatements about Garrett's ability to repay . . ."); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (noting that analyst's statement, "[w]hen you say one thing on the conference call and report something different on the 10-Q, that raises concern," is probative of loss causation).[4]

---

[4]     Defendants' citation to this Court's decision in *Fleming v. Impax Laboratories Inc.*, 2018 WL 4616291, at *5 (N.D. Cal. Sept. 7, 2018) is misplaced. Mot. 16. In *Fleming*—unlike here—there were not multiple analysts reacting to the relevant disclosures with bewilderment and casting doubt on the defendants' previous representations. In fact, in finding the loss causation allegations deficient, this Court distinguished the facts from those in *Lloyd*, where loss causation was "sufficiently alleged" because "the market and various analysts perceived the subpoena [which precipitated the stock price

1

2

In sum, Defendants' fact-intensive challenges to loss causation are unfounded and cannot be resolved as a matter of law at the pleading stage.

3

**B.     Plaintiffs Adequately Plead Material Misrepresentations and Omissions**

4

5

6

7

8

9

10

11

12

13

14

The Exchange Act protects investors from *both* (i) misstatements *and* (ii) omissions of material fact that render a statement misleading. A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Under the securities laws, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). For example, if a company chooses to tout positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). The question of whether a statement is materially misleading cannot be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018).

15

16

**1.     Defendants Falsely Denied That Cryptocurrency Mining Was a Material Driver of NVIDIA's Revenues**

17

18

19

20

21

22

23

24

25

Throughout the Class Period, when asked pointedly whether cryptocurrency-related sales were a significant source of NVIDIA's revenues, Defendants repeatedly denied it. For example, on November 10, 2017, when *VentureBeat* asked whether "cryptocurrency is driving all of your success," Huang responded that cryptocurrency's contribution to NVIDIA's revenues was "small." ¶ 160. In an interview published on February 9, 2018, in *Barron's*, Huang rejected analysts' "talk" about the effects of mining on NVIDIA's results, again asserting that cryptocurrency-related revenues constituted a "small" part of NVIDIA's business the prior quarter. ¶ 166. Again, on March 26, 2018, in response to direct questioning about mining's impact on NVIDIA's business, Huang assured investors that crypto-related revenues were just "a small percentage" of NVIDIA's business. ¶ 168.

26

27

28

decline] to be related to [the defendant's] alleged misstatements." *Fleming*, 2018 WL 4616269, at *5 (citing *Lloyd*, 811 F.3d at 1210–11). The court in *Rok v. Identiv, Inc.*, 2017 WL 35496, at *19 (N.D. Cal. Jan. 4, 2017) (cited at Mot. 16–17) similarly distinguished *Lloyd*.

15

In truth, at the times Huang issued his denials, cryptocurrency demand was a material driver of NVIDIA's revenues, singlehandedly accounting for hundreds of millions of dollars in revenues each quarter and nearly $1.13 billion for fiscal year 2018. ¶¶ 26, 127. Indeed, had NVIDIA reported cryptocurrency revenues as a standalone segment, it would have been one of NVIDIA's biggest each quarter. ¶¶ 161, 167, 169, 171. Accordingly, Huang's denials were false or, at minimum, misleading because cryptocurrency mining was ***not*** a small source of NVIDIA's revenues, and exposed the Company to substantial risks. *See In re Finisar Sec. Litig.*, 646 Fed. App'x 506, 507 (9th Cir. 2016) (falsity pleaded when defendant denied existence "of an inventory build-up" and "down-played concerns of a looming inventory bubble"); *Lloyd*, 811 F.3d at 1209 ("The omission of [an adverse] fact, combined with the reassurance that everything was fine . . . meets the pleading standard for a material omission.").

In response to Plaintiffs' detailed allegations, Defendants gloss over the Complaint's myriad pleaded facts and erroneously focus their attack on the analysis conducted by Prysm, an economic consulting firm that specializes in the cryptocurrency markets, which corroborates the enormous extent of NVIDIA's undisclosed cryptocurrency-based revenues. Defendants do not contend that expert analysis is inappropriately considered at this stage—nor could they, as "the admissibility of expert testimony to satisfy the PSLRA's heightened pleading requirements has been clearly resolved by the Ninth Circuit." *In re Resonant Inc. Sec. Litig.*, 2016 WL 6603953, at *3 (C.D. Cal. Sept. 6, 2016) (citing *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004)). Rather, they argue that Prysm's analysis is nothing more than "conjecture," "speculation," and "guesses." Mot. 19–21. Defendants claim that the Complaint fails to adequately specify the inputs into, or justify the assumptions undergirding, Prysm's analysis, and thus contend that the Complaint pleads insufficient facts to show that Prysm's analysis is reliable. *Id.* They also suggest that the figures Prysm estimates "are likely impossible to calculate." *Id.* at 21. But Defendants are wrong on all counts.

Drs. Cathy Barrera and Stephanie Hurder, the economists who head Prysm, are both amply qualified to render the analysis provided in the Complaint. They both hold PhDs in Business Economics from Harvard University. ¶¶ 124–25. Dr. Barrera is the lead collaborator at MIT's Cryptoeconomics Lab and a former tenure-track Professor of Economics at Cornell University, and

1    her research on blockchain economics has been presented at Harvard, Stanford, and elsewhere. ¶ 124.

2    Dr. Hurder is a Visiting Scholar at the Center for Cyber-Physical Systems at the University of Southern

3    California and a former Boston Consulting Group management consultant, and she has led seminars

4    on blockchain economics for groups including IBM Blockchain Accelerator. ¶ 125.

5         Applying their expertise, Drs. Barrera and Hurder conducted a rigorous analysis to determine

6    how much of NVIDIA's sales over the course of the Class Period were cryptocurrency-related.

7    Specifically, they used hashrate data to determine how much computing power was being used to mine

8    the top three GPU-mined cryptocurrencies (Ether, Z-Cash, and Monero) each month. ¶ 126. They then

9    used information about the calculations done to mine each of the cryptocurrencies

10   (i.e., cryptocurrency-specific hash function data) to determine how many GPUs were being sold to

11   provide the computing power they observed. *Id.* Finally, they used market-share data from Mercury

12   Research to determine how many of the GPUs being sold for mining would have been NVIDIA GPUs

13   and to determine NVIDIA's associated revenues. *Id.* Thus, their expert determinations of NVIDIA's

14   cryptocurrency-related revenues throughout the Class Period were derived via rigorous mathematical

15   calculation—not "speculation," "guesses," or "guesswork," as Defendants posit. Mot. 20–21.

16        Against this backdrop, Defendants' attacks on the factual basis and methodologies underlying

17   Prysm's analysis (Mot. 20–22) fall far short. Courts recognize that such arguments, which concern an

18   expert's "basis for forming an expert opinion[,]" "are more appropriately presented at later stages in

19   litigation." *Resonant*, 2016 WL 6603953, at *3. Moreover, Defendants' attacks directed at Prysm's

20   data sources and methods are baseless. Contrary to Defendants' contentions:

- The Complaint explains the "cryptocurrencies focused on by Prysm" (Mot. 20): Z-Cash and Monero "affected demand for NVIDIA's products," and Ether, Z-Cash, and Monero were "the top three GPU-mined cryptocurrencies during the Class Period." ¶¶ 61 n.3, 126. Z-Cash and Monero are relatively minor cryptocurrencies, and Prysm's inclusion of them in its analysis demonstrates their thoroughness, rather than undermines it.
- Prysm *did* account for ASICs. Mot. 20. ASICs could not be used to mine Ether or other cryptocurrencies analyzed by Prysm (¶ 61 n.3) and, accordingly, were correctly excluded.
- The Complaint identifies "what market share data was used" by Prysm. Mot. 21. Prysm used market share data from "leading semiconductor industry research data provider Mercury Research" (¶ 126)—whose market share and other data NVIDIA itself has cited repeatedly during quarterly earnings calls. *E.g.*, NVIDIA May 8, 2014 (Q1 2015) Earnings Call Tr. at 3; NVIDIA Aug. 7, 2014 (Q2 2015) Earnings Call Tr. at 3.
- There is a "basis" for Prysm's assessment "that 'miners' and 'gamers' are entirely distinct categories." Mot. 21. As the Complaint explains, mining-related demand overwhelmingly

came from dedicated, for-profit business associations who bought GPUs in bulk to build "mining rigs" dedicated to cryptocurrency mining. ¶ 57. Indeed, ***NVIDIA itself*** identified certain customers in China as miners (and not gamers) based on bulk orders of GeForce cards in quantities of "50,000 or 100,000 per order," and similar bulk orders for mining were observed in the U.S. and Russia. ¶¶ 85, 98–101.

- Prysm was not required to access "internal NVIDIA documents" at this stage. Mot. 21. Indeed, doing so would be impossible: as in all PSLRA cases, discovery here is stayed pending resolution of Defendants' motion to dismiss, 15 U.S.C. § 77z-1(b)(1).[5]

Further, Prysm's conclusions (which would suffice for pleading falsity by themselves, *see Resonant*, 2016 WL 6603953, at *2), are entirely corroborated by the fact that its key finding—that NVIDIA obtained more than ***$1.12 billion*** in undisclosed cryptocurrency-related revenues during the Class Period (¶ 127)—has been independently substantiated by numerous other facts detailed in the Complaint. *See Nursing Home Pension Fund*, 380 F.3d at 1233–35 (evidence cited in complaint corroborated statistical expert's findings); *Daou*, 411 F.3d at 1015 (approach for assessing adequacy of falsity allegations includes an evaluation of the "corroborative nature" of pleaded facts and "coherence" of allegations). For example, in January 2019, after the truth about NVIDIA's dependence on mining demand had been revealed, analysts from the well-known banking firm RBC Capital Markets conducted their own analysis of cryptocurrency-market data and found that NVIDIA had earned more than $1.3 billion in undisclosed cryptocurrency-related revenues—an amount that is commensurate to the $1.126 billion figure that Prysm independently determined using a slightly shorter timeframe. ¶¶ 118–21.[6] Both analyses are further corroborated by Defendants' admissions in

---

[5]     *In re Silicon Storage Technology, Inc., Securities Litigation* is inapposite. 2007 WL 760535 (N.D. Cal. Mar. 9, 2007) (cited at Mot. 20-21). There, plaintiffs' proffered analysis—conducted by counsel and unspecified consultants—considered only generic data concerning products *other* than those the company manufactured, products manufactured by unspecified *other* companies, and pricing from geographies *other* than those in which the company operated. *Id.* at *10–17. Moreover, the findings were contradicted by the company's reported financial data, which was not alleged to be false (*id.* at *17), and were uncorroborated by other "allegations of specific documents or statements by other witnesses." *Id.* at *32. Here, Prysm analyzed data that encompassed NVIDIA's cryptocurrency-related sales, and Prysm's conclusion—that NVIDIA had experienced enormous, undisclosed cryptocurrency sales—is entirely corroborated by other pleaded facts.

[6]     Defendants' suggestion that "RBC and Prysm reached wildly varying results in each quarter" (Mot. 22) is simply incorrect. RBC's and Prysm's quarterly analyses track one another closely, with one exception: Prysm determined that NVIDIA's cryptocurrency-related revenues peaked during fourth-quarter fiscal 2018, while RBC's less precise analysis determined that the peak occurred a quarter later, during first-quarter fiscal 2019. *Compare* ¶ 127 *with* Ex. EE at 3. This variance can be

1   November 2018 that the Gaming channel ended up so flooded "post crypto" that NVIDIA had excess

2   inventory *for an entire quarter*, necessitating a severe revenue guidance cut. ¶¶ 133–43.

3          As further detailed in the Complaint, several former employees reported that NVIDIA was

4   experiencing an extraordinary influx of cryptocurrency-driven demand in its Gaming segment at

5   relevant times. ¶¶ 83–89, 98–101, 109–17. FE 1 detailed a surge in mining revenues in Gaming

6   beginning in 2016 that continued throughout 2017, with 60–70% of NVIDIA's GeForce revenues in

7   NVIDIA's largest market derived from sales to miners. ¶ 86. FE 1's account concerning these

8   undisclosed facts plainly corroborates other evidence pleaded in the Complaint—including Prysm's

9   analysis, RBC's analysis, similar accounts of other former NVIDIA executives and employees, and

10  NVIDIA's admission that cryptocurrency mining had severely affected the Gaming segment channel.

11         Defendants argue that FE 1's testimony should be disregarded because he worked in China

12  and left the Company partway through the Class Period, in December 2017. Mot. 24–25, 27–28 &

13  n.16. But these facts are irrelevant, as numerous pleaded facts demonstrate the reliability of FE 1's

14  account, including that FE 1 was one of NVIDIA's senior-most account managers in the Company's

15  largest market, and worked for NVIDIA for over 10 years, including nearly 40% of the Class Period

16  and approximately half the time that NVIDIA's Gaming-segment results were being sizably inflated

17  by sales to miners. ¶ 37. Courts regularly reject arguments like those Defendants advance here,

18  holding, for example, that a witness need not be employed at the company at all during the Class

19  Period—let alone remain employed during its entirety—for his or her testimony to be credited. *See,*

20  *e.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (crediting statements from

21  confidential witness who "was not at [the company] during the Class Period").

22         Defendants' remaining challenges to the material falsity of these statements fare no better.

23  *First*, Huang's repeated assurances that cryptocurrency-related revenue was "small" were

24  representations of fact, not "opinions." Mot. 26–27. Huang's statements did not reference the speaker's

25  subjective attitude, and they admitted no uncertainty—i.e., they were not prefaced with phrases like

26  "I think" or "I believe." *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,

27

28  easily explained by slight differences in input data and does not undermine the broader conclusion
    that these two independent analyses strongly corroborate one another.

1    135 S. Ct. 1318, 1325 (2015) ("[A] statement of fact ('the coffee is hot') expresses certainty about a

2    thing, whereas a statement of opinion ('I think the coffee is hot') does not."). Moreover, even if certain

3    of Huang's statements could properly be construed as opinions, they would still be actionable because

4    they omitted facts that "conflict with what a reasonable investor would take from the statement."

5    *Id.* at 1329. Among other things, Huang's statements omitted the critical fact that a material amount

6    of NVIDIA's Gaming (and Company-wide) revenues were from cryptocurrency miners. *See In re*

7    *Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *2 (N.D. Cal. Sept. 29, 2017) (under *Omnicare*,

8    "opinion statement omitted a material fact that rendered it 'misleading to an ordinary investor . . .'").

9        *Second*, Huang's statements in the November 10, 2017 *VentureBeat* article and during his

10   March 29, 2018 *MadMoney* appearance were not "forward-looking and protected by the PSLRA's

11   safe harbor" (Mot. 27, 29), but rather statements of past and present fact: cryptocurrency "*is* small for

12   us." ¶¶ 160; *see also* ¶ 170; *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1158–

13   59 (N.D. Cal. 2015) ("yield *is* on expectations" found "present-tense statement[] of fact").[7] And even

14   if they could be construed to include a forward-looking aspect, they are challenged for their

15   misstatement of present facts, and thus remain actionable. *See Quality Sys.*, 865 F.3d at 1142.[8]

16       *Third*, Huang's statements are not immaterial "puffery." Mot. 29. Huang made his statements

17   in response to direct questions from analysts concerned that the Company's Gaming segment revenues

18   consisted of sales to cryptocurrency miners. ¶¶ 166, 168, 170; *see Reese v. Malone*, 747 F.3d 557, 570

19   (9th Cir. 2014) (fact that "key question [was] raised in the media" demonstrated investor "interest in

---

[7]      Defendants do not even attempt to claim that "meaningful cautionary statements" accompanied these statements. 15 U.S.C. § 78u-5 (c)(1)(A)(i). And, of course, the statements were knowingly false. ¶¶ 2, 16, 19, 26, 81, 102–08, 116, 161, 171, 174–80; *see Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (statements that a product would be successful were not protected where defendants knew that the product would not achieve the touted financial outcome).

[8]      Defendants citation to *Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) is equally unavailing. Mot. 27. The statement Defendants identify as a "projection[] about the future" (*Martin*, 732 F. App'x at 40 n.1)—"that crypto was '*going to* remain small for us'" (Mot. 26)—is *not* the statement alleged to be false and misleading in the Complaint. *See* ¶ 160 ("cryptocurrency *was* 'small but not zero'''; "*is* small"). Further, the statement that Defendants identify plainly contains an assertion about the present: for cryptocurrency-related revenues to "remain small," they must already *be* small—and the Complaint alleges they were not. Defendants try to pull the same trick with respect to Huang's March 29, 2018 statement. *Compare* ¶ 170 *with* Mot. 29 (quoting Ex. Y).

1    the withheld information" and "support[ed] its materiality"). In addition, the market's harsh reaction

2    to the revelation that NVIDIA's cryptocurrency-related revenues were substantial further

3    demonstrates the materiality of Huang's statements. ¶¶ 136–43; *see also Mulligan v. Impax Labs, Inc.*,

4    36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) ("[D]etermining whether a given statement is material

5    entail[s] fact-intensive assessments that are more properly left to the jury.").

6            **2.    Defendants' Assurances That NVIDIA's Growth Was "From Sales of**
             **GeForce GPU Products *For Gaming*" Were False and Misleading**
7

8            Compounding their denials that sales to cryptocurrency miners were a material component of

9    NVIDIA's overall revenues, Defendants also stated affirmatively that NVIDIA's revenue growth in

10   its GPU business was driven primarily by GeForce GPU sales for gaming—not mining. Specifically,

11   on August 23, 2017, in NVIDIA's second quarter 2018 10-Q, Defendants represented that NVIDIA's

12   59% ($701 million) increase in GPU revenue year-over-year, "was due ***primarily*** to increased revenue

13   from sales of GeForce GPU products ***for gaming***." ¶ 154. Defendants repeated this statement on

14   November 21, 2017, in NVIDIA's third quarter 2018 10-Q, representing that the Company's 31%

15   increase ($520 million) in GPU revenue year-over-year "was due primarily to increased revenue from

16   sales of GeForce GPU products for gaming." ¶ 162.

17           These statements were false or, at the very least, misleading because they created an

18   "impression of a state of affairs," which "differ[ed] in a material way from" the reality: that growth in

19   NVIDIA's GPU business revenues was due primarily to GeForce sales for mining, not gaming.

20   *Berson*, 527 F.3d at 985; *see also SEC v. Todd*, 642 F.3d 1207, 1222 (9th Cir. 2011) (finding statements

21   actionable that "impliedly attributed" company revenue growth to a list of factors because "[i]f

22   [defendant] . . . had disclosed the true source of the revenue, the investing public would have been

23   alerted to the lesser rate of growth for [the company's] traditional sources of revenue"); *Hatamian*, 87

24   F. Supp. 3d at 1158–59 (falsity sufficiently alleged where semiconductor company misrepresented

25   which channel was the source of its sales when touting its business). In fact, during the second and

26   third quarters of fiscal 2018, NVIDIA's GeForce revenues from miners totaled $648 million—

27   constituting well over 50% of the Company's $1.221 billion year-over-year GPU revenue increase in

28   those two quarters. ¶¶ 155, 163.

When discussing the reasons for their year-over-year success, Defendants also violated the established disclosure rule in this Circuit that, "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009. Indeed, courts routinely hold that once a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *14 (C.D. Cal. Oct. 1, 2013). Here, once Defendants chose to tout revenue increases from GeForce sales, they were required (but failed) to disclose that a substantial driver of those increases was cryptocurrency mining—a notoriously unreliable source of revenue growth, and one about which investors were particularly concerned. ¶¶ 69-72; *see Questcor*, 2013 WL 5486762, at *14 (misleading to conceal "the true causes of the increased sales . . .").

Defendants do not seriously contest that increased GeForce revenue from cryptocurrency mining (and not from gaming) was the primary cause of NVIDIA's dramatic growth in GPU revenues in fiscal 2018—nor could they, as that fact has been confirmed by NVIDIA's former executives, Plaintiffs' expert, multiple securities analysts, and the Company's own admissions. *E.g.*, ¶¶ 86, 98–101, 111, 127, 161. Instead, Defendants accuse Plaintiffs of "mischaracteriz[ing] the meaning" of Defendants' statements to investors, arguing that when they told investors that the increase in revenues was from "GeForce GPU products for gaming," they really meant that the revenues were from GeForce GPUs "*designed and marketed for*" gaming. Mot. 24 n.13 (italics in original). But this argument is factually baseless: when they intended to do so, Defendants explicitly included in their SEC filing the very sorts of phrases that they now urge the Court to insert *ex post* into their challenged statements.[9] In any event, Defendants' argument is legally irrelevant at this stage. Disputes about

---

[9]    For example, when describing NVIDIA's revenues from its OEM segment, Defendants stated that the revenues came from "GPUs **designed for** mainstream desktops, notebooks, and cryptocurrency mining." Ex. G at 24. Similarly, when describing NVIDIA's year-over-year growth for its OEM segment, NVIDIA described the growth as being "due primarily to strong demand for GPU products **targeted for use** in cryptocurrency mining." *Id.* at 27; Ex. N at 26. Such language was absent when the Company falsely assured investors that the uptick in its year-over-year revenues was "due primarily to increased revenue from sales of GeForce GPU products **for gaming**." *Id.*

1    Defendants' intended meaning of their statements cannot be resolved as a matter of law, even when

2    Defendants are able to concoct a *post hoc*, plausible interpretation of the meaning of their statements.

3    *Khoja*, 899 F.3d at 1014; *see also Berson*, 527 F.3d at 986–87 (reversing dismissal and rejecting *post*

4    *hoc* attempt to rewrite phrase in SEC filing—even where interpretation was "conceivable"—because

5    absent "undisputed evidence" that investors would have understood what the phrase meant, the court

6    could not "find, as a matter of law, that defendants" made proper disclosures); *Shenwick v. Twitter,*

7    *Inc.*, 282 F. Supp. 3d 1115, 1139 n.24 (N.D. Cal. 2017) (rejecting defendants' alternative interpretation

8    of misstatement at pleadings stage as improper "dispute over the inferences to be drawn").

9               **3.      Defendants' Statements Identifying the Purported Drivers of Gaming**
10                        **Revenues Were False and Misleading**

11           Defendants further misled investors when they purported to identify the fundamentals

12   "driving" NVIDIA's Gaming revenues. On May 10, 2017, at NVIDIA's Annual Investor Day, Fisher

13   represented that the drivers for Gaming revenues were "eSports, competitive gaming, AAA gaming,

14   [and] notebook gaming." ¶ 149. This statement was materially misleading because it omitted that

15   cryptocurrency mining was a primary driver of NVIDIA's Gaming segment revenues. Fisher himself

16   received reports at the time showing that, even if cryptocurrency mining had been entirely restricted

17   to China, sales to miners in China alone accounted for at least 25% to 35% of NVIDIA's worldwide

18   GeForce "Gaming" revenues—enough, by itself, to make mining one of NVIDIA's four largest

19   Gaming segment drivers. ¶¶ 86–88, 149. Of course, cryptocurrency mining was a phenomenon outside

20   of China as well (*see* ¶¶ 46, 58, 98–101), and when Fisher made this statement during the second

21   quarter of fiscal 2018, at least $199 million of NVIDIA's Gaming-segment revenues were derived

22   from cryptocurrency mining. ¶¶ 127, 149; *see also* Ex. EE at 3 (RBC report).

23           Under similar circumstances, courts hold that companies mislead investors when they disclose

24   certain drivers of success while omitting other significant drivers or facts that show the disclosed

25   drivers are less robust. *See Todd*, 642 F.3d at 1222; *Shenwick*, 282 F. Supp. 3d at 1126, 1139 (finding

26   misleading statement that user engagement metric was a "major growth driver[]" when defendant

27   omitted negative trends in another metric because, due to the omission, "investors interpreted

28   Defendants' statements as reassurances that the Company had experienced and would continue to

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

experience positive growth and engagement trends").

Defendants' principal response—that Fisher did not mean to discuss NVIDIA's "fundamentals," but rather intended to discuss the "market in general" (Mot. 22–23)—ignores his own words and improperly asks the Court to resolve a factual dispute at the pleading stage. Courts consistently reject efforts, such as Defendants' here, to deny falsity by introducing their own counter-narrative at the motion to dismiss stage. *See Khoja*, 899 F.3d at 1014; *Berson*, 527 F.3d at 986–87; *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018) (rejecting defendants' attempt to "offer an alternative interpretation of" their alleged misrepresentations, which "only demonstrate[d] that a factual dispute exists which cannot be resolved at the pleading stage").

Defendants' strained reading of Fisher's statements is further belied by the conference transcript. When Fisher outlined his discussion, he listed "where the market's going" as a ***separate*** topic from "the fundamentals behind PC gaming," Ex. A at 7, and the drivers the Complaint identifies are the "fundamentals of PC gaming" he discussed in connection with the latter topic. *Id.* at 7, 8–9, 11 ("Let's talk about some growth drivers now. I mentioned eSports"; "Okay, let me talk about AAA content, give you an update"; "Last thing I want to talk about is notebooks."). Nowhere did Fisher state that his discussion was of "fundamentals" of the "market in general," as Defendants claim.

Defendants' contention that Fisher's statement identifying the fundamental drivers of NVIDIA's Gaming business was a mere statement of "opinion"—not fact—is equally baseless. The statement, made by the head of the Company's Gaming segment, did not reference his subjective views or admit uncertainty—i.e., it was not prefaced with phrases like "I think" or "I believe." *Omnicare*, 135 S. Ct. at 1325.[10] Moreover, even if Fisher's statement could be read as an "opinion," it is still actionable, as the Complaint pleads numerous facts establishing that, at the time of the Investor Day, Fisher knew of facts that undermined his statement identifying the fundamental revenue drivers of the Gaming segment. *See Nursing Home Pension Fund*, 380 F.3d at 1230 ("The most direct way to show both that a statement was false when made and that the party making the statement knew

---

[10]   Fisher's statement identifying the Gaming segment's "fundamental[]" drivers stands in sharp contrast to those instances in which Fisher *did* express opinions during his presentation. *See, e.g.*, Ex. A at 10 (Fisher opining that "***I believe*** virtual reality is poised for growth.").

that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."). For example, Fisher (i) received weekly sales reports aggregating GeForce sales to cryptocurrency miners from the week before, supplemented by quarterly spreadsheets, ¶¶ 37, 85–93, 175; (ii) had access to NVIDIA's internal software program, GeForce Experience, that compiled usage data concerning whether consumers were using each GPU for gaming or mining, ¶¶ 18, 108, 178; and (iii) commissioned a presentation showing that, during the first eight months of 2017, 1.5 million GeForce units had been sold to cryptocurrency miners in China and that NVIDIA planned to directly target the largest miners, listing the top ten with their contact information. ¶¶ 17, 109–13, 176.

Finally, while Defendants attempt to characterize Fisher's statement as a mere "corporate platitude" (Mot. 23), they ignore his actual words and that even corporate platitudes are actionable in this Circuit when they "address specific aspects of a company's operation[,]" including by "provid[ing] a concrete description of the past and present state" of the business. *Quality Sys.*, 865 F.3d at 1143-44. Such descriptions are false and misleading when they are "inconsistent with real-time financial information." *Id.* at 1144 (reversing dismissal and finding actionable statements reassuring investors about the "*type* of prospective sales" and concerning sales trends for customer segments). Fisher's "concrete description" of the current drivers of NVIDIA's Gaming revenues contradicted the "real-time" information he received.[11] *Id.*

### 4. Defendants' Statements That the "Vast Majority" of Miner Demand Was Served through the Crypto SKU and Omissions of NVIDIA's GeForce Revenues from Miners Were False and Misleading

Defendants further misled investors by repeatedly stating that NVIDIA's cryptocurrency-related revenues were largely limited to sales of its "Crypto SKU" reported in the "OEM segment."

---

[11]     Defendants further try to misdirect by rewriting the Complaint itself, claiming that Plaintiffs allege the falsity of Fisher's characterization of "the strength" of the industry. Mot. 23. But this is a red herring: Plaintiffs nowhere challenge any statement that NVIDIA's Gaming segment was "strong." Rather, Plaintiffs challenge Fisher's misleading identification of the "fundamentals" driving NVIDIA's Gaming revenues, which omitted the most fundamental (and at-risk) driver: cryptocurrency mining. Defendants' cited cases are thus inapposite. *Id.* In both *SolarCity* and *Fusion-io*, the alleged misstatements were limited to "vague statements of optimism," using words or phrases like "strong," "good," "great," and "pretty darn big." *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 995 (N.D. Cal. 2017); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *14-15 (N.D. Cal. Feb. 12, 2015).

1
2
3
4
5
6
7
8
9

¶ 156. For example, Huang stated that "**we serve the vast** . . . **majority of the cryptocurrency demand out of that specialized product**," ¶ 150, and Kress reiterated that "most" and the "majority" of cryptocurrency demand was served by the Crypto SKU. ¶¶ 156, 164. When asked by analysts how much cryptocurrency-related revenue NVIDIA had received, Defendants gave the specific amount of such revenues booked in NVIDIA's OEM segment, without disclosing that substantially greater amounts of cryptocurrency-related revenues were being booked in the Gaming segment. For example, concerning NVIDIA's second quarter fiscal 2018 results, Huang stated that "maybe $150 million or so" of revenue was due to mining—the amount reported for the Crypto SKU just days before (¶¶ 150–52)—but made no mention of the additional $199 million reported in the Gaming segment. ¶ 153.

10
11
12
13
14
15

These statements were materially false and misleading and omitted material facts. When Defendants made their statements asserting that the "vast majority," "most," and the "majority" of NVIDIA's cryptocurrency-related revenues were limited to the Crypto SKU, NVIDIA was actually receiving far more cryptocurrency-related revenues through its Gaming segment. ¶ 127. These statements omitted any mention of the massive cryptocurrency-related sales that were coming through the Gaming segment: $199 million in the second quarter and $229 million in the third quarter. *Id.*

16
17
18
19
20
21
22
23
24
25
26

Defendants assert that Huang's August 2017 statements and Kress's November 9, 2017 statement did not mislead anyone because, according to them, they also made *other* statements suggesting that some GeForce GPUs were, in fact, being sold to miners. Mot. 25–27. Defendants' argument amounts to a "truth-on-the-market" defense—that the allegedly false statements were rendered immaterial by the prior or contemporaneous disclosure of the allegedly concealed truth. *See Provenz*, 102 F.3d at 1492–93. However, as with other materiality challenges, determining whether the concealed truth had in fact been disclosed is intensely fact-specific, and requires factual findings about whether the truth was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance" the alleged false and misleading statement. *Id.* at 1493; *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1036 (S.D. Cal. 2005) ("[T]he [truth-on-the-market defense] is more appropriately resolved by trial than by a motion to dismiss.").

27
28

Moreover, numerous facts show that Defendants' assertion of a truth-on-the-market defense here verges on the frivolous. *First*, Defendants' purportedly curative statements revealed, at the very

1    most, that "*a portion*" (Ex. J at 4) or "*some residual* amount or *some small* amount" (¶ 164) of

2    GeForce sales were made to cryptocurrency miners. This in no way contradicts—let alone

3    "counterbalance[s]," *Provenz*, 102 F.3d at 1493—false assertions that the *vast majority* of NVIDIA's

4    cryptocurrency-related sales were made through the Crypto SKU. ¶¶ 150, 156, 164.

5         *Second*, facts pleaded in the Complaint—including market analysts' severe surprise when, in

6    November 2018, the Company revealed the degree to which its Gaming results had been driven by

7    mining—show conclusively that the truth about Defendants' false and misleading statements was not

8    known to investors during the Class Period. ¶¶ 136–44; *see In re STEC Inc. Sec. Litig.*, 2011 WL

9    2669217, at *8 (C.D. Cal. June 17, 2011) ("[T]he third-party analyst statements comport with

10   Plaintiffs' mosaic . . . that Defendants' statements could have been misleading").

11        *Third*, Defendants' additional false and misleading statements counteracted any effect of their

12   purportedly curative statements conceding that some GeForce GPUs were being sold to miners. For

13   example, to falsely assure investors that NVIDIA was not dependent on cryptocurrency demand,

14   Huang stated during the August 16, 2018 earnings call that "[w]e are masters at managing our channel,

15   and we understand the channel very well." ¶¶ 131, 172. Not only was this statement itself misleading,

16   as it perpetuated NVIDIA's Class Period misrepresentations that cryptocurrency was only a small

17   source of GeForce sales (¶¶ 132, 173), it also undermines Defendants' argument that the Company's

18   disclosure of "*some* mining demand" for GeForce GPUs (Mot. 26) informed the public of the

19   *overwhelming* mining demand for such units. *See Snap*, 2018 WL 2972528, at *7 ("[Defendant's]

20   statements could have misleadingly reassured investors . . . thus operating as a direct rebuttal of any

21   [purported revelation of the truth]"); *Immune Response*, 375 F. Supp. 2d at 1037. Huang's statement

22   successfully lulled analysts into believing (wrongly) that NVIDIA "ha[d] de-risked its portfolio from

23   crypto" (¶132) when, in fact, the opposite was true. In short, Defendants' truth-on-the-market defense

24   is baseless and, at minimum, must await a developed factual record.[12]

25

26   [12]    Defendants also suggest that an analyst's statement that the amount of GeForce revenue
     driven by cryptocurrency mining was "not easy" to "quantify" somehow supports the finding that
27   Defendants' statements to investors were not false. Mot. 27. But this analyst reaction *supports* falsity:
     the market was deceived because Defendants could (and did) determine that mining was driving
28   Gaming revenue. *See, e.g.*, ¶¶ 81–108 ("*We actually know this data*."), 109–17.

Finally, Defendants assert that Kress's November 29, 2017 statement was an "opinion" (Mot. 27), but even an opinion is actionable when, like here, the statement lacks a reasonable basis or if it omits material facts. *Omnicare*, 135 S. Ct. at 1327, 1332. The Complaint alleges ample facts showing that the majority of NVIDIA's cryptocurrency-related sales did not "reside" in the Crypto SKU and that Kress's statement omitted material facts concerning the true proportion of revenues obtained through the Crypto SKU. ¶¶ 164–65. Thus, even if Kress's statement could be construed as an "opinion," it would remain actionable.

### C. Plaintiffs Adequately Plead Scienter

A plaintiff adequately pleads scienter if all of the facts alleged, ***taken collectively***, give rise to the strong inference that "the defendant made false or misleading statements either *intentionally* or with *deliberate recklessness*." *Reese*, 747 F.3d at 569 (italics in original). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). When considering scienter, "a court must first accept all factual allegations in the complaint as true" and must "consider the complaint in its entirety." *Reese*, 747 F.3d at 568; *see also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703. (9th Cir. 2012) ("a holistic review" is required). Here, Plaintiffs allege specific facts establishing that Defendants knew, or were at least deliberately reckless in not knowing, that their statements minimizing NVIDIA's dependence on cryptocurrency mining and the acute risk that this dependence posed were false and misleading.

### 1. Defendants Had Access to Data Showing NVIDIA's Gaming Segment's Reliance on Cryptocurrency Miners

"The most direct way" to show scienter is through allegations of "contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund*, 380 F.3d at 1230; *see also Quality Sys.*, 865 F.3d at 1145 ("[P]articularized allegations that defendants had actual access to the disputed information . . . raise a strong inference of scienter."). Plaintiffs allege in detail how Defendants were informed about and had access to data showing the dramatic surge in cryptocurrency-related sales occurring during 2017 and into 2018. ¶¶ 175–79. Specifically, Plaintiffs allege that, beginning months before the Class Period, NVIDIA tracked GPU sales to miners by

obtaining miner-specific sales data from customers and inputting these figures into a centralized sales database accessible to the GeForce executive team in the U.S., including Fisher, Milner, and Zhang. ¶¶ 85–88. The U.S. executive team, which received weekly reports on miner sales, was "obsessed" with this data, which showed that 60% to 70% of GeForce revenues came from miners. ¶¶ 85–97.

Then, at a March 2017 meeting in China, the U.S. executive team discussed the proliferating demand from miners, which Fisher called "*dangerous*." ¶ 94. Several months later, Senior Director for China, Zhang, at the request of Fisher and Milner, commissioned a study focused on the "[m]ining impact to [the] GeForce business," reporting "1.5 [million] GTX [GeForce] sitting in mining" in China year-to-date and 840,000 GeForce unit sales to miners between April and July 2017 alone. ¶¶ 109–11. The study projected 2.4 million units sold annually to miners in China alone (or $360 million in sales). ¶ 111. While warning of "*high risk and severe [demand] fluctuation*," it described NVIDIA's "New Business Model" whereby the Company would prepare for mining customer orders of 100,000 chips per order while the sales force would "Direct[ly] Engage [the] Top 10-20 miners." ¶¶ 112–13. This is not the hearsay of a confidential witness—it is an internal company document, quoted in the Complaint, memorializing the very sales trends that Defendants publicly denied.

The Complaint also explains how the GeForce Experience software tracked whether the software's 90 million users employed their GeForce chips for gaming or mining. ¶¶ 102–08. Indeed, NVIDIA's own website disclosed that the GeForce Experience software "collects data" including "game usage," and the Company claimed that "mid-to-high 90%" of customers use the software. ¶¶ 104–05. FE 1 confirmed, "*[w]e actually know this data*"; he recounted how management saw the rocketing sales to miners through the data and recalled Zhang explicitly discussing how GeForce Experience data allowed NVIDIA to track mining usage. ¶ 108.[13]

Plaintiffs further allege what Defendants actually did with all of this data: they forecasted a

---

[13] Whether Plaintiffs allege what the GeForce Experience data revealed at any discrete point in time (Mot. 32) is immaterial when the allegations are viewed "holistically as required by *Tellabs*." *S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). The Complaint describes various data streams quantifying cryptocurrency-related sales. ¶¶ 86–88, 94–98, 101, 109–13. NVIDIA's ability to see how its GPUs were being used through the GeForce Experience software is critical because it refutes Defendants' claims that NVIDIA could *not* determine end usage.

1
2
3
4
5
6
7
8
9
10
11
12
13

60% rise in GeForce sales in 2018 driven by miner demand, which impelled NVIDIA to dramatically increase inventory, resulting in a severe glut when miner demand evaporated by the middle of the year. ¶¶ 88, 128, 135. Fisher and his team discussed these forecasts with FE 1 in calls and emails. ¶¶ 88, 176. The internal data also prompted NVIDIA to include a carve-out to the revised EULA to accommodate large miners because, as FE 2, a Senior Product Director, explained, NVIDIA "knew GeForce was being used for crypto, and there was no way they could convince [miners] to use a [more expensive] pro GPU, so they carved it out." ¶¶ 114–17. Decisions of these magnitudes—spiking inventory and fundamentally altering NVIDIA's relationship with lucrative datacenter customers— could not have been made without Huang's approval. *See* ¶ 116 (remark by FE 2 that EULA revision "was almost guaranteed to have been done by Jensen [Huang] himself"). At minimum, the inference that Huang at least knew of this move to accommodate large-scale miners to capitalize on cryptocurrency-related demand is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 at 324.

14
15
16
17
18
19
20
21
22
23
24

Plaintiffs' highly "particularized allegations that defendants had actual access to the disputed information"—extensive contemporaneous data showing that the Gaming segment's meteoric sales growth was driven by cryptocurrency mining—"raise a strong inference of scienter." *Quality Sys.*, 865 F.3d at 1145; *see* ¶¶ 5–7, 81–113, 175–78; *Reese*, 747 F.3d at 571–72 (scienter based on "data to which [defendant] had access . . ."); *Nursing Home Pension Fund*, 380 F.3d at 1230–31 (finding scienter as to CEO based on availability of internal data); *Finisar*, 2017 WL 1549485, at *7 ("[E]ven if [the CEO and board chairman] were not directly involved in these negotiations, they were either aware or should have been aware of this materially relevant business information. And if for some reason they were not, . . . ***as the leaders of the company, both [defendants] had access to it and could have sought it out***."). That Huang's direct report and close colleague, Fisher, monitored the data and foresaw the danger it reflected only reinforces that conclusion. ¶¶ 36, 83–97, 109–13.

25
26
27
28

Faced with the holistic strength of these allegations, Defendants ineffectively attack the former employees' statements in isolation. Mot. 31–32. *First*, what matters is not whether the FEs had direct contact with Defendants, but whether they "held positions that exposed them directly to data" contradicting Defendants' alleged misstatements, which Plaintiffs amply allege. *Robb v. Fitbit Inc.*,

216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (scienter adequately pleaded based on reports of low-level employees to non-defendant COO despite no allegations that reports were conveyed to six individual defendants); *accord Nursing Home Pension Fund*, 380 F.3d at 1233 (crediting witnesses "described with sufficient particularity to establish that they were in a position to know [the information provided]"); *Lloyd*, 811 F.3d at 1208 ("the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus"). FE 1 regularly interacted with Fisher on forecasting calls and met him several times, including FE 1's March 2017 presentation regarding the explosion of GPU sales to miners. ¶¶ 88, 94. FE 1 also prepared the study of "[m]ining's impact [on] GeForce" sales which Fisher commissioned through Zhang. ¶¶ 109–13.

*Second*, Defendants' argument that "FE-1 cannot establish scienter for Huang or Kress" because the Complaint does not "allege that any of the information FE-1 describes was ever conveyed to either of them" (Mot. 31) improperly constricts the scienter test to one of "actual knowledge," ignoring Ninth Circuit precedent premising scienter on "actual access to the disputed information" and/or "recklessness." *Quality Sys.*, 865 F.3d at 1144–45. Defendants also overlook Huang's and Kress's own statements reflecting access to the sales data that FE 1 described (*see* § III.C.2, *infra*) and ignore Fisher's import as the head of Gaming and direct report to Huang, who recognized the danger that cryptocurrency sales posed. ¶¶ 36, 45, 87–88, 94.

*Third*, Defendants mischaracterize the Complaint, wrongly asserting that FE 2 left NVIDIA before the Class Period (FE 2 left in May 2017 (¶ 38))[14] and that Plaintiffs fail to describe FE 4's basis of knowledge or what FE 4 meant by a "high percentage" (FE 4 regularly interacted with distributors and estimated that 50% of first-half 2018 GPU sales in Russia were to miners (¶ 101)). *Cf.* Mot. 31. Moreover, these former employees' accounts are corroborated by the Company's own internal data and by each other, further establishing their reliability. *Daou*, 411 F.3d at 1015.

---

[14] Even were Defendants correct, "common sense dictates that facts relevant to scienter will ordinarily date from before any alleged misrepresentations because the circumstances preceding the statements . . . would be among those knowable at the time of the statements." *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012); *accord Quality Sys.*, 865 F.3d at 1145 (crediting allegations of former director who left company before class period).

### 2.   Defendants' Public Statements Confirm That They Either Had Access to the Internal Data or Were Deliberately Reckless in Making Them

When defendants make specific factual representations about matters of importance to investors, they are deemed to have access to the underlying information. As the Ninth Circuit has explained, when defendants make specific factual representations that are false, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese*, 747 F.3d at 572; *see also S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (where CEO made affirmative statements about risk-management capabilities, "[t]his is enough, under *South Ferry* . . . to find that [the CEO] had actual knowledge of the systems integration and of the hedging capacity of his company") (citing *S. Ferry*, 542 F.3d at 782–86).

Here, Defendants falsely and repeatedly quantified and minimized the magnitude of NVIDIA's cryptocurrency-related Gaming sales. ¶ 150 (Huang stating that NVIDIA had sold $150 million in Crypto SKUs and that it served the "vast . . . majority of the cryptocurrency demand out of that specialized product"), ¶ 152 (Huang claiming *total* crypto-related revenues "represented . . . maybe $150 million or so"). They further assured investors that sales to miners were only a "small percentage" or "some residual amount" of Gaming revenues, insisting that "most" or "the majority" of miner demand resided in the OEM segment. ¶¶ 156, 164, 168.

Defendants' claims that NVIDIA could not identify GeForce sales to miners (Mot. 26–28) conflict with Plaintiffs' well-pleaded allegations, which must be accepted as true when weighing competing inferences. *Tellabs*, 551 U.S. at 322–24; *see* ¶¶ 83–93 (continuous tracking of GeForce sales to miners in internal database and weekly and quarterly sales reports), 102–08 (ability to track end-usage through GeForce Experience software, disclosed on Company website), 109–13 (2017 presentation providing monthly GeForce sales to miners). Moreover, those claims are contradicted by Huang's and Kress's *own* statements quantifying such sales. ¶¶ 77–78, 150, 152, 156, 158, 160, 164, 170, 172; *see Reese*, 747 F.3d at 572 ("[T]he inference that [the SVP] did not have access to the [relevant] data is directly contradicted by the fact that she specifically addressed it in her statement.").

Indeed, if Defendants did *not* have access to the data, they were deliberately reckless, as their

1  statements lacked the factual foundation that they implied. As one court in this Circuit has explained

2  in similar circumstances, "[i]f [the CEO] did not in fact have such knowledge, it would be at least

3  actionably reckless to reassure the public about these matters at all." *S. Ferry*, 687 F. Supp. 2d at 1260;

4  *accord Reese*, 747 F.3d at 569 ("[A]n actor is reckless if he had reasonable grounds to believe material

5  facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts

6  although he could have done so without extraordinary effort."); *Institutional Inv'rs Grp. v. Avaya*, 564

7  F.3d 242, 270 & n.43 (3d Cir. 2009) ("[The possibility that McGuire was ignorant is not necessarily

8  exculpatory. . . . [I]f McGuire simply had no idea whether there was unusual discounting, and

9  nonetheless confidently denied its existence, this would also have presented an obvious risk of

10  misleading investors."); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008)

11  ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead

12  ignorance of the risk.").

13         Moreover, the fact that Defendants' misleading statements came in direct response to questions

14  from analysts further supports scienter. ¶¶ 150, 156, 158, 164, 170, 172; *see Avaya*, 564 F.3d at 270;

15  *Finisar*, 2017 WL 1549485, at *7 (scienter found where "analysts had been speculating about the

16  possibility of an inventory build-up for months, providing further incentive for Defendants to seek out

17  or pay attention to such information"). This is particularly true here, where Defendants, in issuing their

18  denials, expressly touted their focus on the cryptocurrency market and its impact on NVIDIA's

19  revenues. ¶ 180 ("We stay very close to the market. We know its every single move and we know its

20  dynamics."). Such statements by an executive "maintain[ing] that he knew what he was talking about"

21  support scienter. *S. Ferry*, 687 F. Supp. 2d at 1260.

22         **3.      The Core Operations Doctrine Further Supports Scienter**

23         The Ninth Circuit has explained that "[i]t may be inferred that facts critical to a business's core

24  operations . . . are known to key company officers . . . where the nature of the relevant fact is of such

25  prominence that it would be 'absurd' to suggest that management was without knowledge of the

26  matter." *S. Ferry*, 542 F.3d at 782, 786; *accord Reese*, 747 F.3d at 569; *Berson*, 527 F.3d at 988.

27  Although Plaintiffs' scienter allegations do not depend on the core operations inference, it applies

28  here.

Gaming is inarguably NVIDIA's core business, accounting for over half of its total revenues, and the vast majority of Gaming revenues came from GeForce sales. ¶ 44. Given the enormity of NVIDIA's **$1.126 billion understatement** of cryptocurrency-related sales (¶¶ 126–27), it would be "absurd to suggest" that Defendants were without knowledge of the Company's true exposure to and dependence on cryptocurrency. *S. Ferry*, 542 F.3d at 786. Furthermore, the U.S. executive team's acute focus on the cryptocurrency boom's effect on Gaming sales (¶¶ 86–97), as well as Fisher's vantage as head of Gaming (¶ 45), role as Huang's direct report (*id*.), relationship with Huang since childhood (¶ 36), and keen attunement to the danger that the cryptocurrency trend posed (¶ 94), renders it similarly "absurd to suggest that [Defendants] would not discuss" this threat to NVIDIA's largest business. *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003); *see also In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1193 (N.D. Cal. 2010) ("[Scienter] arises because of the likelihood that [an EVP who reported to defendants] **would have told other executive officers** that these important deals involved factors that rendered their classification as term licenses highly questionable."). If there were ever a case where the core operations inference is appropriate, it is here.[15]

### 4.    Defendants Offer No Credible Alternative for Their Statements

Defendants offer no plausible competing explanation for their decision to conceal from investors NVIDIA's heavy dependence on cryptocurrency miners to drive GeForce sales. Their "good-faith" argument that "NVIDIA was simply trying to do its best to manage through a challenging and volatile market situation" is beside the point. Mot. 34. This case is about Defendants' misleading statements regarding the size and impact of NVIDIA's cryptocurrency-related business, not mismanagement. *Schueneman*, 840 F.3d at 709 ("It is the failure to disclose . . . that matters."). Defendants' rhetorical query as to why management would increase sales into the channel if it "[knew] that the lack of gamer demand would quickly come to light" mischaracterizes the Complaint. Mot. 35. Plaintiffs allege that Defendants built up GeForce inventory to meet increasing demand **from miners**. When mining demand disappeared, an inventory glut resulted, and the Company's dependence on

---

[15]    Defendants do not dispute that the Individual Defendants' scienter is properly imputed to NVIDIA. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT

1    cryptocurrency-related revenues was exposed. ¶¶ 88, 128–43.

2            Indeed, the Complaint explains why Defendants obscured NVIDIA's dependence on mining:

3    they wanted to avoid the skepticism—and corresponding discount—that investors would apply to

4    cryptocurrency-related revenues that had proven unreliable during AMD's crash just a few years

5    before. ¶¶ 62–63. At this stage, Plaintiffs need only "provide a narrative of fraud—facts which, if true,

6    substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Capital Partners,*

7    *LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). The Complaint amply meets this standard.

8            **D.    Plaintiffs Adequately Plead Control Person Liability**

9            Defendants do not contest that Huang or Kress are control persons, and instead, challenge only

10   the control person liability of Fisher. Fisher was not simply "a high-ranking corporate officer."

11   Mot. 35. Fisher ran NVIDIA's Gaming business (¶ 36); was NVIDIA's most prominent executive

12   besides Huang and Kress (*id.*); was "responsible for the positioning and go-to-market strategy of

13   GeForce GPUs" (¶ 45); spoke for the Company at public events (¶ 36); directed weekly sales reports

14   and commissioned presentations showing GeForce sales trends (¶¶ 17, 37); and was recognized by

15   insiders as a "company stalwart." *Id.* This is sufficient to plead control liability. *In re Aqua Metals,*

16   *Inc. Sec. Litig.*, 2019 WL 3817849, at *9-10 (N.D. Cal. Aug. 14, 2019).

17   **IV.    CONCLUSION**

18           For the reasons discussed above, Defendants' motion to dismiss should be denied.[16]

19   Dated:  September 13, 2019                    Respectfully submitted,

20                                                KESSLER TOPAZ
                                                  MELTZER & CHECK, LLP
21

22                                                */s/ Andrew L. Zivitz*
                                                  Andrew L. Zivitz (*pro hac vice*)
23                                                (azivitz@ktmc.com)
                                                  Matthew L. Mustokoff (*pro hac vice*)
24                                                (mmustokoff@ktmc.com)
                                                  Eric K. Gerard (*pro hac vice*)
25                                                (egerard@ktmc.com)
                                                  280 King of Prussia Road
26                                                Radnor, PA 19087

27   ─────────────────────
     [16]    In the event that the Court grants Defendants' motion in full or part, Plaintiffs respectfully
28   request that the Court grant leave to amend the Complaint pursuant to Fed. R. Civ. P. 15.

1

Tel:   (610) 667-7706
Fax:   (610) 667-7056

2

-and-

3

Jennifer L. Joost (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:   (415) 400-3000
Fax:   (415) 400-3001

4

5

6

7

*Counsel for Lead Plaintiff E. Öhman J:or Fonder AB
and Co-Lead Counsel for the Class*

8

9

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

10

11

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
Lauren M. Cruz (Bar No. 299664)
(lauren.cruz@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3472

12

13

14

-and-

15

16

John C. Browne (*pro hac vice*)
(johnb@blbglaw.com)
Jeroen van Kwawegen (*pro hac vice*)
(jeroen@blbglaw.com)
Michael M. Mathai (*pro hac vice pending*)
(michael.mathai@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:   (212) 554-1400
Fax:   (212) 554-1444

17

18

19

20

21

*Counsel for Lead Plaintiff Stichting Pensioenfonds
PGB and Co-Lead Counsel for the Class*

22

23

24

25

26

27

28

Case No. 4:18-cv-07669-HSG

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT