UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRON WORKERS LOCAL 580 JOINT FUNDS, et al., <br><br>         Plaintiffs, <br><br>     v. <br><br> NVIDIA CORPORATION, et al., <br><br>         Defendants. | Case No. 18-cv-07669-HSG <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** <br><br> Re: Dkt. No. 123 |

This is a consolidated securities class action brought by Plaintiffs E. Öhman J:or Fonder and Stichting Pensionenonds PGB (collectively, "Plaintiffs") against Defendant NVIDIA Corporation ("NVIDIA" or "the Company") and Jensen Huang, co-founder and Chief Executive Officer, Colette Kress, Chief Financial Officer and Executive Vice President, and Jeff Fisher, Senior Vice President (collectively with NVIDIA, "Defendants"). In their complaint, Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Dkt. No. 113 (Consolidated Class Action Complaint or "CCAC") ¶¶ 147–48. Pending before the Court is Defendants' motion to dismiss the consolidated class action complaint for which briefing is complete. Dkt. Nos. 123 ("Mot."), 128 ("Opp."), and 131 ("Reply"). The Court held a hearing on the motion to dismiss on December 6, 2019. Dkt. No. 140. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.

## I. BACKGROUND

Plaintiffs bring this securities action individually and "on behalf of all others who purchased or otherwise acquired common stock of NVIDIA Corporation" between May 10, 2017, and November 14, 2018, inclusive (the "Class Period"). CCAC at 4. The following facts are

taken from the CCAC and judicially noticeable documents.

### A.    Graphic Processing Units

NVIDIA "is a multinational technology company" that produces graphic processing units ("GPUs"), types of processors that are used in rendering computer graphics.  CCAC ¶ 1. NVIDIA's GPU business is reported by market platforms, two of which are at issue in this case. *Id.* ¶ 43.  The first platform is chips designed for videogames—the Gaming platform—comprised primarily of the "GeForce" GPU product line.  *Id.* ¶¶ 43–44.  Original Equipment Manufacturer & IP ("OEM") is a second platform for chips designed for devices such as tablets and phones.  *Id.* The gaming platform is NVIDIA's largest market: "[i]n every quarter of the Class Period, [g]aming revenues exceeded those of the four other segments combined."  *Id.* ¶ 44 (emphasis not included).  Generally, NVIDIA does not sell GPUs directly to the end users, but rather to device manufacturers, referred to as "partners," that incorporate the GPUs into graphic or video cards.  *Id.* ¶ 42.

Beginning in 2017, prices in the cryptocurrency market began to climb, creating a demand for GPUs processing power.  *Id.* ¶¶ 57, 66.  Generally, cryptocurrencies refer to digital tokens exchanged peer-to-peer through transactions facilitated by the Internet.  *Id.* ¶¶ 49, 52.  These transactions are secured by modern cryptology and are reported on a "decentralized, immutable ledger."  *Id.* ¶ 50.  To maintain the integrity of this ledger, transactions must be verified by network participants "by first consolidating and encrypting the data of a group of transactions using a cryptographic technique of 'hashing'—applying an algorithm to convert a string of text into an inscrutable, random sequence of numbers and letters."  *Id.* ¶ 51.  Users then compete to solve a "mathematical puzzle through laborious trial-and-error work performed by their computers" in order to verify transactions and receive a prize of the network's token—a process referred to as "crypto-mining," or simply "mining."  *Id.* ¶¶ 51–52.  This verification process requires significant processing power.  Because the mining process has essentially become a computational race, miners turned to "GPUs, which could execute the computationally intensive work of crypto-mining hundreds of times faster" than CPUs in home computers.  *Id.* ¶ 57. Due to the significant hardware costs, as well as electricity costs to run and cool the machines, crypto-

United States District Court
Northern District of California

mining is only profitable when prices for cryptocurrencies are above a certain level. *Id.* ¶¶ 59–60. Thus, "[b]ecause cryptocurrency prices have swung wildly over their short history," this has also led to a relatively volatile demand market for mining hardware, including GPUs. *Id.* ¶ 60.

In 2013, Advanced Micro Devices, Inc. ("AMD"), NVIDIA's primary GPU competitor, experienced this volatility when prices for Bitcoin, used on the most popular cryptocurrency network, skyrocketed. *Id.* ¶¶ 62–63. AMD's GPUs were in heavy demand during this time, "with processors that usually sold for $200-300 per unit selling for $600-800 at the height of the bubble." *Id.* ¶ 62. However, when prices for Bitcoin later dropped more than 70%, so too did demand for AMD GPUs—"a problem compounded by miners dumping their AMD GPUs on the secondary market at steep discounts." *Id.* ¶ 63. "AMD revenues suffered as its crypto-related sales evaporated." *Id.*

In 2016, the price of Bitcoin again rallied, and many new currencies entered the market. Although Bitcoin miners moved away from GPUs to application specific integrated circuits ("ASICs"), miners for these new currencies still relied on GPUs. *Id.* ¶¶ 61 n.3, 64. The Ethereum network, "[t]he most significant" of the new cryptocurrency networks, also saw its cryptocurrency, Ether, rise in price: it "temporarily peaked at over $400 per token in June [2017] . . . [and s]everal months later, Ether topped $1,400 per token, an increase of more than 13,000% in a single year." *Id.* ¶ 65. "As AMD processors again became increasingly hard to find, miners began turning to NVIDIA—specifically, its enormously popular line of GeForce Gaming GPUs." *Id.* "NVIDIA internally feared a similar cycle [to AMD in 2013] as it became clear to Defendants that miners had turned to GeForce GPUs as their processor of choice." *Id.* at ¶ 9. In May 2017, NVIDIA launched a special GPU designed specifically for cryptocurrency mining ("Crypto SKUs"). *Id.* ¶ 10. Revenues from Crypto SKU sales were reported in NVIDIA's OEM segment, not the Gaming segment. *Id.* ¶ 10. Unlike the GeForce GPUs, Crypto SKUs did not include video display ports, making them "useless for anything but mining." *Id.* ¶ 12. "Thus, when mining became unprofitable as cryptocurrency prices declined, miners would have no secondary market of gamers on which to dump their idle hardware," and "[t]his feature ensured that most miners would prefer the GeForce to the Crypto SKU." *Id.*

United States District Court
Northern District of California

3

United States District Court
Northern District of California

**B.     Summary of Alleged False and Misleading Statements**

"Throughout the Class Period, NVIDIA reported skyrocketing revenues in its core Gaming segment." *Id.* ¶ 67.  Plaintiffs allege that "investors and analysts alike questioned whether those revenues truly derived from sales to gamers or were rather from sales to cryptocurrency miners, whose demand for NVIDIA GPUs was sure to disappear when the economics of mining turned negative." *Id.* ¶ 68.  Plaintiffs allege that three general representations in Defendants' responses to these questions were materially false and misleading "and concealed from investors the enormous risk that the Company's outsized exposure to crypto-mining posed to its financial results:"

> First, Defendants represented to investors that revenues from sales of its products to cryptocurrency miners were insignificant overall. Second, Defendants promised investors that only a very small portion of NVIDIA's Gaming revenues resulted from sales to cryptocurrency miners.   Third, Defendants represented that NVIDIA's cryptocurrency-related revenues were contained primarily in the Company's OEM reporting segment, when, in fact, almost two-thirds of such revenue came from GeForce sales recorded in its Gaming segment. *Id.* ¶ 66 (emphasis not included).

When the purported truth was revealed, NVIDIA's stock price fell and the putative class members suffered financial losses.  *See id.* ¶¶ 20–22.  For example, on November 15, 2018, NVIDIA cut its revenue guidance for the fiscal fourth quarter, allegedly "[a]ttributing the reversal to a 'sharp falloff in crypto demand' . . ., and it became fully apparent to the market that, contrary to Defendants' earlier representations, NVIDIA's revenues were unduly dependent on cryptocurrency mining." *Id.* ¶ 22.  Following these alleged disclosures, NVIDIA stock price "plummeted 28.5% over two trading sessions, from a close of $202.39 per share on November 15, 2018, to close at $144.70 per share on November 19, 2019." *Id.* ¶ 144.

**i.     Overall revenues from miners were insignificant**

On August 12, 2017, *VentureBeat* published an article that included a transcript of an interview with Defendant Huang.  CCAC ¶ 152.  The interviewer asked if Defendant Huang "sa[id] a hallelujah for cryptocurrency?" *Id.*  Huang responded: "No? Cryptocurrency is around. But it represented only a couple hundred million dollars, maybe $150 million or so. There's still crypto mining to go . . . [i]t comes and goes. It'll come again . . . [w]e're not opposed to it. But our core business is elsewhere."  Dkt. 124-4, Ex. D at 3; *see also* CCAC ¶ 152.  Defendant Huang

4

responded similarly in another *VentureBeat* article published on November 10, 2017, noting that cryptocurrency "is small but not zero. For us it is small because our overall GPU business is so large." Dkt. No. 124-13, Ex. M at 3; *see also* CCAC ¶ 160. Defendant Huang again noted that "crypto was a real part of our business this past quarter, even though small, overall," in an article published by *Barron's* on February 9, 2018. Dkt. No. 124-20, Ex. T at 1; *see also* CCAC ¶ 166. On March 26, 2018, in an article published by *TechCrunch*, Defendant Huang was reported to have said that "he still attributes crypto's demands as a small percentage of NVIDIA's overall business." Dkt. No. 124-24, Ex. X at 4; *see also* CCAC ¶ 168.

On March 29, 2018, Defendant Huang appeared on the CNBC show *Mad Money*. CCAC ¶ 170. When asked about the growth of cryptocurrency risks, Defendant Huang stated that "our core growth drivers come from video games. It comes from professional graphics visualization . . . [and] from our data center business, which is now a multi-billion dollar business doubling each year, as well as in several years our autonomous vehicle business. So, those are our primary growth drivers. Cryptocurrency just gave it that extra bit of juice that caused all of our GPUs to be in such great demand." Dkt. No. 124-25, Ex. Y at 3; *see also* CCAC ¶ 170.

### ii.   Only a small portion of Gaming revenues was attributable to miners

On May 10, 2017, NVIDIA held its 2017 Annual Investor Day in which Defendants Huang, Kress, and Fisher participated. CCAC ¶ 149. While presenting the "Gaming" portion, Defendant Fisher said that "[t]he fundamentals of PC gaming . . . are also strong. What's driving PC gaming, eSports, competitive gaming AAA gaming [and] notebook gaming, all those fundamentals remain strong." Dkt. No. 124-1, Ex. A at 7; *see also* CCAC ¶ 149.

On August 23, 2017, NVIDIA filed its Form 10-Q for the quarterly period ended July 30, 2017 ("Q2'17 10-Q") with the Securities and Exchange Commission ("SEC"), signed by Defendants Huang and Kress. CCAC ¶ 154. The Management's Discussion and Analysis of Financial Condition and Results of Operations section discussed the GPU business. Specifically, the Q2'17 10-Q stated:

> The GPU business revenue increased by 52% in the first half of fiscal year 2018 compared to the first half of fiscal year 2017. This increase was due primarily to increased revenue from sales of

> GeForce GPU products for gaming, which increased over 30%, reflecting continued strong demand for our Pascal-based GPU products . . . Revenue from GeForce GPU products for mainstream PC OEMs increased by over 90% due primarily to strong demand for GPU products targeted for use in cryptocurrency mining.

Dkt. No. 124-7, Ex. G at 27.  NVIDIA's Form 10-Q for the quarterly period ended October 29, 2017 ("Q3'17 10-Q") similarly stated that "GPU business revenue increased by 31% . . . due primarily to increased revenue from sales of GeForce GPU products for gaming, which increased over 10%."  Dkt. No. 124-14, Ex. N at 26; *see also* CCAC ¶ 162.

On November 29, 2017, Defendant Kress represented NVIDIA at the Credit Suisse Technology, Media and Telecom Conference.  CCAC ¶ 164.  A Credit Suisse analyst asked: "I think [the October quarter] was the first time that you had mentioned cryptocurrency as being partly driven by – that's partly driving the gaming side of the business. If you look at it historically, it's been in the OEM business. I think it was down almost 50% sequentially in the OEM portion, did you say that some of that crypto demand was made up for in gaming. Can you quantify that?"  Dkt. No. 124-15, Ex. O at 13.  Defendant Kress responded:

> In Q2 is when we started to create boards specifically for cryptocurrency that we classify in our OEM business. Now keep in mind, what that means is these are boards that can be done for compute, okay, meaning they do not have any graphics capabilities so they can't be used for overall gaming. And the reason we did this is we wanted to make sure that we supplied the overall cards that we needed to our gamers, because that is our very important strategic importance that we did. However, in certain times, if there is not the overall availability and/or if price of Ethereum reaches high levels, there's a fairly good return on investment by buying a high-end card. There could be a good return on investment that says, "I could actually buy a higher-end game. I can actually do gaming and mining at the same time if I was doing that." So you're correct, there probably is some residual amount or some small amount in terms of that, and that's not something that we can visibly see, we can visibly count in [indiscernible] there. We do believe the majority does reside in terms of our overall crypto card, which is the size of about $150 million in Q2 and met our expectations in terms of Q3, that we thought it would be more residual and most probably closer to [indiscernible].

*Id.*; *see also* CCAC ¶¶ 164–65.

### iii.   Cryptocurrency-related revenues were primarily reported in the OEM segment

On August 10, 2017, NVIDIA held its second-quarter fiscal year 2018 earnings call.

CCAC ¶ 150.  A Goldman Sachs analyst asked, "So Q2 revenue came in roughly about $250 million above your guide. Can you confirm what some of the drivers were to the upside relative to your guidance? Was it all cryptocurrency or was it a combination of multiple things?"  Dkt. No. 124-3, Ex. C at 7.  Defendant Huang responded:

> [T]he $250 million, you could see in our – what we categorized under the OEM SKUs, basically the cryptocurrency SKUs. And that, if you reverse-engineered it out, I think, is approximately $150 million. And I – and we serve the vast – I would say, the large majority of the cryptocurrency demand out of that specialized products.  There're still small miners that buy GeForces here and there, and that probably also increased the demand of GeForces.

*Id.*  Similarly, in Defendant Huang's statement in the August 12, 2017 interview with *VentureBeat*, he noted that cryptocurrency represented about $150 million in revenues, the same amount he referenced as being within the OEM segment during the second-quarter fiscal year 2018 earnings call.  *See* Dkt. No. 124-4, Ex. D at 3; *see also* CCAC ¶ 152.

On September 6, 2017, Defendant Kress spoke at the Citi Global Technology Conference. CCAC ¶ 156.  When asked "what steps has NVIDIA taken to avoid cannibalization of core gaming market from these cards," Defendant Kress responded:

> Cryptocurrency has been a very interesting market dynamics over the last couple of years. I think you'll remember 2 years ago, when the Bitcoin mining market came, it was probably one of the shortest-lived cryptocurrency time periods because that moved to the overall compute moving to custom ASICs. That wasn't a market that we particularly paid any attention to or were even a participant in terms of that. But the newest cryptocurrency market took quite a leap ahead in our second quarter that we just finished to where we had planned cryptocurrency cards that would be available to miners and exclusively for miners. So what we mean by that is we did not enable the capabilities for graphics with those cards. You'll see those cards in our OEM business not in our overall gaming business, and those were available throughout most of Q2. But there was very, very strong demand for mining as the overall price of Ethereum, one of the most popular cryptocurrencies, was very, very high. And so what you had seen in some of those shortages is there was a possibility in terms of some of the gaming cards that they might have bought as well. But we covered most of cryptocurrency with our cryptocards that we had developed and that was probably about $150 million in our quarter.

Dkt. No. 124-8, Ex. H at 9–10.[1]

---

[1] Defendant Kress provided a similar response on the November 29, 2017 call with Credit Suisse.

1       On November 9, 2017, Defendants Huang and Kress hosted NVIDIA's third-quarter fiscal

2   year 2018 earnings call.  CCAC ¶ 158.  When asked to "quantify how much crypto was in the

3   October quarter," Defendant Kress responded: "So in our results, in the OEM results, our specific

4   crypto [boards] equated to about $70 million of revenue, which is the comparable to the $150

5   million that we saw last quarter."  Dkt. No. 124-10, Ex. J at 11; *see also id.*

6       Outside of the three categories of statements detailed above, Plaintiffs also allege that one

7   of Defendant Huang's answers during the second-quarter fiscal 2019 earnings call on August 16,

8   2018, was materially false and misleading.  CCAC ¶ 172.  When asked about the channel

9   inventory, Huang responded, "We're expecting the channel inventory to work itself out. We are

10  the masters at managing our channel, and we understand the channel very well . . . we have plenty

11  of opportunities as the – as we go back to the back-to-school and the gaming cycle to manage the

12  inventory, so we feel pretty good about that."  Dkt. No. 124-27, Ex. AA at 11.  Plaintiffs allege

13  that these statements were materially false and misleading because "(i) throughout the Class

14  Period, the overwhelming majority of NVIDIA's cryptocurrency-related revenues . . . was made

15  through the Gaming segment" and "(ii) the diminishment of NVIDIA's cryptocurrency-related

16  revenues in second-quarter fiscal 2019 would continue to materially and adversely impact the

17  Company in the form of a massive glut of unsold GeForce GPUs that NVIDIA had amassed to

18  satisfy the anticipated demand from crypto-miners and because there was not sufficient demand

19  from gamers to mitigate the loss of cryptocurrency-related demand."  CCAC ¶ 173.

20  ## II.    REQUEST FOR JUDICIAL NOTICE

21      Defendants request that the Court take judicial notice of or consider incorporated by

22  reference the following 33 documents: (1) SEC filings (Exs. B, G, I, N, W, DD); (2) securities

23  analyst reports (Exs. E, F, K, L, Q, R, S, EE); (3) earnings calls transcripts (Exs. C, J, P, Z, AA,

24  BB); (4) industry conference presentations (Exs. A, H, O, U, V); (5) articles (Exs. D, M, T, X, Y);

25  (6) charts of historical stock prices during the Class Period (Exs. FF, GG); and (7) a press release

26  (Ex. CC).  Dkt. No. 125 at 16–18; Dkt. No. 124 ("Kirby Decl."), Exs. 1–33.  Plaintiffs object to

*See* Dkt. No. 124-15, Ex. O at 13; *see also* CCAC ¶ 164.

*United States District Court*
*Northern District of California*

Defendants' request as to 15 of the 33 documents.  Dkt. No. 129 at 5.

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine.  899 F.3d 988 (9th Cir. 2018).  Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records."  *Khoja*, 899 F.3d at 999 (citation and quotations omitted).  The Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document.  *Id.*  Separately, the incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself.  *Id*. at 1002.  This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims.  *Id.*  However, it is improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint."  *Id*. at 1014.

Plaintiffs object to Defendants' request to the extent that Defendants seek to introduce the documents not specifically referenced in the complaint.  Dkt. No. 129 at 7 (citing Exs. B, E, F, K, L, P, Q, R, S, U, W, Z, CC, DD).  Although Plaintiffs do not oppose Defendants' request for judicial notice of Exhibits I, FF, and GG, Plaintiffs argue that "these items should not be used to resolve factual disputes in Defendants' favor."  *Id.*

The Court will consider the SEC filings, conference presentations, earnings call transcripts, and articles that Plaintiffs allege contain false and/or misleading statements for the purpose of determining what was disclosed to the market.  Because "the plaintiff refers extensively to the document[s] [and] the document[s] form[ ] the basis of the plaintiff's claim," the Court **GRANTS** judicial notice of Exhibits A, C, D, G, H, J, M, N, O, T, X, Y, AA, and BB.  *Khoja*, 899 F.3d at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)); *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings subject to judicial notice); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (same); *Brodsky*

United States District Court
Northern District of California

*v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (taking judicial notice of press releases); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979–80 (N.D. Cal. 2010) (taking judicial notice of slide presentations to analysts).

Because the CCAC relies on Exhibit I (a Form 4) to support "a scienter inference" as to Defendant Huang, the Court will consider this document for its truth.  CCAC ¶ 186.  Although Plaintiffs argue the Court should not use the document to resolve any factual disputes in Defendants' favor, the Supreme Court has instructed "courts [to] consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" when determining whether the allegations in a securities complaint "give rise to a strong inference of scienter."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).  Because Exhibit I is a publicly filed SEC document that is expressly referenced in the CCAC, the Court **GRANTS** Defendants' request for judicial notice as to Exhibit I.  *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018) ("Courts in this circuit have routinely taken judicial notice of Forms 4 to determine whether insider stock sales raise an inference of scienter to support a § 10(b) action.").

"[S]tock price is public information 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' and are the proper subject of judicial notice in a motion to dismiss."  *In re Finisar Corp. Derivative Litig.*, 542 F. Supp. 2d 980, 990 (N.D. Cal. 2008) (quoting Fed. R. Evid. 201(b)).  Accordingly, the Court **GRANTS** Defendants' request for judicial notice as to Exhibits FF and GG.

Defendants' Exhibits B, E, F, K, L, P, Q, R, S, U, V, W, Z, CC, and DD are not specifically referenced in the CCAC or relevant to the Court's analysis.  Therefore, Defendants' request as to those exhibits is **DENIED AS MOOT**.  Finally, Defendants request, without objection by Plaintiffs, that the Court take judicial notice of Exhibit EE, an analyst report published by RBC Capital Markets, LLC.  Dkt. 125 at 6.  Although Exhibit EE is cited extensively in the CCAC, *see* CCAC ¶¶ 24, 25, 119, 120, 122, 126, it "did not necessarily form the basis of the complaint."  Instead, Defendants offer it to contradict Plaintiffs' allegations.  *Khoja*, 899 F.3d at

1002.  Accordingly, the Court **DENIES** Defendants' request for judicial notice as to Exhibit EE.

## III.   LEGAL STANDARD

### a.  Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### b.  Heightened Pleading Standard

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b).  Under this section, the SEC promulgated Rule 10b–5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).  To

United States District Court
Northern District of California

prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

## IV.   ANALYSIS

Defendants argue that Plaintiffs fail to sufficiently plead loss causation, falsity, scienter, and control person liability as to Defendant Fisher. *See generally* Mot. The Court agrees that Plaintiffs fail to allege falsity and scienter, but finds that Plaintiffs sufficiently plead loss causation. Because the Court finds that Plaintiffs fail to adequately plead a Section 10(b) violation, it must also dismiss the Section 20(a) control person liability claim.

### A.   Falsity

Plaintiffs underlying theory is that Defendants falsely represented that gaming revenues were largely unrelated to sales to miners. Relying on an expert witness and confidential former employees, Plaintiffs allege that Defendants' statements that revenues from miners were largely encompassed by the Crypto SKU products or that mining revenues had a minimal effect on NVIDIA's overall financial performance were false. CCAC ¶¶ 14–15. Falsity is alleged "when a plaintiff points to [the] defendant's statements that directly contradict what the defendant knew at

that time." *Khoja*, 899 F.3d at 1008. "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quotations and alterations omitted). Misleading statements "must be 'capable of objective verification.'" *Id.* (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)). "For example, 'puffing'—expressing an opinion rather than a knowingly false statement of fact—is not misleading." *Id.* Finally, an actionable representation must be material. "For the purposes of a 10b–5 claim, a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

Defendants argue that Plaintiffs' falsity allegations, which rely entirely on an expert opinion by Prysm Group ("Prysm"), fail to satisfy the PSLRA pleading standards. Mot. at 19–22. "There is authority for the proposition that a plaintiff in a securities fraud action controlled by the requirements of the PSLRA can support its allegations of falsity with facts provided by an expert." *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535 at *30 (N.D. Cal. 2007) (citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233–34 (9th Cir. 2004)). "[S]uch factual allegations are subject to the same standard applied to evaluate facts alleged to have originated with any 'confidential informant' (or other witness)." *Id.* Namely, Plaintiffs must allege "with sufficient particularity" that the expert was "in a position to know" the relevant fact claimed: here, how much of Defendants' revenues relied on crypto-mining. *Nursing Home*, 380 F.3d at 1233.

Defendants argue that Plaintiffs fail to meet this standard for two reasons. First, Plaintiffs do not adequately detail the assumptions underlying Prysm's conclusions: "[t]he Complaint does not explain, among other things, the relevance of other cryptocurrencies focused on by Prysm, the source of the hashrate data, what demand (if any) Prysm assumed was met with ASICs or other non-GPU products, which of the 'various popular GPUs' Prysm considered in its calculations, what market share data was used, or what Prysm's 'conservative price and hashrate estimates'

13

were." Mot. at 20–21.  Second, Defendants argue that even as to the assumptions detailed in the Complaint, Plaintiffs do not allege facts with sufficient particularity for the Court to assess whether Prysm's estimates are reliable.  *Id.* at 21.

Plaintiffs allege that "Prysm Group designed and performed a rigorous demand-side analysis to determine the amount of NVIDIA's revenues attributable to crypto-related sales from May 2017 through August 2018.  Specifically, Drs. [Cathy] Barrera and [Stephanie] Hurder examined the top three GPU-mined cryptocurrencies during the Class period (Ether, Z-Cash, and Monero) for changes in the hashrate, which measures how much computation power is being used by the network for mining."  CCAC ¶ 126.  Using the "quarter-over-quarter change in the hashrate . . . [Prysm] estimated the total units of various popular GPUs required to provide the increase in computational power."  *Id.*  They then relied on market share data from Mercury Research, "a leading semiconductor industry research data provider," to conclude that "NVIDIA earned cryptocurrency-mining-driven revenue of $1.728 billion over [the Class] Period."  *Id.*  Prysm thus calculated that Defendants underreported revenues from cryptocurrency mining by approximately $1.126 billion.  *Id.*

Plaintiffs argue that Prysm's qualifications as well as its data sources and methods meet the standard required by the PSLRA.  Opp. at 17.  Specifically, Plaintiffs attempt to address many of Defendants' arguments by pointing to allegations in the CCAC that detail the assumptions upon which Prysm relied.  *See id.* at 17–18.  Still, none of these allegations identify the source of the hashrate data, indicate Prysm's "conservative price and hashrate estimates," indicate any sort of interaction between Prysm and former or current NVIDIA employees or review of its financial data, or respond to Defendants' argument that Prysm's estimate is unreliable without an explanation as to why NVIDIA's mining market share should mirror its share of the gaming market.  The Court agrees that more detail is necessary.

Plaintiffs provide no allegations supporting a major assumption underlying the expert analysis: that NVIDIA's market share in the crypto mining market is equal to its market share in the gaming market.  While Plaintiffs provide the source of NVIDIA's gaming market share (Mercury Research), they do not explain why such a figure reliably indicates NVIDIA's market

share in the mining market. This significantly undermines Prysm's conclusion, as the market share figure forms the baseline multiplier for NVIDIA's estimated revenue from miners during the Class Period. If NVIDIA's mining market share is lower than its gaming market share, Prysm's conclusion could significantly overstate NVIDIA's estimated revenues from mining. This ambiguity precludes Plaintiffs from meeting the PSLRA's heightened pleading requirement. Prsym's conclusion is further clouded by Plaintiffs' own allegations about miners' preferences. The CCAC notes that "GPUs made by AMD . . . were viewed as the gold standard in Bitcoin mining, and it was widely understood that miners preferred AMD's GPUs to NVIDIA's." CCAC ¶ 62. Plaintiffs further note that only "[a]s AMD processors again became increasingly hard to find, miners began turning to NVIDIA." *Id.* ¶ 65. There is no similar allegation that gamers or the gaming industry generally preferred AMD GPUs. Instead, AMD is referred to as "NVIDIA's chief rival," suggesting, minimally, that NVIDIA had a role in the gaming market that did not simply consist of taking AMD's leftovers, as alleged for the mining market. *See id.* ¶ 62.

Plaintiffs argue that Prysm's conclusions are reliable because they "are entirely corroborated by the fact that its key finding—that NVIDIA obtained more than $1.12 billion in undisclosed cryptocurrency-related revenues during the Class Period—has been independently substantiated by numerous other facts," including an independent analysis by Royal Bank of Canada ("RBC") Capital Markets and allegations from FE-1. Opp. 18–19. In their Complaint, Plaintiffs alleged that "RBC's analysis indicated that NVIDIA had understated its cryptocurrency-related revenue by $1.35 billion over an 18-month period that largely overlapped with the Class Period." CCAC ¶ 119. This, however, does not substitute for the detailed allegations regarding Prysm's analysis that the PSLRA requires. There is a $230 million difference between RBC's figure and Prysm's, the analyses estimate revenues for different time periods, and there is no explanation of what assumptions the two analyses may or may not have in common.

FE-1's statements similarly fail to supply the missing specificity. FE-1 was a Senior Account Manager for NVIDIA in China and provided market and revenue figures about the China market only. CCAC ¶¶ 83–92. Although Plaintiffs allege that "40% to 50% of NVIDIA's worldwide GeForce sales were in China," they also note that mining activity was heavily

concentrated in the China market, "where "indigenous miners and . . . representatives of cryptocurrency 'farms' . . . travelled from Russia and elsewhere in Europe and Asia to make bulk purchases from the Chinese manufacturers (NVIDIA's partners)." *Id.* ¶ 83, 98.  FE-1's statements, then, are insufficient to corroborate the (unstated) assumptions underlying Prysm's estimate of NVIDIA's revenues from mining consumers worldwide.

Because Plaintiffs fail to describe Prysm's assumptions and analysis with sufficient particularity to establish a probability that its conclusions are reliable, the Court finds that Plaintiffs fail to allege falsity with the specificity the PSLRA requires.  The Court thus **GRANTS** Defendants' motion to dismiss on this basis.[2]

**B.    Scienter**

Defendants also argue that Plaintiffs fail to raise a strong inference of scienter.  Mot. at 30–35.  Specifically, Defendants argue that none of the confidential former employees' statements support such an inference, *id.* at 31–32, the core operations theory does not apply, *id.* at 32–33, and Huang's stock sale was too small to be suspicious, *id.* at 33–34.  Under the PSLRA, whenever intent is an element of a claim, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required statement of mind."  15 U.S.C. § 78u-4(b)(2).  "The inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  The required state of mind is one of at least "deliberate recklessness."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *as amended* (Aug. 4, 1999).  "[R]ecklessness only satisfies scienter under § 10(b) to

---

[2] Because all falsity claims rely on Prysm's analysis, the Court will not engage in a statement-by-statement analysis until Plaintiffs adequately plead Prysm's underlying assumptions and analysis as described above.  When preparing an amended complaint, Lead Plaintiffs are further ordered to prepare a statement-by-statement chart of the information required by 15 U.S.C. § 78u-4(b)(1) and (2) that specifically identifies: (A) each statement alleged to have been false or misleading, (B) the reasons the statement was false or misleading when made, and (C) if an allegation regarding the statement or omission is made on information and belief, all facts on which the belief is formed.  The chart should clearly identify which statements or omissions are attributable to which defendants, and include a detailed statement of the facts giving rise to a strong inference that each defendant acted with the required state of mind.  Plaintiffs should also summarize their allegations regarding what each defendant knew with regard to the statement or omission, and when they knew it.  Such a chart should be included within any amended complaint or attached to any amended complaint.  For guidance on the format for such a chart, the Court directs Lead Plaintiffs to review *In re InvenSense, Inc. Sec. Litig.*, 15-cv-00084-JD, Dkt. No. 79-1.

the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977. The Court agrees that Plaintiffs fail to adequately allege scienter.

### i. Confidential Witnesses

Where a complaint relies on statements from confidential witnesses, it must "pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (internal citations and quotation marks omitted). The statements by NVIDIA's former employees cited by Plaintiffs do not meet this standard.

FE-1 was a Senior Account Manager for NVIDIA in China who reported to a Senior Sales manager in China, who in turn reported to a Senior Director for China, who reported to the VP for Worldwide GeForce Sales who finally reported to Defendant Fisher. CCAC ¶ 83 n.4. Plaintiffs rely on FE-1 for the proposition that NVIDIA kept track of who was buying GPUs, and that Defendant Fisher was aware that "sales to miners [in China] had caused GeForce sales to almost double in a short period" based on a presentation that FE-1 made. *Id.* ¶ 94. First, there is no link between FE-1 and Defendants Huang or Kress, who made all but one of the allegedly misleading statements. Plaintiffs' allegation that Fisher saw FE-1's presentation, and was "one of NVIDIA's oldest employees" who "grew up together" with Huang, is insufficient to show that Huang also knew the information. *Id.* ¶ 36. This assumption flatly fails to provide the particularized showing necessary under the PSLRA. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) (explaining that "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud"). Second, as to Defendant Fisher, FE-1's presentation to Fisher concerned GeForce sales in China and included detail about the "growing reliance on crypto-miners." CCAC ¶ 94. But, Fisher's single alleged misrepresentation did not concern China GeForce sales. Instead, as noted above, it

United States District Court
Northern District of California

discussed "[t]he fundamentals of PC gaming . . . eSports, competitive gaming AAA gaming [and] notebook gaming" of NVIDIA as a whole, and stated that "all those fundamentals remain strong." Dkt. No. 124-1, Ex. A at 7.  Nothing about the allegations meets the required PSLRA standard of "alleg[ing] with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged." *Zucco Partners*, 552 F.3d at 996.  FE-1's knowledge and presentation about China GeForce sales does not establish that he or she would be knowledgeable about NVIDIA's fundamentals internationally in several subsections of the Gaming segment.  *See Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, No. 15-CV-02938-HSG, 2018 WL 3126393, at *8 (N.D. Cal. June 26, 2018).  Additionally, even if the Court assumes that Plaintiffs can establish reliability and basis of personal knowledge of FE-1's statements, the statements themselves are not indicative of scienter for any of the Defendants. Plaintiffs fail to tie any of FE-1's statements to "any 'specific contemporaneous statements or conditions'" as required to meet the PSLRA standard.  *Markette v. XOMA Corp.*, No. 15-CV-03425-HSG, 2017 WL 4310759, at *12 (N.D. Cal. Sept. 28, 2017) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001)).  FE-1's allegations thus provide no support for an inference of scienter for any statement by any Individual Defendant.

FE-2 was a Senior Products Director involved in "software product management and commercialization, focused particularly on software designed to make hardware run more efficiently and effectively."  CCAC ¶ 38.  Plaintiffs rely on FE-2 for the claim that "it was common knowledge . . . that GeForce was being selected by the miners" over other higher-end processors.  *Id.* ¶ 99.  There is no allegation that FE-2 ever communicated with any Individual Defendant, and this "common knowledge" allegation is only marginally reliable or relevant, so this witness provides no support for an inference of scienter for any Individual Defendant as to any particular statement.  *See Metzler Inv.*, 540 F.3d at 1068; *see also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 980 (N.D. Cal. 2015) ("generalized claims about corporate knowledge [that] offer[ ] no reliable personal knowledge concerning the individual defendants' mental state are insufficient to satisfy the scienter requirement.") (quotations omitted).  FE-3 served as a Senior Director of Marketing for the Americas and then Senior Director for Consumer Marketing in Latin

United States District Court
Northern District of California

America.  CCAC ¶ 39.  Similarly, FE-3 is not alleged to have ever communicated with any Individual Defendant and the CCAC provides no basis on which scienter could plausibly be found for any alleged statement.  *See id.*  Finally, FE-4 was a Community Manager for NVIDIA in Moscow, Russia.  *Id.* ¶ 40.  Plaintiffs fail to allege that FE-4 ever communicated with Individual Defendants or explain why an individual in FE-4's position would know about the overall revenue makeup for NVIDIA.  Taking all the allegations provided by the confidential witnesses together, they fail to plausibly establish that any particular statement by any Individual Defendant was knowingly or recklessly false or misleading when made.  *Tellabs*, 551 U.S. at 314.

### ii.   Core Operations Theory

Plaintiffs also argue that because "Defendants' misstatements and omissions concerned NVIDIA's primary business of selling GPUs," there is a strong inference of scienter.  CCAC ¶ 183.  "The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017)).  "Proof under this theory is not easy.  A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports."  *Id.*  A plaintiff may also meet the standard "[i]n rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).  The Court finds that Plaintiffs fail to meet this heavy burden.

Under the first prong, Plaintiffs point to Defendants' alleged misstatements and omissions to argue that because Defendants "repeatedly quantified and minimized the magnitude of NVIDIA's cryptocurrency-related Gaming sales," they must have had access to the underlying data and information.  Opp. at 32–33.  Pointing to Defendants' statements does not suffice under this theory.  Instead, Plaintiffs must produce "specific admissions . . . of detailed involvement in

19

1    the minutia of a company's operations," and none of Defendants' alleged misstatements provide

2    such admissions.  Plaintiffs also rely on FE-1's statement that "NVIDIA kept meticulous track of

3    who was buying its GPUs" through "order sheets [that] specifically described the purchaser,

4    product, and quantity of the device containing NVIDIA's GPU."  CCAC ¶ 85.  However, FE-1's

5    statement only concerned NVIDIA's China operations.  As noted above, Plaintiffs fail to establish

6    the basis for FE-1's reliability and personal knowledge as to statements about NVIDIA's

7    operations internationally, given his limited, low-level position in the China market.  *See* CCAC

8    ¶ 83 n.4 (describing the four-level separation between him and Defendant Fisher).  Plaintiffs

9    otherwise fail to provide particularized allegations that Individual Defendants were provided

10   secondary data differentiating end user purchasers, or even that "material inventory-related

11   information was disclosed to and/or discussed by Defendants."  *In re Finisar Corp. Sec. Litig.*, No.

12   5:11-CV-01252-EJD, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017).  Without particularized

13   allegations indicating Individual Defendants' detailed involvement with this level of secondary

14   data, as opposed to higher-level information about direct sales by product type, the statements

15   alone do not meet the standard required to show scienter under the core operations theory.[3]

16         Under the second prong, Plaintiffs argue that "Gaming is inarguably NVIDIA's core

17   business . . . [and] it would be 'absurd to suggest' that Defendants were without knowledge of the

18   Company's true exposure to and dependence on cryptocurrency."  Opp. at 34.  Simply alleging

19   that gaming is NVIDIA's core business does not give rise to an inference of scienter.  *See In re*

20   *NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (denying application of the core

21   operations theory even when "the problem concerned [NVIDIA's] flagship product and was cause

22   for concern to [NVIDIA's] two largest customers."); *see also Solazyme*, 2018 WL 3126393 at *9

23   (finding that Plaintiffs failed to allege "specific involvement of the [d]efendants in the details of

24   _____

25   [3] While Plaintiffs argue that Defendants had access to data quantifying the amount of GeForce
     GPUs being used for gaming versus mining through GeForce Experience software, they fail to

26   provide any specific allegations as to the content of the data.  Opp. at 29 (citing CCAC ¶¶ 102–
     108).  Plaintiffs "do not identify any internal reports of 'sales data,' much less plead, in any detail,

27   the contents of any such report or the purported data."  *Lipton v. Pathogenesis Corp.*, 284 F.3d
     1027, 1036 (9th Cir. 2002).  The existence of this software thus cannot lend any support to a

28   showing of "data monitoring," so as to support an inference of scienter under the core operations
     theory.  *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1062.

the purported misrepresentations" even where the alleged misrepresentations concerned the "central cornerstone" of defendants' strategy.). Plaintiffs also claim that the repeated questions from analysts regarding mining demand and effect on revenues suggest that any lack of awareness must have been reckless. Opp. at 33–34. However, in order to show recklessness, Plaintiff must allege facts that reflect "some degree of intentional or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 977. Plaintiffs provide no such allegations and the Court finds no basis for an inference of scienter on this ground.

### iii. Stock Sales

Finally, Plaintiffs point to Defendant Huang's stock sale of 110,000 shares "during the Class Period [to] further support[] the scienter inference." CCAC ¶ 186. To determine whether stock sales are indicative of knowledge, the Court must look to three relevant factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Ronconi*, 253 F.3d at 435 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 986). Based on these factors, the Court agrees with Defendants that the sale does not support an inference of scienter. First, the Form 4 stipulates that as of September 6, 2017, the day of the stock sale, Huang owned more than twenty-two million shares, meaning that the sale amounted to less than one-half of one percent of his stock holdings. Dkt. No. 124-9, Ex. I at 1. This is hardly suspicious. *See e.g.*, *Ronconi*, 253 F.3d at 435 (finding sales of ten percent and seventeen percent were not suspicious). Second, Huang made this sale well before the peak stock price of NVIDIA during the class period. The stock peaked at $289.36 on October 1, 2018, while this stock sale was made at $166.08 per share. Dkt. No. 124-33, Ex. GG. While Plaintiffs do allege that this sale was "highly unusual" for Huang, whose previous "sales were made pursuant to a 10b5-1 plan and related to the exercise of options," this factor is not enough given the weakness of Plaintiffs' showing as to the other two factors. CCAC ¶ 186. Plaintiffs failure to respond to Defendants' arguments on this ground reinforces this conclusion. Thus, Huang's stock sale does not support an inference of scienter.

In summary, the Court **GRANTS** Defendants' motion to dismiss as to scienter. As noted in footnote 1 above, in any amended complaint, Plaintiffs must provide individualized statement-

United States District Court
Northern District of California

United States District Court
Northern District of California

by-statement allegations of scienter that establish that each Individual Defendant possessed the information that purportedly made the statement knowingly or recklessly false or misleading at the time it was made.

### C. Loss Causation

Although the Court need not address loss causation given the above holdings, it does so in order to give guidance to the parties for any later motion to dismiss litigation. "[T]o satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007)). [4] This "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014)). However, this is not the only way to meet the pleading burden. Instead, "loss causation is simply a variant of proximate cause," and "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* at 1210.

Plaintiffs ultimately contend that the partial disclosure on August 16, 2018, which led to a 4.9% drop in NVIDIA's stock price, and the partial disclosure on November 15, 2018, which led to a 28.5% drop in NVIDIA's stock price, revealed NVIDIA's true dependence on crypto-mining, notwithstanding Defendants' challenged statements minimizing the Company's exposure during

---

[4] The parties initially disagree on the pleading standard for loss causation. *See* Opp. at 9–10; Reply at 1–2. As Defendants note, the Ninth Circuit has stated that loss causation must be alleged with particularity under Rule 9(b). *See Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) (holding "that Rule 9(b) applies to all elements of a securities fraud action, including loss causation."). But subsequent cases, as noted by Plaintiffs, state that a plaintiff "need only show a causal connection between the fraud and the loss" to adequately plead loss causation. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *see also Lloyd*, 811 F.3d at 1209 (9th Cir. 2016). The Court need not determine which standard applies, because Plaintiffs meet even the heightened standard.

the Class Period.  CCAC ¶¶ 128–146.  During the August 16, 2018 earnings call, NVIDIA reported that it had lowered its revenue guidance by 2.2%, noting that it expected no further contributions from crypto-mining.  *Id.* ¶ 128.  Defendant Kress stated that "over the last several quarters, we have seen the impacts of crypto and what that can do to elevate our overall gross margins."  *Id.*; *see also* Dkt. No. 124-27, Ex. AA at 9.  In response to a question asking whether the GeForce gaming business was being driven by crypto, Defendant Huang further stated that "some miners were unable to buy our OEM products, and so they jumped onto the market to buy it from retail. And that probably happened a great deal as well."  Dkt. No. 124-27, Ex. AA at 12; *see also* CCAC ¶ 128.  Plaintiffs allege that the November 15, 2018 earnings call provided additional information.  Defendant Kress stated, "Gaming was short of expectations as post crypto channel inventory took longer than expected to sell through.  Gaming card prices, which were elevated following the sharp crypto falloff, took longer than expected to normalize."  CCAC ¶ 134; *see also* Dkt. No. 124-28, Ex. BB at 4.  Plaintiffs allege that "[t]his, of course, could not have been the case had Kress's prior assurances that the 'vast majority' of crypto-related demand was met by the Crypto SKU been true."  CCAC ¶ 134; *see also* Dkt. No. 124-3, Ex. C at 7.

Plaintiffs contend that these disclosures "partially corrected Defendants' prior materially misleading misstatements and omissions, which had falsely minimized the impact of cryptocurrency-related sales on NVIDIA's financial performance."  CCAC ¶ 131.  The Court agrees that Plaintiffs sufficiently plead that Defendants' alleged misstatements were the proximate cause of Plaintiffs' loss.  In the CCAC, Plaintiffs allege that Defendants' alleged misstatements created the following impressions:

- "[O]nly a very small portion of NVIDIA's Gaming revenues resulted from sales to cryptocurrency miners."  CCAC ¶ 66.  For example, Plaintiffs allege:

> To better understand the riskiness of NVIDIA's reported revenues, and whether the explosive growth in those numbers was sustainable, analysts pressed Defendants for assurances that the surge in sales was not being driven by cryptocurrency-mining demand . . . Defendants assuaged these concerns by repeatedly telling investors throughout the Class Period that cryptocurrency-related sales contributed a "small" portion to the Company's overall revenues. For example, when told that "[i]t seemed like people had the impression that cryptocurrency is driving all of your success," Defendant Huang called the impression "wrong" and stated that

23

cryptocurrency's effect on NVIDIA's sales was "small but not zero . . . It's going to remain small for us." CCAC ¶¶ 69–70 (emphasis removed); *see also* Dkt. No. 124-13, Ex. M at 3.

- "NVIDIA's cryptocurrency-related revenues were contained primarily in the Company's OEM reporting segment, [not] from GeForce sales recorded in its Gaming segment." CCAC ¶ 66.  For example, Plaintiffs allege:

> NVIDIA had begun selling the Crypto SKU, a GPU designed specifically for cryptocurrency mining, in the summer of 2017 . . . Crypto SKU sales appeared only in the OEM segment, not in the core Gaming segment.  This conspicuous segregation of the Crypto SKUs from Gaming was by design: it allowed Defendants to publicly claim that its mining-related sales were cordoned off in OEM, ostensibly isolating NVIDIA's cash-cow Gaming business from cryptocurrency-related volatility while capitalizing on white-hot demand for the hardware needed for mining.  Defendants repeatedly and falsely assured investors and analysts that NVIDIA met virtually all of crypto-miners' demand for its GPUs through sales of the Crypto SKU . . . . CCAC ¶ 76.

> For example, when NVIDIA reported on August 10, 2017, "record revenue" for the second quarter of fiscal 2018 of $2.23 billion driven largely by $1.19 billion in revenues from the Company's Gaming segment, Defendant Huang reassured investors that cryptocurrency mining was not driving the quarter's Gaming revenues.  He claims that "we serve the vast . . . majority of the cryptocurrency demand out of that specialized product [the Crypto SKU] in the OEM segment, which recorded just $150 million in cryptocurrency sales."  CCAC ¶ 77 (emphasis removed); *see also* Dkt. No. 124-3, Ex. C at 7.

Plaintiffs directly tie the August and November statements puncturing these allegedly misleading impressions to their loss.  Plaintiffs allege that the market had been pointedly concerned about the risk of whether crypto-mining was truly behind the surge in NVIDIA's gaming revenues, or only accounted for "some residual amount or some small amount," as stated by Defendants.  CCAC ¶ 152.  Investors and analysts asked about these concerns, and Defendants made statements that created the impressions noted above.  Plaintiffs allege that "[t]hese . . . statements caused NVIDIA's common stock to trade at artificially inflated prices."  *Id.* at 145.  However, instead of cryptocurrency-related GPU revenue being reported almost exclusively in the OEM segment, and instead of cryptocurrency mining being only a small part of NVIDIA's revenues, Defendant Huang later stated that "some miners were unable to buy our OEM products, and so they jumped onto the market to buy it from retail. And that probably happened a great deal as well."  Dkt. No. 124-27, Ex. AA at 12; *see also* CCAC ¶ 128.  Defendant Kress further pointed to an inventory

1    buildup in the Gaming sector and noted that "[G]aming was short of expectations . . . Gaming card

2    prices, which were elevated following the sharp crypto falloff, took longer than expected to

3    normalize."  Dkt. No. 124-28, Ex. BB at 4; *see also* CCAC ¶ 134.

4        These acknowledgements allegedly changed the impressions created by Defendants'

5    statements that the vast majority of crypto-mining sales were covered by Crypto SKUs in the

6    OEM segment.  Instead, Plaintiffs allege it became clear that the earlier statements did not

7    meaningfully inform investors and analysts that the Gaming segment played a substantial role in

8    cryptocurrency sales, which was the precise concern noted by analysts and investors throughout

9    the class period.  *See Lloyd*, 811 F.3d at 1210 (finding loss causation adequately alleged where

10   "investors understood the SEC announcement as at least a partial disclosure of the inaccuracy of

11   the previous 'no serious doubts' statements"); *Nuveen*, 730 F.3d at 1120 ("[A] plaintiff can satisfy

12   loss causation by showing that 'the defendant misrepresented or omitted the *very facts* that were a

13   substantial factor in causing the plaintiff's economic loss.'") (quoting *McCabe*, 494 F.3d at 425).

14       Given these detailed allegations, the Court finds that Plaintiffs adequately pled loss

15   causation and **DENIES** Defendants' motion as to this element.

16       **D.    *Section 20(a) Control Person Liability***

17       Plaintiffs claim under Section 20(a) of the Securities Act is expressly premised on the

18   Section 10(b) violation.  CCAC ¶¶ 209–10.  Since Plaintiffs fail to allege a Section 10(b) claim

19   against Defendants due to a failure to adequately plead falsity and scienter, the Section 20(a) claim

20   must be **DISMISSED**.  *See Zucco*, 552 F.3d at 990.

21       //

22       //

23       //

24       //

25       //

26       //

27       //

28       //

25

## V.    CONCLUSION

For the reasons noted above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss **WITH LEAVE TO AMEND**.  In amending, Plaintiffs are directed to comply with the standards stated above and must include the chart representation noted in footnote 1.  Any amended complaint must be filed within twenty-eight (28) days of the date of this order.

**IT IS SO ORDERED.**

Dated:  3/16/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge