1   COOLEY LLP
    JOHN C. DWYER (136533) (dwyerjc@cooley.com)
2   PATRICK E. GIBBS (183174) (pgibbs@cooley.com)
    SARAH M. LIGHTDALE (4395661) (slightdale@cooley.com)
3   CLAIRE A. MCCORMACK (241806) (cmccormack@cooley.com)
    SAMANTHA A. KIRBY (307917) (skirby@cooley.com)
4   3175 Hanover Street
    Palo Alto, CA  94304-1130
5   Telephone:    (650) 843-5000
    Facsimile:     (650) 849-7400
6
    Attorneys for Defendants
7   NVIDIA CORPORATION,
    JENSEN HUANG, COLETTE KRESS
8   and JEFF FISHER

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                          OAKLAND DIVISION

13

14  In re NVIDIA CORPORATION          Case No.  4:18-cv-07669-HSG
    SECURITIES LITIGATION
15                                    **DEFENDANTS' NOTICE OF MOTION AND
                                      MOTION TO DISMISS PLAINTIFFS' FIRST
16  _____  AMENDED CONSOLIDATED CLASS
                                      ACTION COMPLAINT**
    This Document Relates to:  All Actions.
17                                    Date: October 15, 2020
18                                    Time: 2:00 p.m.
                                      Place:  Courtroom 2
19                                    Judge:  Hon. Haywood S. Gilliam, Jr.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ........................................................ 1

STATEMENT OF RELIEF SOUGHT ............................................................................... 1

STATEMENT OF ISSUE TO BE DECIDED ................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.    INTRODUCTION ...................................................................................................... 1

II.   STATEMENT OF ALLEGATIONS AND FACTS SUBJECT TO JUDICIAL NOTICE ...................................................................................................................... 3

    A.    NVIDIA's Business ........................................................................................ 3

    B.    Distribution of NVIDIA's GPUs .................................................................... 4

    C.    The 2017-2018 Cryptocurrency Opportunity ................................................ 4

        1.    The First Cryptocurrency Spike: March to July 2017 ....................... 5

        2.    Cryptocurrency Levels Off: August to October 2017........................ 7

        3.    The Second Cryptocurrency Spike: November 2017 to March 2018 ............ 8

    D.    The 2018 Inventory Challenges ..................................................................... 9

    E.    November 2018 Inventory Announcement ................................................... 10

    F.    Procedural History and New Allegations in the FAC .................................. 11

        1.    Removed Allegations and Admissions ............................................. 12

        2.    New Allegations Related to the Prysm Group's Analysis ............................ 13

        3.    New Allegations Related to Kress and Fisher ................................. 13

        4.    New Allegations Related to Former Employee 5 (FE-5) ............................. 14

        5.    New Allegations Related to Access to Data ..................................... 14

III.  ARGUMENT .......................................................................................................... 16

    A.    Plaintiffs Fail to Plead Scienter ................................................................... 16

        1.    The Nonculpable Explanation is Far More Plausible ..................... 16

        2.    The Former Employees Do Not Support a Strong Inference of Scienter ...... 17

            A.    FE-1............................................................................................ 18

            B.    FE-2............................................................................................ 19

            C.    FE-3 AND FE-4 ........................................................................ 20

            D.    FE-5............................................................................................ 21

         3.    The Core Operations Theory Does Not Apply Here ....................... 22

    B.    Plaintiffs Fail to Plead Falsity ..................................................................... 24

        1.    Plaintiffs Have Not Cured the Pleading Deficiencies as to Prysm ............... 24

        2.    Plaintiffs Have Not Adequately Pled an Omission ........................ 29

        3.    Challenged Statements Not False or Misleading for Other Reasons ............ 30

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

i

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NO. 4:18-CV-07669-HSG

# TABLE OF CONTENTS
(continued)

**Page**

C.    Plaintiffs' Control Person Claim Fails ......................................................... 35

IV.    CONCLUSION .............................................................................................................. 35

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NO. 4:18-CV-07669-HSG

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Apparel, Inc. S'holder Litig.*,
  855 F. Supp. 2d 1043 (C.D. Cal. 2012) ...................................................................23

*Applestein v. Medivation, Inc.*,
  561 F. App'x 598 (9th Cir. 2014) .........................................................................28

*Bao v. Solarcity Corp.*,
  2016 WL 54133 (N.D. Cal. Jan. 5, 2016) .........................................................18, 20

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ...............................................................................29

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Cal. Mar. 24, 2014).................................................19, 21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  65 F. Supp. 3d 840 (N.D. Cal. 2014) ...................................................................20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...................................................................30, 31, 34

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ....................................................21

*Costabile v. Natus Med. Inc.*,
  2018 WL 7134363 (N.D. Cal. Dec. 18, 2018)......................................................17

*Costabile v. Natus Med. Inc.*,
  293 F. Supp. 3d 994 (N.D. Cal. 2018) ..................................................................18

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) .............................................................................34

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ................................................19, 35

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018)....................................................................34

*Hernandez v. Schaad*,
  2017 WL 6731624 (N.D. Cal. Dec. 29, 2017).................................................13, 25

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
  2020 WL 1244936 (N.D. Cal. Mar. 16, 2020)................................................ *passim*

*Jackson v. Loews Hotels, Inc.*,
  2019 WL 6721637 (C.D. Cal. July 24, 2019) ........................................................13

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Leapfrog Enter., Inc. Sec. Litig.*,
200 F. Supp. 3d 987 (N.D. Cal. 2016) .................................................................................35

*In re LifeLock, Inc. Sec. Litig.*,
690 F. App'x 947 (9th Cir. 2017) .......................................................................................34

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ..........................................................................................34

*In re Maxwell Techs., Inc., Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014) .................................................................................18

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ..............................................................................................11

*Nguyen v. Endologix, Inc.*,
2020 WL 3069776 (9th Cir. June 10, 2020) .............................................................. *passim*

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
2018 WL 3126393 (N.D. Cal. June 26, 2018) ....................................................................18

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ......................................................................................25, 28

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ..............................................................................................11

*Pierrelouis v. Gogo, Inc.*,
414 F. Supp. 3d 1164, 1174 (N.D. Ill. 2019) .....................................................................21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ............................................................................................22

*S.E.C. v. Todd*,
642 F.3d 1207 (9th Cir. 2011) ............................................................................................35

*Sgarlata v. PayPal Holdings, Inc.*,
409 F. Supp. 3d 846 (N.D. Cal. 2019) ..........................................................................19, 28

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ........................................................................25

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ................................................................................31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................................................................16

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
2013 WL 2247394 (C.D. Cal. May 9, 2013) .......................................................................25

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Veal v. Lendingclub Corp.*,
   2020 WL 3128909 (N.D. Cal. June 12, 2020) ..........................................................................26

*Xiaojiao Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ............................................................................30, 32

*In re YogaWorks, Inc. Sec. Litig.*,
   2020 WL 2549290 (C.D. Cal. Apr. 23, 2020) .......................................................................13

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .............................................................................17, 18, 23, 35

**Statutes**

15 U.S.C.
   § 78u-4(b) (PSLRA) ....................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P.
   8.......................................................................................................................................1
   9(b)..............................................................................................................................1, 11
   12(b)(6) .............................................................................................................................1

v

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NO. 4:18-CV-07669-HSG

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on October 15, 2020, or as soon thereafter as this Motion may be heard, defendants NVIDIA Corporation ("NVIDIA" or the "Company"), Jensen Huang, Colette Kress, and Jeff Fisher will and hereby do move to dismiss with prejudice all claims asserted in Plaintiffs' First Amended Consolidated Class Action Complaint ("First Amended Complaint" or "FAC"), pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6) and Section 21D(b) ("PSLRA") of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78u-4(b). This Motion is based on the pleadings; Defendants' Memorandum of Points and Authorities; Request for Judicial Notice and Consideration of Documents Incorporated by Reference ("RJN"); the Declaration of Samantha A. Kirby and exhibits thereto; and other matters as may be presented at the hearing.

### STATEMENT OF RELIEF SOUGHT

Defendants seek an order dismissing the FAC with prejudice for failure to state a claim.

### STATEMENT OF ISSUE TO BE DECIDED

Whether the FAC states a claim under Exchange Act Sections 10(b) and 20(a).

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Although this Court's March 16, 2020 Order identified several deficiencies in Plaintiffs' prior complaint, the First Amended Complaint still fails to allege scienter or falsity with the particularity required by the PSLRA and Rule 9(b). Because this is Plaintiffs' third attempt to state a securities fraud claim and further amendment would be futile, the FAC should be dismissed with prejudice.

As before, Plaintiffs' core claim is that NVIDIA and its senior executives misled investors "into believing that ***nearly all***" of NVIDIA's cryptocurrency-related GPU revenue was derived from sales of the Crypto SKU, rather than GeForce GPUs. (¶ 72.)[1] And, as before, Plaintiffs claim that the Company revealed the "full extent" that revenue had been "dependent" on sales to miners when it announced that it would not ship additional mid-range GPUs in late 2018 and early 2019 because the

---

[1] All cites to "¶" are to paragraphs of the FAC. Unless otherwise noted, all emphasis is added and all citations are omitted.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

channel was full. (¶ 161.) Yet, as before, Plaintiffs still fail to adequately allege the existence of any contemporaneous internal NVIDIA documents or information showing either **how many** GeForce GPUs miners purchased or **how much** such purchases were worth. Instead, Plaintiffs again present only estimates prepared by a consulting firm, hired and paid for by Plaintiffs themselves long after the Class Period, which in turn rest on other estimates and assumptions external to NVIDIA. As a result, the FAC fails largely on the same grounds as the Plaintiffs' earlier pleading efforts.

Having based their falsity arguments on information that did not exist during the Class Period (and obviously was not known to any of the Individual Defendants when they spoke), Plaintiffs face a high hurdle to plead scienter. The Court previously held that Plaintiffs' prior complaint, the Consolidated Class Action Complaint ("CAC"), failed to clear this hurdle through statements attributed to former employees or by meeting the "heavy burden" of pleading scienter through the core operations theory. Although the FAC includes pages of vague "new" allegations, it too lacks any particularized facts to support a strong inference that any of the Individual Defendants acted either recklessly or with an intent to deceive. Plaintiffs' new scienter allegations are largely based on accounts from the same former employees this Court previously rejected. The FAC adds a few additional statements, and one new former employee (FE-5), but fails for the same reasons. Plaintiffs fail to identify anywhere in the 263 paragraphs of the FAC a single contemporaneous email, report or other document or a single interaction between any of the former employees and any of the Individual Defendants that supports an inference, let alone a strong inference, that any of the Defendants acted with the requisite scienter. Further, Plaintiffs fail to identify any plausible motive for such fraud. According to the FAC, Defendants concealed from investors a lack of gaming end-user demand and nonetheless opted to sell large volumes of GeForce chips into the channel, intentionally creating an inventory glut that could not possibly end well. There are no allegations that any of the Defendants benefitted financially from this. Indeed, the FAC offers no plausible rationale for why NVIDIA's top executives (including its largest single shareholder, Mr. Huang) would deliberately harm the Company and its shareholders. Earlier this month, the Ninth Circuit rejected a similar theory precisely because it did "not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 2020 WL 3069776, at *8 (9th Cir. June 10, 2020). This Court should do the same.

Cooley LLP
Attorneys At Law
Palo Alto

2

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

Plaintiffs' new falsity allegations also fail to close the gaps identified in the Order. Dismissing the CAC for failure to plead falsity, the Court found that, while Plaintiffs' allegations relied "***entirely***" on an "expert" opinion by Prysm Group, Plaintiffs failed to plead Prysm's "assumptions and analysis" with sufficient particularity. The FAC fails for the same reason. In the CAC, Prysm simply assumed that the Company's share of the gaming market reliably indicated its share of the mining market. In the FAC, Plaintiffs delete that critical admission and allege instead that Prysm relied on a 2018 "Jon Peddie Research" report purporting to analyze the effect of crypto-mining on NVIDIA's add-in board sales. (Despite this entirely "new" input data, Prysm's conclusions somehow remain precisely the same—to the dollar.) Far from curing the problems identified by the Court, Prysm's after-the-fact "reliance" on yet another third-party's market share estimate just compounds them. The Jon Peddie estimate rests on a host of unidentified and unexplained assumptions and inputs, which the FAC does not allege that Prysm investigated at all. This renders Prysm's analysis even ***less*** reliable than before.

For these and the other reasons addressed below, Plaintiffs fail to overcome the fatal defects the Court identified in the Order, and any further amendment would be futile. Defendants respectfully request that the Court dismiss the First Amended Complaint with prejudice.

## II.     STATEMENT OF ALLEGATIONS AND FACTS SUBJECT TO JUDICIAL NOTICE

### A.     NVIDIA's Business

NVIDIA "produces graphic processing units ('GPUs'), types of processors that are used in rendering computer graphics." *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 2020 WL 1244936, at *1 (N.D. Cal. Mar. 16, 2020) ("Order"); ¶ 29. NVIDIA's revenue is reported by "market platforms," which reflect the markets towards which the NVIDIA products are branded and marketed. The two market platforms at issue here are: (1) Gaming, which includes chips designed and marketed to play video games, and is primarily comprised of the "GeForce" or "GTX" product line of GPUs; and (2) Original Equipment Manufacturer & IP ("OEM"), a catch-all category that includes GPUs sold for, among other things, embedded devices and mainstream PCs. (¶ 39.)

Defendant Jensen Huang is the co-founder and Chief Executive Officer of NVIDIA; defendant Colette Kress is the Executive Vice President and Chief Financial Officer; and defendant Jeff Fisher was the Head of Gaming throughout the Class Period. (¶¶ 30-32.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

3

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

### B.    Distribution of NVIDIA's GPUs

NVIDIA generally does not sell its GPUs directly to end users. Order at *1; ¶ 42. Instead, it sells them to other device manufacturers ("partners") that incorporate the GPUs into their own products, such as graphics or video cards ("GPU cards"). *Id.* These device manufacturers then sell the GPU cards into multi-level distribution and reseller channels. (¶ 42.) NVIDIA refers to its direct customers, together with their distribution networks, as the "channel."

It typically takes months for an NVIDIA GPU to move from the beginning of the channel (when NVIDIA sells a GPU to one of its channel customers) to the end (when an end user buys a product that incorporates the GPU). (*See, e.g.*, Ex. BB at 13; Ex. P at 10.)[2] Thus, at any given time, NVIDIA's channel customers and the companies in their distribution networks will have some volume of NVIDIA products in inventory ("channel inventory"). (*See, e.g.*, ¶ 142; Ex. BB at 12-13.) If sales at the end of the channel accelerate suddenly, before NVIDIA can increase the supply coming into it, supplies for end users can get tight and prices can increase. (*See, e.g.*, Ex. W at 15; Ex. Z at 8.) But if end-user demand slows while NVIDIA continues to sell product into the channel, channel inventory can increase to a point at which NVIDIA's channel customers might halt their purchases. (*See, e.g.*, ¶ 162.) And, while NVIDIA suggests a price ("MSRP") for graphics cards containing its GPUs, it does not control pricing in the channel. (*See, e.g.*, Ex. P at 12; Ex. V at 6.) Thus, third parties' purchasing and pricing decisions dramatically impact the flow of NVIDIA's products through the channel.

### C.    The 2017-2018 Cryptocurrency Opportunity

GPUs have been used to "mine" certain cryptocurrencies. Order at *1; ¶¶ 44-54. As the price of a cryptocurrency goes up, miners have financial incentives to invest in more processing power (including GPUs). *Id.* Because crypto prices have "swung wildly," the demand for mining hardware has been "volatile." Order at *1; ¶ 55. NVIDIA's primary GPU competitor, AMD, experienced this volatility in 2013, when the price of Bitcoin increased 14-fold over a six-month period. Order at *2; ¶¶ 56-58. As Bitcoin miners favored AMD's GPUs, demand—and retail prices—for them

---

[2] All cites to "Ex." are to exhibits to the Declaration of Samantha A. Kirby filed herewith. The Court previously granted judicial notice as to many of these exhibits, which were submitted with the Motion to Dismiss the CAC. *See* Order at *5-6. Where Defendants' prior request for judicial notice was denied as moot (Exs. B, E, K, L, P, Q, R, S, U, V, W, Z, and DD) and Defendants refer to those exhibits in this Motion to Dismiss the FAC, Defendants have renewed their request.

Cooley LLP
Attorneys At Law
Palo Alto

4

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

"skyrocketed." *Id.* When Bitcoin prices later plummeted, that demand collapsed, a problem compounded by those miners dumping AMD GPUs on the secondary market at steep discounts. *Id.*

In the spring of 2017, the price of Ether—"the most significant" of the new cryptocurrency networks—began a "meteoric climb" that peaked at over $400 in June, compared to $23 three months earlier. Order at *2; ¶ 60; Ex. FF at 1, 3. The rise of Ether prices created a significant business opportunity, as "miners turned to NVIDIA" during the "run up" in cryptocurrency prices. (¶ 61.) But it also created a challenge, as NVIDIA also wanted to provide adequate supplies of GPUs for gamers, at properly calibrated prices, to continue serving that core market. (*See, e.g.*, Ex. O at 13.) The challenge of managing these dynamics in the face of erratic miner demand grew more acute over time due to the unpredictable swings in cryptocurrency prices—especially Ether, which dropped to $132 in July 2017, then skyrocketed from $276 in November to $1,422 in January 2018. (Ex. FF at 4, 6, 8.)

### 1.     The First Cryptocurrency Spike: March to July 2017

As increasing Ether prices in the spring of 2017 began to drive some demand for NVIDIA GPUs, NVIDIA management did not want to "fall prey to the boom-and-bust cycle" AMD had experienced, and was concerned that demand by miners could adversely affect the availability of GeForce cards for the Company's core gaming customers. Order at *2; ¶ 5. In May 2017, NVIDIA launched a GPU designed specifically for cryptocurrency mining, referred to as "Crypto SKUs" in the FAC. Order at *2; ¶ 72. Revenue from the Crypto SKUs was reported in the OEM segment. (¶ 6.)

The Class Period in the FAC starts, as it did in the CAC, around this time on May 10, 2017. It begins with the single challenged statement made by Fisher. (¶ 176.) At NVIDIA's Annual Investor day, Fisher offered his "perspective" on "some of the fundamentals behind PC gaming." (¶ 176; Ex. A at 7.) He opined, "The fundamentals of PC gaming, as I'll talk about today, are also strong. What's driving PC gaming, eSports, competitive gaming, AAA gaming, notebook gaming, all those fundamentals remain strong." (*Id.*) The statement made no reference to mining.

On August 10, 2017, on the first quarterly earnings call after the June 2017 Ether spike and the Crypto SKU launch, NVIDIA reported financial results for the second quarter of its 2018 fiscal year: total revenue of $2.23 billion, $1.19 billion in revenue from its Gaming market platform, and $150 million in OEM revenue from the new Crypto SKUs. (¶ 73; Ex. C at 3-4, 7.) CFO Kress made clear

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

5

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

that miners were buying GeForce units as well as the new Crypto SKUs: "GPU sales were lifted by demand from increasing[] mining activity, or Ethereum. We served a large portion of this specialized market with a dedicated board, as seen in our OEM sales, and some with GeForce GTX boards." (Ex. C at 4.) In response to an analyst's question, CEO Huang stated that, while he believed that NVIDIA satisfied "the large majority of the cryptocurrency demand out of [the Crypto SKU]," miners "probably also increased the demand of" GeForce GPUs. (Ex. C at 7; *see also* ¶ 73.) He also stated that, because of the market dynamics facing the Company, there were gamers "whose needs and demands were not filled last quarter." (*Id*.) Analysts issuing reports shortly after the call understood that NVIDIA was meeting miner demand with both the Crypto SKUs and GeForce chips. One estimated that as much as $100 million worth of the total of $1.19 billion in Gaming revenue could have been driven by mining.[3] (Ex. E ("In addition to strong gaming sales, we believe new cryptocurrency demand added up to $250M to the topline ($150M in OEM revenue and ***another bit of upside in GeForce***)").)

Two days later, *VentureBeat* magazine published an article containing an "edited transcript" of an interview with Huang. (¶ 183; Ex. D at 3.) According to the article, the magazine asked Huang: "Did you say a hallelujah for cryptocurrency?" Huang is quoted as responding: "No? Cryptocurrency is around. But it represented only a couple hundred million dollars, maybe $150 million or so. There's still crypto mining to go to, currency mining." (*Id*.) He went on to say that NVIDIA was "not opposed to [cryptocurrency mining]. But our core business is elsewhere." (*Id*.)

In early September, during a technology conference hosted by Citigroup, an analyst asked Kress her views about longer-term mining demand. (¶ 190; Ex. H at 9-10.) After referring back to the market dynamics during the 2013 Bitcoin bubble, Kress responded:

> [T]here was very, very strong demand for mining as the overall price of Ethereum, one of the most popular cryptocurrencies, was very, very high. And so what you had seen in some of those shortages is there was a possibility in terms of some of the gaming cards that they might have bought as well. But we covered most of cryptocurrency with our cryptocards that we had developed and that was probably about $150 million in our quarter.

(*Id.*) Plaintiffs claim these statements were all false because, according to Plaintiffs, they understated the impact mining was having on NVIDIA's revenue. (¶¶ 174, 180-82, 184-86, 191-92.)

---

[3] The Court has recognized that analyst reactions, and whether or not they are consistent with Plaintiffs' theory, can be informative. (*See* Motion to Dismiss Hr'g Tr. at 10-11, Dec. 6, 2019.)

Cooley LLP
Attorneys At Law
Palo Alto

6

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

**2.     Cryptocurrency Levels Off: August to October 2017**

In late summer and early fall of 2017, the price of Ether leveled off, hovering between roughly $200 and $300. (Ex. FF at 4-6.) On November 9, 2017, NVIDIA publicly reported its third quarter results, reporting total revenue of $2.64 billion, Gaming segment revenue of $1.56 billion, and $70 million of OEM revenue attributable to the Crypto SKU. (¶ 193; Ex. J at 3, 11.)

In her opening remarks during the investors' call that day, Kress stated: "GPU sales also benefited from continued cryptocurrency mining. We met some of this demand with a dedicated board in our OEM business and a portion with GeForce GTX boards, though it's difficult to quantify." (Ex. J at 4.) In response to a question regarding "*longer term*" expectations as to the impact of mining "*in the future*," Huang opined: "I believe that crypto will be around for sometime, kind of like today. There will be new currencies emerging. Existing currencies will grow in value. . . . [S]o I think for some time, we're going to see that crypto will be a small but not zero . . . part of our business." (*Id.* at 11.) He explained two reasons for his opinion. First, he noted that the impact of crypto had to be considered "in the context of our company overall" ("the largest GPU computing company in the world") and that its "really sizable" GPU business had multiple "large and growing" segments. (*Id.*) Second, he clarified, "the reason why I say that . . . crypto usage of GPUs will be small but not zero for some time . . . [is] because when it gets big, somebody will go and build a custom ASIC [a custom chip]. But if somebody builds a custom ASIC, there will be a new emerging cryptocurrency, so ebbs and flows." (*Id.* at 12.) Huang repeated a similar message in a November 10 *VentureBeat* interview.[4] (¶ 196; Ex. M at 3-4 ("As you know, crypto is going to ebb and flow. It is small but not zero. For us it is small because our overall GPU business is so large. . . . It's going to remain small for us.").)

On November 29, Kress attended a conference during which an analyst, noting that revenue from Crypto SKUs was down but that "you did say that some of that crypto demand was made up for in gaming," asked Kress to "quantify that." (¶ 203; Ex. O at 13.) Kress responded, in part, that "there probably is some residual amount or some small amount" in Gaming revenue that the company cannot "visibly count" but "[w]e do believe the majority does reside in terms of our overall crypto card." (*Id.*)

---

[4] Plaintiffs challenge the *VentureBeat* statement, but not the substantively identical statement on the earnings call.

Cooley LLP
Attorneys At Law
Palo Alto

7

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

Again, Plaintiffs claim these statements were false because they allegedly understated the impact mining was having on NVIDIA's revenue. (¶¶ 194-95, 204-06.)

### 3. The Second Cryptocurrency Spike: November 2017 to March 2018

The price of Ether climbed from $296 on November 5, 2017 to over $1,400 on January 13, 2018. (*See* Ex. FF.) Not surprisingly, these record prices created a high demand for GPUs. (¶ 60.) On February 8, 2018, NVIDIA reported its financial results for the quarter ended January 28, 2018, its fourth fiscal quarter: record revenue of $2.91 billion, Gaming revenue of $1.74 billion, and OEM revenue for Crypto SKUs of $75 million. (Ex. P at 3.) During that earnings call, Kress addressed the impact the increase in Ether prices was having on NVIDIA's business and channel inventory levels:

> Strong demand in the cryptocurrency market exceeded our expectations. We met some of this demand with a dedicated board in our OEM business, and some was met with our gaming GPUs. This contributed to lower than historical channel inventory levels of our gaming GPUs throughout the quarter. While the overall contribution of cryptocurrency to our business remains difficult to quantify, we believe it was a higher percentage of revenue than the prior quarter. That said, our main focus remains on our core gaming market as cryptocurrency trends will likely remain volatile.

(Ex. P at 4.) Analysts issued reports shortly thereafter estimating as much as $400 million in GeForce revenue was attributable to demand from miners. (*See, e.g.*, Ex. S at 1 ("we believe the vast majority of Gaming upside came from Ethereum-related GPU sales (we note $400M of these sales in 4Q17)"); Ex. Q at 1 ("DBe Gaming crypto revs ~$300m"); Ex. R (estimating "north of $200 mm of GeForce sales that are now sold into cryptocurrency—but that's just an estimate").) A few days later, Kress reiterated that some miners were buying GeForce GPUs, but that it was "extremely tough to gauge" the numbers in part because all the chips were "sold through the exact same channels." (Ex. U at 9.)

In a *Barron's* article published the day after the February 8 earnings call, Huang is quoted as saying that "crypto was a real part of our business this past quarter, even though small, overall" in light of, for example, the rise in data centers, gaming, and self-driving cars. (¶ 207; Ex. T at 1.) On March 26, a *TechCrunch* article noted, without quoting, that Huang "still attributes crypto's demands as a small percentage of Nvidia's overall business." (¶ 210; Ex. X at 4.) And on March 29, in an interview with *Mad Money*, Huang reiterated his expectation that cryptocurrency would remain part of NVIDIA's future business, but would be a relatively small driver of growth long term as compared

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

8

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

with the Company's "core growth drivers" (again naming NVIDIA's primary market platforms of Gaming, Professional Visualization, Datacenter and Automotive). (¶ 213; Ex. Y at 3.) Plaintiffs challenge the statements in these three articles for the same reasons referenced above.

### D. The 2018 Inventory Challenges

During the same February 8 earnings call, NVIDIA management also discussed in detail the impact Ether prices were having on its channel inventory, the high prices (above MSRP) being charged by downstream channel participants, and the resulting inability for gamers to purchase GeForce cards at reasonable prices. (*See* Ex. P.) Huang noted that, because of these dynamics, there was "a fairly sizable pent-up demand [for GeForce cards] going into this quarter," meaning that the higher prices had caused some gamers to wait until those prices returned to more normal levels. (*Id.* at 7.) After noting that channel inventory for GeForce cards was "relatively lean," Huang stated, "We're working really hard to get GPUs down to the marketplace for the gamers." (*Id.* at 10.) He also said, "it's very likely the demand will remain great as we look throughout . . . this quarter," and that NVIDIA would "have to keep working on increasing supply." (*Id.* at 12; *see also* Ex. X at 4 (noting Huang's frustration at the difficulty of getting GeForce cards to gamers due to miner demand).)

By the end of March 2018, the price of Ether had dropped below $370. (*See* Ex. FF at 9.) On May 10, 2018, NVIDIA announced its financial results for the quarter ended April 29, 2018, the first quarter of its fiscal year 2019: total revenue of $3.21 billion, Gaming revenue of $1.72 billion, and $289 million in OEM revenue attributable to the Crypto SKU. (¶ 63; Ex. Z at 4-5.) The earnings call that day was again dominated by questions about channel inventory, though this time focused on the impact of *falling* (not rising) Ether prices. As Kress put it in her opening remarks:

> While supply was tight earlier in the quarter, the situation is now easing. As a result, we are pleased to see that channel prices for our GPUs are beginning to normalize, allowing gamers who had been priced out of the market last quarter to get their hands on the new GeForce GTX at a reasonable price. Cryptocurrency demand was again stronger than expected, but we were able to fulfill most of it with crypto-specific GPUs, which are included in our OEM business, at $289 million. As a result, we could protect the vast majority of our limited gaming GPU supply for use by gamers. Looking into Q2, we expect crypto-specific revenue to be about 1/3 of its Q1 level.

(Ex. Z at 5.) Later on the call, Huang stated that "miners bought a lot of our GPUs during the quarter, and it drove prices up," such that many gamers were not able to purchase GeForce GPUs. (*Id.* at 8.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

9

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

Given this, he opined "my sense is that there's a fair amount of pent-up demand [from gamers] still." (*Id.*) Huang again stated (as he had in February) that the Company would "work as hard as we can to get supply out into the marketplace." (*Id.*; *see also id.* at 17.) Plaintiffs do not allege that any of these statements or any other descriptions of inventory dynamics were false or misleading.

The price of Ether continued to fall. On the August 16, 2018 earnings call, the Company reported that its total revenue for the second quarter of fiscal 2019 was $3.12 billion, up 40% year-over-year (which exceeded guidance) and that its GPU revenue likewise grew 40% year-over-year. (Ex. AA at 4.) The Company also reported OEM revenue attributable to the Crypto SKU of $18 million—short of its internal projection of about $100 million. (Ex. AA at 4.) Accordingly, Kress explained that, whereas NVIDIA "had previously anticipated cryptocurrency to be meaningful for the year, [it was] now projecting no contributions going forward." (¶ 155.)

In response to an analyst question asking the Company to "look backwards" and "size" the GeForce business that had been driven by crypto, Huang again readily acknowledged both the existence of GeForce revenue from cryptocurrency and the difficulty in estimating it:

> [I]t's ambiguous and hard to predict anyway. It's hard to estimate no matter what . . . And for . . . how much of GeForce could have been used for crypto, a lot of gamers at night, they could—while they're sleeping, they could do some mining. And so whether they buy it for mining or do they buy it for gaming, it's kind of hard to say. And some miners were unable to buy our OEM products, and so they jumped onto the market to buy it from retail. And that probably happened a great deal . . . .

(Ex. AA at 12; ¶ 155.) Later, in response to a question regarding whether the Company's disappointing guidance assumed a drawdown of inventory levels, Huang stated: "We're expecting the channel inventory to work itself out. We are masters at managing our channel, and we understand the channel very well." (¶ 158; Ex. AA at 11.) Plaintiffs challenge this statement. (¶ 216.)

**E.   November 2018 Inventory Announcement**

On November 15, 2018, the Company disclosed financial results for the third quarter short of its guidance. (Ex. BB at 4.) Gaming revenue fell short because "channel inventory took longer than expected to sell through [as] [g]aming card prices, which were elevated following the sharp crypto falloff, took longer than expected to normalize." (*Id.*; ¶ 161.) For the first time during the relevant period, the Company provided revenue guidance reflecting an anticipated decline the next quarter.

Cooley LLP
Attorneys At Law
Palo Alto

10

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

1    (¶ 160.) Kress explained that this reflected the Company's expectation that it would not ship any mid-

2    range GPUs as it worked through high channel inventory that quarter. (*See* Ex. BB at 4; ¶ 162.)

3          NVIDIA's disappointing guidance for the fourth quarter made clear that the pent-up demand

4    Defendants predicted had not materialized. Huang explained what he believed had happened: "we

5    came into Q3 with excess channel inventory post the crypto hangover. We expected the pricing in the

6    marketplace to decline. It declined slower than we expected . . . and the volume increase took longer

7    than we expected." (¶ 163; Ex. BB at 10.) Later in the call, Huang stated that NVIDIA did not realize

8    the magnitude of the issue until towards the end of the quarter, and that channel inventory dynamics

9    were further complicated by the difficulty in estimating how much inventory "other brands" (*i.e.*,

10   AMD) had in the channel. (¶ 165; Ex. BB at 11-13.) Ultimately, the Company projected that it would

11   take one to two quarters to work through the excess channel inventory. The price of NVIDIA's stock

12   dropped 28.5% over the next two days. (¶ 171.)

13         **F.      Procedural History and New Allegations in the FAC**

14         On March 16, 2020, this Court granted Defendants' motion to dismiss Plaintiffs' CAC for

15   failure to plead falsity and scienter, and granted Plaintiffs leave to amend.[5] Order at *7-14.

16         The Court first found that Plaintiffs' falsity allegations relied "entirely" on an "expert" opinion

17   by Prysm Group, which allegedly estimated the amount of quarterly Gaming revenue that was driven

18   by mining end users, rather than by gamers. Order at *7. The Court held that Plaintiffs had not

19   adequately alleged falsity because they "fail[ed] to describe Prysm's assumptions and analysis with

20   sufficient particularity to establish a probability that its conclusions are reliable." *Id.* at *9. Plaintiffs'

21   attempt to "corroborate" Prysm's analysis with a report from RBC was similarly rejected, because the

22   RBC report was no "substitute for the detailed allegations regarding Prysm's analysis that the PSLRA

23

24   _____

     [5] The Court also addressed whether loss causation was adequately alleged in the CAC "to give
25   guidance" for "later motion to dismiss litigation," and concluded that it was. Order at *12-14. This
     briefing is confined to whether Plaintiffs' changed allegations in the FAC remediated the pleading
26   deficiencies identified by the Court. As they do not, the Court need not revisit loss causation to dismiss
     the FAC with prejudice. However, Defendants maintain that Plaintiffs have not pled loss causation;
27   governing law requires loss causation to be pled with particularity under Rule 9(b); and the Ninth
     Circuit's ruling in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018), did
28   not alter this burden. *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th
     Cir. 2014). Defendants do not waive and expressly preserve all loss causation-related arguments.

requires." *Id.* Nor could statements from a former employee, FE-1, supply the "missing specificity," given that the employee was only versed in the China market and could not corroborate Prysm's estimate of **worldwide** mining revenue. *Id.* As to scienter, this Court held that none of the statements by the four former employees met the requisite pleading standard or were indicative of scienter. *Id.* at *10. The Court also determined that Plaintiffs failed to meet the "heavy burden" of pleading scienter through the core operations theory and that there was "no basis" for a finding of recklessness. *Id.* at *11-12.  The Court granted leave to amend, and Plaintiffs filed the FAC on May 13, 2020. (Dkt. 149.)

### 1. Removed Allegations and Admissions

In the FAC, Plaintiffs have removed critical allegations from the CAC that undermined Plaintiffs' claims. For example, the Court found that Prysm's conclusion was undermined by the allegation that Prysm's analysis was based on NVIDIA's share of the gaming market (sourced, according to the CAC, from Mercury Research), as Plaintiffs provided no basis to assume that NVIDIA's gaming market share was a reliable indicator of its mining market share. Order at *8. In a tacit admission that nothing supported Prysm's critical yet illogical assumption, Plaintiffs simply struck any mention of it and the Mercury Research data, while continuing to rely on the Prysm opinion. (*Compare* Dkt. 113 ¶ 126, *with* ¶¶ 147-49, 152-53.) Relatedly, the Court noted that Prysm's conclusion was "further clouded" by Plaintiffs' allegations that miners "preferred" GPUs made by AMD to NVIDIA's and began to purchase NVIDIA's GPUs only after AMD's became hard to find. Order at *8. These allegations, too, have vanished. (*Compare* Dkt. 113 ¶¶ 62, 65, *with* ¶¶ 57, 60.) The Court also noted that Plaintiffs' allegations that miners from Russia and Europe traveled to China to make bulk purchases of GPUs undercut Plaintiffs' attempt to use sales in the China market as a proxy for the rest of the world. Order at *9. In lieu of attempting to address these substantive disconnects, Plaintiffs simply excised the allegations from the FAC. (*Compare* Dkt. 113 ¶ 98, *with* ¶ 127.)

Plaintiffs also removed key factual admissions related to the Crypto SKU. Specifically, Plaintiffs previously alleged that the Crypto SKU provided the computing functionality found in many GeForce GPUs but not display ports. Order at *2; Dkt. 113 ¶ 12. This made the Crypto SKUs "useless for anything but mining" and, thus, eliminated the risk that they would be dumped onto the gaming market should Ether prices drop. *Id.* That the Crypto SKU could not be used for gaming also supplied

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

a compelling, and benign, explanation for why NVIDIA reported Crypto SKU revenue in the OEM segment rather than Gaming. *Id*. Plaintiffs deleted these allegations but cannot "simply erase" them from the case.[6] *In re YogaWorks, Inc. Sec. Litig*., 2020 WL 2549290, at *3 (C.D. Cal. Apr. 23, 2020).

### 2. New Allegations Related to the Prysm Group's Analysis

As before (*see* Order at *9), Plaintiffs' falsity claims rely on Prysm's analysis. (¶ 154.) Having scrubbed any reference to Mercury Research's estimate of NVIDIA's gaming market share, Plaintiffs now claim that Prysm based its analysis on a 2018 Jon Peddie Research report ("Peddie Report"). (¶152(a).) The Peddie Report purports to analyze the effect of crypto-mining on add-in board sales and is based on myriad assumptions and estimates involving the "running average" of "attach rates" and data from unspecified sources. (Ex. HH at 11.) The FAC again references two other market share estimates—a financial analyst report from RBC that post-dates the Class Period by several months, as well as an internal presentation about the China market from August 2017—but does not actually state whether or to what extent Prysm's analysis relied on these. *See infra* Section III.B.1. Moreover, on its face, the presentation appears to only discuss "GPU sales" to miners in China from April 2017 (before the Crypto SKU launch) to July 2017 (shortly after the Crypto SKU launch). (¶ 121.) Plaintiffs do not allege that it was shared with or endorsed by any of the Individual Defendants. (¶ 152.)

The FAC still does not allege that Prysm interacted with any former or current NVIDIA employees or based its analysis on relevant financial data from the Company. Order at *8.

### 3. New Allegations Related to Kress and Fisher

The FAC does not provide a single new allegation related to Fisher's one alleged misstatement, made on the first day of the Class Period (May 10, 2017). *See* Order at *10; ¶ 176. The only new allegations about Kress relate to alleged "authority" to access a database (¶ 84) and pre-Class Period statements about gaming-related usage of the GeForce Experience ("GFE") software. (¶¶ 107, 108.)

---

[6] Where Plaintiffs "merely omit[] previously-pled material information that harms" their case, it may be "characterized as judicial admissions that Plaintiff[s] ha[ve] not cured." *Jackson v. Loews Hotels, Inc*., 2019 WL 6721637, at *3 (C.D. Cal. July 24, 2019). "[W]hen evaluating an amended complaint, the court may also consider the prior allegations as part of its 'context-specific' inquiry based on its judicial experience and common sense to assess whether an amended complaint plausibly suggests an entitlement to relief." *Hernandez v. Schaad*, 2017 WL 6731624, at *3 (N.D. Cal. Dec. 29, 2017).

**4.      New Allegations Related to Former Employee 5 (FE-5)**

The FAC includes statements attributed to a new witness, FE-5, described as the "Head of Consumer Marketing for South Asia" based in India.[7] (¶ 37.) FE-5 is not alleged to have interacted with Kress or Fisher. Although FE-5 allegedly communicated with Huang in some capacity—FE-5 was supposedly "included on a weekly email distribution chain with Huang" and "presented GeForce sales data to Huang" (not allegedly mining-related) at a meeting in India in 2017 (¶ 37)—FE-5 does not purport to have personal knowledge about what Huang knew about sales to mining end users.

**5.      New Allegations Related to Access to Data**

Most new allegations in the FAC relate to the Individual Defendants' purported access to data. Some are internally inconsistent and others are not attributed to any witness or source. Most problematic is that none say what ***actual data*** was contained in any internal report at any given time.

**Centralized sales database:** Plaintiffs now allege that Huang "maintained access" to a "centralized internal sales database." (¶ 78.) This is based solely on statements attributed to FE-1 in China and FE-5 in India, neither of whom actually describes what this sales database showed at any point in time. Neither of these regional employees is alleged to have personal knowledge of NVIDIA's operations worldwide, nor do their accounts of disparate processes suggest any kind of uniform, global database identifying GeForce sales to miners.[8] (¶¶ 78-86.) Plaintiffs also assert that "sell-out" data "allowed NVIDIA to determine the percentage of GeForce GPUs sold to crypto-miners." (¶ 82.) But this is attributed to ***no*** source and again does not indicate what such data was or how it "allowed" the Company, much less any individual at the Company, to "determine" anything about sales to miners.

**Quarterly meetings:** The FAC also alleges that Huang attended quarterly meetings with "Vice Presidents and other managers." (¶ 87.) According to FE-1, who did not attend these meetings, they took place on unspecified dates in 2017 and included presentations of unspecified "sales data reflecting GeForce sales to miners." (¶ 88.) Another FE who allegedly attended two such meetings, FE-2, says only that Huang "reviewed GeForce sales data" at them. (¶ 92.) Plaintiffs assert (without attribution)

---

[7] FE-5's allegations are subject to a separate Motion to Strike. This Motion to Dismiss, however, should be granted regardless of the how the Court resolves the Motion to Strike; the entirety of this brief assumes the Court does not strike the allegations attributed to FE-5.

[8] For example, one refers to "order sheets" being input into an "internal sales database." (¶¶ 80, 83.) The other states that "sell-out" data from "sales reports" were input into NVIDIA's "system." (¶ 82.)

Cooley LLP
Attorneys At Law
Palo Alto

14

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

that Fisher also attended quarterly meetings, but not that Kress attended any. (¶ 87.)

The FAC also describes "regional Quarterly Business Review meetings," which Plaintiffs do not allege that *any* Defendant attended. The FAC alleges that these meetings included discussion of "sell-in/sell-out data." (¶ 89.) FE-5 allegedly said that "the sales data and forecasts presented at the regional meetings" were "sent directly to Huang," but does not indicate by whom or when, or what was in that data. (¶ 90.) There are no allegations that either Kress or Fisher received such reports.

**Weekly "Top 5" reports:** Plaintiffs also allege that Huang (but not Kress or Fisher) received something called "Top 5" weekly emails, which "during the Class Period" contained discussion of "the effect of cryptocurrency mining on demand for GeForce GPUs" and "crypto-related GeForce sales." (¶¶ 94, 97.) They allege no facts about what any Top 5 email said on any given date, much less facts to show that any Top 5 email was inconsistent with any of the challenged statements.

**GeForce Experience data:** Without specifics, the FAC speculates that "the usage data" contained in GFE software reports "showed that over 60% of GeForce GPU sales *during the Class Period* were to miners." (¶ 106.) The FAC alleges that monthly reports containing some GFE data were sent to Huang (¶ 106), but does not describe that data or how GFE could possibly "show sales" to miners. The FAC does not allege that any report sent to Huang contained the alleged "over 60%" figure, or that Kress or Fisher ever received any GFE reports at all. The FAC quotes two statements Kress made before the Class Period about gaming-related use of GFE, neither of which reference mining. (¶ 107 ("[W]e can see the games that you're playing."); Ex. KK at 7; ¶ 108 ("[W]e can actually see [users] through our GeForce experience, sign on, download the drivers for games."); Ex. LL at 6).

**Reports from China:** As in the CAC, the FAC alleges that Fisher received information about GeForce GPU sales to miners in China. Plaintiffs include screenshots of slides from an internal presentation dated September 2017 (previously described in the CAC) regarding sales of GeForce and Crypto SKU to miners in China.[9] (*E.g.*, ¶¶ 120, 121, 124-26.) The screenshots add nothing new. The FAC does not allege that Huang or Kress were aware of the presentation.

**GeForce shortages:** Finally, the FAC alleges that Fisher attended meetings with FE-2 and

---

[9] For unknown reasons, the title of one slide (a list of mining firms in China) does not appear in the FAC. (¶ 126.) The title is: "PRO MINERS IN CHINA (NEED VERIFY)." (Ex. MM at 2.)

Cooley LLP
ATTORNEYS AT LAW
PALO ALTO

15

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

discussed "attempts" by miners to bulk-purchase GeForce chips. (¶ 130.) As FE-2 left NVIDIA around the May 2017 Crypto SKU launch, GeForce was then the only NVIDIA product for miners. (¶¶ 6, 34, 130.) The FAC also references shortages of GeForce in India, but not the size of that market.[10] (¶ 133.)

## III.    ARGUMENT

### A.    Plaintiffs Fail to Plead Scienter

The FAC does not remedy the material deficiencies the Court identified regarding scienter.[11]

#### 1.    The Nonculpable Explanation is Far More Plausible

As the Ninth Circuit recently confirmed, the familiar *Tellabs* analysis requires the Court to "compare the malicious and innocent inferences cognizable from the facts pled," and only allows a complaint to survive "if the malicious inference is at least as compelling as any opposing innocent inference." *Endologix*, 2020 WL 3069776, at *12; *see Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 314, 324 (2007). The Ninth Circuit emphasized that the requirement of pleading a "strong inference" of scienter "has teeth" and is an "exacting" obligation. *Endologix*, 2020 WL 3069776,  at *8. The *Endologix* plaintiff alleged that the defendants *knew* the FDA would not approve a new drug, but made misleading statements about its approval prospects. *Id.* at *8. The Ninth Circuit affirmed dismissal with prejudice, holding it was implausible that executives would pursue an FDA application they knew was destined to fail, and rejecting the "improbable" theory that the company "would stake its existence on a drug and a clinical trial [it] thought was doomed." *Id.* at *8-9, 11-12.

The Ninth Circuit's analysis in *Endologix* applies with full force here: Recall that by February of 2018, Huang and Kress told investors that miners were buying GeForce chips in the channel in sufficient amounts that they had driven ***down*** channel inventory (and hence supply), thereby driving ***up*** prices in the channel such that gamers were not able to buy the GeForce chips they wanted. (Ex. P at 4, 7, 10, 12-13.) Huang explained that, as a result, he believed there was "pent up" demand from gamers for GeForce chips. (*Id.*) Huang and Kress informed the market that NVIDIA planned to address this problem by stepping up sales of GeForce chips into the channel, hoping to normalize supply, cause

---

[10] NVIDIA's Form 10-K for the year ended January 28, 2018 reported that about 8% of revenue was generated from the entire "Europe" region, which FE-5 alleges included India. (Ex. W at 73; ¶ 37.)

[11]  Plaintiffs' Exhibit B (Dkt. 149-2) summarizes the scienter and falsity allegations in the FAC. Defendants respond to the alleged grounds for scienter and falsity in the following sections.

Cooley LLP
Attorneys At Law
Palo Alto

16

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

prices to drop, and meet pent up gamer demand. (*Id.*; *see also* Ex. V at 6.) And NVIDIA did just that, selling large quantities of GeForce chips into the channel during the spring and summer of 2018. (*See, e.g.*, ¶ 162.) According to Plaintiffs' theory, Defendants knew that there was, in fact, no "pent up" gaming demand to absorb the additional supply (because they had intentionally been lying about the amount mining demand was driving GeForce sales), but they went ahead and sold massive quantities of GeForce chips into the channel.[12] Put another way, Plaintiffs' theory is that NVIDIA and its top executives (including Huang, NVIDIA's largest single shareholder) deliberately created a massive build-up of inventory in the channel, knowing that it would come to light within a quarter or two, as NVIDIA's channel customers would not keep buying products they were unable to sell to end users.

Plaintiffs' theory here makes no more sense than what the Ninth Circuit rejected in *Endologix*. It similarly "depends on the supposition that [D]efendants would rather keep the stock price high for a time and then face the inevitable fallout" once the unconcealable truth was revealed. 2020 WL 3069776, *8. And similarly, no Individual Defendant reaped a financial or other benefit from the alleged scheme.[13] *See id*. They held their own shares and authorized the Company to **repurchase** $1.77 billion of its stock. *See* Ex. B at 21 and Ex. DD at 19; *Costabile v. Natus Med. Inc.*, 2018 WL 7134363, at *5 n.5 (N.D. Cal. Dec. 18, 2018) ("stock repurchase programs . . . negate a finding of scienter").

For all these reasons, Plaintiffs' theory of scienter does "not make a whole lot of sense." *Endologix*, 2020 WL 3069776, at *8. The far more compelling inference here is that NVIDIA's executives did their best to manage a novel and challenging business environment.

### 2.     The Former Employees Do Not Support a Strong Inference of Scienter

The Court held that the CAC failed to fulfill the PSLRA's requirements that (1) confidential witnesses must be "described with sufficient particularity to establish [the witness's] reliability and personal knowledge," and (2) their statements must be "indicative of scienter." Order at *10 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).) Again, none of the FAC's

---

[12] Plaintiffs claim that Defendants "flooded" the channel with inventory to meet mining demand "just as that demand began its inevitable decline." (¶ 162.) Again, it would make no sense for Defendants to spend months selling inventory into the channel to meet mining demand that was "***inevitably*** declining," along with the price of Ether. (*See* Ex. FF at 8, 10, 12 ($751 on 2/7 and 5/9; $281 on 8/15).)
[13] In the CAC, Plaintiffs alleged that a single stock sale by Huang showed scienter. This Court held it did not, and Plaintiffs then deleted all allegations related to that sale. Order at *12.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

17

**DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG**

FE allegations suggest any Defendant possessed a single particularized fact contradicting their statements when made. *See Norfolk Cty. Ret. Sys. v. Solazyme, Inc*., 2018 WL 3126393, at *8 (N.D. Cal. June 26, 2018). To obscure the gap between what FEs actually said and what Plaintiffs wish they said, Plaintiffs pepper the FAC with ***unattributed*** commentary. (*See, e.g.*, ¶¶ 81-83, 88, 89.) Plaintiffs cannot satisfy the PSLRA this way. *See, e.g.*, *In re Maxwell Techs., Inc., Sec. Litig*., 18 F. Supp. 3d 1023, 1034 (S.D. Cal. 2014).

### a.     FE-1

**No personal knowledge:** The Court previously found that statements attributed to FE-1 were not reliable in part because there was no "link" between FE-1 and Huang or Kress. Order at *10. Plaintiffs still do not allege that FE-1 ever interacted with Kress, and the only alleged "link" to Huang is that FE-1 "spoke with colleagues who attended meetings at which crypto-related sales data was presented to Huang." (¶ 33.) These "colleagues" are unidentified, and this vague secondhand account lacks "any context surrounding when, why, or how [they] provided [FE-1] with information." *Costabile v. Natus Med. Inc*., 293 F. Supp. 3d 994, 1010 (N.D. Cal. 2018). As such, FE-1's statements cannot be credited. *Id.*; *see also Zucco*, 552 F.3d at 997 (no reliance on vague CW allegations based on double or triple hearsay); *Bao v. Solarcity Corp*., 2016 WL 54133, at *6 (N.D. Cal. Jan. 5, 2016) (similar). And this "link" is certainly not enough to show that FE-1 had any basis to know what data or databases Huang or Kress could access, much less what they ***did*** access. (¶ 84.)

Moreover, Plaintiffs still do not allege that FE-1's knowledge extended beyond China. (¶ 33.) "FE-1's statements, then, are insufficient to corroborate the (unstated) assumptions underlying Prysm's estimate of NVIDIA's revenues from mining consumers ***worldwide***" or to undermine Fisher's single alleged misrepresentation regarding "NVIDIA's fundamentals ***internationally***."[14] Order at *9-10.

**Statements not indicative of scienter:** In the CAC, Plaintiffs "fail[ed] to tie any of FE-1's statements to any specific contemporaneous statements or conditions as required to meet the PSLRA

---

[14] And FE-1's statements about Fisher's supposed knowledge of China have no bearing on Huang's scienter. Order at *10; ¶ 32; *In re Maxwell Techs.*, 18 F. Supp. 3d at 1039 ("[T]he existence of a warm relationship does not indicate that [the defendants] knew what [the "third in command"] was doing").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

18

**DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG**

standard."[15] Order at *10. The FAC fares no better. The new allegations attributed to FE-1 at *most* state that *some* data "reflecting GeForce sales to miners" was presented to Huang at *some* point. (¶ 88.) FE-1 does not state what that data was, much less establish Huang's "knowledge of [its] magnitude." *See Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 858 (N.D. Cal. 2019). More importantly, this is completely consistent with Huang's repeated public statements throughout the Class Period that miners were buying GeForce GPUs. (*See, e.g.*, Ex. C at 7; Ex. X at 4; Ex. Y at 3; Ex. Z at 8, 15, 17.)

Critically, these new statements attributed to FE-1 simply expand upon the same subject matter (that "NVIDIA kept track of who was buying GPUs," Order at *10) with the same focus on process— *e.g.*, how information from China was allegedly collected and stored. (¶¶ 79-81, 83-84, 86.) But Plaintiffs never describe the content of any internal reports, much less show that they contained facts inconsistent with any challenged statements. Absent such facts, the allegations about FE-1 do not show scienter. *Endologix*, 2020 WL 3069776, at *10 (no scienter where CW referenced a "stream of complaints and incident reports" but did not provide "any details about these reports"); *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *16 (N.D. Cal. Mar. 24, 2014) (allegations that defendant "'could regularly track its sales data' or 'tracked demand using data' are insufficient" without "'hard numbers or other specific information' about what the data showed"); Order at *11 n.3.

The new statements attributed to FE-1 regarding quarterly meetings that Huang allegedly attended (but FE-1 did not) likewise fail to support an inference of scienter. First, FE-1 is repeating hearsay from other employees not alleged to have personal knowledge of the meetings. (¶¶ 87, 88.) Second, FE-1 fails to give "information about precisely what was said by the parties in these meetings, which facts [Huang was] exposed to, and why this exposure supports an inference of scienter." *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016). And once again, nothing about FE-1's account of these meetings is remotely inconsistent with what Huang told investors.

### b.     FE-2

**No personal knowledge:** The CAC contained "no allegation that FE-2 ever communicated

---

[15] This ruling necessarily rejected as insufficiently particularized FE-1's statement that "60 to 70% of NVIDIA's GeForce revenue" in China came from sales to miners "***throughout 2017***." (¶ 86.) Indeed, that statement fails for the same reason as Plaintiffs' new allegation regarding what the GFE data allegedly showed "during the Class Period." *See infra* p. 21 & n.16; Section III.B.2.

with any Individual Defendant." Order at *11. The FAC still does not allege that FE-2 ever communicated with Kress. The FAC adds allegations that FE-2 met with Huang on a monthly basis about unspecified topics and was on an email distribution list with him, and attended unspecified meetings with Fisher in 2017. (¶¶ 34, 85, 96, 130.) These allegations do not demonstrate that FE-2 had any personal knowledge of specific facts known to Huang or Fisher about GeForce sales to miners.

FE-2's statement about Huang's purported access to a "centralized sales database" is similarly unsupported. The **only** basis for FE-2's statement that "Huang personally reviewed" the data in that database was FE-2's memory of a video once played at a Company meeting that supposedly showed Huang "looking at the sales data in the database." This is a tongue-in-cheek training video made in 2012 (well before the Class Period). (¶ 85; Ex. NN.) Its purpose was to motivate employees to correctly input Salesforce entries, and Huang's role was a humorous reminder that sloppiness has consequences. (*Id.*) This video has nothing to do with GeForce sales to miners, or any of the allegations in the FAC.

**Statements not indicative of scienter:** FE-2's new statements "provide[] no support for an inference of scienter." Order at *11. FE-2 allegedly described the process by which Huang allegedly reviewed Top 5 emails; yet, there is not a single allegation about the information conveyed in any of those emails. Not one. (¶ 96.) FE-2 also allegedly attended meetings in 2017 where Huang referred to miners' preference for GeForce over NVIDIA's more expensive professional cards. (¶ 93.) None of this contradicts any of Huang's public statements. Moreover, as FE-2 left NVIDIA in May 2017 (¶ 34), these meetings must have occurred either before or just after the Class Period started on May 10. Either way, they could not have been contemporaneous with Huang's challenged statements, the first of which was made in August 2017. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 65 F. Supp. 3d 840, 859 n.8 (N.D. Cal. 2014) ("events too far removed from the alleged misrepresentation" to show scienter); *Bao*, 2016 WL 54133, at *6 (CW "d[id] not state when . . . the conference calls discussing [the issue] occurred; if they occurred before the relevant time period, they cannot establish simultaneity").

### c.     FE-3 and FE-4

The Court held that the CAC's FE-3 and FE-4 allegations did not indicate scienter. Order at *11. As Plaintiffs did not attempt to remedy this in the FAC, the Court need not revisit this holding.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

20

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

### d.     FE-5

**No personal knowledge:** FE-5 was allegedly the "Head of Consumer Marketing for South Asia" based in Bengaluru, India. (¶ 37.) The FAC does not allege that FE-5 ever interacted with Kress or Fisher. As to Huang, FE-5 was allegedly "included on a weekly email distribution chain" with him. (¶ 37.) FE-5 also supposedly "presented GeForce sales data to Huang" at a meeting in India "in 2017," but the FAC does not say *when* in 2017 that occurred (or even whether it was during the Class Period). Moreover, there is no allegation that FE-5 or anyone else at these alleged meetings presented any "data" regarding GeForce sales *to miners*. (¶¶ 37, 91.) The FAC also alleges that FE-5 claims some knowledge of GFE data. (¶ 106.) Yet the FAC is devoid of any allegation that, in FE-5's consumer marketing position, he was responsible for collecting, analyzing, or presenting GFE data. Nor does it allege that FE-5 had any personal knowledge of or experience with how GFE data was collected, analyzed or distributed, what the data means, what it allegedly showed or how reliable it is.

**Statements not indicative of scienter:** Even putting aside FE-5's lack of personal knowledge, his statements fail to demonstrate any Defendant's scienter.

The Court previously found that the CAC's allegations about GFE were lacking because they "fail[ed] to provide any specific allegations as to the *content* of [that] data." Order at *11 n.3. Plaintiffs now claim that FE-5 said "the usage data contained in these [GFE] reports showed that over 60% of GeForce GPU sales *during the Class Period* were to miners." (¶ 106.) But the FAC leaves all of the context for and meaning of this lonely statistic entirely to the reader's imagination. Did the "over 60%" figure appear in one GFE report "during the [19-month] Class Period"? Or multiple reports? Or is it an average taken from reports "during the Class Period," and if so, which ones? Which Defendants, if any, received any GFE report(s) that contained the "over 60%" figure? And when? As the FAC still fails to plead any of these particularized facts, it still fails the PSLRA.[16] Order at *10.

---

[16] *See Browning*, 2014 WL 1285175, at *12 (rejecting allegations where challenged statement was made "three months into the nine-month class period" and complaint merely alleged that defendants knew particular fact "*during* the Class Period"); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) (CW describing "increased frequency" of audits "in fiscal year 2017" not particularized because "CW reports must be specific in their time references to support that *each alleged misstatement* was false *when made*"); *Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1174 (N.D. Ill. 2019) (allegations that company tracked service outages,

Cooley LLP
Attorneys At Law
Palo Alto

21

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

The GFE allegations in the FAC also fail for other reasons. For one, the FAC does not allege that all purchasers of GeForce GPUs during the Class Period used GFE. To the contrary, the FAC acknowledges that the GFE program, which is focused on optimizing graphics settings for gaming, is *optional*, thereby rendering it implausible that market-wide data could reliably be extrapolated from it. (¶¶ 100-01.) The FAC also acknowledges that GFE provides information relating to graphics usage in the installed base of already-sold GPUs (¶ 100), rather than information about new GPU sales. And the FAC fails to describe, even in the abstract, how GFE "technical usage data" would reveal anything about mining activity, let alone mining *sales*. In fact, the FAC does not allege that miners have any use for GFE.

Finally, FE-5 also allegedly describes processes related to obtaining and recording "sell-out" data and the Top 5 email reports. (¶¶ 82, 94, 95.) But critically, FE-5 does not specify the **content** of any "sell-out" data or a single fact shared in a Top 5 email (even though FE-5 was allegedly "privy to the contents" of those emails "at all relevant times"). ¶ 94; *Endologix*, 2020 WL 3069776, at *10. Further, FE-5 allegedly attended meetings (on unspecified dates) with regional leaders about "sell-out data," and stated that this sales data was "sent directly to Huang." (¶¶ 89, 90.) The FAC fails to state how FE-5 learned this information was sent to Huang or anything as to the method, form or frequency. And once again, FE-5 does not identify the **contents** of any sell-out data, at any time, that would render any of Huang's statements false or misleading when made. (¶ 37.)

### 3. The Core Operations Theory Does Not Apply Here

The often-invoked but seldom-applied core operations inference arises where plaintiffs plead "particular" allegations establishing "that defendants had actual access to the disputed information" or the "rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). The FAC does not meet this high bar.

As to the first prong, Plaintiffs' two new "admissions" fail to show that Defendants "closely

---

defendants had access to outage reports, and "at some time prior to May 4, 2018 . . . [product] availability plunged down" were not particularized as to "*when* the data revealed . . . a precipitous drop in availability").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

monitored" and "had visibility into" "the ultimate purchasers of their products" during the Class Period. (¶ 234.) The first is a statement that former NVIDIA CFO Marv Burkett, *not* Huang, made in 2007—a full decade before the Class Period—about NVIDIA's efforts to monitor inventory in its channel (comprised of distributors and resellers). (¶ 43; Ex. II at 1, 4-5.) That statement said nothing about visibility into *end consumers*, much less how those consumers used NVIDIA's products. The second is from a 2015 earnings call, still several years before the Class Period. Plaintiffs take the statement ("we monitor sellout in the channel literally every day") entirely out of context. (¶ 234.) In response to an analyst asking, "how are you making sure there is no build-up of excess inventory," Huang explained that NVIDIA's new focus on specialized platforms allowed for relatively "more visibility" as compared to the prior business model (selling into OEMs). (¶ 43; Ex. JJ at 9.) He did not suggest NVIDIA could track the identity of all (or even any) end users. *See In re Am. Apparel, Inc. S'holder Litig*., 855 F. Supp. 2d 1043, 1082 n.212 (C.D. Cal. 2012) (statement about "visuality as to what's going on in [ ] stores" and allegation that defendants "reviewed daily information concerning inventory levels" insufficient for core operations).

Considering that both alleged "admissions" significantly pre-date the Class Period—the first by *10 years*, and the second by several years—they are far too attenuated in both time and logic. This is particularly so given that the first cryptocurrency had not even launched in 2007 and Ether is not alleged to have had a meaningful impact on the GPU market until 2017. *See In re Am. Apparel*, 855 F. Supp. 2d at 1081 ("eight months to a year" before events at issue "too attenuated in a temporal sense to support the inference plaintiffs seek"). Tellingly, Plaintiffs identify no similar "admission" during the Class Period.[17] Rather, during the Class Period, Defendants repeatedly cautioned investors that it was "difficult to quantify" the impact of mining of GeForce demand and that they could not "visibly count" the impact. (*See, e.g.*, Ex. J at 4; Ex. P at 4, 10; Ex. O at 13; Ex. U at 9, 10; Ex. AA at 12.)

The second prong of core operations is met only "where the falsity is patently obvious." *Zucco*, 552 F.3d at 1001. This Court previously held that the mere fact that "gaming is NVIDIA's core

---

[17] Plaintiffs cannot rely on the challenged statements themselves to plead scienter, as they have not pled particularized facts showing the Individual Defendants' "detailed involvement" with "secondary data differentiating end user purchasers." Order at *11; ¶ 232; *supra* Section III.A.2.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

23

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

business does not give rise to an inference of scienter." Order at *12. Plaintiffs have added nothing to the FAC that supports a different conclusion.[18]

### B.   Plaintiffs Fail to Plead Falsity

The FAC also fails to remedy the deficiencies regarding Plaintiffs' falsity allegations.

#### 1.   Plaintiffs Have Not Cured the Pleading Deficiencies as to Prysm

The Court previously held that, while the CAC's falsity allegations relied "entirely on an expert opinion by Prysm," Plaintiffs did not "describe Prysm's assumptions and analysis with sufficient particularity." Order at *9. The FAC still relies on Prysm's "expert" opinion to allege that every challenged statement is false or misleading because, according to Prysm, Defendants allegedly understated and/or omitted the magnitude of revenue derived from miners purchasing GeForce GPUs. (*See, e.g.*, ¶¶ 154, 177-78, 180-82.) The FAC still fails to adequately allege falsity under the PSLRA.

**Inadequate market share data:** As previously pled, Prysm extrapolated a critical piece of data—NVIDIA's supposed mining market share—from Mercury Research's estimate of NVIDIA's gaming market share. (Dkt. 113 ¶ 126.) In dismissing the CAC, the Court noted Plaintiffs failed to support the "major assumption . . . that NVIDIA's market share in the crypto mining market is equal to its market share in the gaming market." Order at *8. In response, Plaintiffs deleted all reference to Mercury Research. The FAC now alleges that Prysm "determined that NVIDIA maintained a cryptocurrency-specific market share of approximately 69%," and that this "parameter" was based on three sources. (¶ 152.) Bizarrely, the conclusions allegedly reached by Prysm based on this very different assumption and methodology ***are identical, to the dollar***, to the conclusions attributed to Prysm in the CAC based on the Mercury Research data. (*Compare* Dkt. 113 ¶ 127, *with* ¶ 154.) This curious result alone casts substantial doubt on the reliability and integrity of Prysm's analysis. Adding to this is the fact that two of the sources on which Prysm now supposedly relied (the RBC report and an internal presentation on China) featured prominently in the CAC but were never linked in that

---

[18] Nor do allegations that Huang discussed "business opportunities involving direct sales" to miners show scienter, particularly as such "opportunities" did not even allegedly involve sales of GeForce GPUs (as opposed to the Crypto SKUs). (¶¶ 88, 126, 235.) As to the EULA revision, the FAC does not allege that any Individual Defendant was ever aware of it. (¶¶ 134-38, 235.) Plaintiffs deleted FE-2's prior speculation that Huang was involved in it. (*Compare* ¶ 138, *with* Dkt. 113 ¶ 116.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

24

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

pleading to Prysm's analysis. (*E.g.*, Dkt. 113 ¶¶ 91, 92, 109-13, 119, 122.) *See Hernandez*, 2017 WL 6731624, at *3 (court may consider prior allegations in assessing plausibility of amended pleading). And, in any event, as discussed below the three new sources of market share data fail in their own right and only serve to further undermine the reliability of Prysm's analysis.

Jon Peddie Report: The Peddie Report does not "reliably indicate" NVIDIA's share of the mining market. Order at *8. Indeed, Plaintiffs have not alleged "with sufficient particularity" that Peddie was "in a position to know" NVIDIA's crypto-specific market share any more than Prysm itself. *Id.* (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004)). There are at least four separate and independently fatal problems with Prysm's reliance on the Peddie Report and, as a result, the FAC's reliance on Prysm.

First, rather than providing objective facts or hard data, the Peddie Report's conclusions are simply another third party's estimates and opinions, which Prysm adopted, apparently wholesale and without analysis, as its ***own*** estimates. The FAC nowhere alleges that Peddie based its conclusions on reliable, personal knowledge—rather, it alleges that the Peddie Report uses "***proprietary analytic models*** to ***estimate*** NVIDIA's market share."[19] (¶ 152(a).) *See Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2013 WL 2247394, at *13 (C.D. Cal. May 9, 2013) ("Conclusory allegations and speculation carry no additional weight merely because a plaintiff placed them within the [mouth] of a retained expert."). Prysm's alleged reliance on yet another third party's estimate (which itself would fail the PSLRA) likewise fails the PSLRA. *See In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535, at *17, *29-32 (N.D. Cal. Mar. 9, 2007) ("generic industry data supplied by a market research company" "fail[ed] to provide particularized information").

Second, Plaintiffs mischaracterize what the Peddie Report actually says. Most significantly,

---

[19] The Peddie Report provides a one-paragraph description of its "methodology." (Ex. HH at 11.) Peddie uses something Peddie calls AIB (add-in board) "attach rates," a bespoke metric that is largely unexplained and entirely unsourced. Peddie defines "attach rate by segment" as "AIBs of segment per DT PCs." (*Id.*) Defendants surmise that "attach rates" are Peddie's guess at the ratio of AIBs (sold by third-parties) to desktop PCs (sold by third-party OEMs). To approximate NVIDIA's market share as of a given quarter, the Report takes a "running average" of Peddie's "attach rate" estimates for past quarters and subtracts those from Peddie's estimate of the "raw" attach rate for the quarter at issue to "reveal[] the deviation from normality." (*Id.*) Peddie then "t[akes] that percentage and applie[s] it to unit shipments to . . . estimate . . . the number of AIBs that were bought for crypto mining." (*Id.*)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

25

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

Plaintiffs claim the Peddie Report estimates NVIDIA's share of the crypto mining market to be 69.4% "in" Q3 2017 and 68.6% in Q4 2017. (¶ 152(a); *see* RJN at 6-7.) But in fact, the Peddie Report makes clear that those numbers reflect the estimated *cumulative* market share for the periods running from the beginning of 2015 though the third and fourth quarters of 2017, respectively—not the estimated market shares *for* either of those specific quarters. *See* Ex. HH at 11 ("Vendor total to date crypto shares"); *see also Veal v. Lendingclub Corp*., 2020 WL 3128909, at *4 (N.D. Cal. June 12, 2020) (the Court "need not 'accept as true allegations that contradict matters properly subject to judicial notice'").

Third, the data in the Peddie Report does not support the key assumption that Prysm draws from it—that NVIDIA "maintained a cryptocurrency-specific market share of 69%." (¶ 152.) To start, the FAC alleges no facts to support Prysm's assumption that Peddie's market share estimates for just two quarters in 2017 (Q3 and Q4 2017) can be used to estimate market share throughout the Class Period. (¶ 152(a).) According to Plaintiffs' own allegations, the Peddie Report says *nothing* about crypto market share for half of that period. (*Id*.) This is compounded by the fact that Peddie's estimates for sales *during* the fourth quarter of 2017 yield a market share estimate *for* that quarter of just 64%, not the 69% used in Prysm's analysis. (*See* RJN at 6.) And the Peddie Report itself claims that, for the three quarters leading up to Q4 2017, NVIDIA's share of the mining market had been falling, as AMD's GPUs had become "more attractive to many miners and as a result AMD's market share ha[d] increased . . . In the last three quarters [of 2017], AMD [ ] gained in market share, especially in the cryptocurrency mining segment." (Ex. HH at 10-11.) Put simply, Prysm's unfounded assumption that NVIDIA "maintained" a constant crypto market share during the relevant period, let alone a market share of 69%, is just as unsupported as the assumption in the CAC that NVIDIA's market share for mining was the same as its market share for gaming.

Finally, the Peddie Report is built on yet another fundamental assumption unsupported by fact or logic. That assumption is that *any increase* in NVIDIA's sales in a given quarter (compared to an arbitrary baseline number apparently calculated by Peddie) was *caused entirely by sales to miners*. (Ex. HH at 11; *see supra* n.19.) The Peddie Report cites no support whatsoever for this assumption, the FAC alleges none, and it is implausible in any event. And it completely ignores factors potentially driving demand for GeForce cards for use in gaming, such as the launch of new games. (*See, e.g.*, Ex.

Cooley LLP
Attorneys At Law
Palo Alto

26

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

A at 10; Ex. C at 8; Ex. P at 3; Ex Z at 4, 8.) The Report acknowledges as much: "The overall attach rate of midrange and high-end AIBs has been going up as gamers refresh their AIBs more often than they refresh their PCs to be able to play great new performance-demanding games, and the influence of eSports." (Ex. HH at 10.) If NVIDIA's increased sales in a given quarter were not entirely due to mining, the Report—and therefore, Prysm's analysis—would significantly overstate NVIDIA's share of the mining market. Once again, such "ambiguity precludes Plaintiffs from meeting the PSLRA's heightened pleading requirement." Order at *8.

RBC Report: Prysm also allegedly based its market share estimate on the January 2019 RBC report estimating NVIDIA's crypto-specific share of the market. (¶152(b).) The FAC does not explain how Prysm integrated the RBC estimate into its analysis. The FAC suggests that the RBC estimate is invoked to corroborate Prysm's estimate, which was supposedly ***derived*** from the Peddie Report. (¶ 152(b) ("RBC's estimate is roughly in line with the crypto-specific GPU market share estimate calculated by Jon Peddie Research noted above.").) This does not remedy Plaintiffs' inadequate pleading. As the Court already explained, using the RBC analysis as corroboration "does not substitute for the detailed allegations regarding Prysm's analysis that the PSLRA requires." Order at *9. Moreover, the Court's previous concerns with Prysm's original analysis apply with equal force to the analysis in the FAC: "There is a $230 million difference between RBC's figure and Prysm's, the analyses estimate revenues for different time periods, and there is no explanation of what assumptions the two analyses may or may not have in common." *Id.*

Internal Presentation on China: The third alleged basis for Prysm's estimate appears in an internal presentation about mining sales in China from April to July 2017. (¶¶ 121, 152(c).) The only data referenced from this presentation appears in what is functionally a footnote to one slide: "China 1H 1500Ku+ GPU sold to mining estimated NVIDIA Share >70% est." (¶¶ 121, 152(c).) Plaintiffs take from this note that "NVIDIA was capturing more than 70% of mining-driven GPU sales in China." (¶ 152(c).) But, even if that is the correct reading, the presentation does not make that clear or specify whether that includes NVIDIA's Crypto SKU (launched in May), who generated that estimate, what timeframe it covers, or how it was derived. Further, as with the RBC report, the FAC does not allege how data from this presentation actually informed Prysm's estimate. (*Id.*) Rather, Plaintiffs

Cooley LLP
Attorneys At Law
Palo Alto

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

again seem to use this data simply to *corroborate* Prysm's conclusion. (*Id.*) There are other reasons to question Prysm's reliance on this presentation. First, it is specific to one region, where "mining activity was heavily concentrated," over a four-month period in 2017. Order at *9; ¶ 121. Second, the "estimate" in the presentation is hardly authoritative, given that it was generated by a regional team and is not alleged to have been endorsed by the Company or even shown to the Individual Defendants. The figure in this presentation cannot be taken as "NVIDIA's own estimate" of its market share or extrapolated to global market share throughout the entire Class Period. (¶ 152(c).)

**No interaction with NVIDIA or employees:** An equally glaring defect is that the FAC still does not "indicate any sort of interaction between Prysm and former or current NVIDIA employees or review of its financial data." Order at *8. A plaintiff cannot rely on an expert to plead falsity where that expert had "no personal knowledge of the facts on which he base[d] his conclusion." *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014). Moreover, as explained *supra*, accepting all inferences in favor of Plaintiffs, the FAC reflects that Prysm's opinion is, in fact, *based on* the Peddie Report, which freely acknowledges that it does not incorporate "NVIDIA's latest financial data." (Ex. HH at 23.) The only Company-specific material otherwise referenced in relation to Prysm is the internal presentation on mining in China. (¶ 152(c).) This time-specific estimate as to one region is nothing like the internal information reviewed by experts in other cases where courts have credited expert opinions pled into complaints. *See Sgarlata*, 409 F. Supp. 3d at 860 (expert "did not actually talk to employees" or "review documents that—in and of themselves—demonstrate inconsistencies that were available to [the defendant]"); *cf. Nursing Home*, 380 F.3d at 1233 (expert reviewed "billing and payment histories" of customers and spoke with employees about "customer overpayments").

**Unwarranted assumptions:** Prysm's methodology still includes unwarranted assumptions regarding what portion of the increase in computational power (corresponding to the increase in hashrates) can be attributed to the purchase of *new* GPUs in a particular quarter. First, Prysm continues to assume that the *entire increase* in computational power was due to new GPUs purchased and used in that quarter for mining, rather than the use of previously purchased GPUs. Defendants are unaware of any rational basis for such an assumption, and the FAC fails to provide one. Indeed, given the months it takes a typical GeForce card to make its way through the channel, there can be no reasonable

Cooley LLP
Attorneys At Law
Palo Alto

28

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

dispute that a large number of GeForce cards being activated by end users (whether gamers, miners or gamers that also mine) in any given quarter were actually sold into the channel by NVIDIA many months earlier. The failure of Plaintiffs to address this temporal disconnect further undercuts the reliability of the Prysm estimates. Second, Prysm still assumes that miners and gamers are entirely distinct categories, with no overlap. Yet, the ***Peddie Report itself*** repeatedly acknowledges that many gamers used their systems for mining: "The original consumers of high-end AIBs were of course the gamers. ***They too have joined the ranks of miners*** and put their systems up for use in a pool when they aren't being used for gaming." (Ex. HH at 25, 12, 28.) Defendants discussed this very phenomenon with investors. (*See, e.g.*, Ex. O at 13; Ex. V at 7; Ex. AA at 12.) And the Peddie Report acknowledges a phenomenon wherein GPUs enabling crypto-mining were simultaneously being used for gaming—creating a "conundrum" when trying to "tease[] out the impact of crypto-mining" on GPU sales. (Ex. HH at 13.) Finally, simple math shows that the new "assumptions" added to the FAC do not support Prysm's estimate that NVIDIA's total crypto-related revenue during the relevant period was $1.728B.[20] (¶ 154.)

## 2. Plaintiffs Have Not Adequately Pled an Omission

The FAC also alleges that the challenged statements are false or misleading because Defendants failed to concurrently mention three things: (1) that sales to miners was "one of the greatest drivers of the Company's Gaming revenues at the time" (according to Prysm, ¶¶ 154, 178), (2) that the GFE data allegedly showed that over 60% of GeForce sales were to miners "during the Class Period" (¶ 106), and (3) that sales to miners accounted for 60-70% of GeForce revenue in China "throughout 2017" (¶ 86).[21] (*See, e.g.*, ¶ 178.) In order to adequately plead a material omission, Plaintiffs must show that a statement "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The bar is even higher for a statement of opinion, for which Plaintiffs must identify "particular (and material) facts going to the basis for the [defendant's] opinion . . . whose

---

[20] (*See* ¶¶ 147, 150-52 (alleging 16.9 million GPU units sold industry-wide to miners and NVIDIA captured 69% of market and earned $150 per GPU, implying $1.749B in total crypto-related revenue).)
[21] As to statements made May 10, August 10, and August 12, 2017, Plaintiffs also allege that Defendants omitted that sales to miners in China accounted for $120M in Q2 2018. (¶¶ 178, 182, 186.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

29

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017).[22] They have not done so.

First, none of the three "facts" meet the PSLRA's standard. The Prysm allegations fail for the reasons set forth above. The "facts" about GFE data and the percent of miners purchasing GeForce in China "throughout 2017" both depend on the statements of unreliable FEs. *See supra* Section III.A.2. They also are not particularized as to time. *See supra* pp. 18-19 & n.15, 21 & n.16. Plaintiffs cannot rely on them to establish that any challenged statement was false or misleading ***when made***. Allusions to miners' purchases of GeForce in China "throughout 2017" and what the GFE data showed "during the Class Period" shed no light on the conditions that existed contemporaneous with any challenged statement, particularly given "volatility of the cryptocurrency markets" during the Class Period. (¶ 5.)

Second, as to the percentage of miners purchasing GeForce in the China market "throughout 2017," the Court previously found that this China-specific data does not corroborate anything about "NVIDIA's revenues from mining consumers ***worldwide***." Order at *9. As such, Defendants did not "affirmatively create" a materially different impression by not referencing this data specific to ***China*** when discussing ***global*** GPU sales. The same goes for the "fact" that GeForce sales to miners in China amounted to at least $120 million in Q2 2018.[23] (¶ 121; *see* ¶¶ 178, 182, 186.) Importantly, Plaintiffs do not challenge any statements made by Defendants regarding the China market specifically.

### 3.    Challenged Statements Not False or Misleading for Other Reasons

Plaintiffs have failed to adequately allege falsity with regard to each of the challenged statements for other independent reasons. Most significantly, as set forth below, the FAC ignores all relevant context and disregards what Defendants actually said. But to allege falsity, Plaintiffs "must account for the entirety of the statements on which they rely, and not simply invoke selective quoting to make their claims." *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019).

**Fisher's May 10, 2017 Statement:** Plaintiffs challenge only one of Fisher's statements, made on the first day of the Class Period. On May 10, 2017, Fisher opined that, "The fundamentals of PC

---

[22] Plaintiffs challenge statements of opinion in ¶¶ 176, 179, 183, 196, 203, 207, 210, and 213.
[23] Additionally, this figure is not a particularized fact but Plaintiffs' own calculation. (¶ 121.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

30

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

gaming, as I'll talk about today, are also strong. What's driving PC gaming, eSports, competitive gaming, AAA gaming, notebook gaming, all those fundamentals remain strong." (¶ 176; Ex. A at 7.) Plaintiffs allege that this statement is misleading because Fisher did not state "that 'Gaming' segment revenues actually were being driven significantly by cryptocurrency mining." (¶ 177.) They have not adequately pled falsity. First, as the Court already found, Fisher was describing "the fundamentals of PC gaming . . . as a whole." Order at *10. He was not addressing NVIDIA's GeForce revenue or the amount of that revenue being driven by miners. (Ex. A at 7.) This is clear from his statement and immediately preceding comments. (*Id*. (noting the number of people gaming "in the world today," that "overall gaming market is growing between 8% and 10% a year," and that "PC gaming is growing about 6% to 7% a year as a CAGR").) Second, Plaintiffs again ignore that, when Fisher spoke on May 10, the "facts" they claim show falsity did not even conceivably exist. Third, they ignore this Court's holding that FE-1's purported "knowledge and presentation" about China GeForce sales are irrelevant as "Fisher's single alleged misrepresentation did not concern China GeForce sales." Order at *10. And finally, Fisher's "perspective" on what is "fundamental" to "PC gaming" is an opinion, which Plaintiffs have failed to allege was actionably false. *Dearborn*, 856 F.3d at 615-16; *In re Solarcity Corp. Sec. Litig*., 274 F. Supp. 3d 972, 992 n.2 (N.D. Cal. 2017) (inactionable to state "the 'demand metrics were strong' and [ ] company has 'good underlying market fundamentals'"); Ex. A at 7.

**Huang's August 10, 2017 Statement:** Plaintiffs challenge a portion of the following statement made by Huang during the August 10 earnings call: "And I—and we serve the vast—*I would say, the large* majority of the cryptocurrency demand out of that specialized product[] [Crypto SKU]." (¶ 179; Ex. C at 7.) Plaintiffs selectively omit the italicized words, which reflect that Huang was providing a subjective estimate, that is, ***an opinion***. Plaintiffs fail to even attempt to show that the opinion was not honestly held by Huang or otherwise try to meet the standard for alleging an opinion constitutes a material misrepresentation under the securities laws. *Dearborn*, 856 F.3d at 615-16. Plaintiffs also conveniently ignore the context in which the statement was made. Immediately after making the challenged statement, Huang explained that miners were buying GeForce chips, which "probably also increased the demand of GeForces." (Ex. C at 7.) And on the same call, Defendants told investors that the quarter had seen an increase in mining activity, miners continued to buy GeForce, there were

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

GeForce "shortages all over the world," and they believed there was unmet demand for GeForce from gamers. (Ex. C at 4, 7.) "By cherry-picking portions of Defendants' statements and ignoring other portions, Plaintiff asks the Court to make inferences contradicted by the statements viewed properly as a whole." *Xiaojiao Lu*, 417 F. Supp. 3d at 1276. This fails the PSLRA.

**Huang's August 12, 2017 Statements:** A few days later, Huang is quoted in a *VentureBeat* article as saying that cryptocurrency "represented *only a couple hundred million dollars, maybe* $150 million or so" and that NVIDIA was "not opposed to [mining]. But our core business is elsewhere." (¶ 183, Ex. D at 3.) Plaintiffs' challenge to the first part of this statement fails for the same reason their challenge to the statements made on the earnings call just two days earlier fail. First, they omit language (emphasized above) reflecting the fact that the statement reflected an estimate or opinion regarding the relevant revenue.[24] Second, they again ignore the other disclosures in the same time period that mining activity was increasing, that miners were purchasing GeForce cards and that there were GeForce shortages as a result. (Ex. C at 4, 7.) Further, there is no serious question that NVIDIA's "core business is elsewhere," that is, in Gaming, Datacenter and Professional Visualization. Plaintiffs do not seriously suggest otherwise. Finally, the latter statement is a quintessential opinion and the sort of vague statement that no reasonable investor would rely upon. *See supra*.

**Statements in Form 10-Qs:** Plaintiffs challenge statements in NVIDIA's August 23 and November 21, 2017 Form 10-Qs attributing year-over-year increases in GPU revenue "primarily to increased revenue from sales of GeForce GPU products for gaming." (¶¶ 187, 200.) Plaintiffs again mischaracterize these statements. The words "for gaming" indicate what the product was ***designed and marketed for***, not the end users who may ultimately buy products that incorporate the GPUs, or a prediction about how end users would deploy them. (*See* Exs. G at 24 & N at 23 ("Our GPU product brands are *aimed at* specialized markets including GeForce for gamers.").) Further, the Company was reporting revenue from the "GPU business," and attributing growth to a sub-group of products within that business, GeForce GPUs made "for gaming." A similar construction is used throughout the

---

[24] Plaintiffs also rely on selective quotation to argue that Kress's September 6 statement that "we covered most of cryptocurrency with our cryptocards" was false. (¶ 190.) They do not acknowledge that immediately before Kress made that statement, she referenced GeForce shortages and pointed out that miners bought "some of the gaming cards" as well. (Ex. H at 10.)

Cooley LLP
Attorneys At Law
Palo Alto

32

Defendants' Notice of Motion
and MTD FAC
Case Nos. 4:18-cv-07669-HSG

passage to distinguish various types of GPUs. (*See* Exs. G at 27 & N at 26 (referencing "GeForce GPU products for mainstream PC OEMs" and "Quadro GPUs for professional visualization").)

**Kress's November 9, 2017 Statement:** On the November 2017 earnings call, an analyst noted that, on the previous earnings call, Kress had "mentioned crypto was $150 million in the OEM line" and asked her to "quantify how much crypto was in the October quarter." (¶ 193; Ex. J at 11.) Kress responded, "in the OEM results, our specific crypto boards equated to about $70 million of revenue, which is the comparable to the $150 million that we saw last quarter." (*Id*.) Plaintiffs do not challenge the accuracy of the statement but claim that it somehow left a misleading impression. In making that claim, Plaintiffs completely ignore that the question Kress was answering referred specifically to OEM revenue, as did her answer. (¶ 194.) Further, Kress had repeatedly made clear during the call that some mining demand was met with GeForce cards but the amount was "difficult to quantify." (Ex. J at 4.) No one listening to that call could have come away with the misimpression Plaintiffs posit. (*See* Ex. K at 1 (estimating after call that "crypto also benefited Gaming revs by ~$100-150m"); Ex. L at 1 (estimating after call that "NVDA saw ~5% or $140M cryptocurrency sales in Oct-Q").)

**Huang's November 10, 2017 Statement:** Plaintiffs also challenge Huang's comments about cryptocurrency's significance to NVIDIA, as reported in a *VentureBeat* interview that ran the following day. (¶ 196.) Again, these comments must be read in context. During the earnings call on November 9, as discussed above, Defendants disclosed that mining demand had been met at least in part with GeForce cards. And Huang explained during the call why he thought mining demand for GPUs would continue for some time, though that demand would be small "in the context of our company overall." (Ex J at 11.)[25]  In the *VentureBeat* interview, the interviewer apparently observed, "It seemed like [on the earnings call] people had the impression that cryptocurrency is driving all of your success." (¶ 196; Ex. M at 3-4.) Huang's response echoed his prior day's comments; he again explained that crypto was "going to remain small for us" "because our overall GPU business is so large," and because of the development of new ASICs and new cryptocurrencies. (*Id*.) These

---

[25] Plaintiffs do ***not*** challenge the veracity of Huang's statements on the earnings call—perhaps because his exhaustive discussion that prior day is less susceptible to mischaracterization than a summary of a subsequent, abbreviated interview (though they contain essentially the same content).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

33

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

comments were plainly expressions of opinion, and Plaintiffs fail to allege any particularized facts showing that he "did not hold the belief [he] professed" or anything else to render them actionable. *Dearborn*, 856 F.3d at 615-16; *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("projections about the future are quintessential opinion statements"); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018). They are also forward-looking and protected by the PSLRA's safe harbor. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

**Kress's November 29, 2017 Statement:** At a Credit Suisse conference on November 29, 2017, an analyst asked Kress to quantify cryptocurrency-related demand for GeForce GPUs, recognizing that it was "not easy" to do. (Ex. O at 13.) Kress readily acknowledged "probably [] some residual amount or some small amount," but explained that NVIDIA could not "visibly see" or "visibly count" that revenue. (*Id.*) She then noted, "***[w]e do believe*** the majority [of cryptocurrency revenue] does reside in [the Crypto SKU]." (¶ 203; Ex. O at 13.) Though Plaintiffs strategically omitted the words "we do believe" from the FAC, Kress was plainly expressing an opinion. Again, Plaintiffs have not adequately pled that her opinion was false or misleading. *See In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 951-52 (9th Cir. 2017) (holding "[w]e believe the increased regulatory scrutiny will continue in our industry for the foreseeable future" was opinion statement not alleged to be false).

**Huang's February and March 2018 Statements:** Plaintiffs challenge three statements Huang made in press interviews in February and March 2018 in which he stated that: (1) while mining was and would be a part of NVIDIA's business, he considered and expected it to be relatively "small," and (2) he believed the Company's long-term "growth drivers" would be its "core" businesses (Gaming, Datacenter, Professional Visualization, and Automotive). (¶¶ 207, 210, 213, Exs. T at 1, X at 4, & Y at 3.) Plaintiffs again ignore the context. Importantly, the statements were all made shortly after the Company's February 8 earnings call, during which the Company disclosed that "strong demand in the cryptocurrency market" had "exceeded" expectations, that some crypto demand was met with the Crypto SKU and some with GeForce chips, and that, while "the overall contribution of cryptocurrency to our business remains difficult to quantify," "it was a higher percentage of revenue than the prior quarter." (Ex. P at 4.) The FAC does not dispute anything said during that call.

Huang's description of NVIDIA's mining-related business as "small" must be read in that

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

34

**DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG**

context. Further, that statement and his view of what constitutes the Company's "core" businesses are inactionable statements of opinion and/or corporate optimism.[26] And Huang's statements in the March 29 *Mad Money* interview are protected under the PSLRA's safe harbor. (*See, e.g.*, ¶ 213; Ex. Y at 3 ("I think over the long term, cryptocurrency will still be here, but our four growth drivers [are] what's going to make NVIDIA ten times larger than we are today.").) Huang was answering a forward-looking question about whether it was possible to "maintain" the cryptocurrency "run rate" and the future value of NVIDIA stock. His response was phrased accordingly: "*I expect* cryptocurrency *to be* an important driver for GPUs." (Ex. Y at 3.)

**Huang's August 16, 2018 Statement:** On the earnings call, an analyst asked if the Company's disappointing guidance for the next quarter assumed a drawdown of inventory levels.[27] (Ex. AA at 11.) Huang answered: "We're expecting the channel inventory to work itself out. We are *masters at managing our channel*, and *we understand the channel very well*." (*Id.*) This is inactionable corporate optimism. *See, e.g.*, *Fadia*, 2016 WL 6679806, at *9 (partners "remain very strong, in terms of relationships" not actionable); *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1002-03 & n.3 (N.D. Cal. 2016) ("[m]y sense is that the bulk of [inventory] will be cleared" not actionable).

### C.   Plaintiffs' Control Person Claim Fails

Because Plaintiffs fail to plead a primary violation of Section 10(b), their Section 20(a) claim fails. *Zucco*, 552 F.3d at 990. And as to Fisher in particular, it is not enough to allege that he is a high-ranking corporate officer. *S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). Instead, "indicia of 'control' include whether the person managed the company on a day-to-day basis and was involved in the formulation of financial statements." *Id.* Plaintiffs have not made any such allegations as to Fisher.

### IV.   CONCLUSION

As set forth above, Plaintiffs' renewed attempt to plead a securities fraud claim fails. They were previously granted leave to amend and "subsequently failed to add the requisite particularity." *Zucco*, 552 F.3d at 1007. The Court should thus dismiss the FAC with prejudice.

---

[26] Moreover, the statement challenged in the *TechCrunch* article is not a direct quote attributed to Huang, nor is it clear to what interview question he was responding. (¶ 210; Ex. X at 4.)
[27] The FAC misrepresents the question Huang was answering. The question quoted in the FAC appears on page 9 of the transcript; Huang's statement is on page 11. (*Compare* ¶ 216, *with* Ex. AA at 9, 11.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

35

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG

1

Dated:        June 29, 2020                    COOLEY LLP

2

3                                                          */s/ John c. Dwyer*
                                                           John C. Dwyer
4

5                                              Attorneys for Defendants
                                               NVIDIA CORPORATION, JENSEN HUANG,
6                                              COLETTE KRESS and JEFF FISHER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

36

DEFENDANTS' NOTICE OF MOTION
AND MTD FAC
CASE NOS. 4:18-CV-07669-HSG