1    COOLEY LLP
     JOHN C. DWYER (136533) (dwyerjc@cooley.com)
2    PATRICK E. GIBBS (183174) (pgibbs@cooley.com)
     SARAH M. LIGHTDALE (4395661) (slightdale@cooley.com)
3    CLAIRE A. MCCORMACK (241806) (cmccormack@cooley.com)
     SAMANTHA A. KIRBY (307917) (skirby@cooley.com)
4    3175 Hanover Street
     Palo Alto, CA 94304-1130
5    Telephone:     (650) 843-5000
     Facsimile:      (650) 849-7400
6
     Attorneys for Defendants
7    NVIDIA CORPORATION,
     JENSEN HUANG, COLETTE KRESS
8    and JEFF FISHER

9

                     UNITED STATES DISTRICT COURT

10

                NORTHERN DISTRICT OF CALIFORNIA

11

                        OAKLAND DIVISION

12

13

14   In re NVIDIA CORPORATION SECURITIES     Case No. 4:18-cv-07669-HSG
     LITIGATION

15                                **DEFENDANTS' REPLY IN SUPPORT OF**
                               **MOTION TO DISMISS PLAINTIFFS' FIRST**
16    _____      **AMENDED CONSOLIDATED CLASS ACTION**
                               **COMPLAINT**
17
     This Document Relates to: All Actions.      Date:     October 15, 2020
18                                Time:     2:00 p.m.
                               Place:     Courtroom 2
19                                Judge:     Hon. Haywood S. Gilliam, Jr.

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

**TABLE OF CONTENTS**

Page

I.   Introduction ........................................................................................................... 1

II.  Argument .............................................................................................................. 1

    A.    Plaintiffs Have Failed To Allege Scienter ................................................. 1

        1.    Plaintiffs Still Fail To Allege Scienter As To Fisher Or Kress ............... 1

        2.    Plaintiffs Still Fail To Allege Scienter As To Huang ............................... 2

        3.    FE Allegations Do Not Support An Inference Of Scienter ...................... 6

        4.    The Challenged Statements Do Not Support An Inference Of Scienter .................................................................................................... 7

        5.    The Core Operations Doctrine Does Not Apply ...................................... 9

        6.    Plaintiffs' Theory Of Fraud Is Less Compelling Than The Nonculpable Explanation ........................................................................ 9

    B.    Plaintiffs Have Failed To Allege Falsity ................................................ 10

        1.    Plaintiffs Still Have Not Cured The Pleading Deficiencies As To Prysm ...................................................................................................... 11

        2.    Plaintiffs Do Not Otherwise Adequately Allege Falsity ....................... 16

    C.    Plaintiffs' Control Person Claim Still Fails ............................................ 20

III. Conclusion .......................................................................................................... 20

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

i

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Comput. Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ............................................................................ 17

*In re Aqua Metals, Inc. Sec. Litig.*,
    2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ...................................................... 20

*Avila v. LifeLock Inc.*,
    2016 WL 4157358 (D. Ariz. Aug. 3, 2016) .......................................................... 16

*Bao v. Solarcity Corp.*,
    2016 WL 4192177 (N.D. Cal. Aug. 9, 2016) .......................................................... 5

*Berson v. Applied Signal Technology, Inc.*,
    527 F.3d 982 (9th Cir. 2008) ............................................................................... 16

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ................................................................. 10

*Bolling v. Dendreon Corp.*,
    2014 WL 2533323 (W.D. Wash. June 5, 2014) ....................................................... 8

*Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. 2008) ............................................................... 11

*Browning v. Amyris, Inc.*,
    2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ........................................................ 5

*Chang v. Accelerate Diagnostics, Inc.*,
    2016 WL 3640023 (D. Ariz. Jan. 28, 2016) ......................................................... 17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    65 F. Supp. 3d 840 (N.D. Cal. 2014) ................................................................... 18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .............................................................. 2, 18, 19, 20

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ............................................................... 16

*Curry v. Yelp Inc.*,
    2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) ...................................................... 17

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ............................................................................. 13

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 1549485 (N.D. Cal. May 1, 2017) .......................................................... 8

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018) ..................................................................... 19

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ............................................................. 16

*Hernandez v. Schaad*,
2017 WL 6731624 (N.D. Cal. Dec. 29, 2017) ........................................................ 12

*Hussey v. Ruckus Wireless, Inc.*,
263 F. Supp. 3d 781 (N.D. Cal. 2017) ..................................................................... 16

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ..................................................................... 17

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)....................................................................................... 8

*In re Intel Corp. Sec. Litig.*,
2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ........................................................ 17

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ................................................*passim*

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002)............................................................................ 4, 10

*Lloyd v. CVB Fin. Corp.*,
2012 WL 12883522 (C.D. Cal. Jan. 12, 2012) ......................................................... 9

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) .............................................................................. 19

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) ........................................................... 9

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding
Corp.*,
320 F.3d 920 (9th Cir. 2003) .................................................................................. 10

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ......................................................... 5

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
2018 WL 3126393 (N.D. Cal. June 26, 2018) ...................................................... 2, 3

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004)......................................................................... 2, 5, 15

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .......................................................... 9

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- iii -

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    575 U.S. 175 (2015) ........................................................................................ 16, 19

*In re Peregrine Sys., Inc. Sec. Litig.,*
    2005 WL 8158825 (S.D. Cal. Mar. 30, 2005) ........................................................ 10

*Pierrelouis v. Gogo, Inc.,*
    414 F. Supp. 3d 1164 (N.D. Ill. 2019) ..................................................................... 5

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
    759 F.3d 1051 (9th Cir. 2014) ................................................................................. 4

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ............................................................................... 17

*In re Quality Sys., Inc. Sec. Litig.,*
    865 F.3d 1130 (9th Cir. 2017) ................................................................................. 2

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014) ............................................................................... 2, 8

*In re Resonant Inc. Sec. Litig.,*
    2016 WL 6571267 (C.D. Cal. July 11, 2016) ........................................................ 13

*In re Resonant Inc. Sec. Litig.,*
    2016 WL 6603953 (C.D. Cal. Sept. 6, 2016) ........................................................ 13

*Robb v. Fitbit Inc.,*
    2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ............................................................ 4

*S. Ferry LP #2 v. Killinger,*
    687 F. Supp. 2d 1248 (W.D. Wash. 2009) ........................................................... 8, 9

*S. Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ................................................................................... 9

*Shenwick v. Twitter, Inc.,*
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ....................................................... 4, 8, 17

*In re Silicon Storage Tech., Inc., Sec. Litig.,*
    2007 WL 760535 (N.D. Cal. Mar. 9, 2007) .......................................................... 14

*In re Snap Inc. Sec. Litig.,*
    2018 WL 2972528 (C.D. Cal. June 7, 2018) ......................................................... 20

*In re Vantive Corp. Sec. Litig.,*
    283 F.3d 1079 (9th Cir. 2002) ................................................................................. 4

*Veal v. Lendingclub Corp.,*
    2020 WL 3128909 (N.D. Cal. June 12, 2020) ...................................................... 15

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- iv -

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.,*
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) ............................................................. 14

*Waterford Twp. Police v. Mattel, Inc.,*
  321 F. Supp. 3d 1133 (C.D. Cal. 2018) ................................................................. 19

*Wozniak v. Align Tech., Inc.,*
  850 F. Supp. 2d 1029 (N.D. Cal. 2012) ................................................................... 4

*In re YogaWorks, Inc. Sec. Litig.,*
  2020 WL 2549290 (C.D. Cal. Apr. 23, 2020) ....................................................... 12

*Zucco Partners, LLC v. Digimarc Corp.,*
  552 F.3d 981 (9th Cir. 2009).................................................................................... 6

**Statutes**

15 U.S.C.
  § 78u-4(b) (PSLRA)......................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 9(b) .................................................................................................... 13

Cooley LLP
ATTORNEYS AT LAW
PALO ALTO

- v -

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

## I. INTRODUCTION

At the hearing on Defendants' Motion to Dismiss the CAC, the Court observed that Plaintiffs' allegations had generated some "smoke," but cautioned that the "PSLRA requires what it requires." MTD Hearing Tr. at 4 (Dec. 6, 2019) (Dkt. 143). The Court dismissed the CAC for failure to allege falsity or scienter with the requisite particularity. In the FAC, Plaintiffs point to the same smoke from a variety of different angles, but, again, fail to satisfy the PSLRA. The Opposition largely regurgitates pages of the FAC's allegations and urges the Court to take an impressionistic, high-level view of them every step of the way, whether in evaluating statements attributed to former NVIDIA employees, the reliability of estimations of NVIDIA's internal financial data by Plaintiffs' outside "experts" at Prysm Group, or the actual content and context of Defendants' statements that Plaintiffs claim were false. Plaintiffs are sophisticated investors who experienced temporary losses when NVIDIA's stock price fell; but the federal securities laws do not amount to an insurance policy for such losses. The FAC fails for the same reason the Court dismissed the CAC: when reviewed for the detail and sensibility required by the PSLRA, it falls apart. Plaintiffs' second attempt to plead more than just "smoke" fails. The FAC should be dismissed with prejudice.

## II. ARGUMENT

### A. Plaintiffs Have Failed To Allege Scienter

This Court dismissed Plaintiffs' CAC because (among other things) Plaintiffs failed to allege particularized facts showing that, when the speakers made the challenged statements, they were aware of facts that allegedly rendered those statements materially false or misleading. *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ("Order") at *9-12. Nothing in Plaintiffs' Opposition supports a different result here.

### 1. Plaintiffs Still Fail To Allege Scienter As To Fisher Or Kress

Plaintiffs do not dispute that the FAC fails to make a single new allegation relevant to Fisher's state of mind when he spoke. Mot. at 13; *see* Order at *10; ¶ 176.[1] The FAC offers nothing

---

[1] Plaintiffs also continue to ignore that, when Fisher made his sole challenged statement on May 10, 2017, on the first day of the 18-month Class Period and ten days into a new fiscal quarter, the "facts" they claim he omitted did not even conceivably exist. (¶¶ 177-78 (referencing total alleged crypto-related sales for all of that fiscal quarter, GFE data "during the Class Period," and a China GeForce revenue estimate derived from a September 2017 internal presentation).)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

new regarding Kress's scienter. Plaintiffs do not contest that FE-1 (who allegedly said that Kress had "authority" to access a sales database, ¶ 84) never communicated with her and thus lacks any personal knowledge as to her state of mind. Mot. at 18; *see* Order at *10. Plaintiffs also fail to dispute that they have not made a single particularized allegation about what this database allegedly showed at any time. Mot. at 14. Plaintiffs do argue that Kress's pre-Class Period Statements about GFE software (¶¶ 107-08) are not rendered categorically irrelevant by their timing (Opp. at 9 n.6), but that is a *non sequitur*. Those comments did not address mining usage, and Plaintiffs do not allege that she ever had access to, much less received, any particular mining-related GFE data.

## 2.    Plaintiffs Still Fail To Allege Scienter As To Huang

Plaintiffs primarily argue Huang's scienter on the theory that he had "access" to five sources of information about "crypto-related GeForce sales." Opp. at 1, 6-11. In other words, Plaintiffs allege that Huang **could have** or **might have** seen information having something to do with miners buying GeForce chips. *Id*. The PSLRA requires more than speculation. Plaintiffs must allege facts showing that Huang **actually did have** contradictory information when he made the challenged statements.[2] *See, e.g.*, *Norfolk Cty. Ret. Sys. v. Solazyme, Inc*., 2018 WL 3126393, at *8 (N.D. Cal. June 26, 2018) (no scienter absent allegation "[CWs] shared the purportedly contradictory information with the Defendants before they made the challenged statements"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (no scienter absent allegation defendants "personally accessed" contradictory data). And Plaintiffs must allege Huang received **specific** information that put him on notice that his public statements were false. *See, e.g.*, Order at *11 n.3; *infra* pp. 4-5. The FAC fails on both fronts.

To gloss over this problem, Plaintiffs cite allegations in the FAC describing various "numerical details" about GeForce purchases by miners. Opp. at 15-16. The FAC stops short of alleging—even conclusorily—that Huang received the vast majority of this information.[3] In fact,

---

[2] None of Plaintiffs' cases show that "access" to data is enough for scienter. Opp. at 6; *In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1145 (9th Cir. 2017) (CWs alleged defendants "used" reports; defendants stated they had "knowledge" of information); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (defendant publicly "specifically addressed" corrosion-rate data at issue); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (defendants publicly admitted to monitoring global database; plaintiffs pled "hard numbers" regarding data in dispute).
[3] Opp. at 15-16 (¶ 154 (Prysm estimate of crypto-related revenue by quarter, prepared after Class

Plaintiffs identify only two "numerical details" with any supposed link to Huang at all: (1) FE-1's alleged statement that "sales data" showed 60-70% of GeForce revenue **in China** "throughout 2017" was from miners (¶ 86); and (2) FE-5's alleged statement that GFE "usage data" showed "over 60% of GeForce GPU sales during the Class Period were to miners" (¶ 106). Opp. at 9-10, 14 n.8. But as discussed *infra*, Plaintiffs fail to allege anything to suggest that Huang actually had such data when he made any challenged statement, and the allegations lack the specificity required.

**Database, Quarterly Meetings, and "Top 5" Emails:** Plaintiffs purport to describe a sales database, quarterly meetings, and periodic "Top 5" emails, each of which allegedly contained some information about miners purchasing GeForce GPUs. Opp. at 7-10. But Plaintiffs allege no facts showing that Huang was actually privy to much of this,[4] and provide no meaningful detail about the **contents** of any of it.[5] As such, they do not plead that Huang was aware of information that contradicted any of his public statements.[6] Mot. at 14-15, 18-22; *see Norfolk Cty.*, 2018 WL 3126393, at *8 (references to "conference calls" and "updates" insufficient where complaint "fail[s] to identify any call, meeting or other type of communication (1) participated in by both [CW] and [speaker], (2) prior to the [challenged] statements, and (3) disclosing information contradicted by

Period); ¶ 114 (forecast of 2018 GeForce sales due to mining-related demand, not alleged to have ever been provided to Huang); ¶¶ 119-26 (facts about China sales from internal presentation, not alleged to have ever been provided to Huang); ¶ 131 (estimate of Gaming GPUs sold in Russia, not alleged to have ever been provided to Huang, alleged source of which (social media manager in Russia) had no alleged contact with Huang); ¶ 132 (estimate of GeForce revenue in India, not alleged to have ever been shared with Huang or even prepared during Class Period).)

[4] As to the sales database, for example, Plaintiffs rely on FE-2's vague recollection of Huang's acting turn in a Salesforce training video. This allegation is insufficient as pled, as the video underscores. Mot. 19-20; Ex. NN. Even the (clearly tongue-in-cheek) video does not depict Huang accessing any database—he calls someone else to request a report. Opp. at 7, 14 & n.3; Ex. NN.

[5] For example, the Opposition alludes to allegations about the "content and frequency of cryptocurrency-related discussions" in "Top 5" emails (Opp. at 9 n.4), but the FAC itself identifies zero details about or facts in any such emails that would have put Huang on notice that any given challenged statement was false. *Id.*; ¶¶ 94-98. At most, the FAC indicates there was some discussion of some mining-related GeForce orders in some "Top 5" emails Huang received at some unknown points in 2017 and 2018. This is consistent with his public statements. *E.g.*, Mot. at 31.

[6] The absence of any allegations about specific crypto-related GeForce sales data makes sense, given what the Court has previously observed (and what Plaintiffs elsewhere acknowledge): "NVIDIA does not sell its GPUs directly to consumers" but instead has a complex distribution channel, and NVIDIA makes sales almost exclusively not to any type of end users but to "wholesalers, retailers, or internet platforms." (¶ 42; Order at *2; Mot. at 9, 12-13 & n.6.)

those statements."); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (no scienter based on receipt of "daily 'run-rate' reports" without "data or other detail").

Faced with this pleading deficiency, Plaintiffs wrongly argue that the law does not require such particularity. Opp. at 15. But this Court has already recognized that, in order to plead scienter here, Plaintiffs must supply "specific allegations as to the content of the data [quantifying GeForce GPUs being used for gaming versus mining]."[7] Order at *11 n.3 (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002)). Plaintiffs' citations to *Shenwick v. Twitter, Inc.* and *Robb v. Fitbit Inc.* (Opp. at 15) do not help their cause. The *Robb* plaintiffs specifically alleged that a CW hired to test the accuracy of a heart-rate tracking device sent monthly reports directly to management detailing "significant issues with the accuracy." 2017 WL 219673, at *4 (N.D. Cal. Jan. 19, 2017). Plaintiffs cite *Shenwick*'s discussion of falsity, not scienter, which does not address the "strong inference" requirement. 282 F. Supp. 3d 1115, 1137-38 (N.D. Cal. 2017). In any event, the *Shenwick* plaintiffs specifically alleged that statements regarding one user metric (Monthly Active Users) were rendered misleading by the failure to disclose a negative trend in another user metric (Daily Active Users or DAU) that raised questions about the viability of the product user base. *Id.* at 1127-32, 1137. And contemporaneous statements by the speakers indicated they possessed the adverse DAU data when they made the allegedly misleading statements. *Id.* at 1147. The allegations in both of those cases contained the specificity sorely lacking in the FAC.

**"Throughout 2017" China Sales Data:** Plaintiffs make no effort to explain if, when, or how Huang actually learned the alleged "60-70%" China mining sales figure. Opp. at 10 (Huang allegedly "had access" to database); *see supra* p. 2 & n.2. Plaintiffs also ignore that this same figure was in the CAC, which the Court deemed "not indicative of scienter." Order at *10; Mot. at 18-19 & n.15. And Plaintiffs do not try to explain how the Court could conclude, from a general allegation about revenue "throughout" 2017 (only partly in the Class Period, and during which mining demand indisputably fluctuated), what mining-related revenue was at the time of any of Huang's challenged

---

[7] *See also, e.g., In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002) (mere existence of periodic reports, without specifics as to contents, insufficient for scienter); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

statements.[8] Mot. at 19 & n.15, 21 & n.16; *see, e.g.*, *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *12 (N.D. Cal. Mar. 24, 2014) (insufficient to allege defendants knew fact "during" class period).

Further, Plaintiffs still attempt to rely on data from a single, outlier market (China) to challenge Huang's statements about NVIDIA's worldwide business. *See* Order at *9 (data about crypto-related GeForce sales in China cannot be easily extrapolated to sales worldwide); Mot. at 12-13 & n.6. Plaintiffs rely solely on *Nursing Home* (Opp. at 10-11), but that case does not stand for the broad proposition that data from a "primary market" is "sufficient" to show scienter, and is wholly distinguishable. Unlike in *Nursing Home* (where most challenged statements focused on the U.S.), here none of the challenged statements address China. 380 F.3d at 1228, 1231 & n.1. While the *Nursing Home* court found that U.S. data offered a "substantial window" into the company's financials because it accounted "for approximately half of [its] annual revenue," *id.* at 1231, the FAC alleges that GeForce sales to miners in China accounted for "25% to 35% of NVIDIA's worldwide GeForce revenue" in 2017, meaning only 14% to 20% of global revenue. (Ex. W at 74; ¶ 86.) And Plaintiffs have conceded that mining activity was concentrated in China. Order at *9; Mot. at 12-13 & n.6. There is simply no basis to deem mining demand in China to be representative of NVIDIA's business worldwide. Finally, *Nursing Home* held that allegations about U.S. sales created a strong inference of scienter *only* "[i]n combination with" "astronomical" stock sales ($900 million) "highly inconsistent" with the defendant's trading history, and, "very importantly," improper revenue accounting records. *Id.* at 1231-33. There are no such allegations here.

**GFE "Usage Data":** Plaintiffs also fail to plead that Huang ever actually received any GFE data showing "that over 60% of GeForce GPU sales during the Class Period were to miners," when he received it, or that a report reflecting such data ever even existed. Mot. at 22; *see supra* p. 2 & n.2. Courts have rejected similar allegations for insufficient specificity; the Opposition makes no attempt to distinguish this precedent. Mot. at 21; *see also Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,

[8] *See also Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1175-76 (N.D. Ill. 2019) (allegations insufficient to "answer the critical question of when defendants had sufficient knowledge to put them on notice" of contradictory facts); *Bao v. Solarcity Corp.*, 2016 WL 4192177, at *6, *10 (N.D. Cal. Aug. 9, 2016) (allegations defendants "knew that some sales were, at times, unprofitable" did not show they "knew of the entire segment's underperformance and therefore should have known of the falsity of their public statements").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

2016 WL 7475555, at \*3 (N.D. Cal. Dec. 29, 2016) ("Generically asserting in an undifferentiated manner that facts occurred 'during the Class Period' is insufficient."). Plaintiffs also fail to allege that the GFE software could track when and to whom a GPU was **sold**, rather than how it was **used**. Mot. at 22. The Opposition protests that Plaintiffs need not provide a "technical" explanation of GFE, but this misses the point; the facts the FAC does allege about GFE are completely inconsistent with, and thus render implausible, the inference that it permitted quantification of sales to miners.[9] (*See, e.g.*, ¶¶ 100, 105 (GFE "optimize[s] graphics settings to improve graphics performance while gaming" and was used "to determine what games were being played in different regions").)

### 3. FE Allegations Do Not Support An Inference Of Scienter

Plaintiffs suggest it is somehow improper to evaluate whether each of the FEs' allegations meet the relevant pleading standards.[10] Opp. at 13. But this is precisely the analysis required by the PSLRA and is entirely consistent with *Tellabs*. *See, e.g.*, Order at \*10-11; *see also* Mot. at 16-17. Considered individually or in concert, the FEs fail to support a strong inference of scienter.

The liberties taken in the Opposition's FE discussions are telling. For example, the Opposition is littered with references to FE-2 but simply ignores that FE-2 left the Company around when the Class Period began in May 2017. (¶ 34.) FE-2 thus cannot speak to what Huang knew, did or said **during** the Class Period. *See* Mot. at 20; *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009). And because the Crypto SKU launched about when FE-2 left NVIDIA (¶ 6), FE-2 can offer no reliable insight into Huang's knowledge at any point regarding how many miners were purchasing GeForce GPUs as compared to the Crypto SKUs. The FAC and Opposition are replete with similar examples.[11]

---

[9] Plaintiffs' allegation that, at some unspecified time, NVIDIA publicly stated that "mid-to-high 90%" of its users use GFE (Opp. at 10; ¶ 101) sheds no light on circumstances during the Class Period—when, according to Plaintiffs themselves, the profile of NVIDIA's GeForce user base shifted. Plaintiffs nowhere allege what portion of GeForce users used GFE during the Class Period.
[10] Plaintiffs do not dispute that the FAC fails to remedy the pleading deficiencies as to FE-3 and FE-4. Mot. at 20; Order at \*11. Plaintiffs' references to them should be disregarded.
[11] As Defendants noted in the Motion, the paragraphs in the FAC containing FE allegations include several key sentences not attributed to anyone. Mot. at 18. For example, every sentence of paragraph 82 is expressly attributed to something FE-5 "confirmed," "explained" or "said" **except for** the only sentence that purports to link NVIDIA's internal sales data to the statements challenged in this case: "This 'sell-in/sell-out' data recorded sales throughout the distribution chain **and**

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

While FE-5 is the only FE who is new to the FAC, the Opposition makes remarkably little effort to defend the adequacy of the statements attributed to FE-5. Plaintiffs do not dispute that the FAC alleges no personal knowledge for FE-5's most critical statements, such as how FE-5 learned that sales data presented at certain meetings was "sent directly to Huang." Mot. at 21-22; ¶¶ 89, 90.[12] And, Plaintiffs do not even attempt to argue that the FAC alleges how anyone in FE-5's consumer marketing position would have had personal knowledge of how GFE software usage data was collected, analyzed or distributed, or what it showed. Mot. at 21; ¶¶ 105-06.

Evidently unable to defend their FE allegations individually, Plaintiffs argue that the various FE allegations "reinforce" one another. But Plaintiffs' sole example of this—claiming FE-2's memory of a sales training video "reinforces" the description by FE-1 (an account manager in China) of a "sales database" to which Huang supposedly had access (Opp. at 13-14)—falls flat, as it simply ignores that neither FE has personal knowledge as to Huang. Mot. at 20. No FE describes the content of the alleged sales database in any detail or at any point in time. Plaintiffs vaguely add that FE-5 "corroborated these accounts" (Opp. at 7), but FE-5's allegations do not mention any sales database at all. Simply put, zero plus zero is still zero.

### 4. The Challenged Statements Do Not Support An Inference Of Scienter

Plaintiffs again attempt to rely on the fact that Defendants made the challenged statements to show scienter. Opp. at 11-13. The Court should reject this argument as it did before.

***First***, this Court previously held that Plaintiffs could not plead scienter by merely pointing to the alleged misstatements as evidence that Defendants "had access to the underlying data." Order at *11. Though Plaintiffs contend otherwise (Opp. at 7), they have not remedied the key defect identified in the Order: the FAC remains devoid of "particularized allegations that [Defendants] were provided secondary data differentiating end user purchasers." Order at *11; *see supra*.

---

***allowed NVIDIA to determine the percentage of GeForce GPUs sold to crypto-miners***." (¶ 82 (emphasis added).) Plaintiffs retort that the paragraphs at issue "begin[] with an unambiguous attribution to a *single* FE and include[] additional references *repeating*" that attribution. Opp. at 15. This provides no explanation or justification for allegations that lack any attribution. There is simply no way for the Court to conclude that an FE or anyone else actually made those statements.
[12] Similarly, FE-5's statement that Huang "personally reviewed" GFE data was not based on FE-5's personal knowledge but hearsay from FE-5's unnamed "superiors." (¶ 106.)

Cooley LLP
Attorneys at Law
Palo Alto

Defendants' Reply ISO
Motion to Dismiss
Case No. 18-cv-07669-HSG

***Second***, Plaintiffs mischaracterize certain of Defendants' statements, which did not purport to "quantify" "crypto-related sales" in general as Plaintiffs suggest (Opp. at 11), but rather reported OEM revenue from the Crypto SKU.[13] (*See, e.g.*, ¶ 193; Ex. J at 11.) Defendants consistently disclosed that some Gaming revenue was also driven by mining.[14] Mot. at 19. To the extent that Defendants "characterize[d] the magnitude" (Opp. at 11), they did so broadly and ***disclaimed*** the ability to provide detailed, reliable numbers, cautioning that mining-related GeForce sales were "hard to estimate" and not something they could "visibly count."[15] Mot. at 10, 23.

***Finally***, Plaintiffs again argue that the challenged statements reflect deliberate recklessness because some were made in response to analysts' questions, but that still provides "no basis" for scienter. Order at *12; Opp. at 12-13. "[I]t does not demonstrate scienter to point out that analysts asked questions about a topic." *Bolling v. Dendreon Corp.*, 2014 WL 2533323, at *14 (W.D. Wash. June 5, 2014). Plaintiffs' argument depends on the assumption that Defendants could have reviewed data reliably quantifying global sales of GeForce GPUs to mining end-users before speaking to the market, but willfully abstained. Opp. at 13. Nothing in the FAC supports this. *Cf. In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *6-7 (N.D. Cal. May 1, 2017) (defendants "silent" when asked about inventory build-up, though reliable CWs said they "would have been given" relevant information); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009) (executive represented he "had all of the information necessary to make accurate predictions"). Like the CAC, nothing in the FAC reflects "intentional or conscious misconduct." Order at *12.

---

[13] Based on the allegations in the FAC, there is arguably one exception to this, but the meaning of that statement is made clear by its context. In an August 12, 2017 interview, Huang stated: "cryptocurrency . . . represented only a couple hundred million dollars, maybe $150 million or so." (¶ 183; Ex. D at 3.) Two days earlier, during the quarterly earnings call, Huang had reported about $150M in Crypto SKU revenue. Opp. at 11; Ex. C at 7. As such, his reference to "cryptocurrency" in the interview appears to have been an echo of his recent statement about the Crypto SKU. And in any event, his interview response clearly gave a qualified and subjective estimate.

[14] (*See, e.g.*, Exs. C at 4, 7; H at 9-10; J at 4; O at 13; P at 4, 10; X at 4; Y at 3; Z at 5, 8, 15, 17.)

[15] *Cf.* Opp. at 11-12 (citing *Shenwick*, 282 F. Supp. 3d at 1147 ("detailed factual statements" including that the disputed data was "dependent by market" and "similar" to what was previously reported); *Reese*, 747 F.3d at 572 (engineer responsible for pipeline operations "specifically addressed" corrosion-rate data in question); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) ("confident, unhedged denials")).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 8 -

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

### 5.     The Core Operations Doctrine Does Not Apply

The core operations inference remains inapplicable. Mot. at 22-23; Order at *11-12. As to the first prong of the doctrine, as noted in the Motion, the FAC's new "admissions" are deficient in several respects, including that they were made well before the Class Period and referred to monitoring inventory sold into NVIDIA's ***channel*** (comprised of distributors and resellers), not end-user data. Mot. at 22-23. The Opposition fails to address those flaws. Rather, Plaintiffs simply regurgitate their allegations and cite a case that presented inapposite facts. Opp. at 16-17; *S. Ferry*, 687 F. Supp. 2d at 1260 (contemporaneous admissions "displayed an intimate knowledge" of key facts); *cf. In re Nektar Therapeutics*, 2020 WL 3962004, at *13 (N.D. Cal. July 13, 2020) (no "detailed involvement" with relevant data where plaintiffs failed to allege "there existed reasonably accessible data within the company materially contradicting those statements" when made).

As to the second prong, Plaintiffs again essentially argue that gaming is NVIDIA's core business, which this Court already held does not suffice. Order at *12. In an effort at a new spin, the Opposition contends that revenue derived from GeForce (reported in the Gaming segment) in China alone was enough to support core operations. Opp. at 16. But even if FE-1's allegations are credited (which they should not be, *see* Mot. at 18-19) and the Court were to assume that crypto-related sales of GeForce in China at some point accounted for 14-20% of worldwide revenue (*see supra* p. 5), this would not make it "'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *30 (C.D. Cal. Apr. 14, 2015) (deferred earnings from contracts that were "less than 20%" of revenue "insufficiently substantial"); *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *27 (C.D. Cal. Jan. 12, 2012) (failure to disclose "troubled" loans that "represented 14%" of portfolio not enough for core operations). To the contrary, Plaintiffs have not even tried to challenge Defendants' consistent statements that crypto-related GeForce sales were "difficult to quantify" and could not be "visibly count[ed]." Mot. at 23.

### 6.     Plaintiffs' Theory Of Fraud Is Less Compelling Than The Nonculpable Explanation

Plaintiffs' theory, as alleged in the FAC, is that Defendants dramatically increased sales of

Cooley LLP
Attorneys at Law
Palo Alto

Defendants' Reply ISO
Motion to Dismiss
Case No. 18-cv-07669-HSG

GeForce chips into the channel during the Class Period, knowing that there was not enough gaming demand to absorb it and that the decline of mining demand was "*inevitable*." (¶ 162.) Given that this makes no sense, it is perhaps not surprising that Plaintiffs disavow it in the Opposition. Plaintiffs now assert that Defendants increased GeForce supply to "capitalize on the cryptocurrency boom" "by selling GeForce GPUs to miners," and argue that inventory built up in the fall of 2018 because demand from miners "vanished" in mid-2018. Opp. at 18. Even as modified, Plaintiffs' theory assumes Defendants sold massive quantities of GeForce chips into the channel based on nothing more than a hope and a prayer that mining demand would somehow miraculously reappear and absorb the excess supply. Yet Plaintiffs offer no plausible reason why Defendants would have taken that risk as Ether prices (and thus mining demand) were declining, rather than simply easing up on GeForce sales into the channel.[16] (*See* Ex. FF; ¶¶ 54-55.) The excess supply was bound to catch up with NVIDIA in short order, when the channel simply stopped buying GeForce chips.

And what would Defendants have gained by postponing the "inevitable" for a few months? It is no answer to speculate (as Plaintiffs do) that Defendants wanted to avoid investor "skepticism." Opp. at 18. The Ninth Circuit has firmly rejected efforts to plead motive to commit securities fraud based on such generic allegations of universal corporate desires (*e.g.*, to perform well and maintain stock value). *See Lipton*, 284 F.3d at 1038; *In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *64 (S.D. Cal. Mar. 30, 2005). Plaintiffs otherwise do not identify any motive for Huang, Fisher, or Kress to lie to the market, which "significantly undermine[s]" their theory. *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017). They do not allege that any Individual Defendant received a financial benefit and cannot explain why NVIDIA would undertake a $1.77B stock *buyback* program during the Class Period.[17] Mot. at 17.

### B.    Plaintiffs Have Failed To Allege Falsity

As before, Plaintiffs' falsity allegations rely "entirely" on Prysm's speculative revenue estimates. Order at *7. But, despite a clear roadmap from the Court (Order at *7-9), Plaintiffs have

---

[16] And Plaintiffs' theory is impossible to square with Defendants' repeated statements opining that there was unmet demand from gamers. (*E.g.*, Ex. X at 3-5 (incorporated by reference, Order at *5).)
[17] Plaintiffs argue buybacks do not "categorically" negate scienter, Opp. at 17 n.9, but their sole authority is a case where a repurchase was part of the alleged fraud. *Cf. No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 928 (9th Cir. 2003).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

not filled the gaps in their Prysm allegations. This alone suffices to dismiss the FAC with prejudice. Plaintiffs have also otherwise failed to assert well-pled factual allegations that any of the challenged statements were false or misleading when made. That failure is also independently fatal to the FAC.

### 1. Plaintiffs Still Have Not Cured The Pleading Deficiencies As To Prysm

Plaintiffs argue, repeatedly, that the Court should accept Prysm's estimates because some of their assumptions are allegedly "conservative." Opp. at 2-5, 22-26. All that means is that Prysm could have altered *some* of its assumptions to generate even higher and even less reliable and more unfounded estimates. In any event, simply saying "conservative" is not a route to circumvent the PSLRA. The question is whether Plaintiffs have alleged "with sufficient particularity that [Prysm] was *in a position to* know the relevant fact claimed: here, how much of Defendants' revenues relied on crypto-mining." Order at *7. This is the same standard applied "to evaluate facts alleged to have originated with any [confidential witness]." *Id.* In that regard, for all the reasons set forth below, if a CW were to simply assert what Prysm asserts here, there is no question that the allegations would fail under the PSLRA. *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201-02 (N.D. Cal. 2008) (declining to credit CWs' revenue "estimates" absent allegations of relevant responsibilities or "first-hand knowledge"). The conclusion here should be the same.

#### a. Still No Review Of Relevant NVIDIA-Specific Information

As Defendants noted in the Motion, the FAC still does not "indicate any sort of interaction between Prysm and former or current NVIDIA employees or review of its financial data." Mot. at 28 (quoting Order at *8). While Plaintiffs cite a handful of items Prysm allegedly considered (Opp. at 27-28), these fail to show Prysm was "in a position to know" the amount of NVIDIA's revenue driven by mining. For example, Plaintiffs list several FE allegations (*id.*), but Plaintiffs do not suggest that Prysm in fact interacted with any FE, and no FE allegation comes close to supporting the mountain of technical assumptions underlying Prysm's estimates. Mot. at 17-22.

Plaintiffs also argue that Prysm reviewed the MSRP of various GeForce models. Opp. at 27. But far from showing that Prysm was "in a position to know" how much of NVIDIA's revenue was driven by mining, this actually shows the opposite: the MSRP (the price NVIDIA recommended that retailers charge end customers) provides little, if any, insight into the amount of

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

revenue earned by NVIDIA when it sold GeForce chips to its channel partners far upstream from the end users. Accordingly, Prysm had to make an (essentially arbitrary) assumption about the relationship between NVIDIA's revenue and the MSRP. *Id.*; ¶ 151. Other observers made different assumptions about that very fact. (¶ 153 & n.15.) Plaintiffs also fail to explain how Prysm's review of NVIDIA's publicly reported revenue (Opp. at 27; ¶¶ 153-54) informed its estimate of unreported mining revenue, or supports any of the assumptions underlying Prysm's estimates. Finally, the internal China presentation is of limited relevance. Mot at 27-28; *see also infra* p. 15. Indeed, the FAC is not clear if Prysm actually used that presentation in its analysis or merely looked at it (Mot. at 24-25), and the Opposition sheds no light on this. Opp. at 27 (Prysm "examined" presentation).

### b. Market Share Data Still Unreliable

As this Court previously recognized, market share is a critical input for Prysm's revenue estimates. Order at *8-9. Plaintiffs nevertheless admit that, instead of explaining "why Prysm's use of general ***gaming*** GPU market share data reliably indicated NVIDIA's share of the ***mining*** market" (as directed in the Order, Opp. at 19), Plaintiffs simply replaced their prior market share allegations with new ones. Opp. at 19; Mot. at 24. Plaintiffs also admit that, despite the alleged change in market share data, Prysm's quarterly revenue estimates remain precisely the same, to the dollar. *Id.* Plaintiffs wave off this debilitatingly suspicious coincidence by asserting that Prysm did not "alter" any assumptions (Opp. at 19 n.11), but this is no response at all. Plaintiffs do not suggest that NVIDIA's mining market share was, in fact, the same as (or even similar to) its share of the gaming market (which would be another unlikely coincidence), but offer no other explanation for how the change did not "alter" any of Prysm's conclusions. Plaintiffs' obfuscation on this is reason enough for the Court to reject their revised Prysm allegations. *See, e.g.*, *Hernandez v. Schaad*, 2017 WL 6731624, at *3 (N.D. Cal. Dec. 29, 2017) (prior allegations part of "'context-specific' inquiry" in assessing amended complaint); *In re YogaWorks, Inc. Sec. Litig.*, 2020 WL 2549290, at *3 (C.D. Cal. Apr. 23, 2020). So is the fact that Prysm's estimates of mining revenue cannot be reconciled or reproduced with the new "assumptions" pled—as Plaintiffs do not dispute, "conservative" or not, Prysm's own stated math just does not add up. Mot. at 29 n.20; Opp. at 25 n.14.

But even setting these issues aside, as discussed below, Plaintiffs fail to articulate why

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Prysm's revised market share assumption is any more reliable than the one proffered in the CAC.[18]

**Inconsistency of Market Share "Sources":** Plaintiffs argue that Prysm's market share assumption is reliable because it is based on three supposedly "consistent" sources: the Peddie Report, the RBC report, and the internal China presentation. Opp. at 24-25. Each of these "sources" offers nothing more than guesses (*see infra* pp. 14-15)—and guesses do not satisfy the PSLRA, no matter how many people make them. In any event, Plaintiffs' argument fails in its own right, because here the guesses diverge. The RBC report generally quotes 75%, the China presentation generally quotes 70%, and the Peddie Report quotes a cumulative share through Q4 2017 of 69% and a quarterly share during Q4 2017 of just 64%.[19] Opp. at 21. Plaintiffs do not grapple with the fact that these drive disparate revenue estimates that can vary by hundreds of millions of dollars.

Plaintiffs' "consistency" argument also ignores that Prysm's purported sources are inconsistent with ***Prysm's analysis***. For example, Prysm allegedly assumed a steady mining market share of 69% across the Class Period. But Peddie estimated that NVIDIA's mining market share dropped sharply early in the proposed Class Period, from 71.6% in Q3 2017 to 64.4% in Q4 2017, while AMD's share was increasing.[20] Mot. at 26; Ex. HH at 10-11. Unable to harmonize Peddie's opinions with Prysm's, Plaintiffs suggest that the Court could still find falsity pled if Prysm had assumed that NVIDIA's mining share was 64.4%.[21] Opp. at 22. But Plaintiffs offer no reason to

---

[18] Plaintiffs contend that Prysm's analysis is "sufficient at the pleading stage," citing *In re Resonant Inc. Sec. Litig.*, 2016 WL 6571267, at *5 (C.D. Cal. July 11, 2016). Opp. at 25, 27. But unlike here, in *Resonant* the expert's opinion was based ***solely*** on the company's "public filings and communications" and the defendants did not argue the information contained in those sources was unreliable. *Id.* Further, there the expert "only serve[d] to buttress the other factual allegations." *In re Resonant Inc. Sec. Litig.*, 2016 WL 6603953, at *3 (C.D. Cal. Sept. 6, 2016) ("It would be unreasonable for securities action plaintiffs to make conclusory references to the findings of purported experts" to meet Rule 9(b) and the PSLRA). Here, Plaintiffs depend entirely on Prysm.

[19] Plaintiffs admit that the Peddie Report market share estimates referenced in the FAC (69.4% and 68.6%) are cumulative for Q1 of calendar 2015 through Q3 and Q4 of calendar 2017, respectively. Opp. at 21. They do not reflect Peddie's market share estimate for any quarter. *Id.*; Mot. at 26.

[20] Plaintiffs do not deny that, in response to the Court's finding that Prysm's conclusion was "clouded" by allegations that miners "preferred" GPUs made by AMD, Plaintiffs simply deleted those allegations. Mot. at 12-13. Peddie amplifies, not "addresses," this cloud. Opp. at 20-21.

[21] Plaintiffs argue they need not allege the "precise" amount of crypto-related revenue and rely on cases about accounting irregularities (allegations not present here). Opp. at 24-25. But Defendants ask for ***reliability*** (the standard for pleading expert opinions), not "exactitude." Plaintiffs' authorities, which hold that a GAAP violation may be alleged with the "approximate amount" of affected revenue plus reliable witness accounts, are completely off base. *See In re Daou Sys., Inc.*,

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

think that the downward trajectory traced in the Peddie Report bottomed out there (and Plaintiffs' willingness to discard Prysm's "analysis" underscores its lack of reliability). Nor do Plaintiffs explain how RBC's 75% market share estimate provides "empirical support" for Prysm's lower guess. Opp. at 22-23. Plaintiffs downplay the gap's size, but then point to it to explain why RBC and Prysm's estimates of NVIDIA's mining revenue are so far apart ($230m, *see* Order at *9).

**Prysm's "Sources" Not Reliable:** As Plaintiffs' falsity allegations "rely entirely" on Prysm's revenue estimates, those allegations cannot be credited unless Prysm's mining market share assumption is reliable. And absent facts showing that any Prysm source itself "reliably indicates" NVIDIA's mining market share (Order at *8), this part of Prysm's analysis fails, as it amounts to piling one unsupported opinion on top of another. Plaintiffs have alleged no facts showing that any of Prysm's sources "reliably indicated" NVIDIA's share of the mining market.

Plaintiffs concede that the Peddie Report is not a "fact" based on personal knowledge, but just another third party's opinion (based on a "proprietary analytic model") and thus subject to the same reliability standard as Prysm itself. Mot. at 25. Plaintiffs argue that Defendants have cited Peddie's gaming industry data in the past (Opp. at 20), but this has no bearing on whether Peddie had any reliable basis for estimating market share in an entirely new and different market. Plaintiffs do not allege that NVIDIA ever cited, much less adopted, Peddie's guess about ***mining***.[22] And while Plaintiffs inexplicably deny it, it is clear that Peddie illogically assumed that any increase in quarterly sales (above a baseline that Peddie did not explain) was caused ***entirely*** by sales to miners. Mot. at 26-27. Plaintiffs can offer no other interpretation of Peddie's statement that: "We then took

---

411 F.3d 1006, 1016-19 (9th Cir. 2005) (GAAP violation alleged through CW statements with "a large degree of specificity," including direct interactions with defendants); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1209-10, 1214, 1222 (W.D. Wash. 2009) (GAAP violation alleged through internal memo and statements from 80 CWs).

[22] Plaintiffs argue that *In re Silicon Storage Tech., Inc.* is inapt because that case involved market share data that was not specific to the defendant's products, while "Prysm analyzed data that encompassed NVIDIA's crypto-related sales." Opp. at 21 n.13 (citing 2007 WL 760535 (N.D. Cal. Mar. 9, 2007)). Plaintiffs do not identify what that data was, but in any event *Silicon Storage* applies in full force. Peddie's market share estimates are no more reliable—and shed no more light on NVIDIA's actual market share—than the data in *Silicon Storage*. *Id.* at *17; Mot. at 25-27. As in *Silicon Storage*, the issue is further compounded by the unwarranted assumptions in Prysm's methodology. 2007 WL 760535, at *15-16; *infra* pp. 15-16. And as in *Silicon Storage*, Prysm's conclusion is not corroborated by "specific documents or statements by other witnesses." *Id.* at *32.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

that percentage ["deviation from normality"] and applied it to unit shipments to arrive at our estimate for the number of AIBs that were bought for crypto mining."[23] (Ex. HH at 11.)

Further, the Opposition does not cite any factual allegations that suggest the authors of the RBC report were able to reliably estimate NVIDIA's crypto market share. Opp. at 22-23. Plaintiffs concede that Prysm and RBC made different assumptions about NVIDIA's revenue per GPU (Opp. at 22-23), yet another inconsistency which highlights that neither was "in a position to know."

Finally, Prysm's purported reliance on the China presentation screenshotted in the FAC falls short, as nothing in the Opposition shows that one regional market share estimate in an internal presentation (never allegedly provided to any Individual Defendant or signed off on by any executive) constituted "***NVIDIA's*** internal estimate" of its crypto market share. Opp. at 23-24; Mot. at 27-28. Plaintiffs do not dispute this presentation's limited scope (four months in one region where mining was "heavily concentrated"). As explained *supra* p. 5, *Nursing Home* does not suggest that, under these facts, such data from a single market is sufficient.[24]

### c. Prysm Still Makes Aggressive And Impossible Assumptions About Computational Power

The Opposition highlights that Prysm is not "in a position to know" two other key assumptions incorporated into its analysis. Opp. at 26-27; Mot. at 28-29.

***First***, Plaintiffs fail to explain how Prysm can reliably assume that every GPU sold by NVIDIA in any given quarter reached and was deployed by the end user in that same quarter, and that therefore ***zero*** increase in computational power in a given quarter was due to GPUs purchased in prior quarters. Mot. at 28-29. They argue it is "purely speculative" to expect that some "GPUs added to the cryptocurrency networks analyzed may have been purchased in earlier quarters." Opp. at 26. It is not. Chips sold by NVIDIA into the channel can take months to reach end users. Mot. at 4; *see, e.g.*, Ex. P at 10 (NVIDIA "typically" has "between 6 to 8 weeks of inventory in the

---

[23] Plaintiffs suggest Defendants draw on disputed facts in making this argument. Opp. at 22. But the Court "need not 'accept as true allegations that contradict matters properly subject to judicial notice.'" *Veal v. Lendingclub Corp.*, 2020 WL 3128909, at *4 (N.D. Cal. June 12, 2020).

[24] As to whether the 70% figure includes the Crypto SKU, the bar graph includes data for "GTX" and "Minning [sic]." (¶ 121; Opp. at 23.) The separate estimate below that graph does not specify whether "GPU sold to mining" encompassed both these categories. (¶ 121.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

channel."). It is thus only logical to conclude that at least some GPUs added to cryptocurrency networks in any given quarter were purchased beforehand. Plaintiffs postulate that miners would promptly deploy new equipment (Opp. at 26), but this assumes the very thing Plaintiffs are tasked to show—namely, that every GPU deployed for mining was purchased by dedicated miners, rather than gamers who may have decided to mine while their GPUs would otherwise have been idle.

**Second**, Prysm assumes that miners and gamers are entirely distinct categories (despite that Peddie recognizes the opposite). Mot. at 28-29. In the Opposition, Plaintiffs irrationally assume that the rise in mining farms rendered any mining by gamers immaterial. Opp. at 26-27. Under the PSLRA, Plaintiffs cannot simply guess that mining performed by gamers **must have been** de minimis, without alleging **how much** mining was performed by farms.

### 2. Plaintiffs Do Not Otherwise Adequately Allege Falsity

As before, Plaintiffs' failure to allege Prysm was "in a position to know" how much NVIDIA Gaming revenue was mining-driven warrants dismissal. Order at *7-9. But as set forth in the Motion (30-35), Plaintiffs' falsity allegations fail on several other grounds, and the Opposition (Opp. at 28-35) does not establish otherwise. We address the challenged statements below in chronological order, but, before doing so, we address two issues that cut across multiple statements.

**Statements Must be Read in Context:** Plaintiffs repeatedly urge the Court to ignore the context of the challenged statements. Opp. at 29-30. But the law is clear that such statements must be evaluated "in the context in which they were made," not just in isolation. *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017); *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015); *Hussey v. Ruckus Wireless, Inc.*, 263 F. Supp. 3d 781, 786 & n.5 (N.D. Cal. 2017). The law is equally clear that this context includes not just the words immediately surrounding a challenged statement, but also the defendants' other disclosures.[25] *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1066 & n.6 (N.D. Cal. 2012); *Avila v. LifeLock Inc.*, 2016 WL 4157358, at

---

[25] In *Berson v. Applied Signal Technology, Inc.*, the defendants argued that investors would understand a particular phrase ("uncompleted portions of existing contracts") to imply something not said ("stopped work"). 527 F.3d 982, 985-87 (9th Cir. 2008); Opp. at 29. Defendants are not engaging in any such parsing exercise here.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

*6 (D. Ariz. Aug. 3, 2016). For example, in *Shenwick* (which Plaintiffs cite liberally), the court held that statements on an earnings call were not misleading when viewed in light of other disclosures—in that call and ***separate*** SEC filings and earnings calls. 282 F. Supp. 3d at 1143-44.

**No Truth-on-the-Market Defense:** Plaintiffs also repeatedly wave off important context by accusing Defendants of invoking a "truth-on-the-market" defense. Opp. at 32-33; Mot. at 31-33; ¶¶ 179, 183, 190, 193, 203. Plaintiffs are conflating two very different arguments: a "truth-on-the-market" defense is where defendants argue "that information has been made credibly available to the market ***by other sources***."[26] *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989). It does not apply where defendants "argue that ***they*** disclosed all required information." *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *13 n.18 (N.D. Cal. Mar. 29, 2019). Here, Defendants have asked the Court to consider the challenged statements in the context of other statements ***by Defendants*** (many made in the very same document or transcript as the challenged statements themselves), and they do so "not to assess whether the market was generally aware of the truth and thus not affected by [an] allegedly false statement, but rather to resolve whether [the] statements were even false." *Curry v. Yelp Inc*., 2015 WL 1849037, at *6 n.1 (N.D. Cal. Apr. 21, 2015); *see also Chang v. Accelerate Diagnostics, Inc*., 2016 WL 3640023, at *5 (D. Ariz. Jan. 28, 2016). That is entirely proper (and, indeed, is required). Plaintiffs' cited cases declining to apply the "truth-on-the-market" defense at the pleading stage simply have no application here.

**Fisher's 5/10/2017 Statement (¶ 176):** This Court previously found that, with his May 10, 2017 statement, Fisher was talking about the "fundamentals of PC gaming." Order at *10. Plaintiffs offer no reasoned defense for recasting this as a statement about GeForce revenue. Opp. at 35 n.19. It was and still is a statement regarding the fundamentals of PC gaming. Further, Plaintiffs do not dispute that his statement was an opinion. Plaintiffs nevertheless claim that the opinion was somehow misleading because it did not reference miners buying GeForce in China. But that argument fails as well, as the statement "did not concern China GeForce sales." Order at *10. Finally, Plaintiffs point to data they claim was somehow inconsistent with their reimagined working

---

[26] Plaintiffs' authorities reflect this. *Provenz v. Miller*, 102 F.3d 1478, 1492–93 (9th Cir. 1996) (news articles and analyst reports); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1037 (S.D. Cal. 2005) (industry conference presentation the defendants tried to suppress).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

of Fisher's statement; yet, that data not even exist on May 10, 2017. Opp. at 35; *see supra* n.1.

**Huang's 8/10/2017 Statement:** Plaintiffs do not dispute that Huang's challenged statement on the 8/10/2017 earnings call provided a subjective estimate—*e.g.*, an ***opinion***—but do not argue they have met the *Omnicare* standard.[27] (¶ 179, Ex. C at 7 ("we serve the vast—***I would say, the large*** majority" of mining demand from the Crypto SKU)); *see City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 850 (N.D. Cal. 2014) (statements estimating asset's fair market value are opinions); *Dearborn*, 856 F.3d at 615-16; Opp. at 31-33; Mot. at 31-32. And while Plaintiffs contend that Huang suggested that at most a "small amount" of GeForce sales were made to miners (Opp. at 33), the proper context still belies this. On the August 10 call, Defendants told investors that the quarter had seen an increase in mining activity, miners continued to buy GeForce, there were GeForce "shortages all over the world," and they believed there was unmet gamer demand. (Ex. C at 4, 7.) Similarly, while Plaintiffs repeat the notion that "analysts took from [Huang's] statements that GeForce sales to miners were minimal" (Opp. at 29), they cannot deny that analysts attributed significant amounts of Gaming revenue to mining after this call (Mot. at 6-8; Ex. E ($100m)), and later calls (Exs. K, L, S, Q, R (as much as $400m)).

**Statements in Form 10-Qs (¶¶ 187, 200):** Plaintiffs do not contest that statements attributing increased GPU revenue "primarily to increased revenue from sales of GeForce GPU products for gaming" referred to what those GPUs were designed and marketed for, not to specific end users. Mot. at 32-33. Plaintiffs argue, though, that the statements were false because Defendants sought to sell GPUs to mining farms. Opp. at 34-35. But the FAC does not allege that Huang's discussions about a sale to Genesis Mining pertained to sales of GeForce chips (as opposed to the Crypto SKU).[28] Mot. at 24 n.18; ¶ 88. And in any event, any sale of some GeForce chips to mining farms does not change the fact that GeForce chips were "marketed" for gaming.

**Kress's 11/9/2017 Statement (¶ 193):** *First*, Plaintiffs continue to insist Kress represented

---

[27] The same is true for the first portion of Huang's 8/12/2017 *VentureBeat* statement. (¶ 183, Ex. D at 3 ("***only a couple hundred million dollars, maybe*** $150 million or so").) Plaintiffs have apparently abandoned their challenge to the rest ("our core business is elsewhere"). Mot. at 32.

[28] The Company disclosed that the Crypto SKU was "targeted for use in cryptocurrency mining." (Exs. G at 27; N. at 26.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 18 -

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
CASE NO. 18-CV-07669-HSG

"crypto-related revenue" was $70m (corresponding to Crypto SKU revenue in OEM) and implied zero crypto revenue in Gaming. Opp. at 32. But they simply ignore the fact that she was answering a question *about OEM revenue*. Mot. at 33; Ex. J at 11. ***Second***, Kress also stated that some mining demand was met with GeForce cards, but the amount was "difficult to quantify." (Ex. J at 4.) Plaintiffs argue that this statement (and other similar statements) "furthered" the "deception." Opp. at 31. How? Plaintiffs never explain. Defendants' explanation that crypto-related GeForce sales were "difficult to quantify" simply contextualized their attempts at estimating them.

**Huang's 11/10/2017 Statement (¶ 196):** Plaintiffs argue that Huang's November 2017 statement in *VentureBeat* was not an opinion because he did not use specific magic words. Opp. at 30. Huang's response reflected his subjective views about the future impacts and import of mining; no magic "opinion" words are needed. Mot. at 33-34; *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("projections about the future are quintessential opinion[s]"); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) (opinions "include subjective statements that reflect judgments as to values that are not objectively determinable"). Plaintiffs have not alleged "*particular* (and material) facts" omitted that rendered his opinion "misleading to a reasonable person reading the statement fairly ***and in context.***" *Dearborn*, 856 F.3d at 615-16.

Plaintiffs also fail to show that this statement is not forward-looking. Opp. at 30-31. Huang stated: "***It's going to remain small for us***. . . . It's large for somebody else. But ***it*** is small for us." (Ex. at M at 3-4; Mot. at 33-34.) The subject of Huang's statement was clearly his projection of ***future*** crypto revenue, relative to the size of the Company. Any implicit reference to present conditions does not affect whether it is forward-looking. *See Waterford Twp. Police v. Mattel, Inc*., 321 F. Supp. 3d 1133, 1150-51 (C.D. Cal. 2018) ("[T]his kind of reliance on present conditions . . . to make a projection is 'implicit in any forward-looking statement.'").

**Kress's 11/29/2017 Statement (¶ 203):** Plaintiffs assert, without explanation, that this statement—which begins with "***we do believe***"—is not an opinion. Opp. at 33 n.18; Mot. at 34; Ex. O at 13. The statement is quintessential opinion, and Plaintiffs have failed to meet the high bar of pleading an *Omnicare* omission. *Dearborn*, 856 F.3d at 615-16; Ex. O at 13 (explaining in same response that NVIDIA could not "visibly see" or "visibly count" GeForce crypto revenue).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**Huang's February and March 2018 Statements (¶¶ 207, 210, 213):** Plaintiffs again argue that these were not opinions solely because Huang did not preface them with "I think" or "I believe." Opp. at 30. Such magic words are not required by the law. *See supra* p. 19. Plaintiffs fail to identify facts "whose omission [made Huang's statements] misleading to a reasonable person reading the statement fairly and in context." *Dearborn*, 856 F.3d at 616. Indeed, Huang acknowledged the "real" impact of cryptocurrency on NVIDIA's business. (¶ 207; Ex. T at 1.) Plaintiffs also fail to refute the plainly forward-looking nature of Huang's answer to a question about whether it was possible in the future to "maintain" the cryptocurrency "run rate" and the value of NVIDIA stock: "I think ***over the long term***, cryptocurrency ***will*** still be here, but our four growth drivers [are] ***what's going to*** make NVIDIA ten times larger." (¶ 213; Ex. Y at 3 ("I ***expect*** cryptocurrency ***to be*** an important driver for GPUs").) Finally, Plaintiffs contend that Huang's statements were not inactionable corporate optimism (Opp. at 30), but say nothing about their content, and cite no authority holding that statements cannot be inactionable corporate optimism if made in response to media questions or if the company's stock price dropped later.

**Huang's 8/16/2018 Statement (¶ 216):** Plaintiffs do not dispute that Huang's statement about NVIDIA's "master[y]" of its "channel" was inactionable corporate optimism, nor do they distinguish the cited pertinent authority.[29] Mot. at 35.

### C. Plaintiffs' Control Person Claim Still Fails

Fisher's status as a "prominent" executive does not make him a "control person." Opp. at 35. The only case Plaintiffs cite involves C-suite executives, two of whom orchestrated "dog and pony shows" to conceal product problems, and ***none of whom disputed control person liability***. *In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, at *9-10 & n.4 (N.D. Cal. Aug. 14, 2019).

### III. CONCLUSION

The FAC should be dismissed with prejudice.

---

[29] In arguing that Huang's statement "perpetuated" a "falsehood" about crypto-related sales (Opp. at 33), Plaintiffs fail to grapple with the fact that it was classic puffery, which as a matter of law is too vague to rely on. *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528 (C.D. Cal. June 7, 2018) is inapt. There, the court rejected the defendants' argument that the truth had already been disclosed by media reports because in a subsequent S-1 filing the defendants "unequivocally" directed investors not to consider information in the media published by third parties. *Id.* at *7.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

Dated: September 14, 2020                    COOLEY LLP


                                             _____
                                                      */s/ John C. Dwyer*
                                                      John C. Dwyer

                                             Attorneys for Defendants
                                             NVIDIA CORPORATION, JENSEN HUANG,
                                             COLETTE KRESS and JEFF FISHER

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO